Appeal No. 22-8043

---

IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, et al., Petitioners-Appellants,
v.
DEBRA HAALAND, et al., Respondents-Appellees,
and
STATE OF WYOMING, Respondent-Intervenor-Appellee,
and
UPPER GREEN RIVER CATTLE ASSOCIATION, et al., Respondents-Intervenors-Appellees.

---

On Appeal from the United States District Court for the District of Wyoming
The Honorable Nancy D. Freudenthal, Civil Action No. 2:20-cv-00231-NDF

ORAL ARGUMENT REQUESTED

---

**OPENING BRIEF OF APPELLANTS
CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB**

---

Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

William John Snape, III
Center for Biological Diversity
American University Law School
4300 Nebraska Ave, NW
Washington, D.C. 20016
(202) 536-9351
bsnape@biologicaldiversity.org
wsnape@wcl.american.edu.

*Attorneys for Appellants Center for Biological Diversity and Sierra Club*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants Center for Biological Diversity and Sierra Club certify that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

RELATED PRIOR OR PENDING APPEALS ...................................... vi

GLOSSARY OF TERMS .................................................................. vii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED.........................................................................1

STATEMENT OF THE CASE................................................................2

   I.  Legal Background: The Endangered Species Act .........................2

   II.  Factual Background ...................................................................6

     A.    Grizzly Bears in the Greater Yellowstone Ecosystem .............6

     B.    The Upper Green Project .....................................................9

     C.    The Forest Service's Past Consultation History with FWS ....11

     D.    FWS's 2019 BiOp ..............................................................14

   III. Procedural Background ...........................................................18

SUMMARY OF THE ARGUMENT .....................................................19

STANDARD OF REVIEW ...................................................................20

ARGUMENT .......................................................................................21

   I.  FWS's Failure to Consider Limiting Lethal Take of Females was Arbitrary and Capricious. ...............................................................................21

   II.  FWS's Reliance on Conservation Measures to Support Its No-Jeopardy Conclusion is Arbitrary and Capricious. .......................................25

   III. The Forest Service's Reliance on the Faulty Biological Opinion to Approve the Upper Green Project is Unlawful. .............................................30

THE COURT SHOULD VACATE THE 2019 BIOP AND ROD .........31

CONCLUSION ....................................................................................31

STATEMENT REGARDING ORAL ARGUMENT .............................32

ADDENDUM ......................................................................................36

   1. District Court Opinion and Order............................................ A-1

   2. District Court Judgment......................................................... A-31

# TABLE OF AUTHORITIES

**Cases**

*Biodiversity Legal Found. v. Babbitt*,
　146 F.3d 1249 (10th Cir. 1998) ..............................................................20

*Crow Indian Tribe v. United States*,
　343 F. Supp. 3d 999 (D. Mont. 2018), *aff'd*, 965 F.3d 662 (9th Cir. 2020).........14

*Ctr. for Biological Diversity v. Bernhardt*,
　982 F.3d 723 (9th Cir. 2020) ............................................... 19, 26, 28

*Ctr. for Biological Diversity v. Haaland*,
　No. 19-cv-05206-JST, 2022 U.S. Dist. LEXIS 121104
　(N.D. Cal. July 5, 2022) ........................................................................5

*Ctr. for Biological Diversity v. Rumsfeld*,
　198 F. Supp. 2d 1139 (D. Ariz. 2002), *abrogated on other grounds*
　*as recognized by Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
　789 F.3d 1075 (9th Cir. 2015) ....................................................... 26, 30

*Defs. of Wildlife v. U.S. EPA*,
　420 F.3d 946, (9th Cir. 2005), *rev'd on other grounds sub nom.*,
　*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
　551 U.S. 644 (2007) ..............................................................................6

*FCC v. NextWave Pers. Commc'ns Inc.*,
　537 U.S. 293 (2003) ............................................................................31

*Forest Guardians v. Babbitt*,
　174 F.3d 1178 (10th Cir. 1998) ...........................................................20

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
　378 F.3d 1059 (9th Cir. 2004) .............................................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983)................................................ 19, 20, 21, 23, 25

*N.M. ex rel. Richardson v. BLM*,
　565 F.3d 683 (10th Cir. 2009) .............................................................25

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
　524 F.3d 917 (9th Cir. 2008) ....................................................... 19, 27

*Olenhouse v. Commodity Credit Corp.*,
　42 F.3d 1560 (10th Cir. 1994) ................................................. 21, 23-24

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
   265 F.3d 1028 (9th Cir. 2001) ...............................................................23

*Res. Ltd., Inc. v. Robertson*,
   35 F.3d 1300 (9th Cir. 1994) ................................................................30

*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) ..............................................................26

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)................................................................................2

*Utah Env't Cong. v. Troyer*,
   479 F.3d 1269 (10th Cir. 2007) ............................................................25

*Utahns v. United States DOT*,
   305 F.3d 1152 (10th Cir. 2002) ............................................................23

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
   870 F.3d 1222 (10th Cir. 2017) ............................................................25

*Wyoming v. United States*,
   279 F.3d 1214 (10th Cir. 2002) ............................................................21

**Statutes**

5 U.S.C. § 702 ..........................................................................................1

5 U.S.C. § 706(2)(A)........................................................... 19, 20, 25, 30, 31

16 U.S.C. § 1531(b) ..................................................................................2

16 U.S.C. § 1532(19) ................................................................................5

16 U.S.C. § 1532(20) ................................................................................3

16 U.S.C. § 1532(3) ..................................................................................2

16 U.S.C. § 1532(6) ..................................................................................2

16 U.S.C. § 1533 ......................................................................................2

16 U.S.C. § 1536(a)(2)................................................................ 3, 5, 6, 19, 30

16 U.S.C. § 1536(b)(3)(A) .......................................................... 4, 5, 25

16 U.S.C. § 1536(b)(4)...............................................................................6

16 U.S.C. § 1536(c)(1)...............................................................................3

16 U.S.C. § 1538 ......................................................................................6

16 U.S.C. § 1538(a)(1)(B) ...................................................................5

16 U.S.C. § 1540(c) ..............................................................................1

16 U.S.C. § 1540(g)(1)(c) .....................................................................1

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 2201 ...................................................................................1

28 U.S.C. § 2202 ...................................................................................1

## Regulations

50 C.F.R. § 402.02 .................................................................... 3, 4, 15

50 C.F.R. § 402.12 ................................................................................3

50 C.F.R. § 402.14 ................................................................................6

50 C.F.R. § 402.14(a) ...........................................................................3

50 C.F.R. § 402.14(b) ...........................................................................3

50 C.F.R. § 402.14(d) ...........................................................................5

50 C.F.R. § 402.14(g)(1) .......................................................................4

50 C.F.R. § 402.14(g)(2) .......................................................................4

50 C.F.R. § 402.14(g)(3) ............................................................... 4, 25

50 C.F.R. § 402.14(g)(4) .......................................................................5

50 C.F.R. § 402.14(i)(1)(i) ....................................................................6

50 C.F.R. § 402.14(i)(1)(ii) ...................................................................6

50 C.F.R. § 402.14(i)(1)(iv) ..................................................................6

50 C.F.R. § 402.16(a)(1) .......................................................................6

## Other Authorities

Fed. R. App. P. 4 ..................................................................................1

40 Fed. Reg. 31,734 (July 28, 1975) ...................................................7

82 Fed. Reg. 30,502 (June 30, 2017) .................................................14

84 Fed. Reg. 44,976 (Aug. 27, 2019) ..................................................5

## RELATED PRIOR OR PENDING APPEALS

Before the U.S. District Court for the District of Columbia, *Western Watersheds Project et al. v. Haaland et al.*, 2:20-cv-860-APM was consolidated with *Center for Biological Diversity and Sierra Club v. Haaland et al.*, 2:20-cv-855-APM. 1-App-072. The cases were then transferred to the U.S. District Court for the District of Wyoming as a consolidated matter. 1-App-101 – 1-App-106. The U.S. District Court for the District of Wyoming's Opinion and Order from which Center for Biological Diversity and Sierra Club now appeal addressed the consolidated cases. 1-App-102 – 1-App-149.

*Western Watersheds Project et al.* has also filed an appeal (1-App-151 – 1-App-153), docketed in the Tenth Circuit Court of Appeals as Appeal No. 2:22-cv-8031. Because these cases stem from the same district court order, they are related.

# GLOSSARY OF TERMS

APA - Administrative Procedure Act

BA – Biological Assessment

BiOp – Biological Opinion

CM – Conservation Measure

DMA – Demographic Monitoring Area

EIS - Environmental Impact Statement

ESA – Endangered Species Act

FWS - U.S. Fish and Wildlife Service

GTNP – Grand Teton National Park

GYE – Greater Yellowstone Ecosystem

ITS – Incidental Take Statement

ROD - Record of Decision

USFS – U.S. Forest Service

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201-2202 (declaratory judgment and further relief); 16 U.S.C. § 1540(c), (g)(1)(c) (action arising under the Endangered Species Act and citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act). This Court has jurisdiction under 28 U.S.C. § 1291.

The district court entered its order disposing of all claims on May 17, 2022. (1-App-120 – 1-App-149) and entered final judgment on June 1, 2022 (1-App-150). This appeal was timely filed on July 7, 2022, pursuant to Fed. R. App. P. 4. 1-App-154 – 1-App-156.

## ISSUES PRESENTED

1.      Whether the U.S. Fish and Wildlife Service's ("FWS") failure to consider limiting lethal take of female grizzly bears in issuing a 2019 Biological Opinion ("2019 BiOp") for the Upper Green River Area Rangeland Project ("Project") was arbitrary and capricious in violation of the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

2.      Whether FWS's reliance on ineffective and unenforceable conservation measures in concluding that the Project would not jeopardize grizzly bears was arbitrary and capricious in violation of the ESA and the APA.

1

3.      Whether the Forest Service's reliance on FWS's flawed 2019 BiOp to satisfy its own duties under the ESA in connection with the Project violated the ESA and the APA.

## STATEMENT OF THE CASE

## I.      Legal Background: The Endangered Species Act

Enacted in 1973, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is meant to provide a means to conserve the ecosystems upon which endangered and threatened species depend and to provide a program to conserve listed species. 16 U.S.C. § 1531(b).  To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3), *i.e.,* to bring about the recovery of a species listed as endangered or threatened.

To receive the full protections of the ESA, a species must first be listed by the Secretary of Interior as "endangered" or "threatened" pursuant to ESA section 4. *See id.* § 1533. An "endangered species" is "any species which is danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened species" is "any species which is likely to become endangered within

2

the foreseeable future throughout all or a significant portion of its range." *Id.* §
1532(20).

Section 7 of the ESA requires federal agencies, in consultation with a federal
wildlife agency (FWS for terrestrial mammals such as the grizzly bear), to insure
that any proposed action is not likely to jeopardize the continued existence of a
listed species. *Id.* § 1536(a)(2). To "jeopardize the continued existence of" under
the ESA means "to engage in an action that reasonably would be expected, directly
or indirectly, to reduce appreciably the likelihood of both the survival and recovery
of a listed species in the wild by reducing the reproduction, numbers, or
distribution of that species." 50 C.F.R. § 402.02.

To carry out these mandates, if listed species may be present, the action
agency must prepare a "biological assessment" to determine the impacts of the
proposed action on the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.
If an agency determines that its action "may affect" but is "not likely to adversely
affect" a listed species or its critical habitat, the regulations permit "informal
consultation." 50 C.F.R. §§ 402.14(a), (b). However, if the agency determines that
the action is "likely to adversely affect" a listed species, the agency must engage in
"formal consultation" with FWS. *Id.* §§ 402.02, 402.14(a).

During consultation, FWS must review all relevant information, evaluate the
current status and environmental baseline of the species, and evaluate the effects of

the proposed action on the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)-(3). For purposes of the ESA, "'[e]ffects of the action' refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification," while "[i]nterdependent actions are those that have no independent utility apart from the action under consideration." *Id.* Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* Throughout its analysis, FWS must utilize the "best scientific

and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).[1]

After FWS evaluates the current status of the listed species and the proposed action's impacts on the species, FWS reaches a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species . . . ." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(d), (g)(4). If FWS concludes that the proposed action "will jeopardize the continued existence of" a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

Section 9 prohibits the unauthorized "take" of any listed species by anyone, including federal agencies. *Id.* § 1538(a)(1)(B). "Taking" under the ESA "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). Along with a biological opinion, FWS must issue an "incidental take statement" if it concludes that a federal action

---

[1] FWS issued the 2019 BiOp at issue on April 29, 2019. In August 2019, FWS published a rule revising the regulatory definition of "effects of the action." 84 Fed. Reg. 44,976 (Aug. 27, 2019). On July 5, 2022, the U.S. District Court for the Northern District of California vacated the 2019 regulations, effectively reinstating the regulations in place in 2018. *Ctr. for Biological Diversity v. Haaland*, No. 19-cv-05206-JST, 2022 U.S. Dist. LEXIS 121104 (N.D. Cal. July 5, 2022). Thus, the 2018 regulations are currently applicable and are the regulations that were in place when FWS issued the 2019 BiOp.

will take members of a listed species but is not likely to cause jeopardy. 50 C.F.R.
§ 402.14.

The incidental take statement must specify the amount or extent of such incidental taking on the listed species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and the "terms and conditions" with which the action agency must comply to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii), (iv). Taking of listed species without, or in excess of, the coverage of an incidental take statement violates the ESA and requires reinitiation of consultation. 16 U.S.C. § 1538; 50 C.F.R. § 402.16(a)(1).

Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA section 7 duty is arbitrary and capricious. 16 U.S.C. § 1536(a)(2); *Defs. of Wildlife v. U.S. EPA*, 420 F.3d 946, 976 (9th Cir. 2005), *rev'd on other grounds sub nom.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).

## II.    Factual Background

### A.    Grizzly Bears in the Greater Yellowstone Ecosystem

An estimated 50,000 grizzly bears inhabited most of western North

American prior to European settlement. 2-App-219. By 1975, after decades of human persecution and loss of habitat, grizzly bears had been eliminated from all but less than two percent of their historic range in the lower 48 states and only approximately 700-800 bears remained. *Id.*; 2-App-215. As a result, in 1975, FWS listed the grizzly bear as a threatened species in the lower 48 states under the ESA. 40 Fed. Reg. 31,734 (July 28, 1975).

In 1982, FWS issued a Grizzly Bear Recovery Plan, which was revised in 1993. 2-App-213 ("Recovery Plan"). The Recovery Plan identifies six recovery zones, including the Yellowstone Grizzly Bear Recovery Zone, delineated within the Greater Yellowstone Ecosystem ("GYE"). *Id.* The Yellowstone Grizzly Bear Recovery Zone spans more than 5 million acres and includes portions of Wyoming, Montana, and Idaho, and portions of five National Forests. 2-App-161 – 2-App-162. It also includes Yellowstone and Grand Teton National Parks, John D. Rockefeller, Jr. Memorial Parkway (Bureau of Land Management land), and adjacent private and state lands. 2-App-162.

In the GYE, FWS and other agencies manage grizzly bears and their habitat by combining the "Primary Conservation Area" (the Yellowstone Grizzly Bear Recovery Zone) with adjacent areas where occupancy by grizzly bears is anticipated and acceptable. 4-App-008. Combined, these areas form the Demographic Monitoring Area ("DMA") within which habitat is considered

suitable to support grizzly bears and recovery criteria for grizzly bears are assessed. 4-App-011. The Upper Green allotments all lie within the DMA. 2-App-173.

Although the number of grizzly bears in the GYE has increased under ESA protection, they still face a host of threats, including human-caused mortality, and grizzly bear mortalities have been on the rise. The 2019 Biological Opinion estimates that grizzly mortalities averaged 64 deaths per year between 2015 and 2018 compared with 28 grizzly bear mortalities in 2014 and 29 in 2013. 2-App-177. The Upper Green area consistently represents the highest number of grizzly bear conflicts in the entire GYE, and between 1999-2018, a total of 37 grizzly bears were killed in the action area identified for this Project. 2-App-184.

In the GYE, grizzly home range estimates are 81 square miles for females and 309 square miles for males. 2-App-158. Both males and females residing primarily in Grand Teton National Park may have home ranges that overlap with the project area. *See* 2-App-174 (discussing a bear in the action area that ranged northwest 29 air miles to near the east boundary of GTNP); *see also* 11-App-155 (vicinity map for Upper Green River project area in relation to GTNP).

Female survival is the primary factor impacting grizzly bear population trend because the survival of a female grizzly bear and her cubs enables the population to grow. 12-App-181. FWS has declared that "providing maximum

protection for females is essential to recovery." 2-App-217. The Forest Service acknowledges that the project area contains ideal habitat for female grizzly bears because it has abundant and widely distributed food, provides adequate cover, is far from large human population centers, has very few roads, and supports little recreational activity. 3-App-020. Thus, it is unsurprising that females with cubs are increasingly occupying the area. 2-App-176. However, due to ongoing conflicts with livestock, the project area is considered a "sink habitat" for grizzly bears, indicating low female survival resulting in unsustainable mortality and potential population decline. 12-App-182; 2-App-012; 2-App-181.

The death of a female grizzly bear impacts the population because grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America, resulting primarily from the late age at first reproduction, small average litter size, and long interval between litters. 2-App-216; 2-App-158. The average age at first reproduction is 5.5 years and the average litter size is two cubs. 2-App-216; 2-App-158 Due to the slow rate of reproduction, it takes approximately ten years for a breeding female to be replaced in the wild. 2-App-216.

## B.    The Upper Green Project

The project area encompasses the headwaters of both the Green River and the Gros Ventre River and is within the Pinedale Ranger District of the Bridger-Teton National Forest. 11-App-164 – 11-App-165. The project area lies within the

9

GYE, which the Forest Service recognizes as one of the largest intact ecosystems remaining in the temperate zones of the world. 11-App-165. Of the 170,643-acre project area, 17,818 acres lie in designated Wilderness areas.[2] 11-App-165; 4-App-141.

The project area contains six grazing allotments and the decision at issue authorizes 8,819 head of livestock, including 8,772 cow/calf pairs or yearlings and 47 horses. 4-App-141; 4-App-154. The grazing season may vary slightly by allotment but generally occurs from June 14 to October 15.[3] 4-App-154 – 4-App-155. 21 people are authorized to graze livestock in the project area, for a maximum permitted use of approximately 44,722 animal unit months.[4] 4-App-154; 11-App-165. This decision permits ongoing grazing at high levels for up to 10 years, through the 2028 grazing season, despite previous and ongoing impacts to wildlife, fish, water quality, soil quality, and vegetation. *See, e.g.,* 11-App-138 – 11-App-151.

---

[2] In the 2019 Biological Opinion, FWS incorrectly states that the allotments encompass 170,641 acres, two acres less than the Forest Service's description. 2-App-155.

[3] The Forest Service is authorized to make adjustments to allow livestock to enter one week earlier or leave one week later. 4-App-154 – 4-App-155.

[4] An "animal unit month," or AUM, is the amount of forage for one mature cow or equivalent for one month based upon an average daily forage consumption of 26 pounds of dry matter. 11-App-165.

**C.      The Forest Service's Past Consultation History with FWS**

As required by section 7 of the ESA, the Forest Service has engaged in a series of consultations with FWS to assess the impacts of grazing activities on federally protected species, including grizzly bears, in the project area. To place the consultation at issue in context, it is helpful to summarize the repeated exceedances of incidental take limits set by FWS and the ever-increasing number of bears that FWS has authorized to be killed to accommodate grazing.

Such consultation began 25 years ago, in 1997, when the agency drafted a biological assessment ("BA") to assess the impacts of grazing on grizzly bears on six permitted allotments in the Upper Green area. *See* 1-App-157 – 1-App-158. In 1999, the Forest Service amended that BA and initiated formal consultation with FWS. *See* 1-App-158. Following consultation, FWS issued a BiOp ("1999 BiOp") permitting, through an incidental take statement ("ITS"), the lethal removal of up to five grizzly bears over an indefinite period of time. 1-App-157 – 1-App-176. The 1999 BiOp/ITS authorized the lethal removal of four males and one female grizzly bear. 1-App-170. FWS also concluded that an unquantifiable number of grizzly bears would suffer non-lethal take resulting from displacement. *Id.*

In 2009, the Forest Service reached the level of lethal take identified in the 1999 BiOp with the mortality of five bears. Consequently, in 2010, the Forest Service amended the 1999 BA and reinitiated consultation with FWS. 1-App-177 –

11

1-App-235 ("2010 Amendment to 1999 BA"). In its request for further consultation, the Forest Service expanded the area for consideration to encompass three new allotments in the Upper Green area. 2-App-075. In 2011, FWS issued an amended BiOp ("2011 BiOp") and an ITS authorizing the killing of six grizzly bears within any consecutive three-year period. 1-App-236 – 1-App-271. Under the terms and conditions of the BiOp, the Forest Service was required to coordinate with FWS regarding the adequacy of existing measures to minimize take if more than two grizzly bears were killed in the project area in any given year. 1-App-262.

Less than two years later, in August 2012, the Forest Service again found it necessary to reinitiate formal consultation upon reaching the permissible level of incidental killing of six grizzly bears in a consecutive three-year period. 2-App-075. Later that month, a seventh grizzly bear was killed, thereby exceeding the level of authorized take. *Id.*

In June 2012, FWS stated in a meeting with the Forest Service that increasing the permitted level of incidental take was not appropriate because the Forest Service was not in compliance with its own conservation measures and the 2011 BiOp's terms and conditions. 2-App-260. Nevertheless, rather than enforcing the conditions for authorized take, on September 5, 2012, FWS issued a short-term amended BiOp and ITS permitting the killing of an additional three grizzly bears in the project area during the 2012 grazing season. 2-App-075 – 2-App-076.

12

In March 2013, the Forest Service drafted the 2013 Supplement to the 1999 BA and reinitiated formal consultation in April 2013. 1-App-272 – 1-App-288; 2-App-076. In June 2013, FWS issued an Appended BiOp ("2013 BiOp") and associated ITS. 2-App-001 – 2-App-021. In a now predictable pattern, FWS again increased authorized take, permitting the take of 11 grizzly bears in any consecutive three-year period and limiting take to no more than three female bears. 2-App-016.

By the end of the 2013 grazing season, four more grizzly bears had been killed, including two males and two females. 2-App-076. Seeking approval to kill more females before the end of the consecutive three-year period, the Forest Service yet again reinitiated formal consultation in January 2014 and drafted a new 2014 Supplement to its BA. 2-App-022 – 2-App-067;  2-App-076.

Unsurprisingly, in September 2014, FWS issued another BiOp ("2014 BiOp") and associated ITS once again increasing the number of grizzly bears that could be killed in the Upper Green area in deference to the livestock industry. 2-App-70 – 2-App-133. The 2014 BiOp, valid through the end of 2019, exempted the lethal take of 11 grizzly bears and the relocation of 18 grizzly bears within any three-year period. 2-App-115.

From 2014 to 2018, 23 grizzly bears were killed in the Upper Green grazing allotments. 2-App-176. In 2017, however, the grizzly bear in the GYE had been

13

delisted and removed from the list of threatened and endangered species under the ESA. 82 Fed. Reg. 30,502 (June 30, 2017) (the delisting rule became effective July 31, 2017). In September 2018, the U.S. District Court for the District of Montana vacated the delisting rule and the grizzly bear was relisted as a threatened species. *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999 (D. Mont. 2018), *aff'd*, 965 F.3d 662 (9th Cir. 2020). The Forest Service and FWS decided that lethal removals or relocations between July 31, 2017, and September 24, 2018, did not count against the incidental take limits set in the 2014 BiOp. 2-App-069. However, because the 2014 BiOp was set to expire in 2019, the Forest Service requested reinitiation in October 2018 (2-App-068 – 2-App-069) and FWS subsequently issued the 2019 BiOp (2-App-134 – 2-App-211), challenged here.

### D.    FWS's 2019 BiOp

Acknowledging that ongoing livestock grazing for the Project was likely to adversely affect grizzly bears, the Forest Service again reinitiated consultation with FWS. 2-App-068 – 2-App-069. The Forest Service committed to preparing a new BA to determine the impacts of the Project on grizzly bears and evaluate the effectiveness of past conservation measures (3-App-002), but never prepared one. Nevertheless, without the benefit of a BA, on April 29, 2019, FWS issued the 2019 BiOp. 2-App-134 – 2-App-211.

In the 2019 BiOp, FWS assessed the impacts of the Project in its defined

14

action area, which FWS delineated as the grazing allotments plus a 7.5-mile buffer, resulting in an action area of approximately 711,627 acres.[5] 2-App-154 – 2-App-155. FWS chose this action area boundary based upon its interpretation of a 1982 study finding that grizzly bears may generally be drawn to livestock carcasses from a distance of 7.5 miles away, though some were drawn to carcasses from much further away. *Id.* (noting one adult moved 18.6 miles to a carcass).

FWS predicts in the 2019 BiOp that grizzly bear occupancy and conflicts in the action area are likely to increase, noting that the number of conflicts in the area increased by an average of nine percent per year from 2010 to 2014 and eight percent per year from 2014 to 2018. 2-App-175; 2-App-189. Using the eight percent growth rate observed from 2014 to 2018, FWS approved an ITS permitting the lethal take of 72 grizzly bears over the ten-year life of the Project. 2-App-190; 2-App-194 – 2-App-195. Thus, the 2019 ITS authorizes the killing of nearly double the number of bears that have been killed in the project area over the past 20 years (37 bears) in just half the time. 2-App-184.

As FWS notes in the BiOp, "the long-term survival of the Yellowstone grizzly bear population over the next 100 to 200 years is contingent upon

_____

[5] In accordance with ESA regulations, the identified action area is meant to reflect "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

minimizing average annual mortality within the total population *and especially that of adult females*." 2-App-167 (emphasis added). Although FWS states that management removals of grizzly bears on the allotments have not detrimentally impacted the GYE grizzly bear population to date (2-App-176; 2-App-191), most previous removals targeted male grizzly bears. *See, e.g.,* 1-App-213 (noting all five removals between 1999-2009 were male). This is consistent with the fact that subadult males disperse great distances and males occurred in the action area more often than females. 1-App-197 (USFS noting males are responsible for most cattle depredations); 2-App-158; 2-App-162. But now, as FWS recognizes, patterns have changed from dispersing males occupying the action area to females with cubs increasingly establishing home ranges in the project area. 2-App-176. *See also* 2-App-212 (FWS recognizing that breeding occurs in the project area). As a result, more females are being killed. *See* 2-App-074.

Despite acknowledging that females with cubs are increasingly occupying the action area and that more females may be killed in the future than in past years, not only did FWS fail to include a limit on female grizzly bear take in the BiOp, but FWS never even considered whether including a female take limitation would be consistent with grizzly bear conservation. 2-App-193 – 2-App-195. Therefore, a high number of female grizzly bears could be killed—theoretically all 72 grizzly bears killed could be females—without FWS even having considered that scenario

or what it could portent for the species' survival and recovery.

Notwithstanding FWS's authorization of killing up to 72 grizzly bears, and the absence of a limit on how many female grizzly bears may be killed or any analysis on how that may impact the population, FWS concludes that the Project will not jeopardize grizzly bears. 2-App-192; 2-App-195. In reaching this no-jeopardy opinion, FWS relies in part on the Forest Service's commitment to implement conservation measures in the BiOp. 2-App-192. The measures are meant to prevent grizzly bear-livestock conflicts and thus limit management removals. 2-App-153. They generally include sanitation guidelines, monitoring recommendations, watching for sick or injured cattle, moving carcasses in some circumstances, and meeting with permittees. 2-App-153 – 2-App-154.

FWS assumed that the conservation measures will effectively protect grizzly bears even though many of the same measures have been in place for years with the number of conflicts only increasing. *See, e.g.,* 1-App-159 – 1-App-161 (showing the 1999 BiOp contained nearly identical conservation measures to those in the 2019 BiOp). Moreover, FWS must rely upon the Forest Service and permittees to implement and enforce most of the measures, despite past issues with compliance. *See, e.g.,* 2-App-160 (FWS noting the Forest Service's noncompliance). Most violations are likely not even documented, given that the Forest Service itself has failed to comply with monitoring requirements in the past.

17

*See, e.g.,* 2-App-258 (noting that despite a measure requiring the Forest Service to monitor allotments on a regular basis, the Forest Service only visited allotments twice that year).

Directly following the release of the 2019 BiOp, the Forest Service issued a Record of Decision ("ROD") approving the Project. 4-App-140 – 4-App-194. The ROD incorporates the conservation measures from the 2019 BiOp and relies on them to minimize grizzly bear removals. 4-App-159 – 4-App-160; *see also* 4-App-164 – 4-App-165.

## III. Procedural Background

On March 31, 2020, Plaintiffs filed suit against Defendants challenging the lawfulness of the 2019 BiOp under the ESA and the APA, as well as the Forest Service's reliance on the BiOp. 1-App-022 – 1-App-050. On July 29, 2020, the State of Wyoming and the Green River Cattle Association *et al.* were granted the right to intervene in the case.

The district court's Opinion and Order dismissing Plaintiffs' claims was signed on May 16, 2022 and docketed on May 17, 2022. 1-App-120 – 1-App-149. Judgment was entered on June 1, 2022. 1-App-150. Plaintiffs timely filed this appeal on July 7, 2022. 1-App-154 – 1-App-156.

## SUMMARY OF THE ARGUMENT

FWS's 2019 BiOp, and the Forest Service's reliance on it, violates the ESA and APA in two important ways.

First, FWS entirely failed to consider limiting the lethal removal of female grizzly bears, even though female survival is necessary to sustain the species, previous biological opinions had done so, and females are increasingly occupying the project area. FWS therefore failed to consider an important aspect of the problem, in violation of the APA. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, contrary to section 7 of the ESA, the unanalyzed level of female take means that FWS and the Forest Service have not ensured that the action at issue is not likely to jeopardize the continued existence of the species. *See* 16 U.S.C. § 1536(a)(2).

Second, FWS arbitrarily and capriciously relied on mitigation measures to determine the Project will not jeopardize grizzly bears. Precedents construing the ESA establish that purported mitigation measures cannot be relied upon to reach a no-jeopardy conclusion if the measures are vague, unenforceable, uncertain to occur, or ineffective at protecting the listed species, as is the case here. *See, e.g., Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935 (9th Cir. 2008).

Because the 2019 BiOp was flawed and unlawful, the Forest Service could not reasonably rely upon it to satisfy its own ESA obligations.  As such, the 2019 BiOp and the Forest Service's authorization of the Upper Green Project should be set aside.

## STANDARD OF REVIEW

In examining whether the Service violated the ESA, the Court applies the APA standard of review and reviews the district court's grant of summary judgment de novo. *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998). Under de novo review, this Court owes no deference to the legal or factual decisions of the district court. *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1186 (10th Cir. 1998) (citations and quotations omitted).

Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious,

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43. It is the duty of the reviewing court to "ascertain whether the agency examined the relevant data and articulated a rational

connection between the facts found and the decision made. In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *State Farm*, 463 U.S. at 43). This includes a "thorough, probing, and in-depth review" of the administrative record. *Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002).

## ARGUMENT

### I.  FWS's Failure to Consider Limiting Lethal Take of Females was Arbitrary and Capricious.

FWS's unexplained failure to even consider limiting the authorized killing of female grizzly bears in connection with the Project is arbitrary and capricious and contrary to the ESA's mandate that federal agencies insure that their actions do not jeopardize the continued existence of listed species. Female survival is the primary factor impacting grizzly bear population trends (12-App-181), and FWS acknowledged in the 2019 BiOp that the long-term survival of the Yellowstone grizzly bear population relies upon minimizing mortality of adult female grizzly bears.  2-App-167. *See also* 2-App-217 (FWS stating "providing *maximum protection* for females is essential to recovery.") (emphasis added). For these reasons, in previous BiOps authorizing grazing in the Upper Green project area, FWS often included a limitation on lethal take of females. *See* 1-App-170 (1999

BiOp allowed take of four males and one female grizzly bear); 2-App-016 (2013 BiOp allowed take of 11 bears in a consecutive three-year period but no more than three female bears); 2-App-116 (2014 BiOp requiring a conference between USFS and FWS to discuss adequacy of existing mechanisms to minimize take if three or more females are lethally removed in one year).

Moreover, while FWS declined to specify a female take limitation in the 2014 BiOp, the agency at least fully explained why it made its decision—it was deemed to be unnecessary at that time given the small number of females in the area. *See* 2-App-132 (FWS explaining that it did not delineate the anticipated level of incidental take by gender in large part because take of females on the allotments generally numbered two or less individuals per year). By contrast, FWS included no such consideration in the 2019 BiOp. For example, there is no discussion of whether reinstituting a female take limitation would be prudent and consistent with grizzly bear recovery given the increasing presence of females with cubs on the allotments, no indication as to whether female take has increased since the 2014 BiOp, and no explanation as to why FWS declined to include a female take limitation. In fact, while FWS includes a table listing the number of conflicts and removals on the allotments within the action area from 2010 to 2018, nowhere does FWS reveal how many of those removals were female bears. *See* 1-App-186. FWS's failure to include this crucial information is insufficient to comply with the

mandates of the ESA and APA. At the very least, whether the take of females should be specifically limited is a highly relevant factor that the agency is obligated to address. *See State Farm*, 463 U.S. at 43.

The district court held that because FWS discussed the ecosystem-wide female mortality thresholds contained within the 2017 Supplement to the 1993 Grizzly Bear Recovery Plan, FWS satisfied its duty to consider female mortality. 1-App-134 – 1-App-137. However, ecosystem-wide mortality thresholds are not a substitute for discussing female take in a site-specific and project-specific biological opinion. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1075 (9th Cir. 2004) ("Focusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to the species.") (citation omitted); *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001) (focusing only on watershed-scale impacts while failing to analyze "site-specific degradation that could lead to a jeopardy finding contradicts the purpose of the ESA and is arbitrary.").

Moreover, FWS did not itself rely on a broad-scale assessment to explain its failure to impose—or even consider imposing—a female take limit. Thus, this is an illegitimate post hoc rationalization on which the agency cannot rely. *See Utahns v. United States DOT*, 305 F.3d 1152, 1165 (10th Cir. 2002) (citing *Olenhouse*, 42

F.3d at 1565). It also conflicts with the fact that previous biological opinions *both* discussed ecosystem-wide mortality thresholds that were recommended or in place at the time and *also* included a discussion of female take in the project area. *See, e.g.,* 2-App-094 – 2-App-095 (FWS discussing ecosystem-wide mortality limits in 2014 BiOp); 2-App-010 & 2-App-014 (FWS discussing ecosystem-wide female mortality limits in 2013 BiOp). Furthermore, these ecosystem-wide mortality thresholds are sometimes exceeded, rendering it even more problematic for FWS to assert reliance on them in the context of the BiOp at issue here. *See, e.g.,* 2-App-010 (noting both male and female mortality in the GYE exceeded sustainable limits in 2011).

Even the district court said that it "agrees with Petitioners that it may have been better had the 2019 BiOp directly discussed the possible effects of a worst-case scenario in which as an example—all 72 authorized removals were female grizzlies." 1-App-136. However, the court held that "this lapse does not require a finding that FWS made a *clear error* in its determination that UGRA take would not cause GYE demographic recovery criteria to be exceeded, or that it would not jeopardize the continued existence of the grizzly bear in the GYE." 1-App-137 – 1-App-137 (emphasis added). But the district court was mistaken in applying a "clear error" standard. It is correct that the Tenth Circuit has held that an agency decision is arbitrary and capricious if the agency made a clear error of

judgment. *See N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Env't Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)). But as the Supreme Court held and the Tenth Circuit confirmed, an agency action is also considered arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017) (citations and quotations omitted). Here, FWS entirely failed to consider an important aspect of the problem when it neglected to address whether to include a female take limitation.

Because FWS entirely failed to consider an important aspect of the problem by failing to consider whether to impose a female lethal take limitation and, in turn, this failure implicates the Forest Service's obligation to ensure that the Project is not likely to jeopardize the continued existence of the grizzly bear population, the biological opinion is arbitrary and capricious in violation of the ESA and APA. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(3); 5 U.S.C. § 706(2)(A).

## II.    FWS's Reliance on Conservation Measures to Support Its No-Jeopardy Conclusion is Arbitrary and Capricious.

The 2019 BiOp contains nine conservation measures that FWS relies upon to supports its conclusion that the Project will not jeopardize grizzly bears. 2-App-153 – 2-App-154. In construing section 7 of the ESA, courts have held that FWS

cannot rely on conservation measures to reach a no-jeopardy conclusion unless

those measures are "reasonably specific, certain to occur, and capable of

implementation; they must be subject to deadlines or otherwise-enforceable

obligations; and most important, they must address the threats to the species in a

way that satisfies the jeopardy and adverse modification standards." *Ctr. for*

*Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)

(citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1379-80 (9th Cir. 1987), *abrogated*

*on other grounds as recognized by Cottonwood Env't Law Ctr. v. U.S. Forest*

*Serv.*, 789 F.3d 1075, 1088-91 (9th Cir. 2015)). "Binding mitigation measures

cannot refer only to generalized contingencies or gesture at hopeful plans; they

must describe, in detail, the action agency's plan to offset the environmental

damage caused by the project." *Bernhardt*, 982 F.3d at 743.[6]

---

[6] The district court cites *Bernhardt* to hold that FWS did not *rely* on the
conservation measures to make its no-jeopardy finding. 1-App-142 – 1-App-143.
In *Bernhardt*, the court found that FWS did not explicitly rely on mitigation
measures in making its no-jeopardy finding because FWS "[a]ppeared to conclude
that the [project], as a whole, will not significantly impact polar bears, with or
without mitigation measures," and thus the flawed mitigation measures did not
render the biological opinion fatally flawed. 982 F.3d at 748. In that case, FWS
stated only that it "review[ed] the current status of the species, environmental
baseline, effects of the action, and cumulative effects" in reaching its no-jeopardy
determination. *Id.* By contrast, in the 2019 BiOp here, FWS specifically stated that
it reached its no-jeopardy determination "[a]fter reviewing . . . *the Forest's*
*commitment to implement their Conservation Measures*," amongst other factors. 2-
App-192 (emphasis added).

The conservation measures here do not satisfy those criteria. First, some of the measures are not implemented by the action agency (the Forest Service). Rather, implementation requires the permittees to take action. For example, CM 4 requires permittees to move carcasses from campgrounds and roads. 2-App-153. CM 1 relies on permittees to follow food storage orders and to bear-proof toilets, and CM 2 relies on permittees to ensure range riders monitor livestock herds for sick, injured or stray animals. *Id.* Because these measures require implementation by the permittees, they are not "under agency control or otherwise reasonably certain to occur." *See Nat'l Wildlife Fed'n.*, 524 F.3d at 935.

"[E]ven a sincere general commitment" to implement the conservation measures is insufficient "absent specific and binding plans." *Id.* at 935-36. This is especially true here because the Forest Service has demonstrated that it cannot be relied upon to enforce permittees' failure to implement mitigation measures. *See, e.g.,* 2-App-260 (FWS declaring USFS was not in compliance with the conservation measures in place); 2-App-019 (FWS expressing concern about noncompliance).

Second, many of the conservation measures are vague and would be difficult to enforce even if the Forest Service endeavored to do so. Vague mitigation

27

measures are additionally problematic because they create difficulty in knowing at which point the action agency has failed to comply with the measures, and thus at which point reinitiation of consultation is required. *Bernhardt*, 982 F.3d at 744. For example, CM 2 requires range riders to watch livestock closely (2-App-153) but does not specify how many riders should be on the landscape at any given time nor how often they should be checking on the livestock. To rely on such a measure, it was incumbent on FWS to require the Forest Service to at least set forth a specific and enforceable measure specifying how many riders are appropriate to cover more than 170,000 acres.

Similarly, CM 3 calls on Forest Service employees to "monitor" allotments "on a regular basis." 2-App-153. But FWS does not explain what type of monitoring is required or what "on a regular basis" means. In 2012, FWS expressed the need to define "regular basis" after the Forest Service only visited allotments twice the previous year to comply with this measure. 2-App-258. *See also* 2-App-263 (same). For this reason, in the 2014 BiOp's terms and conditions, FWS required the Forest Service to "define what 'regular' monitoring schedule would be for the upcoming season," including "documentation explaining how and when this monitoring will be conducted." 2-App-117. However, this important

requirement appears nowhere in the 2019 BiOp.[7]

Finally, many of the measures are demonstrably ineffective to protect grizzly bears. For example, CMs 4 and 5 include requirements to move carcasses away from roads, trailheads and campgrounds. 2-App-153. However, there is no requirement to move carcasses off of allotments, even though FWS notes in the 2019 BiOp that grizzlies can be drawn to carcasses from seven miles away.  2-App-153 – 2-App-155. As an alternative to protect grizzly bears, FWS could have required that carcasses be removed from the project area or be destroyed using proven methods including using dynamite or lime. *See, e.g.,* 4-App-135 (Montana's Livestock Loss Board explaining that removal of carcasses can be useful to prevent grizzly bear-livestock conflicts). But FWS and the Forest Service declined to include such a requirement to appease the permittees. *See* 2-App-267 (USFS informing FWS it is modifying the carcass removal requirement to include exceptions as requested by permittees). Moreover, while the 2014 BiOp also required that all sick or injured animals be removed or treated because they can

---

[7] The district court held that the conservation measures are certain to occur, citing only CM 6 requiring that the Forest Service recommend that permittees carry bear spray and CMs 7-9 requiring monitoring and reporting. 1-App-143. The court failed to address any of the conservation measures described as vague and unenforceable as discussed above.

also attract predators (*see* 2-App-595 – 2-App-596), this requirement has been inexplicably removed from the 2019 BiOp. Because these measures are not aimed at protecting grizzly bears, they do not sufficiently "address the threat to the species." *Rumsfeld*, 198 F. Supp. 2d at 1152.

In sum, because the conservation measures are not certain to occur, are vague and not reasonably specific, are difficult or impossible to enforce, and are ineffective at protecting grizzly bears, FWS's reliance on these measures in making its no-jeopardy determination is arbitrary and capricious, rendering the 2019 BiOp unlawful. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

### III.    The Forest Service's Reliance on the Faulty Biological Opinion to Approve the Upper Green Project is Unlawful.

The Forest Service has its own duty under the ESA to ensure that the Project will not jeopardize grizzly bears. 16 U.S.C. § 1536(a)(2). "Consulting with FWS alone does not satisfy an agency's duty under the Endangered Species Act." *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994). Because "[a]n agency cannot abrogate its responsibility to ensure that its action will not jeopardize a listed species[,] its decision to rely on a FWS biological opinion must not have been arbitrary and capricious." *Id.* at 1304 (citations and quotations omitted). The Forest Service's unreasonably reliance on the unlawful 2019 BiOp to discharge its ESA duties violates the ESA and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

## THE COURT SHOULD VACATE THE 2019 BIOP AND ROD

This Court should vacate the Record of Decision if it finds that FWS's 2019 BiOp is unlawful. Vacatur is the presumptive remedy for arbitrary agency action, 5 U.S.C. § 706(2)(A) (providing that courts "shall" set aside arbitrary agency action), and the Supreme Court has stated that "[t]he [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law.'" *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). Here, vacatur will serve the ESA's purpose by ensuring FWS and the Forest Service fully comply with the ESA before implementing the Project. Where FWS has authorized the killing of 72 grizzly bears in connection with the Upper Green Project, the nature of the violations and the resulting impacts are significant. Because it would serve the ESA's fundamental purpose to protect listed species, this Court should vacate the 2019 BiOp and the associated ROD.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court: (1) reverse and vacate the district court's decision; (2) declare that the Fish and Wildlife Service's 2019 BiOp violates the ESA and the APA; (3) declare that the Forest Service's reliance on the unlawful 2019 BiOp is arbitrary and capricious; and (4) vacate and set aside the 2019 BiOp and associated ROD.

31

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that oral argument would be beneficial because this case involves significant issues regarding ESA compliance.


Respectfully submitted, September 15, 2022

 *s/ Andrea Zaccardi*
Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-8849
azaccardi@biologicaldiversity.org

 *s/ Willian John Snape, III*
William John Snape, III
Center for Biological Diversity
American University Law School
4300 Nebraska Ave, NW
Washington, D.C. 20016
(202) 536-9351
bsnape@biologicaldiversity.org
wsnape@wcl.american.edu.

*Attorneys for Appellants Center for Biological Diversity and Sierra Club*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,319 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2016 in 14 point font size and Times New Roman.

Date: September 15, 2022

 *s/ Andrea Zaccardi*
Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorney for Appellants*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Emsisoft Business Security, version 2022.9.1.11645, last updated September 6, 2022, and according to the program are free of viruses.

Date: September 15, 2022


 *s/ Andrea Zaccardi*
Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorney for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022, I electronically filed the

foregoing OPENING BRIEF OF APPELLANTS CENTER FOR BIOLOGICAL

DIVERSITY AND SIERRA CLUB, with attached Appendices, using the court's

CM/ECF system, which will send notification of this filing to counsel for all

parties.


 *s/ Andrea Zaccardi*
Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorney for Appellants*

**ADDENDUM**

| Document | Page No. |
|---|---|
| District Court Opinion and Order, ECF No. 147 (05/17/2022) | A-1 to A-30 |
| District Court Judgment, ECF No. 148 (06/01/2022) | A-31 |



**FILED**

**8:56 am, 5/17/22**

**Margaret Botkins**
**Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

CENTER FOR BIOLOGICAL
DIVERSITY and SIERRA CLUB,

*and*

WESTERN WATERSHEDS PROJECT,
ALLIANCE FOR THE WILD ROCKIES,
and YELLOWSTONE TO UINTAS
CONNECTION,

        Petitioners,

vs.

DEBRA A. HAALAND *et al.*,

        Federal Respondents, and

STATE OF WYOMING and UPPER
GREEN RIVER CATTLE
ASSOCIATION *et al.*,

        Respondent-Intervenors.

Lead Case No. 20-cv-231-NDF

Member Case No. 20-cv-234-NDF

## OPINION AND ORDER

This consolidated matter comes before the Court upon the Amended

Complaint/Petition for Review of Petitioners Center for Biological Diversity and Sierra

Club (collectively, "CBD"), and the Supplemented and Amended Petition for Review of

Agency Action of Western Watersheds Project, Alliance for the Wild Rockies, and

Yellowstone to Uintas Connection (collectively, "WWP"), against Respondents Debra A. Haaland in her official capacity as United States Department of Interior Secretary, United States Forest Service, and United States Fish and Wildlife Service (collectively, "Federal Respondents"). On July 29, 2020, the State of Wyoming was granted permission to intervene, as were the Upper Green River Cattle Association, Sommers Ranch, LLC, Price Cattle Ranch, Murdock Land and Livestock Co., and the Wyoming Stock Growers Association.

As an aid, the Court provides the following list of less familiar acronyms:

AMP – Allotment Management Plan

AOI – Annual Operating Instructions

BiOp – Biological Opinion

BTNF – Bridger-Teton National Forest

DMA – Demographic Monitoring Area

GYE – Greater Yellowstone Ecosystem

IGBST – Interagency Grizzly Bear Study Team

ITS – Incidental Take Statement

KWS – Kendall Warm Springs

PCA – Primary Conservation Area

ROD – Record of Decision

UGRA Project – Upper Green River Area Rangeland Project

After considering the administrative record, reading the briefs of the parties, reviewing the materials on file, and being fully advised in the premises, the Court **FINDS and ORDERS** as follows:

## I. Introduction

On October 11, 2019, the United States Forest Service (USFS) signed the Record of Decision (ROD) for the Upper Green River Area Rangeland Project (UGRA Project). NFMA-FS-SAR-062815. The 170,643-acre project area is located in western Wyoming— and within the Greater Yellowstone Ecosystem (GYE) — approximately 30 miles northwest of Pinedale near the Green River Lakes. NFMA-FS-SAR-062816. The GYE is one of the largest intact ecosystems remaining in the temperate zones of the world. FS-012073.

There are six cattle and horse grazing allotments in the project area: Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Wagon Creek, and Upper Green River. FS-13686. The stated purpose of the UGRA Project is to "authorize livestock grazing in a manner that will maintain or improve resource conditions." *Id.* Under the UGRA Project ROD, USFS will issue grazing permits for the project for a period of 10 years. FWS-664. The project allows approximately 8,819 livestock, including 8,772 cow/calf pairs and yearlings and 47 horses, to graze in the six allotments from June 14th to October 15th. FS-13699.

To assess the effects of the UGRA Project on the federally threatened grizzly bear, USFS requested consultation with the United States Fish and Wildlife Service (FWS). FWS-648. USFS also requested concurrence from FWS on its determination for the

endangered Kendall Warm Springs dace (KWS dace). *Id.* On April 29, 2019, FWS issued its biological opinion (BiOp) finding that the effects of livestock grazing as proposed in the UGRA Project are not likely to jeopardize the continued existence of the grizzly bear. FWS-706. As part of its informal consultation, FWS also concurred with USFS's determination that the project is not likely to adversely affect the KWS dace. FWS-653.

Petitioners CBD and WWP jointly argue that FWS's 2019 BiOp is arbitrary, capricious, and violates the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), and the Administrative Procedure Act (APA), 5 U.S.C. § 706. Petitioners also jointly argue that USFS arbitrarily, unreasonably, and unlawfully relied on the BiOp when approving the UGRA Project. Petitioner WWP additionally argues that USFS and FWS unlawfully failed to engage in formal consultation regarding the UGRA Project's effects on the KWS dace. WWP also argues that, in violation of the National Forest Management Act (NFMA), the UGRA Project's ROD and associated Annual Operating Instructions (AOIs) and Allotment Management Plans (AMPs) do not prescribe the site-specific forage utilization levels needed to meet Bridger-Teton National Forest (BTNF) Plan objectives and fail to retain cover for sensitive amphibians and birds.

Petitioners request that the Court 1) set aside/vacate FWS's 2019 BiOp and Incidental Take Statement (ITS) for the UGRA Project as well as FWS's concurrence regarding the KWS dace; 2) set aside/vacate USFS's UGRA Project ROD and associated AOIs; 3) enjoin the lethal removal of grizzly bears from UGRA Project allotments until FWS and USFS complete consultation in compliance with the ESA; 4) enjoin cattle trailing through the KWS dace enclosure until FWS and USFS complete consultation in

4

A-4

compliance with the ESA; 5) enjoin grazing authorizations within the UGRA Project area until USFS ensures that such authorizations comply with the BTNF Plan's Forage Utilization Standard.

For the reasons that follow, the Court **AFFIRMS** the UGRA Project ROD, associated AOIs, and associated BiOp and ITS, as supported by substantial evidence, and neither arbitrary, capricious, an abuse of discretion, or inconsistent with law. Consequently, CBD's Amended Complaint/Petition for Review and WWP's Supplemented and Amended Petition for Review of Agency Action are **DISMISSED**.

## II. Legal Background

### A. *The Endangered Species Act*

The ESA defines an endangered species as one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Once FWS lists a species, Section 7 of the ESA dictates that federal agencies must ensure that any federal agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" *Id.* § 1536(a)(2). To achieve this goal, an "action agency must first determine whether its proposed discretionary action may affect a listed species or a critical habitat." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 (10th Cir. 2010) (citing to 50 C.F.R. § 402.14(a), (c)). "If so, the agency must consult with the FWS." *Id.* The FWS then formulates a biological opinion, and, based on the best scientific and

commercial data available, determines whether the action is likely to jeopardize the continued existence of listed species. *Id.*

Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). However, "[i]f the biological opinion concludes that jeopardy is not likely… the consulting agency can issue an 'Incidental Take Statement.'" *Rio Grande*, 601 F.3d at 1106 (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008)); 16 U.S.C. § 1536(b)(4). An ITS "constitutes a permit authorizing the action agency to take the endangered or threatened species so long as it respects the [FWS's] terms and conditions." *Rio Grande,* 601 F.3d at 1106. (quoting *Bennett v. Spear*, 520 U.S. 154, 170 (1997)).

### B. *National Forest Management Act*

NFMA requires the USFS to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" 16 U.S.C. § 1604(a). These "forest plans" must "provide for multiple use and sustained yield" and "include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]" *Id.* § 1604(e)(1). A forest plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." *McKeen v. U.S. Forest Serv.,* 615 F.3d 1244, 1247 (10th Cir. 2010) (citing 16 U.S.C. § 1604(g)(3)(B)).

Projects approved by the USFS "must be consistent with the applicable forest plan." *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 427 (10th Cir. 2011) (citing *Utah Env't Cong. v. Bosworth (UEC III)*, 443 F.3d 732, 737 (10th Cir. 2006); 16 U.S.C. §

1604(i)). Specifically, "AMPs must be consistent with the [f]orest [p]lan for the forest in which the allotment sits." *McKeen*, 615 F.3d at 1247 (citing 36 C.F.R. § 222.2(c)). Grazing permits allow a recipient to graze livestock in accordance with policies including the relevant forest plan and any relevant AMPs. *Id.* (citing 36 C.F.R. § 222.3(c)(1); 43 U.S.C. § 1752(a), (d), (e)).

### III. Factual Background

#### A. The Grizzly Bear in the GYE

Grizzly bears are among the largest terrestrial mammals in North America, and, in the lower 48 states, range from 250 to 600 pounds. FS-4198. They are omnivorous, opportunistic feeders and can live 25 years or longer in the wild. *Id.* Grizzlies originally inhabited a variety of habitats from the Great Plains to the mountains of western North America, and from central Mexico to the Arctic Ocean. FS-4201. South of Canada, the grizzly population has dropped from 50,000 to less than 1,000 over the last two hundred years, and they now occupy less than two percent of their former range. *Id.* Grizzlies have one of the lowest reproductive rates among terrestrial mammals, and a female grizzly requires a decade, at best, to replace herself. FWS-2424. The low survival rate of adult females was identified as the single most important factor in causing the decline in the Yellowstone population prior to the mid-1980's. FS-4205. The two primary challenges in grizzly conservation lie in reducing human-caused mortality and conserving remaining habitat. FS-4201.

The grizzly bear was listed as a threatened species under the ESA in the lower 48 states on July 28, 1975. *Id.* Prior to listing, the Interagency Grizzly Bear Study Team

(IGBST) was formed in 1973 to further understanding of grizzly bear dynamics and centralize data collection and analysis. FS-3117. The IGBST is a cooperative effort between the USGS, NPS, USFS, FWS, and state wildlife agencies in Idaho, Montana, and Wyoming. *Id.*

FWS issued a "Grizzly Bear Recovery Plan" in 1982 and revised the plan in 1993. FWS-2405–2585. To facilitate consistency in the management of grizzly habitat across ecosystems, the Interagency Grizzly Bear Committee also developed the Interagency Grizzly Bear Guidelines in 1986. FS-4205. The most recent supplement to the recovery plan ("Revised Demographic Recovery Criteria for the Yellowstone Ecosystem") was approved in 2017. FWS-6884. The supplement outlines specific recovery criteria for the GYE (such as minimum population size, female bear distribution, and mortality limits) that will be discussed in further detail *infra.* FS-4206.

The recovery plan identifies six recovery zones—the GYE recovery zone is one of them—which were established to include areas large enough and of sufficient habitat quality to support a recovered bear population. FS-4202. For each zone, the plan details recovery objectives and strategies. FS-4201. The 5,438,000-acre GYE recovery zone includes portions of Wyoming, Montana, and Idaho, portions of five National Forests, Yellowstone and Grand Teton National Parks, the John D. Rockefeller, Jr. Memorial Parkway, and adjacent Bureau of Land Management, state, and private lands. FS-4203-204. The GYE recovery zone lies within but does not constitute the whole of the broader GYE, which is substantially larger. As of 2017, the known area occupied by grizzlies in the entire GYE was 16,024,482 acres. FS-4204. Between the 1970s and early 2000s,

8

occupied range in the GYE increased by 48 percent; between 2000 and 2017, it increased another 51 percent. *Id.* In 2017, the estimated grizzly population in the GYE was 718. FWS-706. This number is likely an underestimate. FWS-682. Current population growth in the GYE is estimated at 0 to 2 percent annually. FWS-706.

Within the GYE, grizzlies are now managed using an inter-agency approach[1] that identifies a Primary Conservation Area (PCA) as well as adjacent areas where occupancy by grizzlies is anticipated and acceptable. FS-3020. The PCA is the area within the GYE recovery zone. *Id.* The PCA plus adjacent areas within the GYE form the Demographic Monitoring Area (DMA). *Id.* The DMA was delineated around suitable habitat in order to capture the extent of grizzly bear occupancy over time. FWS-686. The goal within the DMA is to manage grizzlies to ensure a recovered population in accordance with established recovery criteria (including those found in the Grizzly Bear Recovery Plan and the 2017 supplement). FS-3023.

All six of the grazing allotments in the UGRA Project area lie outside the bounds of the GYE recovery zone/PCA. FWS-687. However, all UGRA allotments are within the DMA. *Id.*

B.  *The Kendall Warm Springs (KWS) Dace*

The only known location of the KWS dace—a small fish federally listed as endangered in 1970—is within the bounds of the Kendall Warm Springs located

---

[1] *See* 2016 Conservation Strategy for the Grizzly Bear in the GYE. FS-3013. The USFS, Idaho Department of Fish and Game, Montana Fish, Wildlife and Parks, Wyoming Game and Fish Department, National Park Service, BLM, and FWS were all signatories. FS-3032.

approximately 32 miles north of Pinedale. FS-12346, FS-4481, FS-4580. The springs are within the UGRA Project area. FS-4481. Originating at the base of a bluff, the springs flow through a braided channel for 328 yards and cascade into the Green River. *Id*. Fences currently exclude domestic livestock from the springs. FS-12357. However, native ungulates can easily navigate the fence and still have access to the springs. *Id.* A road and culvert built across the channel prior to 1934 (which fragmented the dace's habitat into two sections) was removed and replaced with a bridge in 1997, allowing reconnection of the habitat. FS-4588.

The dace utilize various habitats within the springs; adults favor shallow pools in the main channel while juveniles are found mostly in slower channels on the margins. FS-4481. Aquatic vegetation in the springs provides important hiding cover, and small pools created by large ungulates are believed to provide valuable habitat for the dace. *Id.* The USFS conducted surveys monitoring the dace population between 1995 and 2013. *Id.* The monitoring indicated a sharp decline in the dace population density between 2005 and 2007 but the population trend may have stabilized since that time. *Id.* The cause of this decline is unknown, but a narrowing and deepening of the stream has been noted which reduces the shallow, small pools valuable to dace. FS-12357. The channel changes may be related to the exclusion of domestic livestock from the springs. *Id.*

The UGRA Project excludes grazing livestock from the Kendall Warm Springs enclosure except when cattle are allowed through on their way to the allotments or back from the allotments. FS-12360. Cattle within the enclosure are required to be actively herded through to the other side. *Id.* Herding cattle through the enclosure will cause some

10

A-10

bank and channel alteration. *Id.* This could have a beneficial effect on the dace habitat but could also cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetation cover. *Id.* Ultimately, USFS determined that the UGRA Project was not likely to adversely affect the KWS dace or their habitat. *Id.* FWS concurred with this determination, noting that any negative impacts to the dace are temporary and insignificant. FS-4172.

### C. 2019 UGRA Project ROD and 1990 BTNF Forest Plan

The UGRA Project ROD authorized grazing on the six allotments using a management strategy that represents a modification of "Alternative 3" that includes some elements of Alternative 2 (as the alternatives are described in the 2017 FEIS). NFMA-FS-SAR-62818. The ROD allows a maximum of 8,819 head of livestock within the project area and a maximum 44,722 animal unit months of forage authorized for consumption. NFMA-FS-SAR-62829. Grazing was re-authorized on the allotments to "contribute to the accomplishment of Bridger-Teton Land and Resource Management Plan (Forest Plan) Goal 1.1 to support community prosperity and Objective 1.1(h) to provide forage for about 260,000 animal unit months of livestock grazing annually." NFMA-FS-SAR-62816. The ROD states that "[t]here is also a need to avoid unacceptable effects from livestock use (Forest Plan Goal 4.7)." *Id.*

The ROD set maximum forage utilization percentages on key forage species for each pasture and for seven focus areas. NFMA-FS-SAR-62819. The key forage species are primarily Idaho fescue in the uplands and sedges or tufted hairgrass in riparian and meadow areas. *Id.* The Noble Pastures Allotment's maximum forage utilization was set at 60% in

11

A-11

the uplands and 65% in riparian/meadow areas. *Id.* All other allotments have a maximum set at 50% forage utilization in both upland <u>and</u> riparian/meadow areas. *Id.*

The 1990 BTNF Forest Plan set Resource Management Prescriptions, Standards, and Guidelines. NFMA-FS-SAR-127. They "represent land management direction responsive to… the Bridger-Teton Management Problems, Challenges, Goals, and Objectives." *Id.* Of relevance to this case, Objective 4.7(d) "require[s] that suitable and adequate amounts of forage and cover are retained for wildlife and fish." NFMA-FS-SAR-126.

The Forage Utilization Standard imposes maximum utilization levels allowed for all herbivores on key vegetative species. NFMA-FS-SAR-133. The Forage Utilization Standard also states that "[d]uring AMP revision, the Interdisciplinary (ID) Team and livestock permittees will prescribe site-specific utilization levels needed to meet Forest Plan objectives." NFMA-FS-SAR-134.

In the Forest Plan, by the Court's count, there are 24 "Goals" and 73 "Objectives." NFMA-FS-SAR-118–127.

### IV. Standard of Review

Claims arising under the ESA and NFMA are reviewed under the Administrative Procedure Act (APA). *See Biodiversity Legal Foundation v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998); *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1058-59 (10th Cir. 2014). Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's

decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Env't. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).

"The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't. of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) (citation omitted). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)). Further, a deferential approach to judicial review is particularly appropriate where the challenged decision implicates substantial agency expertise. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

However, the presumption of validity does not shield the agency from a "thorough, probing, in-depth review." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574

(10th Cir. 1994). Further, the "[d]etermination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency action can reasonably be said to be within that range." *Id*.

## V. Discussion

### A. *FWS compliance with the ESA in issuing the 2019 BiOp*

Petitioners argue that the FWS's 2019 BiOp is arbitrary and capricious and violates the ESA. In support of this argument, they assert that 1) the 2019 BiOp and accompanying ITS do not specifically limit the number of female grizzly bears that can be removed under the ITS's 10-year, 72-bear lethal removal limit, nor do they examine the effect of the project on female bears; 2) previous BiOps (1999, 2013, and 2014) included sex-based removal limits or reporting triggers for female bears, while the 2019 BiOp does not— rendering this departure without a reasoned explanation arbitrary and capricious; 3) the 2019 BiOp failed to address the likelihood that the project's 72 lethal removals will perpetuate the UGRA Project allotments as mortality sinks; 4) the 2019 BiOp failed to consider other anticipated take of grizzlies within the GYE; and 5) the FWS arbitrarily relied on ineffective conservation measures that lack certainty and specificity to support its no jeopardy finding.

#### i.   2019 BiOp does not specifically limit female grizzly take

The 2019 BiOp states that "[t]he long-term survival of the Yellowstone grizzly bear population over the next 100 to 200 years is contingent upon minimizing average annual mortality within the total population and especially that of adult females," FWS-681, and

14

that "female bears have established territories within the [UGRA Project] area." FWS-689. The USFS's Final Environmental Impact Statement (FEIS) for the UGRA Project notes that "[s]urvival of adult female grizzly bears in the Greater Yellowstone Area is the most important factor influencing population trend." FS-12387.

The 2019 BiOp (in the associated ITS) exempts 72[2] lethal grizzly bear removals starting in 2019 and ending in 2028 (10 years) as a consequence of livestock grazing in the allotments in the UGRA Project. FWS-708. Of these 72, the ITS does not separately limit the number of female bears that can be removed during the period. *See* FWS-708–711. Petitioners argue—given the vital demographic role of female bears outlined above—that without a limit on the take of female bears, and without an examination of the Project's effect on female bears, the 2019 BiOp cannot ensure against jeopardy and that its no-jeopardy determination is thus unsupported, unlawful, and failed to use best available science.

All Respondents variously assert that FWS manages the grizzly bear population at the GYE level, and that because female-specific take limitations exist on the GYE scale, Petitioners' contentions are based on faulty premises.

The 2017 supplement to the Grizzly Bear Recovery Plan (FWS-6884) was appended to the Yellowstone chapter of the Grizzly Bear Recovery Plan as well as the 2016 Conservation Strategy. FWS-6890. The 2017 supplement revised three demographic criteria based on updated demographic analyses and the best available science. FWS-6885.

---

[2] For an explanation of how this number was generated, *see* FWS-708–709.

Demographic Recovery Criterion 1 requires a minimum grizzly population of 500 bears, and at least 48 females with cubs-of-the-year, within the DMA. *Id.* Criterion 2 requires that 16 of 18 bear management units within the GYE recovery zone[3] be occupied by females with young, with no two adjacent units unoccupied. FWS-6887.

Perhaps most importantly, Criterion 3 imposes annual mortality limits within the DMA. FWS-6888. The mortality limits—which are on a sliding scale based on the total grizzly population in the DMA—were set to achieve/maintain the population goal within the DMA of 674 bears. FWS-6888–889. There are separately calculated limits for independent females, independent males, and dependent young, and take into account all known and probable grizzly mortality from all causes[4]. *Id.* If any of the sex/age class mortality limits are exceeded for three years and any annual population estimate falls below 612, Criterion 3 requires that the IGBST produce a "Biology and Monitoring Review" to inform the appropriate management response. *Id.* If any annual population estimate falls below 600, Criterion 3 requires a cessation of all discretionary mortality within the DMA except as necessary for human safety. *Id.*

The 2019 BiOp fully discusses the 2017 supplement and its demographic recovery criteria. FWS-677. It notes that—as per the data collected by the IGBST—none of the

---

[3] As previously referenced, the GYE recovery zone is now also referred to as the "Primary Conservation Area" or PCA. FS-3020.

[4] These causes include management removals, illegal kills, mistaken identity kills, self-defense kills, vehicle kills, natural mortalities, undetermined-cause mortalities, grizzly bear hunting, and a statistical estimate of the number of unknown or unreported mortalities. FWS-6889.

mortality thresholds for females, males, or young were exceeded in 2017[5] (the first year that Criterion 3, as it appears in the 2017 supplement, was imposed) and that recent levels of mortality in the GYE (including those mortalities within the UGRA Project area) have been sustainable. FWS-682, 696. It also states that the anticipated level of grizzly bear mortality caused by the UGRA Project falls within the scope of the demographic recovery criterion 3. FWS-706. There is no assertion by Petitioners that the data used in these findings falls short of best available science.

In short, the criteria in the 2017 supplement supply a mechanism to remedy the possibility of an uptick in take of female bears. A lack of a female-specific take limit in the UGRA Project area does not connote with an absence of protections for female grizzlies within the DMA. There are female mortality limits in the DMA, and FWS states (see above) that projected take in the UGRA Project area will not cause those limits to be exceeded. Accordingly, the lack of female-specific take limits within the UGRA Project does not render the 2019 BiOp's determination (that the UGRA Project will not jeopardize the GYE grizzly population) arbitrary or capricious.

The Court agrees with Petitioners that it may have been better had the 2019 BiOp directly discussed the possible effects of a worst-case scenario in which—as an example— all 72 authorized removals were female grizzlies. However, this lapse does not require a finding that FWS made a clear error in its determination that UGRA take would not cause

---

[5] Although the recovery criterion were different prior to 2017, the 2019 BiOp also states that demographic recovery criteria (as they existed at the time) have been met for all age and sex classes since 2004. FWS-706.

GYE demographic recovery criteria to be exceeded, or that it would not jeopardize the continued existence of the grizzly bear in the GYE. A showing of error in this regard is Petitioners' burden, which they have not satisfied.

    ii.    Departure from previous BiOps with sex-based removal limits

Petitioners assert that previous BiOps for the project area (1999, 2013, 2014) included sex-based removal limits or reporting triggers for females, and that the 2019 BiOp's lack of this feature represents an arbitrary and capricious departure from agency past practice. *See Cotton Petro. Corp. v. U.S. Dep't. of Interior*, 870 F.2d 1515, 1526 (10th Cir. 1989) ("An administrative agency must explain its departure from prior norms (guidelines)"); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure.")(citation omitted).

Respondents point to previous BiOps for the project area that did <u>not</u> include female-specific take limitations (2011, 2014). An examination of the 2011 BiOp shows this to be true (FWS-80–115); the 2014 BiOp does not set female-specific take limits but does require that USFS contact FWS if three or more females are lethally removed in a given year (FWS-209–272, 255). Given this, the Court finds that FWS imposing a female-specific take limit is hardly boilerplate past practice, and does not find the 2109 BiOp's lack of such a limit to be an arbitrary and capricious reversal.

    iii.    2019 BiOp did not address existing sink habitat in the project area

18

As an additional argument that a female-specific take limitation is required, Petitioner WWP points to USFS's 2017 FEIS for the project area which identifies an existing mortality sink for female grizzly bears occurring throughout much of the project area, meaning female mortality exceeds or nearly exceeds survival.[6]  FS-012396.  WWP argues that FWS failed to address the fact that the project would contribute to this existing "sink" habitat for females, thereby completely ignoring an important aspect of the problem before it.  As support, WWP cites *Helena Hunters & Anglers Ass'n v. Marten*, 470 F.Supp.3d 1151 (D. Mont. 2020) for the proposition that this failure violates the ESA and the APA.

The *Hunters* case is not persuasive.  *Helena Hunters* presented a grizzly bear consultation issue for a project which added non-motorized trails in grizzly bear "secure" areas, and grizzly bear survival was strongly linked to the availability of secure habitat. *Id*. at 1179.  In the case before this Court, the purpose of the UGRA Project was to authorize livestock grazing through permits covering six cattle and horse grazing allotments, where most  allotments do not qualify as source/secure habitat.  The Wildlife Specialist Report for the project relies on a model (Schwartz et al. (2010)) which concludes that grizzly bear survival declined as road density, and number of homes and site developments increased, and the bear's "survival on the landscape [was] not explained by the amount of time bears spent on cattle or sheep allotments in the Yellowstone Ecosystem." FS-2822 (emphasis

---

[6] "Source" and "sink" habitat are terms used to differentiate areas based on whether mean female survival estimates are over 91%. FS-2822.  If the 91% threshold is satisfied, the habitat is source habitat. If it is not, the habitat is sink habitat. *Id*. Only the Badger Creek Allotment within the project area had mean female survival estimates over 91%; thus the remaining allotments are sink habitat. *Id*.

added).  Therefore, the case at hand could not be more different than the *Hunters* case, as the UGRA Project does not add development features (such as trails), it is not primarily in source/secure habitat, and it constitutes a landscape where grizzly survival is unrelated to time bears spend on livestock allotments.  WWP does not contest any of these facts, nor does it fault the conclusions of the Schwartz et al. (2010) model, or the science behind it.

Given all this, WWP fails in its burden to show that the BiOp's failure to address sink habitat for female grizzly bear survival within a grazing project violates the ESA or the APA, or that the failure renders the no jeopardy determination unlawful.

iv.     2019 BiOp failed to consider other anticipated take of grizzlies in GYE

WWP argues that FWS unlawfully failed to explain how anticipated take elsewhere in the GYE factors into the agency's conclusion that 72 lethal removals in the project area will not jeopardize the species. WWP cites to *Mayo v. Jarvis,* 177 F. Supp. 3d 91 (D.D.C. 2016) in support. *Mayo* held a FWS BiOp addendum to be arbitrary and capricious because the agency "failed to consider and evaluate the impact of the other incidental takes of the grizzly bear that had been authorized in the GYE since 2007 when making its 'no jeopardy' finding." *Id.* at 137. "The FWS must therefore evaluate the impact of an agency's action 'in light of the environmental baseline' even if the BiOp 'does not numerically add the takes from different sources together." *Id.* (citing *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 230 (D.D.C. 2005)).

Here, the 2019 BiOp does not add up all prospective anticipated take within the DMA. Yet it does consider the proportion of removals within the UGRA allotments compared to total grizzly mortality in the GYE due to livestock depredations. FWS-691. It

20

notes all known and probable grizzly bear mortalities in the GYE from 1997-2017. FWS-680. It discusses the 35 grizzly removals within the UGRA allotments from 2010 to 2018 (FWS-689) and explains (with a cite to the IGBST 2017 report) that those mortalities have not affected population growth at the level of the DMA. FWS-696. It explains that the 72 removal limit over 10 years allowed by the ITS (a larger number than the 2010-2018 period) was decided upon in light of increased conflicts due to a growing grizzly population within the project area. Lastly, and in general, the environmental baseline section of the BiOp (FWS-686–698) is robust and comprehensive.

In *Mayo*, the offending BiOp addendum contained no discussion of the environmental baseline at all. 177 F. Supp. 3d at 137. That is not the case here. Accordingly, the Court does not find that FWS "entirely failed to consider an important aspect of the problem." *Richardson*, 565 F.3d at 704.

        v.   FWS reliance on conservation measures to support a no jeopardy finding

The 2019 BiOp reviewed "the Forest's commitment to implement their Conservation Measures" when issuing its no-jeopardy opinion. FWS-706. There are nine measures, outlined briefly here: 1) sanitation guidelines, 2) rider requirement to watch livestock closely, 3) FS employees' monitoring of allotments, 4) carcass removal requirements, 5) exception to carcass removal requirements if safety is a concern, 6) recommendation that grazing permittees carry bear spray, 7) further identification/implementation of grizzly conflict reducing opportunities, 8) permittee awareness of ESA responsibilities, and 9) a goal to continue to work in cooperation with FWS, Wyoming Game and Fish Department, and the IGBST to collect information on

grizzlies in the allotment areas. FWS-667–668. These measures can also be found in the UGRA Project ROD. NFMA-FS-62834. They are made enforceable by making them a term and condition of all grazing permits in the project area. FWS-701.

Petitioners argue that FWS's reliance on the BiOp's conservation measures to support a no-jeopardy finding was unlawful as the measures are ineffective, vague, and not certain to occur. Both WWP and CBD cite to *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002) in support. *Rumsfeld* involved a challenge to a BiOp which concluded that the Army's activities at Fort Huachuca would not cause jeopardy to the Huachuca water umbel or the Southwestern willow flycatcher. *Id.* at 1143. After a draft BiOp included a number of reasonable and prudent alternatives to address a jeopardy finding, the Army entered into a memorandum of agreement (MOA) to avoid the jeopardy finding. *Id.* at 1144. The MOA, which outlined mitigation measures, provided the basis for the FWS's later no jeopardy finding. *Id.* The court held the Final BiOp to be unlawful, stating that "[t]o avoid a substantive violation of the prohibition against jeopardy, the agency must develop mitigation measures" which must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Id.* at 1152.

Petitioners' reliance on this case is problematic as the facts are readily distinguishable from the case at hand. The Conservation Measures in the 2019 BiOp are intended to "help prevent conflicts with Grizzly Bears in the Upper Green Project Area." FWS-667. They were not specifically designed to <u>avoid</u> a jeopardy finding (as in *Rumsfeld)*

but rather act to generally lower bear/human conflict and the number of management removals within the action area. The Court does not agree that the Conservation Measures in this case equate to the mitigation measures in *Rumsfeld*, and does not find the *Rumsfeld* case to be persuasive.

The Court notes that it has also reviewed *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020), in which the mitigation measures in question were found to be "too vague to enforce" but that such a finding had no legal consequence without evidence the FWS relied on the measures. *Id.* at 747. A "BiOp that integrates mitigation measures into its decision making is more likely to have relied upon those measures." *Id.* The court then held that FWS did not rely on the measures in its no-jeopardy determination because it "appear[ed] to conclude that the [project], as a whole, will not significantly impact polar bears, with or without mitigation measures." *Id.* at 748.

Here, the 2019 BiOp states that it reviewed the Conservation Measures when arriving at its opinion. FWS-706. It's unclear, though, how the mitigation measures were integrated into FWS's decision making beyond the act of review. The BiOp's conclusion does make explicitly clear that the no-jeopardy determination was reached by considering: anticipated change in grizzly population in the project area; the rate of growth and expansion of the GYE population; overall GYE population density; anticipated levels of mortality in the project area and the demographic recovery criteria; that those criteria have been met since 2004; and that the level of projected mortality caused by the project will not appreciably reduce the population, distribution, or reproduction of GYE grizzlies. FWS-706.  The Conservation Measures are not mentioned. *Id.* Thus, the BiOp appears to

conclude that, with or without the Conservation Measures, the project as a whole will not jeopardize GYE grizzlies.

This is not to downplay the significance of the Measures or the fact that FWS reviewed them in coming to its no-jeopardy determination. However, Petitioners' various objections that these measures are not certain to occur or are otherwise unlawful—even if such a standard should be rigidly applied here—are unconvincing. For instance, Measure 6 requires that the USFS recommend that all permittees carry bear spray while working within allotments. FWS-668. CBD argues that because permittees will not be _required_ to carry bear spray, the measure is not certain to occur. Yet Measure 6 only requires that bear spray be _recommended_. CBD does not argue that the recommendation is uncertain to occur.

As another example, WWP argues that Measures 7-9 "do not require any substantive action whatsoever" and thus do not satisfy Section 7 of the ESA. However, the 2019 BiOp did not premise its no-jeopardy finding on Measures 7-9. It rather reviewed all the Conservation Measures as a whole and considered their implementation as a factor in its determination. That some of the measures are clearly aspirational (as FWS surely noticed when reviewing them) cannot coherently serve to invalidate the 2019 BiOp.

The Court finds similar deficiencies in Petitioners' remaining arguments regarding the Measures. In conclusion, the Court does not find that FWS's "reliance" on the Conservation Measures violates the ESA or the APA.

B.  *USFS reliance on the 2019 BiOp*

The Court does not find the FWS's 2019 BiOp to be arbitrary, capricious, or otherwise unlawful. Accordingly, USFS did not unlawfully rely on the FWS's 2019 BiOp when approving the UGRA Project ROD.

C.  *Compliance with the ESA regarding the Kendall Warm Springs Dace*

WWP argues that USFS and FWS unlawfully failed to engage in formal consultation regarding the UGRA Project's effects on the endangered KWS dace. The 2019 BiOp, through informal consultation, concurred with USFS's determination that the project is not likely to adversely affect the KWS dace. FWS-653. However, the Court finds that FWS's concurrence both considered important aspects of the risks to the dace and based its decision on consideration of relevant factors. *See Richardson*, 565 F.3d at 704.

Notably, FWS links a since-stabilized decline (1997-2007) in the dace's population to a "narrowing and deepening of the [KWS] stream" and discusses the potential that this change relates to the exclusion of domestic livestock from the KWS enclosure. FWS-653. FWS acknowledges that herding cattle through the enclosure (on the way to the allotments or back from them) may result in "a few" animals straying into the water leaving hoof prints. *Id.* The prints "could result in some bank and channel alterations" and cause "temporary displacement of dace, an elevation in turbidity, and alteration of submerged vegetation." *Id.* Yet FWS states that the prints could also act to counteract the stream's recent trend of narrowing and deepening. *Id.* Ultimately, FWS found that the negative impacts of a few stray animals in the stream (dace displacement, elevated turbidity, and

25

A-25

vegetation alteration) were temporary and would cause insignificant impacts. *Id.* Moreover, FWS states that livestock impacts on the stream channel could actually result in beneficial effects to the dace. *Id.*

WWP asserts that the concurrence failed to consider the following relevant considerations: 1) the total number of cattle trailed past the Springs, 2) how many "a few" animals straying into the stream actually means, and 3) whether FWS incorrectly stated that cattle would only be present in the KWS area "for one or two days." These assertions do not show the 2019 concurrence to be unlawful. The total number of cattle herded through the KWS enclosure is variable and perhaps impossible to prospectively quantify. *See* FS-12360 ("Based on current management, the permittees would often opt to herd the cattle around the exclosure or allow them to drift around the exclosure.") Short of *requiring* permittees to herd cattle through the KWS area, the total number of cattle herded through could range from zero to the entire permitted number of animals in the allotments. Similarly, a projection that "a few" animals may stray into the stream is acceptably precise and need not be specified down to the exact number to constitute a valid consideration of this factor.

As for WWP's assertion that FWS was wrong in stating that cattle would only be present in the KWS for one or two days per season, the Court concludes WWP misapprehends the record. The UGRA FEIS states that "[c]attle would be confined to the roadway when they are actively herded through the Kendall Warm Springs exclosure. In the fall, cattle would be allowed to drift out towards the southern Forest Boundary and spend additional time grazing within the River Bottom Pasture and along the livestock

26

driveway." FS-12174. WWP cites this language in support of their assertion that cattle would be present for longer periods. However, there is no evidence that allowing cattle to drift out towards the southern Forest boundary means that cattle will be allowed to remain within the KWS exclosure. The FEIS and the 2019 BiOp are clear that cattle in the KWS area will be actively herded to the other side, regardless of the season. FWS-653.

WWP asserts that no language in relevant permits requires cattle to be actively herded through the exclosure. But the grazing permits in the record "specify that the allotment management plan is part of the permit and that the permittee will carry out its provisions, other instructions, or both as issued by the Forest officer in charge for the area under permit[.]" NFMA-FS-SAR-63489. WWP does not assert that Forest officers have not been directing permittees to actively herd cattle through the KWS exclosure. The Court finds WWP's argument unavailing.

Ultimately, FWS not only determined that cattle-related temporary impacts on the KWS dace would be insignificant but found that such impacts could be beneficial at the level imposed by the UGRA Project. WWP does not directly dispute the science that led FWS to this conclusion and only disagrees with the end result of the informal consultation. Accordingly, the Court finds that USFS and FWS did not unlawfully fail to engage in formal consultation regarding the UGRA Project's effects on the endangered KWS dace.

*D. WWP's NFMA claims*

WWP argues that the UGRA Project ROD (and associated AOIs and AMPs) do not prescribe site-specific forage utilization levels that are necessary to meet BTNF Plan Objectives and thus violate NFMA. The argument, as the Court understands it, is that

27

A-27

projects must adhere to Forest Plan standards, such as the Forage Utilization Standard.[7]

The Forage Utilization Standard in the 1990 Forest Plan states that "[d]uring AMP revision,

the Interdisciplinary (ID) team and livestock permittees will prescribe site-specific

utilization levels needed to meet Forest Plan objectives." NFMA-FS-SAR-134. Objective

4.7(d) "require[s] that suitable and adequate amounts of forage and cover are retained for

wildlife and fish." NFMA-FS-SAR-126. WWP asserts that specialist reports, the FEIS, and

other materials show that the selected grazing alternative in the UGRA Project ROD does

not retain suitable cover for wildlife, and that the ROD thus violates NFMA.

As an initial matter, the State of Wyoming argues that Petitioners WWP waived all

of their NFMA arguments that the UGRA Project ROD does not comply with the Forage

Utilization Standard and Objective 4.7(d) related to Idaho fescue, migratory birds, or

sensitive amphibians, by not raising specific concerns during public review of UGRA

Project ROD.[8]   The State of Wyoming also argues that no other objector raised similar

concerns.

"Persons challenging an agency's compliance with NEPA must structure their

participation so that it … alerts the agency to the [parties'] position and contentions, in

order to allow the agency to give the issue meaningful consideration." *Silverton*

*Snowmobile Club v. U.S. Forest Serv*., 433 F.3d 772, 783 (10th Cir. 2006) (quotation

simplified and citations omitted).  As the State of Wyoming recognizes, this general rule

---

[7] In support, WWP cites *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) ("The Forest Service must strictly comply with a forest plan's 'standards,' which are considered binding limitations, but it may deviate from the forest plan's 'guidelines,' so long as the rationale for deviation is documented.")

[8] In support, the State of Wyoming references NFMA-FS-SAR-060566-612 and 060629-52.

has exceptions.  Claims are not waived if "the problems underlying the claim are obvious or otherwise brought to the agency's attention." *Forest Guardians*, 641 F.3d at 430 (internal quote and citation omitted).

The Court is satisfied that WWP's claim is not waived as its comments to the agency complain that the Forage Utilization Standard and Objective 4.7 were ignored, and that the cattle's use of forage in some pastures would not provide for the habitat needs of Sensitive Species.  NFMA-FS-SAR-060663; *see also*, 060664 & 060671 (reference to herbaceous retention not meeting 70% retention objective).  The Court concludes these comments by WWP are sufficient to alert the agency to the issue.

Turning to WWP's substantive argument that the UGRA Project ROD does not comply with the Forage Utilization Standard and Objective 4.7(d), the Court finds that there are fatal problems with this argument. Objective 4.7(d) is somewhat vague—i.e., what exactly are suitable and adequate amounts of forage and cover—and including Objective 4.7(d), there are 73 objectives contained within the 1990 Forest Plan. NFMA-FS-SAR-118–127. Many of them conflict to a certain degree—which is to be expected given the USFS's multiple use mandate. Objective 1.1(h) is to "[p]rovide forage for about 260,000 Animal Unit Months (AUMs) of livestock grazing annually." NFMA-FS-SAR-119. Using WWP's logic, the Forage Utilization Standard's prescription of site-specific utilization levels needed to meet Forest Plan objectives must also take this into account.

The objectives in the Forest Plan apply to all land within the BTNF. Naturally, some sites within the BTNF will more fully accomplish some objectives at the expense of others. USFS's site-specific management necessarily falls, then, within the realm of their agency

expertise.  Accordingly, the Court does not find that the UGRA Project ROD violates NFMA.

## VI. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the UGRA Project ROD and its associated AOIs, along with the associated BiOp and ITS, as supported by substantial evidence, and neither arbitrary, capricious, an abuse of discretion, or inconsistent with law. Consequently, CBD's Amended Complaint/Petition for Review and WWP's Supplemented and Amended Petition for Review of Agency Action are **DISMISSED**.

Dated this 16th day of May, 2022.


_____
NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE

**FILED**

# United States District Court

For The District of Wyoming

9:03 am, 6/1/22

**Margaret Botkins
Clerk of Court**

CENTER FOR BIOLOGICAL DIVERSITY
and SIERRA CLUB,

and

WESTERN WATERSHEDS PROJECT,
ALLIANCE FOR THE WILD ROCKIES,
and YELLOWSTONE TO UINTAS
CONNECTION,

        Petitioners,

                                             Civil No. 20-CV-231-F

vs.                                             20-CV-234-F

DEBRA A. HAALAND, *et al.*,

        Federal Respondents and

STATE OF WYOMING and UPPER
GREEN RIVER CATTLE ASSOCIATION,
*et al.*,

        Respondent-Intervenors.

## JUDGMENT IN A CIVIL ACTION

The Court having entered an Opinion and Order affirming the Upper Green River Area Rangeland Project Record of Decision and its associated Annual Operating Instructions, along with the associated Biological Opinion and Incidental Take Statement on May 16, 2022, has ordered that Center for Biological Diversity's Amended Complaint/Petition for Review and Western Watersheds Project's Supplemented and Amended Petition for Review of Agency Action is DISMISSED.

Dated this 1st day of June, 2022.



_____
Clerk of Court of Deputy Clerk