**Consolidated Appeal Nos. 22-8031 and 22-8043**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

WESTERN WATERSHEDS PROJECT, ALLIANCE FOR THE WILD ROCKIES,
and YELLOWSTONE TO UINTAS CONNECTION,
*Petitioners-Appellants*,

and

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,
*Petitioners-Appellants*,

v.

DEBRA A. HAALAND et al.,
*Federal Respondents-Appellees*,

and

STATE OF WYOMING and UPPER GREEN RIVER CATTLE ASSOCIATION
*et al.*, *Intervenor-Respondents-Appellees*.

On Appeal from the United States District Court for the District of Wyoming
Civil Action Nos. 0:20-CV-231-NDF and 0:20-CV-234-NDF
(Hon. Nancy D. Freudenthal)

**APPELLANTS' JOINT APPENDIX**
**Volume 1 of 15 – Pages 1-App-001 to 1-App-288**

Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

John Persell
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

William John Snape, III
Center for Biological Diversity
American University Law School
4300 Nebraska Ave, NW
Washington, D.C. 20016
(202) 536-9351
bsnape@biologicaldiversity.org
wsnape@wcl.american.edu

Megan Backsen
2810 Severn Dr.
Reno, NV 89503
(719) 207-3493

*Attorneys for Appellants*

**Appellants' Joint Appendix –Volume 1**
**Index**

| Document | Date | ECF / AR No. | Appx. Page No. |
|---|---|---|---|
| District Court Docket Sheet | | | 1-App-001-1-App-021 |
| Center for Biological Diversity and Sierra Club's Complaint for Declaratory and Injunctive Relief | 03/31/2020 | ECF No. 3-1 | 1-App-022-1-App-050 |
| Federal Defendants' Answer to Complaint | 07/07/2020 | ECF No. 16 | 1-App-051-1-App-071 |
| Order Consolidating Cases | 07/21/2020 | ECF No. 26 | 1-App-072 |
| Intervenor-Defendant State of Wyoming's Answer to Complaint | 07/29/2020 | ECF No. 30 | 1-App-073-1-App-085 |
| Intervenor-Defendants Ranchers' Answer to Complaint | 07/29/2020 | ECF No. 31 | 1-App-086-1-App-100 |
| Order Transferring Consolidated Action to the District of Wyoming | 11/28/2020 | ECF No. 46 | 1-App-101-1-App-106 |
| Western Watersheds Project et al.'s Supplemented and Amended Petition for Agency Review | 08/09/2021 | ECF No. 111 | 1-App-107-1-App-119 |
| District Court Opinion and Order | 05/17/2022 | ECF No. 147 | 1-App-120-1-App-149 |
| District Court Judgment | 06/01/2022 | ECF No. 148 | 1-App-150 |
| Western Watersheds Project et al.'s Notice of Appeal | 06/10/2022 | ECF No. 149 | 1-App-151-1-App-153 |
| Center for Biological Diversity and Sierra Club's Notice of Appeal | 07/07/2022 | ECF No. 157 | 1-App-154-1-App-156 |
| 1999 Biological Opinion | 07/16/1999 | FWS_000001-000020 | 1-App-157-1-App-176 |
| 2010 Amendment to the 1999 Biological Assessment | 04/01/2010 | FWS_000021-000079 | 1-App-177-1-App-235 |
| 2011 Biological Opinion | 01/18/2011 | FWS_000080-000115 | 1-App-236-1-App-271 |
| 2013 Supplement to the 1999 Biological Assessment | 03/22/2013 | FWS_000118-000134 | 1-App-272-1-App-288 |

APPEAL,LEADTR,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00231-NDF

CENTER FOR BIOLOGICAL DIVERSITY et al v. BERNHARDT et al
Assigned to: Senior District Judg Nancy D Freudenthal
Referred to: Honorable Kelly H Rankin
Case in other court: District of Columbia, 1:20-cv-00855
    USCA, 22-08031
    USCA, 22-08043
Cause: 05:551 Administrative Procedure Act

Date Filed: 12/09/2020
Date Terminated: 05/17/2022
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2020 | 1 | COMPLAINT against DAVID BERNHARDT, AURELIA SKIPWITH, FISH AND WILDLIFE SERVICE, UNITED STATES FOREST SERVICE ( Filing fee $ 400 receipt number ADCDC-6972661) filed by William CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB. (Attachments: # 1 Civil Cover Sheet, # 2 Declaration Rule 26, # 3 Summons Bernhardt, # 4 Summons FWS, # 5 Summons Skipwith, # 6 Summons Forest Service, # 7 Summons US Atty, # 8 Summons AG)(Snape, William). [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 03/31/2020 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by William CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB (adh, ) [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 03/31/2020 | 3 | NOTICE *Corrected Complaint* by SIERRA CLUB, WILLIAM CENTER FOR BIOLOGICAL DIVERSITY (Attachments: # 1 Errata Modified Complaint)(Snape, William) [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 03/31/2020 | | Case Assigned to Judge Amit P. Mehta. (adh, ) [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 03/31/2020 | 4 | SUMMONS (6) Issued Electronically as to DAVID BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(adh, ) [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 03/31/2020 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Andrea Santarsiere, Filing fee $ 100, receipt number ADCDC-6974875. Fee Status: Fee Paid. by SIERRA CLUB, WILLIAM CENTER FOR BIOLOGICAL DIVERSITY (Attachments: # 1 Declaration Andrea Santarsiere, # 2 Text of Proposed Order)(Snape, William) [Transferred from District of Columbia on 12/9/2020.] (Entered: 03/31/2020) |
| 04/01/2020 | | MINUTE ORDER denying without prejudice 5 Motion for Leave to Appear Pro Hac Vice. The non-member attorney's declaration should include an office telephone number and a statement as to whether the attorney, if the attorney engages in the practice of law from an office located in the District of Columbia, is a member of the District of |

| | | |
|---|---|---|
| | | Columbia Bar or has an application for membership pending. The motion may be resubmitted with the missing information. Signed by Judge Amit P. Mehta on 04/01/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/01/2020) |
| 04/03/2020 | 6 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Andrea Santarsiere, Filing fee $ 100, receipt number ADCDC-6988485. Fee Status: Fee Paid. by CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Snape, William) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/03/2020) |
| 04/03/2020 | | MINUTE ORDER granting 6 Amended Motion for Leave to Appear Pro Hac Vice. Andrea Santarsiere is hereby admitted pro hac vice to appear in this matter on behalf of Plaintiffs. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** **Click for instructions** Signed by Judge Amit P. Mehta on 04/03/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/03/2020) |
| 04/10/2020 | 7 | NOTICE of Appearance by Andrea Santarsiere on behalf of All Plaintiffs (Santarsiere, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/10/2020) |
| 04/17/2020 | 8 | NOTICE of Appearance by John B. Grosko on behalf of All Defendants (Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/17/2020) |
| 04/23/2020 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID L. BERNHARDT served on 4/6/2020; FISH AND WILDLIFE SERVICE served on 4/6/2020; AURELIA SKIPWITH served on 4/20/2020; UNITED STATES FOREST SERVICE served on 4/6/2020 (Attachments: # 1 Exhibit Proof of Service)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/23/2020) |
| 04/23/2020 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/6/2020. (Attachments: # 1 Exhibit Proof of Service)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/23/2020) |
| 04/23/2020 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/17/2020. Answer due for ALL FEDERAL DEFENDANTS by 6/16/2020. (Attachments: # 1 Exhibit Proof of Service)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 04/23/2020) |
| 06/04/2020 | 12 | Unopposed MOTION for Extension of Time to *File Response or Answer* by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE (Attachments: # 1 Text of Proposed Order)(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/04/2020) |
| 06/04/2020 | | MINUTE ORDER granting 12 Defendants' Unopposed Motion for an Extension of Time to File Their Response or Answer. Defendants shall answer or otherwise respond to Plaintiffs' Complaint on or before July 7, 2020. Signed by Judge Amit P. Mehta on 06/04/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/04/2020) |
| 06/04/2020 | | Set/Reset Deadlines: Responsive Pleading due by 7/7/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/05/2020) |
| 06/11/2020 | 13 | MOTION to Transfer Case *to the U.S. District Court for the District of Wyoming* by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE (Attachments: # 1 Exhibit A - Declaration of R. |

| | | |
|---|---|---|
| | | Griebel, U.S. Dept. of Agriculture, # 2 Exhibit 2019 USFS Record of Decision, # 3 Exhibit Declaration of C. Hayward, U.S. Dept. of Agriculture, # 4 Exhibit 2019 Fish and Wildlife Service Biological Opinion, # 5 Exhibit E - Declaration of N. Darnall, U.S. Fish and Wildlife Service, # 6 Text of Proposed Order)(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/11/2020) |
| 06/15/2020 | 14 | Unopposed MOTION for Extension of Time to File Response/Reply as to 13 MOTION to Transfer Case *to the U.S. District Court for the District of Wyoming* by CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB (Attachments: # 1 Text of Proposed Order)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/15/2020) |
| 06/15/2020 | | MINUTE ORDER granting 14 Plaintiffs' Unopposed Motion for an Extension of Time to File Response to Defendants' Motion to Transfer Case. Plaintiffs shall file their Opposition to Defendants' Motion to Transfer on or before July 2, 2020. Signed by Judge Amit P. Mehta on 06/15/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/15/2020) |
| 06/15/2020 | | Set/Reset Deadlines: Opposition due by 7/2/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 06/16/2020) |
| 07/02/2020 | 15 | Memorandum in opposition to re 13 MOTION to Transfer Case *to the U.S. District Court for the District of Wyoming* filed by CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB. (Attachments: # 1 Declaration of Andrea Santarsiere In Support of Plaintiffs' Opposition to Motion to Transfer)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/02/2020) |
| 07/07/2020 | 16 | ANSWER to Complaint by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE.(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/07/2020) |
| 07/08/2020 | 17 | MOTION to Intervene by STATE OF WYOMING (Attachments: # 1 Memorandum in Support, # 2 Exhibit Answer, # 3 Text of Proposed Order)(Jerde, Jay) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/08/2020) |
| 07/08/2020 | 18 | NOTICE of Appearance by Jay A. Jerde on behalf of STATE OF WYOMING (Jerde, Jay) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/08/2020) |
| 07/08/2020 | 19 | NOTICE of Appearance by Elliott Adler on behalf of STATE OF WYOMING (Adler, Elliott) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/08/2020) |
| 07/09/2020 | 20 | REPLY to opposition to motion re 13 MOTION to Transfer Case *to the U.S. District Court for the District of Wyoming* filed by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE. (Attachments: # 1 Exhibit "A" (Declaration of Lisa Solberg Schwab (FWS))(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/09/2020) |
| 07/09/2020 | 21 | ORDER. Both a Complaint and an Answer are now before the court in this APA case. It is hereby ordered that the parties shall meet and confer and file a Joint Status Report on or before July 28, 2020. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 07/09/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/09/2020) |
| 07/09/2020 | | Set/Reset Deadlines: Joint Status Report due by 7/28/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/09/2020) |
| 07/10/2020 | 22 | NOTICE *OF ERRATA* by CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB re 15 Memorandum in Opposition, (Attachments: # 1 Declaration of Cybele Knowles) |

| | | |
|---|---|---|
| | | (Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/10/2020) |
| 07/13/2020 | 23 | MOTION to Intervene by UPPER GREEN RIVER CATTLE ASSOCIATION, SOMMERS RANCH, LLC, PRICE CATTLE RANCH, MURDOCK LAND AND LIVESTOCK CO., WYOMING STOCK GROWERS ASSOCIATION (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Exhibit A - Declaration of Albert Sommers, # 3 Exhibit B - Declaration of Charles Price, # 4 Exhibit C - Declaration of Margaret J. Lockwood, # 5 Exhibit D - Declaration of Jim Magagna, # 6 Exhibit Corporate Disclosure Statement, # 7 Exhibit Proposed Answer, # 8 Exhibit Proposed Order)(Brown, Zhonette) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/13/2020) |
| 07/14/2020 | | NOTICE OF ERROR re 23 Motion to Intervene; emailed to zhonette@mslegal.org, cc'd 12 associated attorneys -- The PDF file you docketed contained errors: 1. Invalid attorney signature, 2. FYI: DO NOT REFILE. Future filings signature must match login/password. (zeg, ) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/14/2020) |
| 07/17/2020 | 24 | MOTION to Consolidate Cases by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE (Attachments: # 1 Text of Proposed Order)(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/17/2020) |
| 07/17/2020 | 25 | ORDER granting 24 Federal Defendants' Motion to Consolidate. It is ordered that case numbers 20-cv-860 and 20-cv-855 are consolidated; all filings in these consolidated cases shall be made only in the first-filed case, 20-cv-855; and the Clerk is directed to administratively close case number 20-cv-860. See attached Order for further details. Signed by Judge Amit P. Mehta on 07/17/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/17/2020) |
| 07/17/2020 | 26 | Cases Consolidated. Case 20-860 have been consolidated with 20-855 pursuant to Minute Orders entered 07/17/2020. ALL PLEADINGS MUST BE FILED IN LEAD CASE NO. 20-855. THE PARTIES ARE ADVISED NOT TO ELECT TO SPREAD TEXT WHEN FILING IN ECF. (eg) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/21/2020) |
| 07/24/2020 | 27 | Joint STATUS REPORT *and Proposed Briefing Schedule* by ALLIANCE FOR THE WILD ROCKIES, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Text of Proposed Order Proposed Order) (Persell, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/24/2020) |
| 07/24/2020 | 28 | ORDER setting the follow briefing schedule in this matter: 1) The index to the administrative record is due August 5, 2020; 2) Federal Defendants shall lodge and serve the administrative record on the parties on or before August 5, 2020; 3) the deadline for amending or supplementing the pleadings without leave of Court shall be September 4, 2020; 4) Plaintiffs or Defendant-Intervenors shall notify Federal Defendants of any objections to the administrative record on or before September 10, 2020; 5) the deadline for Plaintiffs to file any motion to complete or supplement the administrative record shall be September 17, 2020. Any response to such motion shall be due October 1, 2020, and the reply, should Plaintiffs choose to file one, shall be due October 8, 2020; 6) the deadline for Plaintiffs' respective briefs in support of their Motion for Summary Judgment is October 9, 2020; 7) the deadline for Federal Defendants' brief in opposition to Plaintiffs' respective Motions for Summary Judgment and in support of their Cross-Motion for Summary Judgment is December 4, 2020; 8) the deadline for Defendants-Intervenors' respective briefs in opposition to Plaintiffs' respective Motions for Summary |

| | | |
|---|---|---|
| | | Judgment and in support of their Cross-Motions for Summary Judgment is December 15, 2020; 9) the deadline for Plaintiffs' response to Federal Defendants' and Defendant-Intervenors' respective Cross-Motions for Summary Judgment and Reply briefs in support of their Motions for Summary Judgment is January 19, 2021; 10) the deadline for Federal Defendants' Reply brief in support of their Cross-Motion for Summary Judgment is February 15, 2021; 11) the deadline for Defendant-Intervenors' respective Reply briefs in support of their Cross-Motions for Summary Judgment is February 24, 2021; and 12) the deadline to file the appendix with the Court or request leave to file separate appendices is March 8, 2021. See attached Order for further details. Signed by Judge Amit P. Mehta on 07/24/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/24/2020) |
| 07/24/2020 | 29 | PROPOSED BRIEFING SCHEDULE by ALLIANCE FOR THE WILD ROCKIES, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION. (View Docket Entry 27 to view document). (eg) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/27/2020) |
| 07/24/2020 | | Set/Reset Deadlines: Administrative Record due by 8/5/2020. Amendments of Pleadings due by 9/4/2020. Motion to Complete or Supplement Administrative Record due by 9/17/2020. Response due by 10/1/2020. Reply due 10/8/2020. Plaintiffs' Briefs in Support of Motion for Summary Judgment due by 10/9/2020. Federal Defendants' Opposition and Cross-Motion due by 12/4/2020. Defendant-Intervenors' Opposition and Cross-Motion due by 12/15/2020. Plaintiffs' Opposition and Reply due by 1/19/2021. Federal Defendants' Reply due by 2/15/2021. Defendant-Intervenors' Reply due by 2/24/2021. Appendix or Request to File Separate Appendices due by 3/8/2021. (zjd) Modified on 7/28/2020 (zjd). [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/27/2020) |
| 07/29/2020 | | MINUTE ORDER granting State of Wyoming's Motion to Intervene, ECF No. 17 , and Green River Cattle Association Plaintiffs' Motion to Intervene, ECF No. 23 . For the same reasons set forth in the court's Order issued on June 1, 2020, in the related case Western Watersheds Project v. Bernhardt, 20-cv-860 (APM), ECF No. 36, and without any opposition filed by Plaintiffs Center for Biological Diversity or Sierra Club in this case, the State of Wyoming's and the Green River Cattle Association Plaintiffs' motions to intervene are granted. Signed by Judge Amit P. Mehta on 07/29/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/29/2020) |
| 07/29/2020 | 30 | ANSWER to Complaint by STATE OF WYOMING.(eg) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/31/2020) |
| 07/29/2020 | 31 | ANSWER to Complaint by MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, UPPER GREEN RIVER CATTLE ASSOCIATION, WYOMING STOCK GROWERS ASSOCIATION.(eg) [Transferred from District of Columbia on 12/9/2020.] (Entered: 07/31/2020) |
| 08/05/2020 | 32 | NOTICE *of Filing Index to Administrative Record* by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE (Attachments: # 1 Exhibit "A" (Index to FWS Administrative Record), # 2 Exhibit "B" (Index to U.S. Forest Service Administrative Record), # 3 Exhibit "C" (Certification of FWS's Administrative Record), # 4 Exhibit "D" (Certification of Forest Service's Administrative Record))(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 08/05/2020) |
| 08/24/2020 | 33 | NOTICE of Appearance by Brian Earnshaw Gregg on behalf of MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, UPPER GREEN RIVER CATTLE ASSOCIATION, WYOMING STOCK GROWERS |

| | | |
|---|---|---|
| | | ASSOCIATION (Gregg, Brian) [Transferred from District of Columbia on 12/9/2020.] (Entered: 08/24/2020) |
| 09/15/2020 | 34 | MOTION for Extension of Time to *File Motion to Complete or Supplement Administrative Record*, MOTION to Vacate 28 Order,,,,,,,,, *Summary Judgment Briefing Schedule* by ALLIANCE FOR THE WILD ROCKIES, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION (Attachments: # 1 Text of Proposed Order Proposed Order)(Persell, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 09/15/2020) |
| 09/16/2020 | 35 | ORDER granting 34 Motion for Extension of Time. Any motion by Western Watersheds Project, Alliance for the Wild Rockies, and Yellowstone to Uintas Connection to complete or supplement the administrative record will be due by September 24, 2020. Any response to such motion shall be due by October 8, 2020, and any reply, should Plaintiffs choose to file one, shall be due by October 15, 2020. The remaining briefing schedule regarding parties' cross-motions for summary judgment is vacated. The parties shall jointly submit a new proposed briefing schedule within 14 days of the final resolution of any motions regarding the administrative record. See attached Order for details. Signed by Judge Amit P. Mehta on 09/16/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 09/16/2020) |
| 09/16/2020 | | Set/Reset Deadlines: Motion to Complete or Supplement Administrative Record due by 9/24/2020. Response due by 10/8/2020. Reply due by 10/15/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 09/17/2020) |
| 09/17/2020 | 36 | REFERRED TO MAGISTRATE JUDGE. MOTION to Compel *Completion of the Administrative Record* by ALLIANCE FOR THE WILD ROCKIES, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] Referred on 12/10/2020 (Court Staff, sal). (Entered: 09/17/2020) |
| 09/24/2020 | 37 | REFERRED TO MAGISTRATE JUDGE. MOTION to Compel *Completion and Supplementation of Administrative Record* by ALLIANCE FOR THE WILD ROCKIES, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION (Attachments: # 1 Memorandum in Support of Motion to Complete and Supplement Administrative Record, # 2 Text of Proposed Order, # 3 Exhibit Email to DOJ Counsel 9-4-20, # 4 Exhibit Email to DOJ Counsel 9-8-20, # 5 Exhibit Email from DOJ Counsel 9-14-20, # 6 Exhibit Email to DOJ Counsel 9-21-20, # 7 Exhibit WWP FOIA Request 2-7-18, # 8 Exhibit Screenshots of Electronic Record - Comment Attachments, # 9 Exhibit Emails from WWP to USFS with Objection Attachments 1-8-18, # 10 Exhibit Screenshots of Electronic Record - Resource Folder Contents, # 11 Exhibit 60-Day Notice of Intent 1-21-20, # 12 Exhibit Certified Mail Receipts 1-21-20, # 13 Exhibit USPS Tracking Results 1-24-20, # 14 Exhibit FWS Response to NOI 3-20-20, # 15 Exhibit Declaration of Dr. David Mattson 5-7-20, # 16 Exhibit List of Supporting Literature Provided by Flashdrive)(Persell, John) [Transferred from District of Columbia on 12/9/2020.] Referred on 12/10/2020 (Court Staff, sal). (Entered: 09/24/2020) |
| 09/25/2020 | 38 | REFERRED TO MAGISTRATE JUDGE. Unopposed MOTION for Extension of Time to File Response/Reply as to 37 MOTION to Compel *Completion and Supplementation of Administrative Record*, 36 MOTION to Compel *Completion of the Administrative Record* by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE (Attachments: # 1 Text of Proposed Order)(Grosko, John). Added MOTION for Leave to File on 9/28/2020 (znmw). |

| | | |
|---|---|---|
| | | [Transferred from District of Columbia on 12/9/2020.] Referred on 12/10/2020 (Court Staff, sal). (Entered: 09/25/2020) |
| 09/25/2020 | | MINUTE ORDER granting 38 Unopposed Motion for Extension of Time to File Response/Reply. The deadline for Defendants' combined response to both pending Motions to Complete the Administrative Record is October 7, 2020. Signed by Judge Amit P. Mehta on 09/25/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 09/25/2020) |
| 09/25/2020 | | Set/Reset Deadlines: Combined Response due by 10/7/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 09/25/2020) |
| 10/06/2020 | 39 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/2/2020. ( Answer due for ALL FEDERAL DEFENDANTS by 12/1/2020.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 10/02/2020., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID L. BERNHARDT served on 10/1/2020; FISH AND WILDLIFE SERVICE served on 10/1/2020 (Attachments: # 1 Exhibit Certified Mail Return Receipts and Delivery Confirmation)(Bennett, Elise) Modified on 10/7/2020 (eg). [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/06/2020) |
| 10/07/2020 | | NOTICE OF CORRECTED DOCKET ENTRY: re 39 Summons Returned Executed as to US Attorney,,, Summons Returned Executed as to U.S. Attorney General,,, Summons Returned Executed as to Federal Defendant,, was entered in error per counsel request. (eg) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/07/2020) |
| 10/07/2020 | 40 | RESPONSE re 37 MOTION to Compel *Completion and Supplementation of Administrative Record*, 36 MOTION to Compel *Completion of the Administrative Record* filed by STATE OF WYOMING. (Jerde, Jay) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/07/2020) |
| 10/07/2020 | 41 | Memorandum in opposition to re 37 MOTION to Compel *Completion and Supplementation of Administrative Record*, 36 MOTION to Compel *Completion of the Administrative Record* filed by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE. (Attachments: # 1 Text of Proposed Order, # 2 Declaration R. Griebel (USFS), # 3 Declaration R. Hoelscher (USFS), # 4 Exhibit "B" (Fish and Wildlife Service's April 29, 2019 Biological Opinion))(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/07/2020) |
| 10/07/2020 | 42 | RESPONSE re 37 MOTION to Compel *Completion and Supplementation of Administrative Record*, 36 MOTION to Compel *Completion of the Administrative Record* filed by MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, UPPER GREEN RIVER CATTLE ASSOCIATION, WYOMING STOCK GROWERS ASSOCIATION. (Gregg, Brian) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/07/2020) |
| 10/13/2020 | 43 | NOTICE *of Filing Exh. "A" to Defendants' Response to Plaintiffs' Motions to Complete the Administrative Record* by DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, UNITED STATES FOREST SERVICE re 42 Response to motion, (Attachments: # 1 Exhibit Part 1 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 2 Exhibit Part 2 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 3 Exhibit Part 3 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 4 Exhibit Part 4 of 7, Exh. |

| | | |
|---|---|---|
| | | "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 5 Exhibit Part 5 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 6 Exhibit Part 6 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record, # 7 Exhibit Part 7 of 7, Exh. "A" to Defendants' Opposition to Plaintiffs' Motions to Complete the Administrative Record)(Grosko, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/13/2020) |
| 10/14/2020 | 44 | REPLY to opposition to motion re 36 MOTION to Compel *Completion of the Administrative Record* filed by CENTER FOR BIOLOGICAL DIVERSITY. (Zaccardi, Andrea) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/14/2020) |
| 10/14/2020 | 45 | REPLY to opposition to motion re 37 MOTION to Compel *Completion and Supplementation of Administrative Record* filed by ALLIANCE FOR THE WILD ROCKIES, WESTERN WATERSHEDS PROJECT, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Exhibit USPS Tracking Results to DOI, USFS, USDA, # 2 Declaration Kristine Akland)(Persell, John) [Transferred from District of Columbia on 12/9/2020.] (Entered: 10/14/2020) |
| 11/28/2020 | 46 | ORDER granting 13 Motion to Transfer Case to the District of Wyoming. Transfer due by 12/8/2020. See attached Order for additional details. Signed by Judge Amit P. Mehta on 11/28/2020. (lcapm3) [Transferred from District of Columbia on 12/9/2020.] (Entered: 11/28/2020) |
| 12/01/2020 | | Set/Reset Deadlines: Transfer due by 12/8/2020. (zjd) [Transferred from District of Columbia on 12/9/2020.] (Entered: 12/01/2020) |
| 12/02/2020 | 47 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, UPPER GREEN RIVER CATTLE ASSOCIATION, WYOMING STOCK GROWERS ASSOCIATION. Attorney Brian Earnshaw Gregg terminated. (Brown, Zhonette) [Transferred from District of Columbia on 12/9/2020.] (Entered: 12/02/2020) |
| 12/09/2020 | 48 | Case transferred in from District of District of Columbia; Case Number 1:20-cv-00855. (Entered: 12/09/2020) |
| 12/10/2020 | | 37 MOTION to Compel *Completion and Supplementation of Administrative Record*, 36 MOTION to Compel *Completion of the Administrative Record*, 38 Unopposed MOTION for Extension of Time to File Response/Reply as to 37 MOTION to Compel *Completion and Supplementation of Administrative Record* REFERRED to Magistrate Judge (Court Staff, sal) (Entered: 12/10/2020) |
| 12/10/2020 | 49 | (TEXT-ONLY) ORDER by the Honorable Nancy D Freudenthal finding as moot 34 Motion to Vacate. This case was transferred to the District of Wyoming on 12/9/2020 with 34 Motion to Vacate coming through as a pending motion. Upon review of the docket sheet, this motion was already ruled on in the District of Columbia (see docket entry 35 ) and therefore, said motion is moot.(Court Staff, sal) (Entered: 12/10/2020) |
| 12/10/2020 | 50 | (TEXT-ONLY) ORDER SETTING DEADLINE FOR COMPLIANCE WITH USDCWY LOCAL RULE 84.2. by the Honorable Nancy D. Freudenthal. This matter comes before the Court sua sponte. On December 9, 2020, this action was transferred from the District Court for the District of Columbia. The parties shall comply with USDCWY Local Rule 84.2 by 12/30/2020. The Clerk shall email a courtesy copy of this order to counsels email addresses. Emailed to counsel on this date.(Court Staff, sal) (Entered: 12/10/2020) |
| 12/10/2020 | 51 | NOTICE of Attorney Appearance by John Sterling Persell, III on behalf of Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION (Persell, John) (Entered: 12/10/2020) |

| 12/14/2020 | 52 | NOTICE by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION *of Withdrawal of Counsel Kristine M. Akland* (Persell, John) (Entered: 12/14/2020) |
|---|---|---|
| 12/16/2020 | 53 | NOTICE of Attorney Appearance by Timothy Michael Stubson on behalf of MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Stubson, Timothy) (Entered: 12/16/2020) |
| 12/21/2020 | 54 | ORDER RE-SETTING BRIEFING SCHEDULE by the Honorable Nancy D Freudenthal.Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 12/21/2020) |
| 12/21/2020 | 55 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Zhonette M. Brown to appear pro hac vice; Check not tendered; filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Stubson, Timothy) (Entered: 12/21/2020) |
| 12/21/2020 | 56 | ORDER by the Honorable Kelly H Rankin granting (55) Motion to appear pro hac vice in case 0:20-cv-00231-NDF; granting (56) Motion to appear pro hac vice in case 0:20-cv-00234-NDF. Order emailed to Zhonette Brown on this date. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 12/21/2020) |
| 12/22/2020 | 57 | NOTICE of Attorney Appearance by Nicholas Vassallo on behalf of DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, United States Forest Service, DAVID L. BERNHARDT, United States Fish and Wildlife Service Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Vassallo, Nicholas) (Entered: 12/22/2020) |
| 12/22/2020 | 58 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Robert M. Norway and J. Brett Grosko to appear pro hac vice; Check not tendered; filed by Defendants DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, United States Forest Service. (Attachments: # 1 Affidavit Declaration of Robert M. Norway, # 2 Affidavit Declaration of J. Brett Grosko, # 3 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Vassallo, Nicholas) (Entered: 12/22/2020) |
| 12/22/2020 | 59 | NOTICE of Attorney Appearance by Andrea L Santarsiere on behalf of Center for Biological Diversity, Sierra Club Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 12/22/2020) |
| 12/22/2020 | 60 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for William J. Snape, III to appear pro hac vice; Check not tendered; filed by Plaintiffs Center for Biological Diversity, Sierra Club. (Attachments: # 1 Affidavit of William J. Snape in Support of Motion to Appear Pro Hac Vice, # 2 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Santarsiere, Andrea) (Entered: 12/22/2020) |
| 12/23/2020 | 61 | ORDER by the Honorable Kelly H Rankin granting (58) and (59) Motion to appear pro hac vice (Robert M Norway and J Brett Grosko) in case 0:20-cv-00234-NDF. Copy of Order emailed to Pro Hac attorneys on this date. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) Modified text on 3/19/2021 (Court Staff, sjlg). (Entered: 12/23/2020) |
| 12/23/2020 | 62 | ORDER by the Honorable Kelly H Rankin granting (60) Motion to appear in case 0:20-cv-00231-NDF and (61) Motion to appear pro hac vice in case 0:20-cv-00234-NDF (William J Snape III). Copy of Order emailed to PHV attorney on this date.Associated |

| | | |
|---|---|---|
| | | Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, saf) Modified on 3/19/2021 (Court Staff, sjlg). (Entered: 12/23/2020) |
| 12/23/2020 | 63 | Notice of Pro Hac Vice Attorney Appearance by J Brett Grosko on behalf of DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, United States Forest Service Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Grosko, J) Modified filer and text on 12/31/2020 (Court Staff, sjlg). (Entered: 12/23/2020) |
| 12/23/2020 | | FINANCIAL ENTRY: Payment of $100 received for pro hac vice fee for Zhonette M Brown. Receipt CHY034063. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sjk) (Entered: 12/23/2020) |
| 12/24/2020 | 64 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order granting motion to amend complaint in consolidated case No. 0:20-cv-234-NDF, Docket No. 1, into proposed petition for review of agency action. filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Amended Petition, # 2 Proposed Order Granting Motion)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 12/24/2020) |
| 12/28/2020 | 65 | ORDER by the Honorable Kelly H Rankin granting (64) Motion for Order in case 0:20-cv-00231-NDF Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF. Plaintiffs have seven (7) days from the filing of this Order to file the amended petition. (Court Staff, sjgc) (Main Document 65 replaced on 12/28/2020) (Court Staff, sjlg). (Entered: 12/28/2020) |
| 12/29/2020 | 66 | AMENDED COMPLAINT / *Petition for Review* against Defendant DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, United States Forest Service, filed by YELLOWSTONE TO UINTAS CONNECTION, Alliance for the Wild Rockies, Western Watersheds Project. (Persell, John) (Entered: 12/29/2020) |
| 12/29/2020 | 67 | Notice of Pro Hac Vice Attorney Appearance by William John Snape, III on behalf of Center for Biological Diversity, Sierra Club Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Snape, William) (Entered: 12/29/2020) |
| 12/29/2020 | | FINANCIAL ENTRY: Payment of $100 received for pro hac vice fee for William J Snape, III. Receipt AWYDC-1867603. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sjk) (Entered: 12/29/2020) |
| 12/30/2020 | 68 | Notice of Pro Hac Vice Attorney Appearance by Robert Norway on behalf of DAVID L. BERNHARDT, FISH AND WILDLIFE SERVICE, AURELIA SKIPWITH, United States Forest Service, DAVID L. BERNHARDT, United States Fish and Wildlife Service Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Norway, Robert) (Entered: 12/30/2020) |
| 01/14/2021 | 69 | NOTICE by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION, Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION *Of Withdrawal of David A. Bahr* Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Bahr, Dave) (Entered: 01/14/2021) |
| 02/03/2021 | 70 | (TEXT-ONLY) NOTICE of Hearing: BY TELEPHONE - All parties shall appear by telephone through the Courts conference call system. Guests call: Toll Free 1-888-398-2342| Access code 3107456. | Join as guest Press # |Security code 1001#. Status Conference set for 2/8/2021 09:00 AM before Honorable Kelly H Rankin. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, smxb) (Entered: 02/03/2021) |

| | | |
|---|---|---|
| 02/03/2021 | 71 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order to stay completion portion of pending Motion to Complete and Supplement the Administrative Record (ECF No. 37), MOTION for Leave to File Reply/Brief/Supplement (Non-Dispositive) *regarding supplementation portion of pending Motion to Complete and Supplement the Administrative Record (ECF No. 37)* filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) Modified on 2/8/2021 (Court Staff, sjlg). (Entered: 02/03/2021) |
| 02/04/2021 | 72 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File Reply/Brief/Supplement (Non-Dispositive) *Regarding Motion to Complete the Administrative Record* filed by Plaintiffs Center for Biological Diversity, Sierra Club. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Santarsiere, Andrea) Modified on 2/8/2021 (Court Staff, sjlg). (Entered: 02/04/2021) |
| 02/08/2021 | 73 | ORDER on February 8, 2021 Status Conference and ORDER granting in party and denying in part 71 and 72 Plaintiffs' Motion to Stay Ruling and Allow Supplementation on Plaintiffs' Motions to complete and supplement the administrative record by the Honorable Kelly H Rankin. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sjgc) Modified on 2/9/2021 (Court Staff, sal). (Entered: 02/08/2021) |
| 02/08/2021 | 74 | MINUTES for proceedings held before Honorable Kelly H Rankin: Magistrate Judge Status Conference held on 2/8/2021. Written Order will be entered. (Court Reporter - none) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sal) (Entered: 02/08/2021) |
| 02/16/2021 | 75 | NOTICE by Intervenor Defendant State of Wyoming *of Withdrawal of Counsel* Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Adler, Elliott) (Entered: 02/16/2021) |
| 02/22/2021 | 76 | NOTICE of Attorney Appearance by Jay A Jerde on behalf of State of Wyoming Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Jerde, Jay) (Entered: 02/22/2021) |
| 02/22/2021 | 77 | SUPPLEMENT re (40 in 0:20-cv-00231-NDF) Response to Motion, filed by Intervenor Defendant State of Wyoming. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Jerde, Jay) (Entered: 02/22/2021) |
| 02/22/2021 | 78 | NOTICE of Attorney Appearance by Kelly Shaw on behalf of State of Wyoming Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Shaw, Kelly) (Entered: 02/22/2021) |
| 02/22/2021 | 79 | SUPPLEMENT re (37 in 0:20-cv-00231-NDF) Motion to Compel,,,, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 02/22/2021) |
| 02/22/2021 | 80 | SUPPLEMENT re (37 in 0:20-cv-00231-NDF) Motion to Compel,,,, (36 in 0:20-cv-00231-NDF) Motion to Compel, filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Brown, Zhonette) (Entered: 02/22/2021) |
| 02/22/2021 | 81 | SUPPLEMENT re (36 in 0:20-cv-00231-NDF) Motion to Compel, filed by Plaintiffs Center for Biological Diversity, Sierra Club. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 02/22/2021) |

| 02/22/2021 | 82 | SUPPLEMENT re (41 in 0:20-cv-00231-NDF) Response in Opposition to Motion,, filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH. (Attachments: # 1 Exhibit "A" (Respondents' Response to Petitioners, the Western Watersheds Project, et al.'s Motion for a Preliminary Injunction in Case No. 20-cv-860 (DDC)), # 2 Exhibit "B" (Declaration of Lisa Solberg Schwab, Fish and Wildlife Service) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Grosko, J) (Entered: 02/22/2021) |
|---|---|---|
| 03/05/2021 | 83 | *Respondents'* BRIEF *on Citations to Administrative Records* re (73 in 0:20-cv-00231-NDF, 73 in 0:20-cv-00231-NDF) Order on Motion to File Reply/Brief/Supplement (Non-Dispositive),, Order on Motion for Order, filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Exhibit "A" (Complaint, Western Watersheds Project, et al. v. Bernhardt, et al., No. 20-cv-860 (D.D.C.)), # 2 Proposed Order) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Grosko, J) (Entered: 03/05/2021) |
| 03/05/2021 | 84 | NOTICE by Plaintiffs Center for Biological Diversity, Sierra Club *Regarding Supplemental Administrative Record* Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 03/05/2021) |
| 03/05/2021 | 85 | BRIEF *Regarding Citations to the Administrative Record* re (73 in 0:20-cv-00231-NDF, 73 in 0:20-cv-00231-NDF) Order on Motion to File Reply/Brief/Supplement (Non-Dispositive),, Order on Motion for Order, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 03/05/2021) |
| 03/05/2021 | 86 | *Defendant-Intervenor State of Wyoming's* BRIEF *on Citations to the Administrative Record* re (73 in 0:20-cv-00231-NDF, 73 in 0:20-cv-00231-NDF) Order on Motion to File Reply/Brief/Supplement (Non-Dispositive),, Order on Motion for Order, filed by Intervenor Defendant State of Wyoming. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Jerde, Jay) (Entered: 03/05/2021) |
| 03/05/2021 | 87 | *Rancher Intervenors'* BRIEF *Regarding Proper Scope of Administrative Record for Administrative Procedure Act Challenges to Final Agency Actions* re (37 in 0:20-cv-00231-NDF) Motion to Compel,,,, (36 in 0:20-cv-00231-NDF) Motion to Compel, filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Brown, Zhonette) (Entered: 03/05/2021) |
| 03/19/2021 | 88 | REPLY BRIEF re (85 in 0:20-cv-00231-NDF) Brief, (84 in 0:20-cv-00231-NDF) Notice (Other) filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Fish and Wildlife Service, United States Forest Service. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Grosko, J) (Entered: 03/19/2021) |
| 03/19/2021 | 89 | REPLY BRIEF re (87 in 0:20-cv-00231-NDF) Brief,, (86 in 0:20-cv-00231-NDF) Brief, (83 in 0:20-cv-00231-NDF) Brief,, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 03/19/2021) |
| 03/19/2021 | 90 | REPLY BRIEF re (85 in 0:20-cv-00231-NDF) Brief, *regarding Proper Scope of Administrative Record for Administrative Procedure Act Challenges to Final Agency Actions* filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle |

| | | |
|---|---|---|
| | | Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Brown, Zhonette) (Entered: 03/19/2021) |
| 03/19/2021 | 91 | REPLY BRIEF re (84 in 0:20-cv-00231-NDF) Notice (Other) filed by Plaintiffs Center for Biological Diversity, Sierra Club. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 03/19/2021) |
| 03/25/2021 | 92 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File Reply/Brief/Supplement (Non-Dispositive) *in Surreply to Rancher Intervenors' Reply Brief* filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 03/25/2021) |
| 03/26/2021 | 93 | (TEXT-ONLY) ORDER by the Honorable Kelly H Rankin granting (92) Motion to File Reply/Brief/Supplement (Non-Dispositive) in case 0:20-cv-00231-NDF. Petitioners' Motion for Leave to File a Surreply Regarding Proper Scope of the Administrative Record 92 is granted. After careful consideration of Petitioners' Motion, the Court finds good cause for the request to file additional briefing. Therefore, Petitioners may file a single brief up to two pages addressing the issue on or before April 2, 2021. Additionally, Respondents may file a single brief of up to two pages addressing any issues raised in Petitioners' surreply seven days after Petitioners file a surreply. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sjgc) (Entered: 03/26/2021) |
| 03/26/2021 | 94 | *Surreply* BRIEF *Regarding Proper Scope of Administrative Record* re (90 in 0:20-cv-00231-NDF) Reply Brief, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 03/26/2021) |
| 04/27/2021 | 95 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Extension of Time (Non-Dispositive) requesting extension of Deadline for filing Supplemental Administrative Record for Western Watersheds Project, et al.'s National Forest Management Act Claim filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Grosko, J) (Entered: 04/27/2021) |
| 04/28/2021 | 96 | (TEXT-ONLY) ORDER by the Honorable Kelly H Rankin granting (95) Motion for Extension of Time in case 0:20-cv-00231-NDF. Respondents deadline to respond to serve and lodge the supplemental administrative record 73 is extended to and including May 3, 2021. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, smh) (Entered: 04/28/2021) |
| 05/03/2021 | 97 | NOTICE of Filing Administrative Record by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Fish and Wildlife Service, United States Forest Service, DAVID L. BERNHARDT, United States Fish and Wildlife Service, United States Forest Service (Attachments: # 1 Declaration of A. DeLong, # 2 Index) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Norway, Robert) 2 CD's containing the Administrative Record received in the Office of the Clerk on 5/3/2021 - 1 delivered to NDF chambers, 1 kept in Clerk's Office. (Court Staff, sal) (Entered: 05/03/2021) |
| 06/02/2021 | 98 | ORDER LIMITING THE PARTIES CITATIONS TO THE ADMINISTRATIVE RECORD EACH AGENCY COMPILED FOR THE CHALLENGED AGENCY DECISION AND ORDER TERMINATING ALL PENDING MOTIONS AND ORDER SETTING BRIEFING SCHEDULE by the Honorable Kelly H Rankin. See Order for new deadlines.Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 06/02/2021) |

| | | |
|---|---|---|
| 06/17/2021 | 99 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Extension of Time (Non-Dispositive) requesting extension of Record Motion Deadline of Petitioners filed by Plaintiffs Alliance for the Wild Rockies, Center for Biological Diversity, Sierra Club, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 06/17/2021) |
| 06/18/2021 | 100 | (TEXT-ONLY) ORDER by the Honorable Kelly H Rankin granting (99) Motion for Extension of Time in case 0:20-cv-00231-NDF. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF. Petitioners may file motions regarding the administrative record by July 9, 2021. (Court Staff, smh) (Entered: 06/18/2021) |
| 07/02/2021 | 101 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct (66 in 0:20-cv-00231-NDF) Amended Complaint, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Supplemented and Amended Petition, # 2 Exhibit 2021 AOIs, # 3 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) Modified to unrefer on 7/2/2021 (Court Staff, scat). (Entered: 07/02/2021) |
| 07/02/2021 | 102 | MOTION REFERRED TO Judge Kelly H Rankin. Second MOTION for Extension of Time (Non-Dispositive) requesting extension of Deadline to File Record Motion filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 07/02/2021) |
| 07/02/2021 | | Motions No Longer Referred: (101 in 0:20-cv-00231-NDF) MOTION to Amend/Correct (66 in 0:20-cv-00231-NDF) Amended Complaint, Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, scat) (Entered: 07/02/2021) |
| 07/06/2021 | 103 | ORDER by the Honorable Kelly H Rankin granting (102) in 0:20-cv-00231-NDF Motion for Extension of Time. WWP et al may file a motion to complete or supplement the administrative record within two weeks (14 days) of the date that the Court resolves the pending motion to supplement and amend their petition for review. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, smh) Modified text on 7/6/2021 (Court Staff, sbh). (Entered: 07/06/2021) |
| 07/09/2021 | 104 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Complete the Record filed by Plaintiffs Alliance for the Wild Rockies, Center for Biological Diversity, Sierra Club, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Santarsiere, Andrea) Modified text on 7/12/2021 (Court Staff, smxb). Modified text on 8/5/2021 (Court Staff, sal). (Entered: 07/09/2021) |
| 07/09/2021 | 105 | MEMORANDUM in Support of (104 in 0:20-cv-00231-NDF) Motion to Amend/Correct, filed by Plaintiffs Alliance for the Wild Rockies, Center for Biological Diversity, Sierra Club, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 07/09/2021) |
| 07/12/2021 | | Motions No Longer Referred: (104 in 0:20-cv-00231-NDF) MOTION to Amend/Correct (84 in 0:20-cv-00231-NDF) Notice (Other) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, smxb) (Entered: 07/12/2021) |
| 07/16/2021 | 106 | OPPOSITION to (101 in 0:20-cv-00231-NDF) Motion to Amend/Correct, filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, State of Wyoming, Upper Green River Cattle |

| | | |
|---|---|---|
| | | Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Brown, Zhonette) (Entered: 07/16/2021) |
| 07/22/2021 | 107 | ~~MOTION REFERRED TO Judge Kelly H. Rankin.~~ Status Report and Unopposed MOTION for clarification regarding the parties' merits briefing schedule (98 in 0:20-cv-00231-NDF, 98 in 0:20-cv-00231-NDF) filed by Defendants DAVID L. BERNHARDT, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Grosko, J) Modified on 7/23/2021 (Court Staff, szf). Text modified on 8/5/2021 (Court Staff, sal). (Entered: 07/22/2021) |
| 07/22/2021 | | Motions No Longer Referred: (107 in 0:20-cv-00231-NDF) MOTION to Amend/Correct (98 in 0:20-cv-00231-NDF, 98 in 0:20-cv-00231-NDF) Order on Motion to Compel,,, Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, szf) (Entered: 07/23/2021) |
| 07/23/2021 | 108 | REPLY to (106 in 0:20-cv-00231-NDF) Opposition, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 07/23/2021) |
| 08/05/2021 | 109 | ORDER SETTING BRIEFING SCHEDULE by the Honorable Nancy D Freudenthal (granting 104 Motion in 0:20-cv-00231-NDF (104 in 0:20-cv-00231-NDF) and granting 107 Motion in 0:20-cv-00231-NDF (107 in 0:20-cv-00234-NDF)). See Order for deadline specifics.Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 08/05/2021) |
| 08/06/2021 | 110 | ORDER by the Honorable Nancy D Freudenthal granting in part and denying in part 101 MOTION to Amend/Correct (101 in 0:20-cv-00234-NDF). WWP shall file the Supplemented and Amended Petition for Review consistent with this Order no later than 8/9/21 and Federal Respondents shall supplement the record consistent with this Order, or provide notice that no additional supplementation is required no later than 8/20/21.Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 08/06/2021) |
| 08/09/2021 | 111 | SUPPLEMENTED AND AMENDED PETITION FOR REVIEW OF AGENCY ACTION filed by YELLOWSTONE TO UINTAS CONNECTION, Alliance for the Wild Rockies, Western Watersheds Project. (Attachments: # 1 Exhibit 2021 AOIs) (Persell, John) Modified text on 8/17/2021 (Court Staff, sjlg). (Entered: 08/09/2021) |
| 08/13/2021 | 112 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File Excess Pages regarding Brief in Support of Forthcoming Record Motion filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 08/13/2021) |
| 08/16/2021 | 113 | ORDER by the Honorable Kelly H Rankin granting (112) Motion to File Excess Pages Non-Dispositive in case 0:20-cv-00231-NDF. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, smh) (Entered: 08/16/2021) |
| 08/19/2021 | 115 | NOTICE by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service, DAVID L. BERNHARDT, United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service *of Lodging Supplemental Administrative Records* (Attachments: # 1 Exhibit A - Declaration Certifying FWS Supplemental Administrative Record, # 2 Exhibit B - FWS Index, # 3 Exhibit C - Declaration Certifying Forest Service Supplemental Records, # 4 Exhibit D - |

| | | |
|---|---|---|
| | | Forest Service ESA Index, # 5 Exhibit E - Forest Service NMFA Index) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Norway, Robert) (Entered: 08/19/2021) |
| 08/20/2021 | 116 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Compel *Completion and Supplementation of Administrative Record* filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Exhibit CBD FOIA Request 10-22-19, # 2 Exhibit USFS FOIA Response Letter 12-5-19, # 3 Exhibit USFS FOIA Response Letter 12-11-19, # 4 Exhibit Persell Declaration 8-20-21, # 5 Exhibit K. Murphy Email 7-15-15, # 6 Exhibit D. DeLong Email 7-16-15, # 7 Exhibit A. DeLong Email 7-17-15, # 8 Exhibit D. DeLong Email 8-7-15, # 9 Exhibit G. Hanvey Email 8-7-15, # 10 Exhibit L. Jacobson Email 8-10-15, # 11 Exhibit K. Murphy Email 8-13-15, # 12 Exhibit K. Murphy Email 8-18-15, # 13 Exhibit K. Labrum Email 8-30-15, # 14 Exhibit D. DeLong Email 9-11-15, # 15 Exhibit D. DeLong Email 4-19-16, # 16 Exhibit D. DeLong Email 6-27-16, # 17 Exhibit K. Murphy Email 6-28-16, # 18 Exhibit D. DeLong Email 6-29-16, # 19 Exhibit K. Murphy Email 8-3-16, # 20 Exhibit D. DeLong Email 8-4-16, # 21 Exhibit P. Bode Email 8-30-16, # 22 Exhibit P. Bode Email 8-31-16, # 23 Exhibit A. Roberts Email 9-1-16, # 24 Exhibit K. Murphy Draft Amphibians Report 2-16-16, # 25 Exhibit Mattson Declaration 5-7-20, # 26 Exhibit Clark et al. 2017, # 27 Exhibit Ebinger et al. 2016, # 28 Exhibit Eklund et al. 2017, # 29 Exhibit Gergel et al. 2017, # 30 Exhibit Haswell et al. 2019, # 31 Exhibit Luce 2018, # 32 Exhibit Lute et al. 2018, # 33 Exhibit MacFarlane et al. 2013, # 34 Exhibit Mattson et al. 1991, # 35 Exhibit Mattson 1997, # 36 Exhibit Mattson 2000, # 37 Exhibit Merrill & Mattson 2003, # 38 Exhibit Miller et al. 2016, # 39 Exhibit Moreira-Arce et al. 2018, # 40 Exhibit Mowat et al. 2013, # 41 Exhibit Murie 1948, # 42 Exhibit Schwartz et al. 2014, # 43 Exhibit Treves & Naughton-Treves 2005, # 44 Exhibit Treves et al. 2016, # 45 Exhibit Wells et al. 2018, # 46 Exhibit Notice of Intent Letter 1-21-20, # 47 Exhibit Akland Declaration 10-14-20, # 48 Exhibit WWP-DOJ Email Conferral 9-4-20 to 9-21-20, # 49 Exhibit WWP-DOJ Email Conferral 5-26-21 to 6-10-21, # 50 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 08/20/2021) |
| 08/20/2021 | 117 | MEMORANDUM in Support of (116 in 0:20-cv-00231-NDF) Motion to Compel,,,,,,,,,, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 08/20/2021) |
| 08/20/2021 | 118 | MOTION REFERRED TO Judge Kelly H Rankin. Joint MOTION for Extension of Time (Non-Dispositive) requesting extension of Time to File Responses and Reply re: Record Motion filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 08/20/2021) |
| 08/23/2021 | 119 | ORDER by the Honorable Kelly H Rankin granting (118) Motion for Extension of Time in case 0:20-cv-00231-NDF. Respondents time to file their respective responses to WWP Petitioners record motion is extended through and including September 14, 2021. WWP Petitioners time to file any reply in support of the record motion is extended through and including September 27, 2021. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, smh) Modified text on 8/27/2021 (Court Staff, sjlg). (Entered: 08/23/2021) |
| 08/27/2021 | 120 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Joseph A. Bingham to appear pro hac vice; Check not tendered; filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Stubson, Timothy) (Entered: 08/27/2021) |
| 08/27/2021 | 121 | ORDER by the Honorable Kelly H Rankin granting 120 MOTION for Joseph A. Bingham to appear pro hac vice on behalf of Intervenor Defendants SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association, Murdock Land and Livestock Co., Price Cattle Ranch. Associated Cases: 0:20-cv-00231-NDF; 0:20-cv-00234-NDF (cc: order emailed to pro hac vice counsel on this date). (Court Staff, stmo) Modified on 8/27/2021 (Court Staff, stmo). (Entered: 08/27/2021) |
| 08/30/2021 | | FINANCIAL ENTRY: PAYMENT OF $100 RECEIVED FOR PRO HAC VICE FEE FOR JOSEPH A BINGHAM. RECEIPT CHY035191. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sjk) (Entered: 08/31/2021) |
| 09/02/2021 | 122 | RESPONSE to (116 in 0:20-cv-00231-NDF) Motion to Compel,,,,,,,,, filed by Intervenor Defendant State of Wyoming. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Jerde, Jay) (Entered: 09/02/2021) |
| 09/14/2021 | 123 | RESPONSE in Opposition re (116 in 0:20-cv-00231-NDF) MOTION to Compel *Completion and Supplementation of Administrative Record* filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Affidavit Exh. 1 (Decl. of R. Hoelscher, USFS), # 2 Affidavit Exh. 2 (Decl. of Patricia M. O'Connor, USFS), # 3 Affidavit Exh. 3 (Decl. of Randall Griebel, USFS)) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Grosko, J) (Entered: 09/14/2021) |
| 09/14/2021 | 124 | BRIEF in Opposition to (116 in 0:20-cv-00231-NDF) MOTION to Compel *Completion and Supplementation of Administrative Record* filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sjlg) (Entered: 09/15/2021) |
| 09/15/2021 | 125 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Leave to File Excess Pages regarding Response to Western Watersheds Project, et al.'s Motion to Augment and Supplement the Administrative Record filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Grosko, J) (Entered: 09/15/2021) |
| 09/16/2021 | 126 | ORDER by the Honorable Kelly H Rankin granting (125) Motion to File Excess Pages Non-Dispositive in case 0:20-cv-00231-NDF. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sag) (Entered: 09/16/2021) |
| 09/27/2021 | 127 | REPLY BRIEF re (116 in 0:20-cv-00231-NDF) Motion to Compel,,,,,,,,, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 09/27/2021) |
| 10/04/2021 | 128 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order Setting Status Conference filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 10/04/2021) |

| | | |
|---|---|---|
| 10/06/2021 | 129 | ORDER by the Honorable Kelly H Rankin denying (128) Motion for Order Setting Status Conference in case 0:20-cv-00231-NDF. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Court Staff, sag) (Entered: 10/06/2021) |
| 10/14/2021 | 130 | ORDER by the Honorable Kelly H Rankin denying (116) Motion to Compel in case 0:20-cv-00231-NDF. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sag) (Entered: 10/14/2021) |
| 11/18/2021 | 131 | MOTION for Leave to File Excess Pages regarding Principal Briefs filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 11/18/2021) |
| 11/23/2021 | 132 | ORDER by the Honorable Nancy D Freudenthal denying (131) Motion to File Excess Pages in case 0:20-cv-00231-NDF; denying (132) Motion to File Excess Pages in case 0:20-cv-00234-NDF Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sjlg) (Entered: 11/23/2021) |
| 11/29/2021 | 133 | Petitioners' OPENING BRIEF re (111 in 0:20-cv-00231-NDF) Amended Complaint, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Exhibit Declaration of Jason Christensen, # 2 Exhibit Declaration of Jonathan B. Ratner) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) Text modified on 11/29/2021 (Court Staff, sal). (Entered: 11/29/2021) |
| 11/29/2021 | 134 | NOTICE OF WITHDRAWL OF COUNSEL by Intervenor Defendant State of Wyoming. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Shaw, Kelly) Modified on 11/29/2021 (Court Staff, sal). (Entered: 11/29/2021) |
| 11/29/2021 | 135 | *Petitioners' Opening* BRIEF filed by Plaintiffs Center for Biological Diversity, Sierra Club. (Attachments: # 1 Affidavit Decl of Meredith Taylor, # 2 Affidavit Decl of Jim Laybourn) Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 11/29/2021) |
| 11/30/2021 | 136 | NOTICE of Attorney Appearance by Joseph Bingham on behalf of MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Bingham, Joseph) (Entered: 11/30/2021) |
| 12/01/2021 | 137 | ~~MOTION REFERRED TO Judge Kelly H Rankin.~~ MOTION to Amend/Correct (109 in 0:20-cv-00231-NDF, 109 in 0:20-cv-00231-NDF) Order on Motion to Amend/Correct,,, *Case Management Deadlines* filed by Defendants United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Grosko, J) Modified on 12/2/2021 (Court Staff, smxb). (Entered: 12/01/2021) |
| 12/01/2021 | 138 | Joint OPPOSITION to (137 in 0:20-cv-00231-NDF) Motion to Amend/Correct, filed by Plaintiffs Alliance for the Wild Rockies, Center for Biological Diversity, Sierra Club, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 12/01/2021) |
| 12/02/2021 | | Motions No Longer Referred: 137 MOTION to Amend/Correct (109 in 0:20-cv-00231-NDF, 109 in 0:20-cv-00231-NDF) Order on Motion to Amend/Correct,,, *Case Management Deadlines* (Court Staff, smxb) (Entered: 12/02/2021) |
| 12/02/2021 | 139 | ORDER by the Honorable Nancy D Freudenthal granting in part (137 in 0:20-cv-00231- |

| | | |
|---|---|---|
| | | NDF, 138 in 0:20-cv-00234-NDF) MOTION to Revise Case Management Deadlines. See Order for deadlines.Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 12/02/2021) |
| 01/19/2022 | 140 | *Federal Respondents' Merits* BRIEF filed by Defendants DAVID L. BERNHARDT, AURELIA SKIPWITH, United States Department of Interior Secretary, United States Fish and Wildlife Service, United States Forest Service. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Norway, Robert) (Entered: 01/19/2022) |
| 01/26/2022 | 141 | *Respondent-Intervenor State of Wyoming's Response* BRIEF re (135 in 0:20-cv-00231-NDF) Brief, (133 in 0:20-cv-00231-NDF) Brief, filed by Intervenor Defendant State of Wyoming. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Jerde, Jay) (Entered: 01/26/2022) |
| 01/26/2022 | 142 | BRIEF filed by Intervenor Defendants MURDOCK LAND AND LIVESTOCK CO., PRICE CATTLE RANCH, SOMMERS RANCH, LLC, Upper Green River Cattle Association, Wyoming Stock Growers Association. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Brown, Zhonette) (Entered: 01/26/2022) |
| 02/16/2022 | 143 | MOTION for Leave to File Excess Pages regarding Reply Merits Brief filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Attachments: # 1 Proposed Order)Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Persell, John) (Entered: 02/16/2022) |
| 02/18/2022 | 144 | ORDER by the Honorable Nancy D Freudenthal granting (143) Motion to File Excess Pages in case 0:20-cv-00231-NDF; granting (144) Motion to File Excess Pages in case 0:20-cv-00234-NDF Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF(Court Staff, sal) (Entered: 02/18/2022) |
| 02/23/2022 | 145 | REPLY BRIEF re (142 in 0:20-cv-00231-NDF) Brief, (133 in 0:20-cv-00231-NDF) Brief, (140 in 0:20-cv-00231-NDF) Brief, (141 in 0:20-cv-00231-NDF) Brief, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Persell, John) (Entered: 02/23/2022) |
| 02/23/2022 | 146 | REPLY BRIEF re (135 in 0:20-cv-00231-NDF) Brief, (142 in 0:20-cv-00231-NDF) Brief, (140 in 0:20-cv-00231-NDF) Brief, (141 in 0:20-cv-00231-NDF) Brief, filed by Plaintiffs Center for Biological Diversity, Sierra Club. Associated Cases: 0:20-cv-00231-NDF, 0:20-cv-00234-NDF (Santarsiere, Andrea) (Entered: 02/23/2022) |
| 05/17/2022 | 147 | OPINION AND ORDER by the Honorable Nancy D Freudenthal. CBD's Amended Complaint/Petition for Review and WWP's Supplemented and Amended Petition for Review of Agency Action are dismissed.Associated Cases: 2:20-cv-00231-NDF, 2:20-cv-00234-NDF(Court Staff, sal) (Entered: 05/17/2022) |
| 06/01/2022 | 148 | JUDGMENT in favor of Respondents against Petitioners Associated Cases: 2:20-cv-00231-NDF, 2:20-cv-00234-NDF(Court Staff, sal) (Entered: 06/01/2022) |
| 06/10/2022 | 149 | NOTICE OF APPEAL as to (148 in 2:20-cv-00231-NDF, 147 in 2:20-cv-00231-NDF) Judgment, (149 in 2:20-cv-00234-NDF, 148 in 2:20-cv-00234-NDF) Order dismissing case, filed by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION. (Persell, John) Modified text to reflect correct documents being appealed on 6/13/2022 (Court Staff, stbd). (Entered: 06/10/2022) |
| 06/10/2022 | 150 | Preliminary Record of appeal sent to USCA and counsel re (149 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney), **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 |

| | | |
|---|---|---|
| | | Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 06/10/2022) |
| 06/10/2022 | 151 | USCA Appeal Fees received $ 505 receipt number CHY036499 re (149 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney), filed by Western Watersheds Project, Alliance for the Wild Rockies, YELLOWSTONE TO UINTAS CONNECTION (Court Staff, smxb) (Entered: 06/10/2022) |
| 06/10/2022 | 152 | Appeal Number **22-8031** received from USCA for (149 in 2:20-cv-00231-NDF) (150 in 2:20-cv-00234-NDF) Notice of Appeal (Attorney), filed by Western Watersheds Project, Alliance for the Wild Rockies, YELLOWSTONE TO UINTAS CONNECTION. Docketing statement, transcript order form and notice of appearance due 06/24/2022 for Alliance for the Wild Rockies, Western Watersheds Project and Yellowstone to Uintas Connection. Notice of appearance due on 06/24/2022 for Debra A. Haaland, Murdoch Land and Livestock Co., Price Cattle Ranch, Sommers Ranch, LLC, State of Wyoming, United States Fish and Wildlife Service, United States Forest Service, Upper Green River Cattle Association and Wyoming Stock Growers Association. (Court Staff, stbd) Modified to add member case appeal information on 6/13/2022 (Court Staff, stbd). (Entered: 06/13/2022) |
| 06/17/2022 | 153 | TRANSCRIPT REQUEST (No Transcripts Necessary) by Plaintiffs Alliance for the Wild Rockies, Western Watersheds Project, YELLOWSTONE TO UINTAS CONNECTION re (149 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney),. (Persell, John) (Entered: 06/17/2022) |
| 06/17/2022 | 154 | (TEXT-ONLY) APPEAL ORDER from USCA as to (149) in 2:20-cv-00231-NDF Notice of Appeal filed by Western Watersheds Project, Alliance for the Wild Rockies, YELLOWSTONE TO UINTAS CONNECTION. **Record on Appeal/Notice due 6/24/2022**. (Court Staff, sbh) (Entered: 06/17/2022) |
| 06/21/2022 | 155 | Transcript Letter transmitted to USCA re (149) in 2:20-cv-00231-NDF Notice of Appeal. No transcripts have been ordered for this appeal. For purpose of appeal, the record is now ready. (Court Staff, sbh) (Entered: 06/21/2022) |
| 06/21/2022 | 156 | Appeal Remark re (149 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney); Appellants' brief and appendix due on 08/01/2022 for Alliance for the Wild Rockies, Western Watersheds Project and Yellowstone to Uintas Connection. (Court Staff, stbd) (Entered: 06/21/2022) |
| 07/07/2022 | 157 | NOTICE OF APPEAL as to (147 in 2:20-cv-00231-NDF, 148 in 2:20-cv-00231-NDF) Judgment, (148 in 2:20-cv-00234-NDF, 149 in 2:20-cv-00234-NDF) Order dismissing case filed by Plaintiffs Center for Biological Diversity, Sierra Club. (Santarsiere, Andrea) Modified text to identify documents being appealed on 7/7/2022 (Court Staff, stbd). (Entered: 07/07/2022) |
| 07/07/2022 | 158 | USCA Appeal Fees received $ 505 receipt number CHY036631 re (157 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney), filed by Center for Biological Diversity, Sierra Club (Court Staff, stmo) (Entered: 07/07/2022) |
| 07/07/2022 | 159 | Preliminary Record of appeal sent to USCA and counsel re (157 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney), **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 07/07/2022) |
| 07/08/2022 | 160 | Appeal Number **22-8043** received from USCA for (157 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney), filed by Center for Biological Diversity, Sierra Club. Docketing statement, transcript order form and entry of appearance due 07/22/2022 for Center for |

| | | |
|---|---|---|
| | | Biological Diversity and Sierra Club. Notice of appearance due on 07/22/2022 for Debra A. Haaland, Murdoch Land and Livestock Co., Price Cattle Ranch, Sommers Ranch, LLC, State of Wyoming, United States Fish and Wildlife Service, United States Forest Service, Upper Green River Cattle Association and Wyoming Stock Growers Association. (Court Staff, stbd) (Entered: 07/08/2022) |
| 07/18/2022 | 161 | TRANSCRIPT REQUEST (No Transcripts Necessary) by Plaintiffs Center for Biological Diversity, Sierra Club re (157 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney),. (Santarsiere, Andrea) (Entered: 07/18/2022) |
| 07/18/2022 | 162 | (TEXT-ONLY) APPEAL ORDER from USCA as to (157 in 2:20-cv-00231-NDF) Notice of Appeal [22-8043], filed by Center for Biological Diversity, Sierra Club **Record on appeal/Notice due 7/25/2022**) (Court Staff, stbd) (Entered: 07/18/2022) |
| 07/28/2022 | 163 | Transcript Letter transmitted to USCA re (157 in 2:20-cv-00231-NDF) Notice of Appeal (Attorney). No transcripts have been ordered for this appeal. For purpose of appeal, the record is now ready. (Court Staff, stbd) (Entered: 07/28/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/09/2022 15:36:43 | | |
| **PACER Login:** | lwoloshin | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-00231-NDF |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
1411 K Street, NW, Suite 1300
Washington, D.C. 20005

*and*

SIERRA CLUB,
2101 Webster Street, Suite 1300
Oakland, CA 94612

              Plaintiffs,

    v.

DAVID BERNHARDT, *in his official
capacity as Secretary of the United States
Department of the Interior*,
1849 C Street NW
Washington, D.C. 20240,

AURELIA SKIPWITH, *in her official
capacity as the Director of the United States
Fish and Wildlife Service*,
1849 C Street NW
Washington, D.C. 20240

UNITED STATES FISH AND WILDLIFE
SERVICE,
1849 C Street NW
Washington, D.C. 20240

*and*

UNITED STATES FOREST SERVICE,
1400 Independence Avenue SW
Washington, D.C. 20250

           Defendants.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Case No.:  1:20-CV-00855

## **INTRODUCTION**

1.      In this action, Plaintiffs challenge the U.S. Fish and Wildlife Service's ("FWS")

issuance of, and the U.S. Forest Service's ("Forest Service") reliance on, a flawed Biological

Opinion regarding the negative impacts to grizzly bears that arise from the Forest Service's

authorization of continued livestock grazing in prime grizzly bear habitat within the Bridger-

Teton National Forest, in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-

1544.

2.      Specifically, the Forest Service has authorized livestock grazing for cattle for ten

years, through the 2028 grazing season, on numerous allotments in the Upper Green River Area

Rangeland Project area ("Project"), encompassing the headwaters of both the Green and Gros

Ventre River and approximately 170,643 acres.  The closest allotment lies less than 30 miles

from the boundary of Grand Teton National Park.

3.      As a result of previous and ongoing livestock grazing, the Upper Green River

Area represents the highest number of grizzly bear conflicts in the entire Greater Yellowstone

Ecosystem ("GYE"), and thus has become a sink for grizzly bears.  Since 1999, 37 grizzly bears

have been killed in the Project's action area, including 35 on the Upper Green grazing

allotments.

4.      Recognizing that continued livestock grazing was likely to be detrimental to

grizzly bears, the Forest Service initiated consultation with FWS as required under Section 7 of

the ESA.  16 U.S.C. § 1536(a)(2).  Following consultation, FWS issued a Biological Opinion in

2019 ("2019 BiOp") approving the killing of up to 72 grizzly bears over the ten-year life of the

Project.  The anticipated and exempted lethal removal of up to 72 bears nearly doubles the number of grizzly bears killed in the project area over the past 20 years

5.     FWS concluded that despite the high number of bears that may be killed as a result of the authorized livestock grazing, the Project would not jeopardize grizzly bears.  FWS relied upon the Forest Service's commitment to implement enumerated conservation measures to reach its no jeopardy conclusion.

6.     Because FWS must rely upon the livestock permittees to implement several of the conservation measures, FWS cannot presume that the measures are reasonably certain to occur.  Thus, FWS's reliance upon these conservation measures cannot satisfy the ESA's mandate to ensure that the grazing authorization will not jeopardize grizzly bears.

7.     Many of the conservation measures also contain vague language, lack specificity, are mere recommendations, or are subject to agency discretion.  Thus, even if the Forest Service is committed to enforcing the conservation measures, the unclear language and voluntary nature of the conservation measures makes it difficult for the agency to enforce them.

8.     Even if the Forest Service and the permittees fully implement the conservation measures, these measures are insufficient to protect grizzly bears or minimize conflicts in the project area, as explained in detail below.

9.     Furthermore, FWS acknowledged that grizzly bear mortality across the GYE is high and increasing but failed to consider whether the high level of take permitted by the 2019 BiOp may jeopardize the grizzly bear population in connection with the increasing mortality rates across the ecosystem.

10.     For these reasons, FWS's no jeopardy conclusion is arbitrary and capricious, and the Forest Service's reliance on that conclusion and the invalid 2019 Biological Opinion is unlawful.  5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

11.     This action arises under the ESA, 16 U.S.C. § 1531 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §§ 1540(c), (g)(1)(c) (action arising under the ESA and citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act).

12.     Venue in this Court is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because this civil action is brought against agencies of the United States and officers and employees of the United States acting in their official capacities under the color of legal authority, a substantial part of the events giving rise to the claim occurred in the District of Columbia, and no real property is involved in this action.  Plaintiffs Center for Biological Diversity and Sierra Club also maintain offices in this judicial district.

13.     Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to sue on January 21, 2020, as required by 16 U.S.C. § 1540(g)(2)(C).

## PARTIES

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices in Arizona, California, Colorado, the District of Columbia, Florida, Hawai'i, Idaho, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Washington, and Mexico. The Center has more than 74,000 active members,

4

including members within the grizzly bear's current and historic range.  The Center and its members have a long-standing interest in conserving native species in the American West and have routinely advocated for the conservation and protection of native species, including grizzly bears.

15.   The Sierra Club is a national non-profit organization with 67 chapters and more than 796,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club and its members have advocated for grizzly bear recovery and protection of grizzly bear habitat in the Greater Yellowstone Ecosystem for more than 20 years.

16.   Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation and recovery of imperiled species, including grizzly bears in the Greater Yellowstone Ecosystem.  To further these goals, Plaintiffs have participated in various agency proceedings and public comment opportunities to protect and recover grizzly bears, including FWS delisting proposals and Forest Service projects that may negatively impact grizzly bears in and around the project area.

17.   Specific to the Upper Green River Area Rangeland Project, Plaintiffs actively participated in all stages of the Project, submitting comments throughout the National Environmental Policy Act process, including during initial scoping for the project, and providing comments on the Draft Environmental Impact Statement.  Following publication of a Final Environmental Impact Statement, Plaintiffs participated extensively in the objection process provided for under the National Forest Management Act.  Plaintiffs submitted two written

5

objections each, and participated in two objection process meetings with the Forest Service and other objectors.  Plaintiffs also submitted a written letter to the Forest Service following the mandatory objection process to summarize concerns about the Project, mainly highlighting apprehensions regarding the protection and conservation of grizzly bears in the project area.

18.     Plaintiffs' staff and members live near and regularly visit areas in and around the project area, often using these areas for various recreational pursuits, including to observe and photograph grizzly bears in their natural habitat.  Plaintiffs' staff and members have professional, spiritual, aesthetic, and recreational interests in wildlife that may be impacted by the Project. Plaintiffs' staff and members have visited and plan to continue travelling and recreating in these areas, and they will maintain an interest in preserving grizzly bears and grizzly bear habitat in and around the project area in the future.

19.     Plaintiffs' interests in protecting and recovering grizzly bears are directly harmed by the Defendants' approval of the Project.  By approving the killing of up to 72 grizzly bears in the project area, Plaintiffs' professional, spiritual, aesthetic, and recreational interests and enjoyment have been and will continue to be greatly diminished because the Project will thwart grizzly bear recovery and survival, decreasing Plaintiffs' opportunities to see grizzly bears in and around the project area.

20.     Plaintiffs also have an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including the ESA.  Plaintiffs are injured by Defendants' failure to comply with the ESA which they have violated by relying upon conservation measures that are not reasonably certain to occur and lack specificity to find that the Project will not jeopardize grizzly bears.

21.     Defendants' approval of the Project and reliance on the 2019 BiOp without complying with mandatory duties under the ESA and APA have harmed and will continue to harm Plaintiffs' interests.  The injuries described above are actual, concrete injuries presently suffered by Plaintiffs' staff and members and they will continue to occur unless this Court grants relief.  These injuries are directly caused by Defendants' actions and inactions, and the relief sought herein would redress those injuries.  Plaintiffs have no other adequate remedy at law.

22.     Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior.  In this role, Secretary Bernhardt has supervisory responsibility over the United States Fish and Wildlife Service.  Secretary Bernhardt is sued in his official capacity.

23.     Defendant AURELIA SKIPWITH is the Director of the United States Fish and Wildlife Service and is charged with ensuring agency decisions comply with law.  Director Skipwith is sued in her official capacity.

24.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife, such as grizzly bears, and ensuring that agency decisions comply with the ESA and other laws.

25.     Defendant UNITED STATES FOREST SERVICE is a federal agency within the U.S. Department of Agriculture.  The Forest Service is responsible for managing the lands and resources within the Bridger-Teton National Forest in accordance with federal laws and regulations, including the ESA and APA.

## STATUTORY BACKGROUND

26.     The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The ESA provides a means to conserve the ecosystems upon which endangered and threatened species depend and a program to conserve listed species.  16 U.S.C. § 1531(b). The ESA defines "conservation" as the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3), i.e. to bring about the recovery of species listed as endangered or threatened. *See id.* § 1532(6), (20) (definitions of "endangered species" and "threatened species").

27.     To receive the full protections under the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA section 4.  *See id.* § 1533.  An "endangered species" is "any species which is danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

28.     Section 7(a)(2) of the ESA requires each federal agency, in consultation with a federal wildlife agency (FWS for the grizzly bear) to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat.  *Id.* § 1536(a)(2).  To "jeopardize the continued existence of" under the ESA means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

8

29.     To carry out these mandates, the action agency must first ask FWS whether any

listed or proposed species may be present in the area of the agency action.  16 U.S.C.

§ 1536(c)(1); 50 C.F.R. § 402.12.  If listed or proposed species may be present, the action agency

must prepare a "biological assessment" to determine whether the listed species may be affected

by the proposed action.  16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12.  The biological assessment

must generally be completed within 180 days.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

30.     If an agency determines that its action "may affect" but is "not likely to adversely

affect" a listed species or its critical habitat, the regulations permit "informal consultation,"

during which FWS must concur in writing with the agency's determination.  50 C.F.R.

§§ 402.14(a), (b).  If the agency determines that the action is "likely to adversely affect" a listed

species or critical habitat, or if FWS does not concur with the agency's "not likely to adversely

affect" determination, the agency must engage in "formal consultation," as outlined in 50 C.F.R.

§ 402.14.  *Id.* §§ 402.02, 402.14(a).

31.     After FWS evaluates the current status of the listed species and the proposed

action's impacts on the species using the best scientific and commercial data available, FWS

reaches a "biological opinion as to whether the action, taken together with cumulative effects, is

likely to jeopardize the continued existence of listed species . . . ."  16 U.S.C. § 1536(a)(2); 50

C.F.R. §§ 402.14(d), (g)(4).  If FWS concludes that the proposed action "will jeopardize the

continue existence" of a listed species, the biological opinion must outline "reasonable and

prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).

32.     In addition, FWS must provide an "incidental take statement" if FWS concludes

that an action is not likely to jeopardize the continued existence of a listed species or result in the

destruction or adverse modification of critical habitat, either as proposed or through the

implementation of the reasonable and prudent alternatives described in the biological opinion. The incidental take statement must specify the amount or extent of such incidental taking on the listed species; any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact; and the "terms and conditions" with which the action agency must comply to implement those measures. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(i). Taking of listed species without the coverage of an incidental take statement is a violation of the ESA. 16 U.S.C. § 1538.

33.     A biological opinion produced through formal consultation under the ESA is a final agency action subject to judicial review under the arbitrary and capricious standard of the Administrative Procedure Act. *Bennett v. Spear*, 520 U.S. 154, 178 (1997); 5 U.S.C. § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

34.     Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on a flawed biological opinion to satisfy its ESA section 7 duty is arbitrary and capricious and unlawful under the ESA. 16 U.S.C. § 1536(a)(2); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 146 (D.D.C. 2016).

## FACTUAL BACKGROUND

### I. The Upper Green River Area Rangeland Project

35.     The Upper Green River Area Rangeland Project area, which encompasses the headwaters of both the Green River and Gros Ventre River, lies approximately 30 miles northwest of Pinedale, Wyoming in the Bridger-Teton National Forest.

36.     The project area is within the Greater Yellowstone Ecosystem, which the Forest Service describes as one of the largest intact ecosystems remaining in the temperate zones of the world.  Of the 170,643-acre project area, 17,818 acres lie in designated Wilderness areas—12,447 acres in the Gros Ventre Wilderness and 5,371 acres in the Bridger Wilderness.  And while the Forest Service's delineation of the project area does not include Grand Teton National Park, the closest grazing allotment lies less than 30 miles from the park boundary.

37.     The project area contains six grazing allotments:  Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Wagon Creek, and Upper Green River.  Allotment management plans and other direction permit approximately 9,089 livestock—including 9,042 cow/calf pairs and yearlings and 47 horses—to graze these allotments from June 14 to October 15 annually.

38.     There are 21 different people authorized to graze cattle and/or horses in the project area, for a maximum permitted use of approximately 46,148 animal unit months.  An animal unit month is the amount of forage for one mature cow or equivalent for one month based upon an average daily forage consumption of 26 pounds of dry matter.

11

39.     Prior grazing in the project area has led to negative impacts on wildlife, fish, water quality, soil quality, and vegetation.  The Record of Decision authorizes continued grazing in the project area for 10 more years, through the 2028 grazing season.

**II.  Grizzly Bears in the Greater Yellowstone Ecosystem**

40.     Grizzly bears once ranged throughout most of western North America, from the high Arctic to the Sierra Madre Occidental of Mexico, and from the coast of California across most of the Great Plains.  Scientists believe that prior to European settlement, approximately 50,000 grizzly bears occupied the western United States between Canada and Mexico.  With European settlement of the American West and a federally funded bounty program aimed at eradication, grizzly bears were shot, trapped, and poisoned, reducing the population to just two percent of their historic range.

41.     Because of its precipitous decline, FWS listed the grizzly bear as a threatened species in the lower 48 states under the ESA in 1975.  Today scientists estimate there are less than 2,000 grizzly bears left in the lower 48 states, occupying five isolated populations.

42.     In the Greater Yellowstone Ecosystem, FWS and other agencies manage grizzly bears and their habitat by combining the Primary Conservation Area (the existing Yellowstone grizzly bear recovery zone as identified in the 1993 Grizzly Bear Recovery Plan) with adjacent areas where occupancy by grizzly bears is anticipated and acceptable.  Combined, these areas form the Demographic Monitoring Area, within which habitat is considered suitable to support grizzly bears and recovery criteria for grizzly bears are assessed.  The Upper Green allotments all lie within the Demographic Monitoring Area.

43.     Although grizzly bears in the Greater Yellowstone Ecosystem have increased under the protections of the ESA, these bears still face a host of threats.  For example, with the severe decline of traditional food sources such as whitebark pine seeds and Yellowstone

12

cutthroat trout, bears have been forced to seek food elsewhere and have turned to a more meat-based diet. This alternative diet has brought grizzlies into more frequent contact with livestock and with humans, such as hunters.

44.    As a result, conflicts with grizzly bears within the GYE have been on the rise, leading to record-high numbers of grizzly bear mortalities in recent years. The 2019 BiOp estimates 62 grizzly bear deaths in 2018, 66 in 2017, 58 in 2016, and 70 in 2015, compared with 28 grizzly bear mortalities in 2014 and 29 in 2013.

45.    The Upper Green area consistently represents the highest number of grizzly bear conflicts in the GYE. Since 1999, a total of 37 grizzly bears have been killed in the project action area, including 35 on the Upper Green allotments. Indeed, the Forest Service and FWS have determined that the area is a population sink for grizzly bears.

46.    In the GYE, home range estimates are 81 square miles for females and 309 square miles for males. Thus, both males and females that reside primarily in Grand Teton National Park may have home ranges that overlap with the project area.

47.    Grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America, resulting primarily from the late age at first reproduction (four and a half to five and a half years), small average litter size (two cubs), and the long interval between litters. Scientists estimate that female grizzly bears may be able to produce two litters in a ten-year period, with one female surviving to reproductive age. Thus, it takes an adult female grizzly bear approximately ten years to replace herself in the wild.

48.    The survival of a female grizzly bear and her cubs enables the grizzly population to grow. Thus, the 1993 Grizzly Bear Recovery Plan found that "providing maximum protection

for females is essential to recovery." And FWS notes that the long-term survival of grizzly bears in the GYE is contingent upon minimizing annual mortality rates, especially for adult females.

49.     The project area is currently occupied by grizzly bears, including females with cubs. Despite the project area's known history as a hotspot for grizzly bear conflicts and associated mortalities, neither the Forest Service nor FWS provide an estimate as to how many female grizzly bears may use lands in the project area, but FWS acknowledges that there has been an increase in the use of the area by female bears with dependent young.

**III. The Forest Service's Consultation History with FWS**

50.     As required by section 7 of the ESA and in response to livestock-grizzly bear conflicts in the Upper Green, the Forest Service has engaged in a series of consultations with FWS to assess the impacts of livestock grazing on grizzly bears.

51.     In 1997, the Forest Service drafted a Biological Assessment ("BA") to assess the impacts of livestock grazing on grizzly bears on six of the nine permitted allotments in the Upper Green area. In 1999, the Forest Service amended that BA and initiated formal consultation with FWS. Following formal consultation, FWS issued a Biological Opinion ("1999 BiOp") on grazing in the Upper Green. In the 1999 BiOp, FWS anticipated and permitted through an Incidental Take Statement ("ITS") the lethal removal of up to five grizzly bears over an indefinite period of time in the Upper Green area. The 1999 BiOp limited permitted take to four males and one female grizzly bear.

52.     In 2009, the Forest Service reached the level of take identified in the 1999 BiOp and consequently reinitiated consultation with FWS in 2010. In its request for further consultation, the Forest Service expanded the area for consideration to encompass three new allotments in the Upper Green area. In 2011, FWS issued an amended BiOp ("2011 BiOp") that anticipated the lethal removal of six grizzly bears within any consecutive three-year period.

14

53.     The following year, in August 2012, the Forest Service determined that it had reached the level of incidental take identified in the 2011 BiOp, lethally removing six grizzly bears, and again reinitiated consultation.  Later that same month, another grizzly bear was killed, and anticipated take was exceeded.  In total, seven grizzly bears were lethally removed during the 2011-2012 grazing seasons, including 4 bears in 2011 and 3 bears in 2012.

54.     In response, FWS decided to provide "an amended, short-term ITS to the Forest," authorizing the lethal removal of three additional grizzly bears through the end of the 2012 grazing season. No additional grizzly bears were lethally removed through the end of the 2012 grazing season.

55.     In April 2013, the Forest Service reinitiated formal consultation.  In response, FWS issued a revised BiOp anticipating the incidental take of no more than 11 grizzly bears within any three-year period.  Permitted take was limited to eight males and three females.

56.     By the end of the 2013 grazing season, four grizzly bears had been lethally removed, including two males and two females.  Because the Forest Service anticipated that additional females would be killed before the end of the consecutive three-year period, the Forest Service once again reinitiated formal consultation in January 2014.

57.     In 2014, FWS issued another BiOp ("2014 BiOp") and yet again increased the number of grizzly bears that could be lethally removed in the Upper Green area as a result of livestock grazing.  The 2014 BiOp exempted the lethal take of 11 grizzly bears and the relocation of 18 grizzly bears within any three-year period.  The 2014 BiOp, valid through the end of 2019, no longer established separate take allocations by sex.  From 2014 to 2018, 23 grizzly bears were lethally removed.  These lethal removals exceeded the level of exempted take in the 2014 BiOp (for example, 13 bears were killed within the 2015-2017 three-year period, and 15 bears were

15

killed in the three-year period from 2016 to 2018).  Nevertheless, FWS did not issue a new

Biological Opinion until it issued the 2019 BiOp, challenged here.

**IV. The 2019 BiOp**

58.     While the Forest Service was considering its options related to the authorization

of the Upper Green River Area Rangeland Project, it reinitiated consultation with FWS after

determining that most of the Project alternatives under consideration were likely to adversely

affect grizzly bears.  Although a 2016 Supplemental Wildlife Specialist report stated that the

Forest Service would prepare a new biological assessment to obtain a new biological opinion for

the Project, the Forest Service never prepared one. Nevertheless, without the benefit of a new

biological assessment, on April 29, 2019, FWS issued the 2019 BiOp.

59.     In the 2019 BiOp, FWS assessed the impacts from the Project on grizzlies in its

defined action area, which FWS delineated as the grazing allotments plus a 7.5-mile buffer.

FWS chose the boundaries of the action area based upon the agency's interpretation of a 1982

study finding that grizzly bears may generally be drawn to carcasses from a distance of 7.5 miles

away.  In accordance with ESA regulations, the identified action area is meant to reflect "all

areas to be affected directly or indirectly by the Federal action and not merely the immediate area

involved in the action."  50 C.F.R. § 402.02.

60.     FWS predicts in the 2019 BiOp that grizzly bear occupancy and conflicts in the

Project's action area are likely to increase, noting that the number of conflicts in the area has

increased by an average of 9 percent per year since 2010.  As a result, FWS predicts the desire

for lethal removal of grizzly bears will also rise.  To account for the anticipated increase in

grizzly bear occupancy in the action area, FWS approved an ITS exempting the lethal removal of

up to 72 bears over the ten-year life of the Project.  This ITS thus authorizes the lethal removal of

nearly double the number of bears that have been lethally removed in the project area over the past 20 years (37 bears) in half the time.

61.     FWS states that it will review the accuracy of its estimates on the basis of consecutive three-year periods, rather than setting an expectation as to how many bears will be killed on a yearly basis.

62.     Unlike many of the previous biological opinions for the Upper Green area, and despite the importance of female grizzly bear survival for grizzly bear recovery, the ITS does not have a limit on the basis of sex.  Therefore, out of the 72 exempted lethal removals, there is no limit as to how many female grizzly bears may be killed.  FWS fails to explain why it did not include a limit on female take even though it included such a limitation in previous iterations of the BiOp.

63.     FWS acknowledges that females with cubs are increasingly establishing home ranges in the project area and more females may thus be killed for livestock conflicts in the project area than in the past.

64.     Despite FWS's authorization of lethal removal of a large number of grizzly bears, and the absence of a limit on how many female grizzly bears may be killed, FWS concludes that the Project will not jeopardize grizzly bears.

65.     In reaching this no-jeopardy determination, FWS relies heavily on the Forest Service's commitment to implement the conservation measures contained within the BiOp.

66.     The conservation measures are generally meant to prevent grizzly bear conflicts with cattle in order to limit the number of management removals of grizzly bears.  They include bear sanitation guidelines and recommendations for allotment monitoring, watching for sick or

injured cattle, moving carcasses in some circumstances, and meeting with permittees.  The full list of conservation measures is provided in Exhibit 1.  *See also* 2019 BiOp at 7-8.

67.     FWS assumed that the conservation measures will effectively protect grizzly bears even though many of the actions described in the conservation measures have been in place for years with no reduction in the number of reported grizzly bear conflicts from previous years.

68.     FWS must rely upon the Forest Service or the permittees to implement many of the conservation measures.  FWS presumes that the Forest Service will enforce any failure by the permittees to implement the conservation measures.

69.     Nevertheless, FWS premised its conclusion that the Project is not likely to jeopardize grizzly bears on the Forest Service's commitment to implement and enforce the specified conservation measures, as noted in the 2019 BiOp.  FWS states:  "After reviewing the specialists [sic] report, the current status of the grizzly bear in the action area, previous sources of information incorporated by reference (see literature cited), *and the Forest Service's commitment to implement their Conservation measures*, and cumulative effects, it is the Service's biological opinion that the effects of livestock grazing on the Allotments in the northern portions of the Bridger-Teton National Forest's Pinedale Ranger District, west of the Wind River Mountain Range, as proposed, are not likely to jeopardize the continued existence of the grizzly bear."  2019 BiOp at 46 (emphasis added).

70.     FWS does not acknowledge that many of the conservation measures are voluntary or discretionary, are vague and lack specificity, and are not reasonably certain to occur because FWS must rely upon the Forest Service and permittees to implement them.  Moreover, FWS fails to offer any specific and binding plans for implementing the conservation measures, instead

relying upon permittees to take the required actions and relying on the Forest Service to enforce them.

71.     Additionally, many of the conservation measures, even if consistently implemented, will not be effective in protecting grizzly bears.  For example, Conservation Measures 4 and 5 include requirements to move carcasses.  Conservation Measure 4, however, only requires carcasses in the allotments to be moved, "if possible," at least 0.5 miles from identified facilities, trailheads, or roads and at least 0.25 mile from live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites.  Nothing prevents the permittees from moving the carcasses deeper into the grazing allotments to accomplish this goal.  Thus, while this conservation measure may be good from a public safety standpoint, it does little to protect grizzly bears that generally will avoid roads and places with high human presence anyway.  In fact, moving the carcasses away from roads but not removing them from the project area or destroying them may actually draw grizzly bears deeper into the project area, creating a higher risk of cattle being susceptible to grizzly bear predation.

72.     Several of the conservation measures also contain vague language, making it impossible to ensure consistent implementation and enforcement.  For example, Conservation Measure 3 states that "Forest Service employees designated by the Pinedale Ranger District will monitor allotments *on a regular basis*."  *Id.* at 7 (emphasis added).  But the Conservation Measure does not explain what constitutes "a regular basis" or explain what type of monitoring is required, instead leaving these measures open to interpretation.  By contrast, in the 2014 BiOp's Terms and Conditions, FWS required the Forest Service to define what "regular" monitoring would be, including documentation explaining how and when monitoring would be conducted.  This important requirement, which would provide much-needed specificity as to

19

what monitoring will look like and thus how effective it may be, has been removed from the

2019 BiOp.  Without more direct and enforceable language, and specific explanations of how

and when the Forest Service will conduct monitoring, Conservation Measure 3 ensures little

protection for grizzly bears.

73.    Other conservation measures may not even occur because they are voluntary or

are mere recommendations.  Under Conservation Measure 6, for example, the Forest Service

"will recommend" that all permittees and their representatives carry bear spray while working

within the allotments, and additionally recommend that bear spray is holstered or carried so that

it can be readily accessible should a grizzly bear encounter occur.  FWS cannot assume that

recommended actions are reasonably certain to occur, however, and thus cannot rely on this

conservation measure as sufficient to mitigate the negative impacts to grizzly bears from the

Project.

74.    Finally, Conservation Measures 7, 8 and 9 all involve future meetings or

assessments to identify other means of reducing conflicts.  While Plaintiffs support the

commitment to monitor and assess the effectiveness of the conservation measures in the future,

these measures do not provide any definitive actions that will be taken to protect grizzly bears.

75.    FWS also relies upon the demographic recovery criteria mortality thresholds

found in the 2017 Supplement to the 1993 Recovery Plan and the 2016 Conservation Strategy to

rationalize its conclusion that the killing of 72 grizzly bears over the next ten years will not

jeopardize grizzly bears.  The demographic criteria thresholds use a sliding scale to determine

acceptable mortality rates for any sex/age class based upon the current estimated population size.

Given the 2017 estimated population size of 718, the mortality threshold is 9 percent for

independent females and dependent young and 20 percent for males.  These mortality limits are meant to preclude population-level impacts.

76.    FWS explains that because the Forest Service has a commitment to maintain a recovered population, the increased take permitted through the 2019 BiOp will not lead to any exceedance of the mortality thresholds currently in place, and thus will not impact the survival and recovery of the grizzly bear population.

77.    This rationale, however, ignores the high levels of mortality across the rest of the GYE's Demographic Monitoring Area within which these mortality limits apply.  For example, the BiOp recognizes there were 59 documented mortalities within the DMA in 2017, including 12 known and probable female mortalities, which is 8.4 percent of the 2017 population.  There is no reason to believe that mortality rates across the DMA will decrease over the next ten years. In fact, FWS acknowledges that human-grizzly bear interactions and conflicts have been increasing in the GYE.  Thus, while the 8.4 percent mortality level for females is below the 9 percent mortality threshold, the 2019 BiOp and ITS permits an increase in take of females in the DMA, which may lead to the 9 percent threshold being exceeded.  FWS does not consider whether the increased mortality permitted by the 2019 BiOp, with no limit on female take, may lead to an exceedance of the demographic criteria mortality thresholds when added to reasonably foreseeable mortality rates across the DMA over the next ten years.

78.    Moreover, FWS's presumption contradicts its own conclusion that mortality across the GYE may rise above current levels, noting that "[b]ecause more bears are moving into areas with more human and livestock use, we expect even more conflicts and management actions will occur in the future."  2019 BiOp at 29.

79. FWS's presumptions that the increased amount of take in the 2019 BiOp and ITS, in addition to the likelihood of increased mortality across the GYE, will not exceed the recommended mortality thresholds and thus will not jeopardize the grizzly bear population fails to consider an important aspect of the problem by failing to account for high and increasing mortality rates across the GYE.

## FIRST CAUSE OF ACTION

### (FWS's Violation of the ESA and APA)

80. Plaintiffs hereby incorporate all preceding paragraphs.

81. FWS's reliance on implementation of the conservation measures to conclude the Project will not jeopardize grizzly bears is arbitrary because the conservation measures are not "certain to occur." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)).

82. FWS has not shown that the conservation measures are "certain to occur" because FWS must rely upon the Forest Service or permittees to implement them. Reliance on the proposed actions of others does not satisfy the ESA's mandate that agencies insure their actions will not jeopardize protected species. *See Sierra Club*, 816 F.2d at 1385 (citing *Nat'l Wildilfe Fed'n v. Coleman*, 529 F.2d 359, 374 (5th Cir. 1976)).

83. Here, although the 2019 BiOp claims that the Forest Service will require implementation of the grizzly bear conservation measures, 2019 BiOp at 7, "even a sincere general commitment to" implement the conservation measures is inadequate "absent specific and binding plans." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008).

84.     FWS fails to offer any specific and binding plans for implementing the conservation measures, instead relying upon permittees to take the required actions and relying upon the Forest Service to enforce them.  The Forest Service's enforcement actions are completely discretionary and even more tenuous given the discretionary language in the conservation measures themselves.

85.     Reliance on conservation measures to support a no-jeopardy opinion is additionally only appropriate if the conservation measures include "deadlines or other-wise enforceable obligations" and "address the threats to the species in a way that satisfied the jeopardy and adverse modification standards." *Rumsfeld*, 198 F. Supp. 2d at 1152.  Here, however, the conservation measures contain vague language, lack specificity, and are voluntary or discretionary, making enforcement difficult.  And as explained above, the conservation measures are not effective in protecting grizzly bears.

86.     Moreover, to support its no-jeopardy opinion, FWS presumes that increasing the permitted take of grizzly bears under the 2019 BiOp and ITS to 72 lethal removals over the next ten years, with no limits on female take, will not cause population-level impacts to rise to a level that would jeopardize the grizzly bear population.  FWS specifically determines that the permitted level of take will not exceed the mortality thresholds as established in the 2017 Supplement to the 1993 Grizzly Bear Recovery Plan and the 2016 Conservation Strategy.

87.     FWS acknowledges that mortality rates across the GYE are high and increasing, but does not take this into account when estimating whether the anticipated increase in ecosystem-wide mortality, coupled with the increased level of take in the Upper Green, would cause an exceedance of the established mortality thresholds.  This may be especially problematic for females with cubs, given the mortality thresholds are low (9 percent), and FWS has

23

acknowledged that females with cubs are increasingly establishing home ranges in the project area.

88.     The conservation measures are not reasonably certain to occur, because FWS must rely on others to implement them; lack specificity; are vague and unenforceable; and even if implemented will not be effective in protecting grizzly bears. Thus, FWS's reliance on the conservation measures to support the 2019 BiOp's finding that the Project will not jeopardize grizzly bears is arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

89.     Similarly, FWS's presumption that increasing permitted take under the 2019 BiOp and ITS without considering how this may contribute to high and increasing mortality across the GYE to support the 2019 BiOp's no-jeopardy opinion entirely fails to consider an important aspect of the problem and is therefore arbitrary and capricious.  *Id.; Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### SECOND CAUSE OF ACTION

### (The Forest Service's Violation of the ESA and APA)

90.     Plaintiffs hereby incorporate all preceding paragraphs.

91.     Because the no-jeopardy determination in the 2019 BiOp was arbitrary and unlawful for the reasons stated above, the Forest Service could not lawfully rely on that document to discharge that agency's own ESA responsibilities in connection with lethal removal of grizzly bears in the project area.

92.     The ESA requires each agency to "insure that any action authorized, funded, or carried out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  "Consulting with FWS alone does not satisfy an agency's duty under the Endangered Species Act."  *Resources Ltd., Inc. v. Robertson*, 35 F.3d

1300, 1304 (9th Cir. 1994). Because "[a]n agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species[,] its decision to rely on a FWS biological opinion must not have been arbitrary or capricious." *Id.* at 1304 (citation and quotations omitted). *See also Mayo*, 177 F. Supp. 3d at 146 (finding Forest Service's reliance on faulty biological opinion unlawful).

93.     The Forest Service violated the ESA by arbitrarily and capriciously relying on FWS's unlawful 2019 BiOp to satisfy the its duties under the ESA in connection with the anticipated killing of grizzly bears as a result of the Upper Green Project.

94.     Even apart from its reliance on the 2019 BiOp, the Forest Service's authorization of the Project contravenes the no-jeopardy mandate of section 7(a)(2) of the ESA because the Forest Service has no valid factual basis for believing that the conservation measures on which it is relying will in fact be carried out.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that FWS and the Forest Service violated the ESA in connection with FWS's issuance of the 2019 BiOp and the Forest Service's reliance on that document to authorize the Upper Green River Area Rangeland Project;

2.     Set aside FWS's 2019 BiOp and remand the issue of grizzly bear take in connection with the Project for further action consistent with the requirements of the ESA;

3.     Enjoin implementation of all aspects of the Project unless and until Defendants demonstrate compliance with the ESA;

4.     Award Plaintiffs their reasonable attorneys' fees, costs and expenses associated with this litigation; and

5.      Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein.

Dated: March 31, 2020                    Respectfully submitted,

                                         /s/ Andrea Santarsiere
                                         Andrea Santarsiere
                                         (Idaho Bar No. 8818)*
                                         Center for Biological Diversity
                                         P.O. Box 469
                                         Victor, ID  83455
                                         Tel.: (303) 854-7748
                                         Email: asantarsiere@biologicaldiversity.org

                                         /s/ William J. Snape, III
                                         William J. Snape, III
                                         (D.C. Bar No. 455266)
                                         Center for Biological Diversity
                                         1411 K Street, NW, Suite 1300
                                         Washington, D.C.  20005
                                         Tel.: (202) 536-9351
                                         Emails:  bsnape@bioogicaldiversity.org,
                                         wsnape@wcl.american.edu

                                         *Attorneys for Plaintiffs*

                                         *Seeking admission pro hac vice

# EXHIBIT 1

**Conservation Measures**

Conservation measures are consistent with the standards, guidelines, management emphasis for the desired future conditions identified in the Forest Plan and, therefore, are part of the proposed action. The commitments made by the action agency are to contribute to the recovery of the grizzly bear. The FEIS grizzly bear management objective is to minimize the livestock related grizzly bear mortalities. The conservation measures and commitment to grizzly bear recovery identified in the FEIS provide for a balance between livestock grazing management and minimizing grizzly bear conflicts with livestock, in addition, minimizing grizzly bear/human safety concerns.

To help prevent conflicts with grizzly bears in the Upper Green Project Area, the Forest will require implementation of the grizzly bear conservation measures listed below. By reducing the availability of anthropogenic food; decreasing the number of sick, injured, isolated livestock in the allotments; and by removing livestock carcasses, livestock-grizzly bear conflicts will decrease, lowering the number of management removals within the action area.

(1) Bear Sanitation Guidelines will be followed for all camps associated with livestock operations as described and defined in Food Storage Order 04-03-330. Where outdoor toilets are available in Range Camps, keep doors closed and make toilets as "bear proof" as possible.

(2) Riders are required to watch all livestock closely for sick, injured, or stray animals.

(3) Forest Service employees designated by the Pinedale District Ranger will monitor allotments on a regular basis.

(4) On Cattle Allotments: a) all carcasses **located within 0.5 mile** of Green River Lakes Road, Union Pass Rd, FS 605, 660, 663B and 663C, GRL and Whiskey Campgrounds, private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Waterdog Lakes, and North Beaver and Tosi trailheads will be removed if possible or moved so that the carcass is at least **0.5 mile away** from the above described facilities, trailheads or roads; b) all carcasses in locations not described in 1 above that pose a health or safety hazard to the public or to the environment will be removed if possible or moved so that the carcass is at least **0.25 mile from** live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites; and c) all sick or injured animals will be removed or treated. In the event that compliance with this measure is not physically possible, an exception may be granted per the discretion of the Pinedale District Ranger and/or his designated representative. In the event that rider safety is deemed an issue, an exception may be allowed as described in CM #5 below.

(5) Exceptions to requirements for removing or moving carcasses described in **CM #4** may be granted by the Pinedale District Ranger and/or his/her designated representative if human rider or herder safety is of concern. Rider or herder safety concerns include the possible presence of a grizzly bear in the immediate vicinity of carcasses, and carcasses being located in hazardous terrain such that attempting to move or remove may not be possible or unsafe. In such cases, a USFS employee or the WGFD bear specialist will be notified immediately of the hazard location and need for exception.

(6) The Forest will recommend that all permittees and their representatives (herders, riders, or other employees) carry bear spray while working within allotments. Additional recommendations are that spray canisters be holstered or otherwise carried so that they are available for use in the event of encounters with bears; storing spray canisters in back packs, saddle bags, and vehicles are acceptable methods of storage during non-working time periods. Only brands of Bear Spray certified by the Interagency Grizzly Bear Committee are recommended.

(7) Continue to identify and implement opportunities that reduce the potential for grizzly bear conflicts. The Forest has investigated and explored additional means of reducing grizzly bear-livestock conflicts, which included assessments of: a) cattle herding; and, b) where appropriate, and when permittees are willing participants, study sites may be developed within allotments to "test" new management actions.

(8) Through the permitting process and at annual meetings, the USFS will make grazing permittees aware of their responsibilities under the Endangered Species Act (ESA) in regards to laws and regulations concerning the taking of grizzly bears (Interagency Grizzly Bear Guidelines).

(9) Continue to work in cooperation with the Service, the Wyoming Game and Fish Department, and the Interagency Grizzly Bear Study Team to identify and collect information related to the habitat use, survival, reproduction, and depredation tendencies of grizzly bears inhabiting Livestock Grazing Allotments on Northern Portions of the Pinedale Ranger District.

**Action Area**

The action area is defined as all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action. Noise may be caused by the sounds of livestock, herders, riders, dogs, etc. and will extend beyond the boundaries of the grazing allotments. The spatial extent of livestock scent and noise on adjacent lands is highly variable and depends on topographic and weather conditions, the ability of species (e.g., humans or grizzly bears) to detect scents, and the condition of livestock (live or dead). The distance grizzly bears would detect livestock grazing-related odors and noise outside of the allotment is unknown, because grizzly bears are suspected to have a keen sense of smell (Craighead 1976), much greater than that of humans. Craighead (1976) documented grizzly bear movements of approximately 18 miles to feed on a carcass but did not explain how or when the carcass was detected or how researchers attributed the bears' movement to carcass presence. Detectability appears to be site specific. Another grizzly took 60 hours to locate a carcass 1.7 miles away when wind conditions were unfavorable (Craighead 1976). These studies of wild prey carcasses suggest that grizzly bear movement towards the scent of such carcasses is highly variable, and depends on the individual bear, the prey item, weather and topographic conditions, or other factors such as available food resources. Craighead and Mitchell (1982) reported that many grizzly bears moved distances of 5 to 12 km (3.1 to 7.5 miles) to carcasses in Yellowstone National Park, and one adult male moved 30 km (18.6 mi). The smell emanating from carcasses is different from live animals, both of which occur on the allotment.

For purposes of defining the action area, we selected a distance of 7.5 mile beyond the perimeter of the collective allotment boundaries based on the maximum distance many of the bears

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

J. BRETT GROSKO
*Senior Trial Attorney* (Md. Bar)
Wildlife and Marine Resources Section
P.O. Box 7369, Ben Franklin Station
Washington, D.C.  20044
(202) 305-0342 | Phone
(202) 305-0275 | Fax
Brett.Grosko@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>　　　　　*Plaintiffs,*<br><br>　v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the Interior, *et al.*,<br><br>　　　　　*Federal Defendants*.<br>_____ | )<br>)<br>)<br>)<br>)　Case No. 1:20-cv-855<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FEDERAL DEFENDANTS' ANSWER TO THE COMPLAINT**

Federal Defendants, David Bernhardt, in his official capacity as Secretary of the Interior, Aurelia

Skipwith, in her official capacity as the Administrator of the U.S. Fish and Wildlife Service, the U.S. Fish

and Wildlife Service ("FWS") and United States Forest Service ("Forest Service") (collectively, "Federal

Defendants"), hereby respond to the allegations contained in the Complaint. The numbered paragraphs of

this Answer correspond to the numbered paragraphs of the Complaint.

**<u>INTRODUCTION</u>**

　　1.　　Federal Defendants deny the allegations contained in paragraph 1.

1

2.      The allegations contained in the first sentence of paragraph 2 purport to characterize the Forest Service's Record of Decision for the Upper Green River Area Rangeland Project ("ROD"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the ROD are denied. Federal Defendants admit the allegation contained in the second sentence of paragraph 2 that one of the six allotments at issue in the ROD is located less than thirty miles from the boundary Grand Teton National Park.

3.      Federal Defendants deny the allegations contained in paragraph 3.

4.      The allegations contained in the first sentence of paragraph 4 purport to characterize an unspecified Forest Service document, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of that unspecified Forest Service document are denied. The allegations contained in the second and third sentences of paragraph 4 purport to characterize FWS's Biological Opinion for the Effects to the Grizzly Bear from the Upper Green River Area Rangeland Project ("2019 BiOp"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

5.      The allegations contained in paragraph 5 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

6.      The allegations contained in paragraph 6 consist of legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in paragraph 6.

7.      Federal Defendants deny the allegations contained in paragraph 7.

8.      Federal Defendants deny the allegations contained in paragraph 8.

9.      Federal Defendants deny the allegations contained in paragraph 9.

10.     Federal Defendants deny the allegations contained in paragraph 10.

## JURISDICTION AND VENUE

11.     The allegations contained in paragraph 11 consist of legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 11.

12.     The allegations contained in the first sentence of paragraph 12 consist of legal conclusions, to which no response is required. To the extent a response is required as to the allegations contained in the first sentence of paragraph 12, Federal Defendants deny those allegations. To the extent a response is required as to the allegations contained in the second sentence of paragraph 12, Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of those allegations, and deny them on that basis.

13.     The Federal Defendants admit the allegation contained in paragraph 13 that Federal Defendants received a letter from Plaintiffs dated January 21, 2020. That letter speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning and context of the January 21, 2020 letter are denied.

## PARTIES

14.     Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and deny them on that basis.

15.     Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 15, and deny them on that basis.

16.     Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 16, and deny them on that basis.

3

17.     The allegations contained in the first, second, and third sentences of paragraph 17 are vague and ambiguous, and Federal Defendants deny them on that basis. The allegations contained in the fourth sentence of paragraph 17 purport to characterize an unspecified letter from Plaintiffs to the Forest Service, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of that unspecified letter from Plaintiffs to the Forest Service are denied.

18.     Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 18, and on this basis deny them.

19.     Federal Defendants deny the allegations contained in paragraph 19.

20.     Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 20, and on this basis deny them. Federal Defendants deny the allegations contained in the second sentence of paragraph 20.

21.     Federal Defendants deny the allegations contained in the first, second, and third sentences of paragraph 21. The allegations contained in the fourth sentence of paragraph 21 consist of legal conclusions, to which no response is required. To the extent a response, Federal Defendants deny the allegations contained in the fourth sentence of paragraph 21.

22.     Federal Defendants admit the allegations contained in the first and second sentences of paragraph 22. The allegations contained in the third sentence of paragraph 22 constitute Plaintiffs' characterization of their case, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in the third sentence of paragraph 22.

23.     Federal Defendants admit the allegations contained in the first sentence of paragraph 23. The allegations contained in the second sentence of paragraph 23 constitute Plaintiffs' characterization of their case, to which no response is required. To the extent a response is required, Federal Defendants

4

deny the allegations contained in the second sentence of paragraph 23.

24.     Federal Defendants admit the allegations contained in the first sentence of paragraph 24. The allegations contained in the second sentence of paragraph 24 consist of legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in the second sentence of paragraph 24.

25.     Federal Defendants admit the allegations contained in the first sentence of paragraph 25. The allegations contained in the second sentence of paragraph 25 consist of legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in the second sentence of paragraph 25.

## **STATUTORY BACKGROUND**

26.     The allegations contained in the first sentence of paragraph 26 purport to characterize the Endangered Species Act ("ESA"), 16 U.S.C. § 1533, *et seq.*, and *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of the ESA, 16 U.S.C. § 1533, *et seq.*, and *Tennessee Valley Authority v. Hill* are denied. The allegations contained in the second sentence of paragraph 26 purport to characterize 16 U.S.C. § 1531(b), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1531(b) are denied. The allegations contained in the third sentence of paragraph 26 purport to characterize 16 U.S.C. §§ 1532(3), 1532(6), and 1532(20), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. §§ 1532(3), (6), and (20) are denied.

27.     The allegations contained in the first sentence of paragraph 27 purport to characterize 16 U.S.C. § 1533, which speaks for itself and provides the best evidence of its contents. Any allegations

5

contrary to the plain language, meaning, and context of 16 U.S.C. § 1533 are denied. The allegations contained in the second sentence of paragraph 27 purport to characterize 16 U.S.C. § 1532(6), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1532(6) are denied. The allegations contained in the third sentence of paragraph 27 purport to characterize 16 U.S.C. § 1532(20), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1532(20) are denied.

28.     The allegations contained in the first sentence of paragraph 28 purport to characterize 16 U.S.C. § 1536(a)(2), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1536(a)(2) are denied. The allegations contained in the second sentence of paragraph 28 purport to characterize 50 C.F.R. § 402.02, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 50 C.F.R. § 402.02 are denied.

29.     The allegations contained in the first, second, and third sentences of paragraph 29 purport to characterize 16 U.S.C. § 1536(c)(1) and 50 C.F.R. § 402.12, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1536(c)(1) and 50 C.F.R. § 402.12 are denied.

30.     The allegations contained in the first sentence of paragraph 30 purport to characterize 50 C.F.R. §§ 402.14(a) and 402.14(b), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 50 C.F.R. §§ 402.14(a) and 402.14(b) are denied. The allegations contained in the second sentence of paragraph 30 purport to characterize 50 C.F.R. §§ 402.02 and 402.14(a), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 50

6

C.F.R. §§ 402.02 and 402.14(a) are denied.

31.      The allegations contained in the first sentence of paragraph 31 purport to characterize 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(d), and 50 C.F.R. § 402.14(g)(4), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(d) and 50 C.F.R. §§ 402.14(g)(4) are denied. The allegations contained in the second sentence of paragraph 31 purport to characterize 16 U.S.C. § 1536(b)(3)(A), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1536(b)(3)(A) are denied.

32.      The allegations contained in the first sentence of paragraph 32 purport to characterize an unspecified section of the ESA or its implementing regulations, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of that unspecified section of the ESA or its implementing regulations are denied. The allegations contained in the second sentence of paragraph 32 purport to characterize 16 U.S.C. § 1536(b)(4) and 50 C.F.R. § 402.14(i), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1536(b)(4) and 50 C.F.R. § 402.14(i) are denied.

33.      The allegations contained in the first sentence of paragraph 33 purport to characterize 5 U.S.C. § 706(2) and *Bennett v. Spear*, 520 U.S. 154 (1997), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of 5 U.S.C. § 706(2) and *Bennett v. Spear* are denied. The allegations contained in the second sentence of paragraph 33 purport to characterize *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), which speaks for itself and provides the best of its contents. Any allegations contrary to the plain language, meaning, and context of *Motor Vehicle*

7

*Manufacturers Association v. State Farm Mutual Automobile Insurance Company* are denied.

34.    The allegations contained in the first sentence of paragraph 34 consist of legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 34. The allegations contained in the second sentence of this paragraph purport to characterize the ESA and *Mayo v. Jarvis*, 177 F. Supp. 3d 91 (D.D.C. 2016), which speak for themselves and provide the best evidence of their content. Any allegations contrary to the plain language, meaning, and context of the ESA and *Mayo v. Jarvis* are denied.

## **FACTUAL BACKGROUND**

35.    Federal Defendants admit the allegations contained in paragraph 35.

36.    Federal Defendants admit the allegations contained in paragraph 36.

37.    Federal Defendants admit the allegations contained in the first sentence of paragraph 37. Federal Defendants deny the allegations contained in the second sentence of paragraph 37.

38.    Federal Defendants deny the allegations contained in the first sentence of paragraph 38. Federal Defendants admit the allegations contained in the second sentence of paragraph 38.

39.    The allegations contained in the first sentence of paragraph 39 are vague and ambiguous, and are denied on that basis. The allegations contained in the second sentence of paragraph 39 purport to characterize the ROD, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the ROD are denied.

40.    Federal Defendants admit the allegations contained in paragraph 40.

41.    Federal Defendants admit the allegations contained in the first sentence of paragraph 41 that FWS listed the grizzly bear as a threatened species in 1975. Federal Defendants deny the remaining allegations contained in the first sentence of paragraph 41. Federal Defendants admit the allegations

contained in the second sentence of paragraph 41 that the current grizzly bear population in the lower 48 states is estimated at 1,889 individuals. Federal Defendants aver that this is an underestimate, however, because FWS does not include in its estimate bears inhabiting areas outside of the Demographic Monitoring Area within the Greater Yellowstone Ecosystem ("GYE") or outside of grizzly bear recovery zones for the Cabinet-Yaak and Selkirk populations. Federal Defendants deny the remaining allegations contained in the second sentence of paragraph 41.

42.     Federal Defendants deny the allegations contained in the first and second sentences of paragraph 42. Federal Defendants admit the allegations contained in the third sentence of paragraph 42 that the allotments on which grazing occurs pursuant to the ROD all lie within the GYE grizzly bear Demographic Monitoring Area, and deny the remaining allegations.

43.     Federal Defendants admit the allegations contained in the first sentence of paragraph 43 that the GYE grizzly bear population has increased. Federal Defendants deny the remaining allegations contained in the first sentence of paragraph 43. Federal Defendants deny the allegations contained in the second and third sentences of paragraph 43.

44.     Federal Defendants admit the allegations contained in the first sentence of paragraph 44 that conflicts have increased in the GYE due to an increasing grizzly bear population. Federal Defendants deny the remaining allegations contained in the first sentence of paragraph 43. The allegations contained in the second sentence of paragraph 44 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its content. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

45.     Federal Defendants admit the allegations contained in the first sentence of paragraph 45 that 62% of livestock-specific conflicts on Forest Service allotments within the GYE area occurred in the Upper Green River Rangeland Project area from 2014 to 2018. Federal Defendants deny the remaining

allegations contained in the first sentence of paragraph 45. Federal Defendants deny the allegations contained in the second and third sentences of paragraph 45.

46.     Federal Defendants admit the allegations contained in the first sentence of paragraph 46. Federal Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 46, and deny them on this basis.

47.     Federal Defendants admit the allegations contained in paragraph 47.

48.     Federal Defendants admit the allegations contained in the first sentence of paragraph 48. The allegations contained in the second and third sentences of this paragraph purport to characterize the FWS 1993 Grizzly Bear Recovery Plan ("Recovery Plan"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the Recovery Plan are denied.

49.     Federal Defendants admit the allegations contained in the first sentence of paragraph 49. The allegations contained in the second sentence of this paragraph are vague and ambiguous, and are denied on that basis.

50.     Federal Defendants admit the allegations contained in paragraph 50 that the Forest Service has consulted with FWS to assess the effects of authorizing grazing in the Upper Green Rangeland Project area on the grizzly bear. Federal Defendants deny the remaining allegations contained in paragraph 50.

51.     The allegations contained in the first sentence of paragraph 51 purport to characterize the Forest Service's 1997 Biological Assessment concerning grazing on the Upper Green River Rangeland Project area ("1997 BA"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 1997 BA are denied. The allegations contained in the second sentence of paragraph 51 purport to characterize the Forest Service's

amendment to the 1997 Biological Assessment concerning grazing on the Upper Green River Rangeland Project area ("1999 BA Amendment"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 1999 BA Amendment are denied. The allegations contained in the third, fourth, and fifth sentences of paragraph 51 purport to characterize FWS's 1999 Biological Opinion concerning grazing on the Upper Green River Rangeland Project area ("1999 BiOp"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 1999 BiOp are denied.

52.     Federal Defendants admit the allegations contained in the first sentence of paragraph 52. The allegations contained in the second sentence of paragraph 52 purport to characterize a certain 2010 Forest Service letter to FWS requesting reinitiation of consultation concerning grazing within the Upper Green River Rangeland Project area ("2010 Reinitiation Letter"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2010 Reinitiation Letter are denied. The allegations contained in the third sentence of paragraph 52 purport to characterize FWS's 2011 Biological Opinion concerning grazing on the Upper Green River Rangeland Project area ("2011 BiOp"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2011 BiOp are denied.

53.     Federal Defendants admit the allegations contained in paragraph 53.

54.     Federal Defendants admit the allegations contained in paragraph 54.

55.     Federal Defendants admit the allegations contained in the first sentence of paragraph 55. The second and third sentences of paragraph 55 purport to characterize FWS's 2013 Biological Opinion concerning grazing on the Upper Green River Rangeland Project ("2013 BiOp"), which speaks for itself

and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2013 BiOp are denied.

56.     Federal Defendants admit the allegations contained in paragraph 56.

57.     The allegations contained in the first, second, and third sentences of paragraph 57 purport to characterize FWS's 2014 Biological Opinion concerning effects of grazing flowing from the Upper Green River Rangeland Project ("2014 BiOp"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2014 BiOp are denied. Federal Defendants admit the allegations contained in the fourth sentence of paragraph 57. Federal Defendants deny the allegations contained in the fifth sentence five of paragraph 57.  Federal Defendants admit the allegation contained in the sixth sentence of paragraph 57 and aver that FWS did not issue a new biological opinion until 2019 because the 2014 Biological Opinion remained in effect through 2019.

58.     Federal Defendants admit the allegations contained in the first sentence of paragraph 58 that the Forest Service initiated consultation with FWS regarding the Upper Green River Rangeland Project. The allegations contained in the second sentence of paragraph 58 purport to characterize a certain 2016 Forest Service Wildlife Specialist report, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2016 Wildlife Specialist report are denied. Federal Defendants admit the allegations contained in the third sentence of paragraph 58 that FWS issued a biological opinion on April 29, 2019, and deny the remaining allegations contained in the third sentence of paragraph 58.

59.     The allegations contained in the first and second sentences of paragraph 59 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The

12

allegations contained in the third sentence of paragraph 59 purport to characterize 50 C.F.R. § 402.02, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 50 C.F.R. § 402.02 are denied.

60.     The allegations contained in the first sentence of paragraph 60 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. Federal Defendants deny the allegations contained in the second sentence of paragraph 60. The allegations contained in the third and fourth sentences of paragraph 60 purport to characterize FWS's 2019 Incidental Take Statement concerning effects of grazing flowing from the Upper Green River Rangeland Project ("ITS"), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the ITS are denied.

61.     The allegations contained in paragraph 61 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

62.     The allegations contained in the first and second sentences of paragraph 62 purport to characterize FWS's ITS, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the ITS are denied. The allegations contained in the third sentence of paragraph 62 purport to characterize FWS's 2019 BiOp and ITS, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp and ITS are denied.

63.     The allegations contained in paragraph 63 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

64.     The allegations contained in paragraph 64 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

65.     Federal Defendants deny the allegations contained in paragraph 65.

66.     The allegations contained in the first and second sentences of paragraph 66 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The allegations contained in the third sentence of paragraph 66 purport to characterize Exhibit 1 to the Complaint (Dkt. 1 at 28-29), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the document attached to the Complaint as Exhibit 1 are denied.

67.     Federal Defendants deny the allegations contained in paragraph 67.

68.     The allegations contained in paragraph 68 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

69.     The allegations contained in paragraph 69 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

70.     The allegations contained in paragraph 70 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

71.     Federal Defendants deny the allegations contained in the first sentence of paragraph 71. The allegations contained in the second, third, fourth, and fifth sentences purport to characterize the 2019

BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The allegations contained in the sixth sentence of paragraph 71 are vague and ambiguous, and are denied on that basis.

72.     Federal Defendants deny the allegations contained in the first sentence of paragraph 72. The allegations contained in the second, and third sentences of paragraph 72 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The fourth sentence of paragraph 72 purports to characterize the 2014 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2014 BiOp are denied. The allegations contained in the fifth sentence purport to characterize the 2014 and 2019 BiOps, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of the 2014 and 2019 BiOps are denied. Federal Defendants deny the allegations contained in the sixth sentence of paragraph 72.

73.     The allegations contained in the first and second sentences of paragraph 73 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents.  Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The allegations contained in the third sentence of paragraph 73 consist of legal conclusions, which require no response. To the extent a response is required, Federal Defendants deny the allegations contained in the third sentence of paragraph 73.

74.     The allegations contained in the first sentence of paragraph 74 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. Federal Defendants lack sufficient information to form a belief as to the truth of the allegations contained in the second

sentence of paragraph 74, and on this basis deny them. The remaining allegations contained in the second sentence of paragraph 74 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

75.     The allegations contained in paragraph 75 purport to characterize FWS's 2017 Supplement to the Recovery Plan, FWS's 2016 Conservation Strategy, and the 2019 BiOp, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning and context of the 2017 Supplement to the Recovery Plan, 2016 Conservation Strategy, and 2019 BiOp are denied.

76.     The allegations contained in paragraph 76 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

77.     Federal Defendants deny the allegations contained in the first sentence of paragraph 77. The allegations contained in the second sentence of paragraph 77 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. Federal Defendants deny the allegations contained in the third sentence of paragraph 77. The allegations contained in the fourth sentence of paragraph 77 are vague and ambiguous, and are denied on that basis. Federal Defendants deny the allegations contained in the fifth and sixth sentences of paragraph 77.

78.     The allegations contained in paragraph 78 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

79.     The allegations contained in paragraph 79 consist of legal conclusions, to which no

response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 79.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

80.     Federal Defendants incorporate by reference their responses to the allegations contained in paragraphs 1 through 79 above.

81.     The allegations contained in paragraph 81 constitute legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 81. The allegations contained in paragraph 81 additionally purport to characterize *National Wildlife Federation v. National Marine Fisheries Service,* 184 F. Supp. 3d 861 (D. Or. 2016), and *Center for Biological Diversity v. Rumsfeld,* 198 F. Supp. 2d 1139 (D. Ariz. 2002), which provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of *National Wildlife Federation v. National Marine Fisheries Service* and *Center for Biological Diversity v. Rumsfeld* are denied.

82.     The allegations contained in paragraph 82 constitute legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 82. The allegations contained in paragraph 82 additionally purport to characterize *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987), which provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of *Sierra Club v. Marsh* are denied.

83.     The allegations contained in paragraph 83 constitute legal conclusions, to which no response is required. To the extent a response is required, Federal Defendants deny the allegations contained in paragraph 83. The allegations contained in paragraph 83 additionally purport to characterize *National Wildlife Federation v. National Marine Fisheries Service,* 524 F.3d 917 (9th Cir. 2008), which provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and

17

context of *National Wildlife Federation v. National Marine Fisheries Service* are denied.

84.     The allegations contained in the first sentence of paragraph 84 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied. The allegations contained in the second sentence of paragraph 84 purport to characterize the 2019 BiOp and certain unspecified Forest Service regulations, which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp and those unspecified Forest Service regulations are denied.

85.     The allegations contained in the first sentence of paragraph 85 purport to characterize *Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of *Center for Biological Diversity v. Rumsfeld* are denied. Federal Defendants deny the allegations contained in the second and third sentences of paragraph 85.

86.     The allegations contained in first and second sentences of paragraph 86 purport to characterize the 2019 BiOp, which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of the 2019 BiOp are denied.

87.     Federal Defendants deny the allegations contained in the first sentence of paragraph 87. The allegations contained in the second sentence of paragraph 87 are vague and ambiguous, and are denied on that basis.

88.     Federal Defendants deny the allegations contained in paragraph 88.

89.     Federal Defendants deny the allegations contained in paragraph 89.

**SECOND CAUSE OF ACTION**

90.     Federal Defendants incorporate by reference their responses to the allegations contained

in paragraphs 1 through 89 above.

91.     Federal Defendants deny the allegations contained in paragraph 91.

92.     The allegations contained in the first sentence of paragraph 92 purport to characterize 16 U.S.C. § 1536(a)(2), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of 16 U.S.C. § 1526(a)(2) are denied. The allegations contained in the second sentence of paragraph 92 purport to characterize *Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1994), which speaks for itself and provides the best evidence of its contents. Any allegations contrary to the plain language, meaning, and context of *Resources Ltd. v. Robertson*, are denied. The allegations contained in the third sentence of paragraph 92 purport to characterize *Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1994), and *Mayo v. Jarvis*, 177 F. Supp. 3d at 99 (D. Ariz. 2002), which speak for themselves and provide the best evidence of their contents. Any allegations contrary to the plain language, meaning, and context of *Resources Ltd. v. Robertson* and *Mayo v. Jarvis* are denied.

93.     Federal Defendants deny the allegations contained in paragraph 93.

94.     Federal Defendants deny the allegations contained in paragraph 94.

## **PRAYERS FOR RELIEF**

The remainder of the Complaint constitutes Plaintiffs' request for relief, to which no response is required. To the extent a response may be deemed required, Federal Defendants deny that Plaintiffs are entitled to the relief sought or to any form of relief.

## **GENERAL DENIAL**

Federal Defendants deny any allegations of the Complaint, whether express or implied, that are not specifically admitted, denied, or qualified herein.

**AFFIRMATIVE DEFENSES**

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      One or both of the Plaintiffs lack standing.

3.      This Court may lack subject matter jurisdiction over some or all of Plaintiffs' claims.

4.      Federal Defendants reserve the right to assert additional affirmative defenses during the course of litigation.

WHEREFORE, Federal Defendants deny that Plaintiffs are entitled to the requested relief or any relief from this Court and request that this action be dismissed with prejudice, that judgment be entered in favor of Federal Defendants, and that Federal Defendants be allowed their costs and such other and further relief as the Court may allow.

Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


  /s/ J. Brett Grosko
J. BRETT GROSKO
*Senior Trial Attorney* (Md. Bar)
Wildlife and Marine Resources Section
P.O. Box 7369, Ben Franklin Station
Washington, D.C.  20044
(202) 305-0342 | Phone
(202) 305-0275 | Fax
Brett.Grosko@usdoj.gov

*Attorney for Federal Defendants*

*Of Counsel*

Heather R. Hinton-Taylor
Britta Beckstead
U.S. Department of Agriculture
Office of General Counsel

Tyson H. Powell
Dana E. Jacobsen
U.S. Department of the Interior
Office of the Solicitor

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2020, I caused the foregoing document to be served upon counsel of

record, as indicated below, through the Court's electronic service system (ECF/CM):

  */s/ J. Brett Grosko*
Attorney for Federal Defendants

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

<div align="center">

**U.S. District Court**

**District of Columbia**

</div>

## Notice of Electronic Filing

The following transaction was entered on 7/21/2020 at 12:43 PM and filed on 7/17/2020

| | |
|---|---|
| **Case Name:** | CENTER FOR BIOLOGICAL DIVERSITY et al v. BERNHARDT et al |
| **Case Number:** | 1:20-cv-00855-APM |
| **Filer:** | |
| **Document Number:** | 26(No document attached) |

**Docket Text:**
**Cases Consolidated. Case 20-860 have been consolidated with 20-855 pursuant to Minute Orders entered 07/17/2020. ALL PLEADINGS MUST BE FILED IN LEAD CASE NO. 20-855. THE PARTIES ARE ADVISED NOT TO ELECT TO SPREAD TEXT WHEN FILING IN ECF. (eg)**

**1:20-cv-00855-APM Notice has been electronically mailed to:**

William John Snape, III    wsnape@wcl.american.edu

Jay A. Jerde    jay.jerde@wyo.gov, cheryl.lobb@wyo.gov

Zhonette M. Brown    zhonette@mslegal.org, arosso@mslegal.org, brian@mslegal.org, jane@mslegal.org, meri@mslegal.org

John B. Grosko    brett.grosko@usdoj.gov, EFILE_WMRS.ENRD@usdoj.gov

Elliott Adler    elliott.adler@wyo.gov, cheryl.lobb@wyo.gov

Andrea Zaccardi    azaccardi@biologicaldiversity.org

**1:20-cv-00855-APM Notice will be delivered by other means to::**

Jay Jerde, WSB No. 6-2773
Special Assistant Attorney General
Elliott Adler, WSB No. 7-6434
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
jay.jerde@wyo.gov
Elliott.adler@wyo.gov

*Counsel for the State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>            Plaintiffs,<br><br>        v.<br><br>DAVID BERNHARDT, et al.,<br><br>            Defendants. | Case No. 1:20-cv-00855-APM<br><br>**STATE OF WYOMING'S ANSWER TO PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

The State of Wyoming hereby answers the Plaintiffs' Complaint for Declaratory and Injunctive Relief as follows:

## **INTRODUCTION**

1.      The allegations in Paragraph 1 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 1.

2.      The allegations in Paragraph 2 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 2.

3.      The allegations in Paragraph 3 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 3.

4.      The allegations in Paragraph 4 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 4.

5.      The allegations in Paragraph 5 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 5.

6.      The allegations in Paragraph 6 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 6.

7.      The allegations in Paragraph 7 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 7.

8.      The allegations in Paragraph 8 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 8.

9.     The allegations in Paragraph 9 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 9.

10.     The allegations in Paragraph 10 are Plaintiffs' characterization of the nature of their allegations to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 10.

### JURISDICTION AND VENUE

11.     The allegations in Paragraph 11 contain conclusions of law to which no response is required. To the extent a response is required, Wyoming denies the allegations in Paragraph 11.

12.     The allegations in the first sentence of Paragraph 12 contain conclusions of law to which no response is required. To the extent a response is required, Wyoming denies the allegations. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 12.

13.     Wyoming admits the allegations in Paragraph 13.

### PARTIES

14.     Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.     Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.     Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17.     Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.

3

18.    Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18.

19.    Wyoming denies the allegations in Paragraph 19.

20.    Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 20. Wyoming denies the allegations in the second sentence of Paragraph 20.

21.    Wyoming denies the allegations in Paragraph 21.

22.    Wyoming admits the allegations in Paragraph 22.

23.    Wyoming admits the allegations in Paragraph 23.

24.    Wyoming admits the allegations in the first sentence of Paragraph 24. The allegations in the second sentence of Paragraph 24 contain conclusions of law to which no response is required. To the extent a response is required, Wyoming denies the allegations in the second sentence of Paragraph 24.

25.    Wyoming admits the allegations in the first sentence of Paragraph 25. The allegations in the second sentence of Paragraph 25 contain conclusions of law to which no response is required. To the extent a response is required, Wyoming denies the allegations in the second sentence of Paragraph 25.

## STATUTORY BACKGROUND

26.    The allegations in Paragraph 26 purport to characterize the contents of a court opinion and two federal statutes. These documents speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

27.     The allegations in Paragraph 27 purport to characterize the contents of two federal statutes. These statutes speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

28.     The allegations in Paragraph 28 purport to characterize the contents of a federal statute and a federal regulation. The statute and the regulation speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

29.     The allegations in Paragraph 29 purport to characterize the contents of a federal statute and a federal regulation. The statute and the regulation speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

30.     The allegations in Paragraph 30 purport to characterize the contents of a federal regulation. The regulation speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

31.     The allegations in Paragraph 31 purport to characterize the contents of a federal statute and a federal regulation. The statute and the regulation speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

32.     The allegations in Paragraph 32 purport to characterize the contents of two federal statutes and a federal regulation. The statutes and the regulation speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

33.     The allegations in Paragraph 33 purport to characterize the contents of two court opinions and a federal statute. The opinions and the statute speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

34.     Wyoming denies the allegations in Paragraph 34.

**FACTUAL BACKGROUND**

35.     The allegations in Paragraph 35 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

36.     The allegations in Paragraph 36 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

37.     The allegations in Paragraph 37 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

38.     The allegations in Paragraph 38 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

39.     Wyoming denies the allegations in the first sentence of Paragraph 39. The allegations in the second sentence of Paragraph 39 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

6

40.     The allegations in Paragraph 40 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

41.     Wyoming denies the allegations in Paragraph 41.

42.     Wyoming denies the allegations in the first and second sentence of Paragraph 42. Wyoming admits the allegations in the third sentence of Paragraph 42.

43.     Wyoming denies the allegations in Paragraph 43.

44.     Wyoming denies the allegations in the first sentence of Paragraph 44. The allegations in the second sentence of Paragraph 44 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

45.     Wyoming denies the allegations in Paragraph 45.

46.     The allegations in the first sentence of Paragraph 46 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context. Wyoming denies the allegations in the second sentence of Paragraph 46.

47.     The allegations in the first and second sentence of Paragraph 47 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context. Wyoming denies the allegations in the third sentence of Paragraph 47.

48.     Wyoming denies the allegations in the first sentence of Paragraph 48. The allegations in the second and third sentences of Paragraph 48 purport to characterize the contents

of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

49. Wyoming denies the allegations in Paragraph 49.

50. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51. The allegations in Paragraph 51 purport to characterize the contents of two documents. The documents speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

52. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 52. The allegations in the third sentence of Paragraph 52 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

53. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 53. The allegations in the third sentence of Paragraph 53 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

54. The allegations in Paragraph 54 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

55. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 55. The allegations in the second and third

sentences of Paragraph 55 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

56.     The allegations in the first sentence of Paragraph 56 characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 56.

57.     The allegations in the first, second, third, and fourth sentences of Paragraph 57 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context. Wyoming denies the allegations in the fifth sentence of Paragraph 57. Wyoming is without knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of Paragraph 57.

58.     Wyoming admits that the Service issued the 2019 Biological Opinion on April 29, 2019, but Wyoming is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 58.

59.      The allegations in Paragraph 59 purport to characterize the contents of a document and a federal regulation. The document and the regulation speak for themselves and contain the best evidence of their contents. Wyoming denies any allegations inconsistent with their plain language, meaning, or context.

9

60.     The allegations in Paragraph 60 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

61.     The allegations in Paragraph 61 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

62.     Wyoming denies the allegations in Paragraph 62.

63.     Wyoming denies the allegations in Paragraph 63.

64.     Wyoming admits that the FWS concluded that the Project will not jeopardize grizzly bears but denies the remaining allegations in Paragraph 64.

65.     Wyoming denies the allegations in Paragraph 65.

66.     The allegations in Paragraph 66 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

67.     Wyoming denies the allegations in Paragraph 67.

68.     Wyoming denies the allegations in Paragraph 68.

69.     Wyoming denies the allegations in the first sentence of Paragraph 69. The allegations in the second sentence of Paragraph 69 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

70.     Wyoming denies the allegations in Paragraph 70.

71.     Wyoming denies the allegations in Paragraph 71.

72.     Wyoming denies the allegations in Paragraph 72.

73.     Wyoming denies the allegations in Paragraph 73.

74.     Wyoming denies the allegations in Paragraph 74.

75.     The allegations in Paragraph 75 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

76.     The allegations in Paragraph 76 purport to characterize the contents of a document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

77.     Wyoming denies the allegations in Paragraph 77.

78.     Wyoming denies the allegations in Paragraph 78.

79.     Wyoming denies the allegations in Paragraph 79.

## FIRST CAUSE OF ACTION

80.     In response to the allegations in Paragraph 80, Wyoming incorporates by reference and reasserts its responses to Paragraphs 1 through 79.

81.     Wyoming denies the allegations in Paragraph 81.

82.     Wyoming denies the allegations in Paragraph 82.

83.     Wyoming denies the allegations in Paragraph 83.

84.     Wyoming denies the allegations in Paragraph 84.

85.     Wyoming denies the allegations in Paragraph 85.

86.     Wyoming denies the allegations in the first sentence of Paragraph 86. The allegations in the second sentence of Paragraph 86 purport to characterize the contents of a

11

**1-App-083**

document. The document speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context.

87.     Wyoming denies the allegations in Paragraph 87.

88.     Wyoming denies the allegations in Paragraph 88.

89.     Wyoming denies the allegations in Paragraph 89.

**SECOND CAUSE OF ACTION**

90.     In response to the allegations in Paragraph 90, Wyoming incorporates by reference and reasserts its responses to Paragraphs 1 through 89.

91.     Wyoming denies the allegations in Paragraph 91.

92.     The allegations in the first sentence of Paragraph 92 purport to characterize the contents of a federal statute. The statute speaks for itself and contains the best evidence of its contents. Wyoming denies any allegations inconsistent with its plain language, meaning, or context. Wyoming denies the allegations in second and third sentences of Paragraph 92.

93.     Wyoming denies the allegations in Paragraph 93.

94.     Wyoming denies the allegations in Paragraph 94.

95.     Wyoming denies any allegation in the Complaint that is not specifically admitted herein.

**REQUEST FOR RELIEF**

The remainder of Plaintiffs' Complaint constitutes their requests for relief to which no response is required. To the extent that a response is required, Wyoming denies that Plaintiffs are entitled to the relief requested or any relief whatsoever.

**AFFIRMATIVE DEFENSES**

1.      Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

2.      Wyoming reserves the right to assert any additional affirmative defenses that may be discovered after the filing of this Answer.

Wyoming requests that this Court dismiss the Plaintiffs' Complaint with prejudice, award Wyoming its costs incurred herein, and grant such other and further relief as the Court deems just and proper.

Dated this 8th day of July 2020.

/s/ Jay Jerde
Jay Jerde, WSB No. 6-2773
Special Assistant Attorney General
Elliott Adler, WSB No. 7-6434
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
jay.jerde@wyo.gov
elliott.adler@wyo.gov

*Counsel for the State of Wyoming*

**CERTIFICATE OF SERVICE**

I certify that on this 8th day of July 2020, I electronically filed the foregoing with the Clerk of the U.S. District Court for the District of Columbia and served all parties using the CM/ECF system.

/s/ Jay Jerde
Jay Jerde

13

**1-App-085**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; and SIERRA CLUB, | ) )  |
| *Plaintiffs*, | ) No. 1:20-cv-00855-APM ) ) |
| v. | ) ) |
| DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior; AURELIA SKIPWITH, in her official capacity as Director of the United States Fish and Wildlife Service; UNITED STATES FISH AND WILDLIFE SERVICE; and UNITED STATES FOREST SERVICE, | ) **APPLICANTS IN** ) **INTERVENTIONS' PROPOSED** ) **ANSWER TO PLAINTIFFS'** ) **COMPLAINT FOR** ) **DECLARATORY AND** ) **INJUNCTIVE RELIEF** ) ) ) ) |
| *Defendants*, | ) ) |
| and | ) ) |
| UPPER GREEN RIVER CATTLE ASSOCIATION; SOMMERS RANCH, LLC; PRICE CATTLE RANCH; MURDOCK LAND AND LIVESTOCK CO.; and WYOMING STOCK GROWERS ASSOCIATION, | ) ) ) ) ) ) |
| *Applicants in Intervention*. | ) ) |

Applicants in Intervention, the Upper Green River Cattle Association; Sommers Ranch, LLC; Price Cattle Ranch; Murdock Land and Livestock Co.; and the Wyoming Stock Growers Association (collectively, "Ranchers"), hereby respond to Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint") (ECF No. 1) as follows:

**INTRODUCTION**

1.      Paragraph 1 consists of a summary of the claims and assertions of Plaintiffs' Complaint, which are responded to below and to which no separate response is required.  To the extent a response is necessary, Ranchers deny every allegation not specifically admitted below.

1

2.      Paragraph 2 appears to characterize provisions of the Record of Decision reauthorizing livestock grazing under the Upper Green River Area Rangeland Project, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 2 not consistent therewith.  Ranchers note that livestock grazing has occurred in this area for over 100 years, beginning in the late 1800s, and continues virtually unchanged today.

3.      Paragraph 3 appears to characterize provisions of the April 29, 2019 Biological Opinion ("2019 BiOp") at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 3 not consistent therewith.

4.      Paragraph 4 appears to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 4 not consistent therewith.

5.      Paragraph 5 appears to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 5 not consistent therewith.

6.      Paragraph 6 asserts legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

7.      Paragraph 7 asserts legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

8.      Paragraph 8 asserts legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.  Ranchers deny the factual assumption that fully implemented conservation measures are insufficient to minimize conflicts in the project area.

9.     Paragraph 9 asserts legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

10.     Paragraph 10 asserts legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

## JURISDICTION AND VENUE

11.     Admit.

12.     Admit, though Ranchers contend venue would be more appropriate in the U.S. District Court for the District of Wyoming.

13.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 13 and, therefore, deny the same.

## PARTIES

14.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 14 and, therefore, deny the same.

15.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 15 and, therefore, deny the same.

16.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 16 and, therefore, deny the same.

17.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 17 and, therefore, deny the same.

18.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 18 and, therefore, deny the same.

19.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 19 and, therefore, deny the same.

20.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 20 and, therefore, deny the same.

21.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 21 and, therefore, deny the same.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

## STATUTORY BACKGROUND

26.     Paragraph 26 purports to characterize, and quotes from, provisions of the Endangered Species Act ("ESA"), which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 26 not consistent therewith.

27.     Paragraph 27 purports to characterize, and quotes from, provisions of the ESA, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 27 not consistent therewith.

28.     Paragraph 28 purports to characterize, and quotes from, provisions of the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 28 not consistent therewith.

29.     Paragraph 29 purports to characterize, and quotes from, provisions of the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 29 not consistent therewith.

30.     Paragraph 30 purports to characterize, and quotes from, provisions of the regulations implementing the ESA, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 30 not consistent therewith.

31.     Paragraph 31 purports to characterize, and quotes from, provisions of the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 31 not consistent therewith.

32.     Paragraph 32 purports to characterize, and quotes from, provisions of the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 32 not consistent therewith.

33.     Paragraph 33 purports to characterize, and quotes from, provisions of the ESA, APA and/or related caselaw, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 33 not consistent therewith.

34.     Paragraph 34 purports to characterize, and quotes from, provisions of the ESA and related caselaw, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 34 not consistent therewith.  Paragraph 34 also consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

## FACTUAL BACKGROUND

### I.     The Upper Green River Area Rangeland Project

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.   Ranchers deny the first sentence of Paragraph 39.   Ranchers admit the second sentence of Paragraph 39.

## II.   Grizzly Bears in the Greater Yellowstone Ecosystem

40.   Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 40 and, therefore, deny the same.

41.   Paragraph 41 purports to characterize the 1975 listing determination, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 41 not consistent therewith.   Ranchers note that the 1975 listing determination expressly authorized the removal of nuisance grizzly bears.   *See* 40 Fed. Reg. 31,734, 31,736 (July 28, 1975) ("A grizzly bear constituting a demonstrable but non-immediate threat to human safety, or *committing significant depredations to lawfully present livestock*, may be taken . . . ." (emphasis added)).   Ranchers deny that Plaintiffs' claim in Paragraph 41 accurately addresses current estimates of grizzly bear populations in the Lower 48 states.

42.   Ranchers admit that the Upper Green allotments lie within portions of the Demographic Monitoring Area of the 1993 Grizzly Bear Recovery Plan.   The rest of Paragraph 42 appears to characterize the 1993 Grizzly Bear Recovery Plan at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 42 not consistent therewith.

43.   Ranchers admit that grizzly bear numbers have dramatically increased over the last several decades, even despite activities such as livestock grazing and lethal removal of problem bears, but deny the remainder of Paragraph 43.   Ranchers further note that multiple efforts have been made to formally de-list the grizzly bear under the ESA within the Greater Yellowstone Ecosystem because it is objectively acknowledged that the species meets all recovery criteria.

6

44.     Paragraph 44 appears to characterize the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents.  Ranchers admit that the burgeoning grizzly bear population has led to increased depredation on livestock, but deny the remainder of Paragraph 44.

45.     The removal figures cited by Plaintiffs in Paragraph 45 apparently derive from the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 45 not consistent therewith.

46.     The range figures cited by Plaintiffs in Paragraph 46 apparently derive from the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 46 not consistent therewith.

47.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 47 and, therefore, deny the same.

48.     Paragraph 48 appears to characterize the 1993 Grizzly Bear Recovery Plan at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 48 not consistent therewith.

49.     Ranchers admit that the project area is occupied by grizzly bears and is indeed a "hotspot" for livestock depredation.  Ranchers deny the factual assumption that increased grizzly mortality rates are due to potential mismanagement by federal authorities.  The remainder of Paragraph 49 contains legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

**III.     The Forest Service's Consultation with FWS**

50.     Admitted.

51.     Paragraph 51 purports to characterize, and quotes from provisions of previous Biological Assessments and Biological Opinions prepared by FWS, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 51 not consistent therewith.

52.     Paragraph 52 purports to characterize, and quotes from provisions of previous Biological Assessments and Biological Opinions prepared by FWS, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 52 not consistent therewith.

53.     Paragraph 53 purports to characterize, and quotes from provisions of previous Biological Assessments and Biological Opinions prepared by FWS, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 53 not consistent therewith.

54.     Paragraph 54 purports to characterize an Incidental Take Statement ("ITS") issued in 2012, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 54 not consistent therewith.

55.     Paragraph 55 purports to characterize the re-initiation of consultation in 2013 and the preparation of a revised Biological Opinion, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 55 not consistent therewith.

56.     Ranchers have insufficient information to form a belief as to the truth of the allegations of Paragraph 56 and, therefore, deny the same.

57.     Paragraph 57 purports to characterize and cites to provisions of the 2014 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 57 not consistent therewith.

IV.    **The 2019 BiOp**

58.    Paragraph 58 purports to characterize, and quotes from provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 58 not consistent therewith.

59.    Paragraph 59 purports to characterize, and quotes from provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 59 not consistent therewith.

60.    Paragraph 60 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 60 not consistent therewith.

61.    Paragraph 61 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 61 not consistent therewith.

62.    Paragraph 62 purports to characterize, and quotes from provisions of previous Biological Opinions and Incidental Take Statements prepared by FWS, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 62 not consistent therewith.

63.    Paragraph 63 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 63 not consistent therewith.

64.    Paragraph 64 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 64 not consistent therewith.

65.     Paragraph 65 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 65 not consistent therewith.

66.     Paragraph 66 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 66 not consistent therewith.

67.     Paragraph 67 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 67 not consistent therewith.

68.     Paragraph 68 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 68 not consistent therewith.

69.     Paragraph 69 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 69 not consistent therewith.

70.     Ranchers deny the factual assumption that permittees' compliance with conservation measures are voluntary discretionary.  The rest of Paragraph 70 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

71.     Paragraph 71 purports to characterize some of the Conservation Measures set forth in the 2019 BiOp, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 71 not consistent therewith.

10

72.     Paragraph 72 purports to characterize some of the Conservation Measures set forth in the 2019 BiOp, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 72 not consistent therewith.

73.     Paragraph 73 purports to characterize some of the Conservation Measures set forth in the 2019 BiOp, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 73 not consistent therewith.

74.     Paragraph 74 purports to characterize some of the Conservation Measures set forth in the 2019 BiOp, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 74 not consistent therewith.

75.     Paragraph 75 purports to characterize portions of the 1993 Grizzly Bear Recovery Plan and 2016 Conservation Strategy, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 75 not consistent therewith.

76.     Paragraph 76 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 76 not consistent therewith.

77.     Paragraph 77 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 77 not consistent therewith.  Paragraph 77 also contains legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

78.     Paragraph 78 purports to characterize provisions of the 2019 BiOp at issue in this case, which speaks for itself and is the best evidence of its contents; as such, Ranchers deny every allegation in Paragraph 78 not consistent therewith.  Paragraph 78 also contains legal conclusions

11

to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

79.     Paragraph 79 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

## FIRST CAUSE OF ACTION
### (FWS's Violation of the ESA and APA)

80.     Ranchers resubmit their answers to Paragraphs 1–79 of Plaintiffs' Complaint.

81.     Paragraph 81 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

82.     Paragraph 82 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

83.     Paragraph 83 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

84.     Paragraph 84 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

85.     Paragraph 85 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

86.     Paragraph 86 purports to characterize portions of the 2019 BiOp, the 1993 Grizzly Bear Recovery Plan and the 2016 Conservation Strategy, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 86 not consistent therewith.

87.     Paragraph 87 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

88.     Paragraph 88 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

89.     Paragraph 89 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

## SECOND CAUSE OF ACTION
### (Forest Service's Violation of the ESA and APA)

90.     Ranchers resubmit their answers to Paragraphs 1–89 of Plaintiffs' Complaint.

91.     Paragraph 91 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

92.     Paragraph 92 purports to characterize portions of the ESA and related caselaw, which speak for themselves and are the best evidence of their contents; as such, Ranchers deny every allegation in Paragraph 92 not consistent therewith.

93.     Paragraph 93 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

94.     Paragraph 94 consists of legal conclusions to which no response is required; however, to the extent that a response is necessary, Ranchers deny the allegations.

## AFFIRMATIVE DEFENSES

A.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

B.     Plaintiffs lack standing to assert the causes of action contained in Plaintiffs' Complaint.

C.     Plaintiffs' Complaint is barred by Plaintiffs' failure to exhaust administrative remedies.

D.     Plaintiffs' claims are barred by the applicable statute of limitations.

13

E.      Ranchers reserve the right to assert any other claims or defenses as may be available

or may become available during the course of these proceedings.

DATED this 13th day of July 2020.

Respectfully submitted by:

MOUNTAIN STATES LEGAL FOUNDATION

*/s/ Brian E. Gregg*
Brian E. Gregg (Colo. Bar No. 51063)
Zhonette M. Brown, Esq. (D.D.C. Bar No. 463407)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
zhonette@mslegal.org
brian@mslegal.org

Attorneys for Applicants in Intervention

14

**1-App-099**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2020, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all parties or counsel of record, as more fully reflected on the Notice of Electronic Filing.

<u>/s/ Brian E. Gregg</u>

15

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DAVID L. BERNHARDT, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-cv-00855 (APM)<br>)<br>)<br>)<br>)<br>) |
| WESTERN WATERSHEDS PROJECT, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DAVID L. BERNHARDT, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    Case No. 20-cv-00860 (APM)<br>)<br>)<br>)<br>)<br>) |

**<u>ORDER</u>**

I.

Pending before the court in this consolidated action are Defendants' Motions to Transfer to the District of Wyoming. *See* Mot. to Transfer & Mem. of Law, *Ctr. for Biological Diversity v. Bernhardt*, 20-cv-00855 (APM) (D.D.C.), ECF No. 13 [hereinafter *Ctr. for Biological Diversity* Mot.]; Mot. to Transfer & Mem. of Law, *W. Watersheds Project v. Bernhardt*, 20-cv-00860 (APM) (D.D.C.), ECF No. 25. The court has carefully considered Defendants' transfer request pursuant to this court's decision in *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303 (D.D.C. 2015). As *Gulf Restoration* sets forth the governing legal principles for a transfer request, the court does

not repeat them here but refers to them as applicable in the analysis below.  For the reasons that follow, Defendants' Motions to Transfer are granted.

II.

The parties all agree that Plaintiffs could have brought this action in the District of Wyoming.  *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  This threshold inquiry is therefore satisfied.

III.

Turning to the private-interest factors, Plaintiffs' choice of forum is entitled to some deference but not "substantial deference," because this forum has few, if any, meaningful ties to the controversy.  *See Gulf Restoration*, 87 F. Supp. 3d at 311.  "All of the substantive work leading to the issuance of the biological opinion and the incidental take statement," including the drafting of those decisions, "was completed by staff in the Wyoming Field Office" of the U.S. Fish and Wildlife Service, with input from the Service's "Grizzly Bear Recovery Coordinator, located in Missoula, Montana."  *Ctr. for Biological Diversity* Mot., Decl. of Nathan Darnall, ECF No. 13-5, ¶ 2.  "[N]o substantive work on the biological opinion and incidental take statement occurred in any office or location outside of Wyoming."  *Id.; see also Ctr. for Biological Diversity* Mot., Decl. of Randall Griebel, ECF No. 13-1, ¶ 5 (stating that the "2017 Final Environmental Impact Statement and the development of the 2019 Record of Decision for the Upper Green River Rangeland Project was completed by employees on the Pinedale Ranger District with assistance from resource specialists from other Districts and the Supervisor's Office of the Bridger-Teton National Forest").  The fact that the named-defendant agencies and officials are located in Washington, D.C. is not, by itself, sufficient to establish a factual nexus to this District.  *See Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 18 (D.D.C. 1996) (finding the relationship of

2

the agency action to Washington, D.C. to be "attenuated" where "[t]he decision-making process at both the forest and regional level occurred in Colorado, not in Washington, D.C. and not as a result of a directive from a local agency").

Defendants' choice of forum is entitled to "some weight" and favors transfer.  *See Gulf Restoration Network*, 87 F. Supp. 3d at 313.  That is so because, as discussed further below, the effects of the challenged agency's actions, and a court's resolution of them, will be felt most directly in the transferee district.  *See id*.

The third private-interest factor—where the claim arose—likewise favors transfer.  *See id.* In administrative law cases, like this one, courts focus on where the decision-making process occurred to determine where the claim arose.  *See id.*  As noted, the challenged agency decision-making here all occurred in Wyoming.

The remaining private-interest factors slightly favor remaining in this District.  Moving this case to the District of Wyoming will cause some inconvenience, as the parties already have litigated the preliminary injunction motion here and would have to restart in a new forum.  The other two factors—the convenience of the witnesses and the ease of access to sources of proof— are neutral with respect to transfer.  APA cases typically are decided on the administrative record, so these convenience considerations are not relevant.  *See id.* at 315.

IV.

Turning to the public-interest factors, the first two—the transferee court's familiarity with the governing law and the relative congestion of the courts' dockets—are neutral with respect to transfer.  *See id.* at 315.  A federal court in Wyoming is no more or no less competent to address questions of federal law.  Although the parties cite to various cases both here and in Wyoming and the Tenth Circuit to urge a finding of greater competence as to the issues presented here, their

3

presentation only underscores the neutrality of this factor.  Moreover, no party suggests that docket congestion either supports or diminishes the need for transfer.

The final public-interest factor—the local interest in having local controversies decided at home—weighs heavily in favor of transfer.  "[S]uits such as this one, which involve . . . environmental regulation, and local wildlife . . . should be resolved . . . where the people 'whose rights and interests are in fact most vitally affected'" are located.  *Trout Unlimited*, 944 F. Supp. at 19–20 (quoting *Adams v. Bell*, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983)).  This action primarily concerns the use of federal lands in Wyoming and the management of the grizzly bear population on those lands.  Cattle ranchers whose livestock are permitted to graze these lands are all businesses that own base properties in Sublette County, Wyoming.  *See Ctr. for Biological Diversity* Mot., Decl. of Chad Hayward, ECF No. 13-3, ¶ 5.  The Forest Service has authorized 19 seasonal grazing permits for the Upper Green River project area involving 7,765 cattle, for a four-month period from June 15 through October 15.  *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 35 (D.D.C. 2020).  These "permittees range from families who have been working and living on the same ranch for five generations to ranches recently purchased by corporations who employ local people to manage their ranching interests."  *Id.* ¶ 6.  Thus, the consequences of a judicial decision will be felt most acutely in Wyoming.

The State of Wyoming's stake in this litigation only enhances the local interest.  The Wyoming Game and Fish Department plays a key role in managing the grizzly bear population in the Upper Green River area, *see Ctr. for Biological Diversity* Mot., 2019 Biological Opinion, ECF No. 13-4, at 32–34, and is to be consulted before the taking of a nuisance bear is authorized, *see id.* at 43 ("Ultimately, the Service's Grizzly Bear Recovery Coordinator, in close coordination with WGFD (for conflicts in Wyoming), makes the final determination on grizzly bear removals.").

4

The outcome of this matter therefore will have a direct effect on the governing interests of Wyoming state authorities.

Plaintiffs attempt to nationalize the controversy here, asserting that it involves a threatened species, the grizzly bear, that is protected under the Endangered Species Act. But, as Defendants correctly point out, the mere fact that a case involves a protected species does not transform a local controversy into one of national significance. *See* Defs.' Reply in Support of Mot. to Transfer, *Ctr. for Biological Diversity v. Bernhardt*, 20-cv-00855 (APM) (D.D.C.), ECF No. 20, at 11–12 (citing authorities from this District transferring cases involving protected species). That is true here, where the controversy giving rise to the dispute centers on a biological opinion that authorizes continued livestock grazing on six allotments of land totaling 170,643 acres in the western part of Wyoming and the incidental taking of grizzly bears on that land. *See Ctr. for Biological Diversity* Mot. at 4–5. Though involving a threatened species, this case is decidedly a more local controversy than a national one.

V.

For the foregoing reasons, Defendants' Motions to Transfer are granted. These consolidated cases are hereby transferred to the District of Wyoming. The court leaves to the transferee court to resolve the outstanding motions to supplement the administrative record, *see* Mot. to Complete the Admin. Record, *Ctr. for Biological Diversity v. Bernhardt*, 20-cv-00855 (APM) (D.D.C.), ECF No. 36; Mot. to Complete and Suppl. the Admin. Record, *Ctr. for Biological Diversity v. Bernhardt*, 20-cv-00855 (APM) (D.D.C.), ECF No. 37, and to set a summary judgment briefing schedule.

Dated:  November 28, 2020

Amit P. Mehta
United States District Court Judge

6

**1-App-106**

John Persell (WY Bar #7-4672)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

*Attorney for Petitioners*
*Western Watersheds Project et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>and<br><br>WESTERN WATERSHEDS PROJECT, ALLIANCE FOR THE WILD ROCKIES, and YELLOWSTONE TO UINTAS CONNECTION,<br><br> Petitioners,<br><br>v.<br><br>DEBRA A. HAALAND *et al.*, Federal Respondents, and<br><br>STATE OF WYOMING and UPPER GREEN RIVER CATTLE ASSOCIATION *et al.*,<br><br> Respondent-Intervenors. | Lead Case No. 0:20-cv-231-NDF<br><br>Member Case No. 0:20-cv-234-NDF<br><br><br>**SUPPLEMENTED AND AMENDED PETITION FOR REVIEW OF AGENCY ACTION**<br>(Upper Green River Area Rangeland Project)<br><br><br>Judge: Hon. Nancy D. Freudenthal<br>Magistrate: Hon. Kelly H. Rankin |

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 1

1.     Pursuant to District of Wyoming Local Rule 83.6 and *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994), Petitioners Western Watersheds Project, Alliance for the Wild Rockies, and Yellowstone to Uintas Connection (WWP *et al.*) respectfully petition the Court for review of Respondent U.S. Fish and Wildlife Service's (FWS's) April 2019 Biological Opinion (BiOp) for the Effects to the Grizzly Bear (*Ursus arctos horribilis*) from the Upper Green River Area Rangeland Project, Sublette County, Wyoming, and Respondent U.S. Forest Service's (USFS's) reliance on the BiOp to fulfill its obligations under the Endangered Species Act (ESA) regarding threatened grizzly bears in the Upper Green River Area Rangeland Project (UGRA Project) area.

2.     In addition, WWP *et al.* respectfully petition the Court for review of Respondent USFS's October 2019 Record of Decision (ROD) and supporting October 2017 Final Environmental Impact Statement (FEIS) for the UGRA Project addressing livestock grazing on six allotments in the Pinedale Ranger District of the Bridger-Teton National Forest (BTNF).

3.     WWP *et al.* also respectfully petition the Court for review of Annual Operating Instructions (AOIs) issued by Respondent USFS to livestock permittees on the Badger Creek, Beaver-Twin, Noble Pastures, Roaring Fork, Upper Green River, and Wagon Creek allotments for the 2020 and 2021 grazing seasons pursuant to the UGRA Project ROD.

4.     Finally, WWP *et al.* respectfully petition the Court for review of the failure of Respondents USFS and FWS to undertake formal consultation pursuant to the ESA regarding impacts to the endangered Kendall Warm Springs dace prior to authorization of livestock trailing through the Kendall Warm Springs exclosure specifically constructed to protect the species from human-caused impacts, including domestic livestock.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 2

5.      This petition seeks the Court's review of the UGRA Project and associated decisions by Respondents Debra A. Haaland in her official capacity as Secretary of the Interior,[1] FWS, and USFS in accordance with District of Wyoming Local Rule 83.6. WWP *et al.* style it as a "supplemented and amended petition" because it adds challenges to WWP *et al.*'s first amended petition for review filed on December 29, 2020.

6.      In addition to the challenges stated in WWP *et al.*'s first amended petition for review, this supplemented and amended petition now also challenges USFS's management of livestock grazing on the UGRA Project allotments through newly issued AOIs for the 2021 grazing season as inconsistent with the Bridger-Teton National Forest land and resource management plan (BTNF Plan), in violation of the National Forest Management Act (NFMA). This supplemented and amended petition now also challenges USFS's management of livestock grazing on the Roaring Fork and Upper Green River allotments as inconsistent with their respective allotment management plans and the BTNF Plan, in violation of NFMA.

7.       The UGRA Project area lies within the Greater Yellowstone Ecosystem (GYE), one of the only places in the Lower 48 United States that still supports a full complement of native wildlife, including moose, elk, pronghorn, wolves, and grizzly bears. The region's forests, meadows, high plains, and mountainous terrain comprise one of Earth's largest temperate-zone ecosystems still existing in a mostly-intact state.

8.      The ancestral lands of the Kohogue (Green River Shoshone) people, the Upper Green River area lies at an important crossroads and connection point for many species, including grizzly bears, as they forage for food, migrate, and disperse into surrounding areas. The area also

---

[1] Pursuant to Fed. R. Civ. P. 25(d), current Secretary of the Interior Debra A. Haaland, successor to former Secretary David Bernhardt, is substituted as a party in his place.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 3

contains at least 27 stream miles of native Colorado River cutthroat trout habitat, greater sage-grouse leks, and the only known population of the Kendall Warm Springs dace, an endemic fish.

9.      On October 11, 2019, Pinedale District Ranger Rob Hoelscher signed the ROD for the UGRA Project on behalf of Respondent USFS. Through the ROD, USFS authorized the issuance of new term grazing permits across 170,643 acres of suitable grizzly bear habitat within the GYE, and authorized cattle-herding through the Kendall Warm Springs exclosure, which was constructed specifically to prevent livestock access. The UGRA Project ROD authorizes 8,772 cow/calf pairs and 47 horses to graze six allotments between June 14 and October 15. UGRA Project ROD, FS-013699.[2]

10.     Prior to the 2020 turn-out of livestock, District Ranger Hoelscher issued AOIs for allotments in the UGRA Project area. District Ranger also recently issued AOIs for the UGRA Project allotments for the 2021 grazing season.

11.     Because USFS recognized that domestic livestock grazing on these lands would adversely affect grizzly bears, a species listed as threatened under the ESA, the agency consulted with FWS regarding the UGRA Project's impacts pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2). In the resulting BiOp, FWS concluded the UGRA Project would not jeopardize the continued existence of the grizzly bear in the GYE. 2019 BiOp, FWS_000706. Further, FWS included an Incidental Take Statement (ITS) with the BiOp authorizing the killing of up to 72 grizzly bears over the next ten years in association with the UGRA Project, exempting such killings from civil and criminal liability. 2019 BiOp, FWS_000706 and FWS_000708.

---

[2] Record citations refer to the Administrative Records lodged by FWS and USFS on August 5, 2020 (Docket No. 32), and the Supplemental Administrative Record lodged by USFS on May 3, 2021 (Docket No. 97).

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 4

12.     USFS denied that the UGRA Project would adversely affect the Kendall Warm Springs

dace. FWS concurred and no formal consultation for that species occurred pursuant to Section

7(a)(2) of the ESA. 2019 BiOp, FWS_000653.

13.     On April 29, 2019, Tyler A. Abbott, Field Supervisor for Respondent FWS's Wyoming

Ecological Services Field Office signed the BiOp for the UGRA Project, Reference Number

06E13000-2019-F-0012. 2019 BiOp, FWS_000648.

14.     The UGRA Project ROD, associated AOIs, and associated BiOp and ITS are final agency

actions and subject to this Court's review pursuant to the Administrative Procedure Act (APA), 5

U.S.C. § 706. Petitioners WWP *et al.* seek the Court's review under the APA of USFS's actions

for violations of NFMA and the ESA, and review under the APA of FWS's actions for violations

of the ESA.

15.     This Court has jurisdiction over WWP *et al.*'s claims pursuant to 28 U.S.C. § 1331

(federal question) and 16 U.S.C. § 1540(c), (g) (ESA), and may issue a declaratory judgment and

relief pursuant to 28 U.S.C. §§ 2201-02 and 16 U.S.C. § 1540 (ESA). Petitioners WWP *et al.*

bring this action pursuant to the APA, 5 U.S.C. § 706, and the ESA citizen suit provision, 16

U.S.C. § 1540, both of which waive the Respondents' sovereign immunity.

16.     Petitioners WWP *et al.* provided Respondents with notice of their intent to sue pursuant

to the ESA on January 24, 2020, as required by 16 U.S.C. § 1540(g)(2).

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of

the events or omissions giving rise to the claims herein occurred within this district. The UGRA

Project area is located in Wyoming, and the UGRA Project ROD and 2019 BiOp were signed by

officers of Respondents USFS and FWS in Wyoming.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 5

18.     Petitioner WESTERN WATERSHEDS PROJECT (WWP) is a non-profit corporation with more than 12,000 members and supporters, and is dedicated to protecting and restoring wildlife and watersheds throughout the American West. WWP is based in Hailey, Idaho, and has staff in Wyoming and other western states.

19.     Petitioner ALLIANCE FOR THE WILD ROCKIES is a non-profit organization dedicated to the protection and preservation of native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is in Montana. Alliance for the Wild Rockies has over 2,000 individual members.

20.     Petitioner YELLOWSTONE TO UINTAS CONNECTION is a non-profit entity working to restore fish and wildlife habitat, including the regionally significant wildlife corridor connecting the GYE to the Uinta Mountains and Southern Rockies, through the application of science, education, and advocacy. Its registered office is in Idaho.

21.     Petitioners' members and staff use public lands in the GYE, including lands within the UGRA Project area, for professional and recreational pursuits, including hiking, fishing, camping, backpacking, hunting, horseback riding, wildlife viewing (including bear watching) and aesthetic enjoyment. Petitioners' members and staff also use these same lands for scientific study. Petitioners' members and/or staff have viewed and have planned future efforts to view grizzly bears and signs of bear presence, as well as other species, in the wild in the UGRA Project area. For this reason, USFS's and FWS's actions represent a direct threat to interests of all Petitioners. Accordingly, the legal violations alleged in this petition cause direct injury to the aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests of the Petitioners and/or Petitioners' members.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 6

22.     Petitioners' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests have been, are being, and unless their requested relief is granted, will continue to be adversely and irreparably injured by Respondents' failure to comply with federal law. These are actual and concrete injuries, traceable to Respondents' conduct which would be redressed by the requested relief. Petitioners have no adequate remedy at law.

23.     Petitioners WWP *et al.* participated extensively in USFS's processes for approval of the UGRA Project ROD and FEIS, and have exhausted all legally required administrative remedies before bringing this action.

24.     Respondent DEBRA A. HAALAND is the United States Secretary of the Interior. In that capacity, Secretary Haaland has supervisory responsibility over the United States Fish and Wildlife Service. Secretary Haaland is sued in her official capacity.

25.     Respondent UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the Department of the Interior charged with administering and enforcing the Endangered Species Act. FWS is responsible for preparing the challenged 2019 Biological Opinion and Incidental Take Statement regarding the UGRA Project as part of its obligations under the ESA.

26.     Respondent UNITED STATES FOREST SERVICE is an agency within the Department of Agriculture charged with managing the Bridger-Teton National Forest and other units of the National Forest System according to federal statutes and regulations. USFS oversees livestock grazing on the Bridger-Teton National Forest as well as management of other Forest uses and resources. USFS authorized the challenged Upper Green River Area Rangeland Project and associated Final Environmental Impact Statement, as well as the 2020 and 2021 Annual Operating Instructions for the Badger Creek, Beaver-Twin, Noble Pastures, Roaring Fork, Upper Green River, and Wagon Creek allotments.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 7

27.     Respondent-Intervenors STATE OF WYOMING and UPPER GREEN RIVER CATTLE

ASSOCIATION; SOMMERS RANCH, LLC; PRICE CATTLE RANCH; MURDOCK LAND

AND LIVESTOCK CO.; and WYOMING STOCK GROWERS ASSOCIATION were

previously granted intervention in the District Court for the District of Columbia. No. 1:20-cv-

860-APM, Docket No. 36 (June 1, 2020).

28.     Petitioners WWP *et al.* seek the Court's review of the 2019 BiOp and ITS

(FWS_000648) produced by FWS for violation of Section 7(a)(2) of the ESA by:

    A.     Failing to consider and apply the best scientific and commercial data available

        regarding grizzly bear population dynamics and recovery in the GYE;

    B.     Ignoring relevant factors and important aspects of the problem before the agency,

        including but not limited to anticipated take across the GYE, the perpetuation of a

        population sink for female grizzly bears in the project area, and the inter-

        relationship of the decline in whitebark pines and the absence of army cutworm

        moths as food sources with the corresponding rise in livestock depredations in the

        project area;

    C.     Failing to explain its departure from previous biological opinions for the same

        area regarding limits on the lethal removal of female grizzly bears;

    D.     Arbitrarily relying on ineffective conservation measures that lack certainty and

        specificity, and;

    E.     Failing to rationally justify its "no jeopardy" opinion and exemption from ESA

        liability the anticipated killing of 72 grizzly bears in association with the UGRA

        Project.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 8

29.     Petitioners WWP *et al.* also seek the Court's review of USFS's violation of Section 7 of

the ESA by unlawfully relying on FWS's flawed 2019 BiOp and ITS to satisfy its own duty to

ensure its actions do not jeopardize the continued existence of grizzly bears in the GYE. *See*

2019 BiOp, FS-004176; *see also* UGRA Project ROD, FS-013708 to FS-013710.

30.     Petitioners WWP *et al.* also seek the Court's review of the UGRA Project ROD, FEIS,

and associated AOIs produced and issued by USFS for violation of NFMA's requirement that all

projects, permits, "and other instruments for the use and occupancy of National Forest System

lands . . . be consistent with the [relevant] land management plans. 16 U.S.C. § 1604(i); *see also*

UGRA Project ROD, NFMA-FS-SAR-062815; FEIS, NFMA-FS-SAR-059108; 2020 AOIs,

NFMA-FS-SAR-063423, -063425, -063427, -063463, and -063465; 2021 AOIs, Exhibit 1.

      A.     Specifically, the BTNF Plan's Allotment Planning Standard requires that "[a]ll

          livestock grazing use will be managed under the direction of an allotment

          management plan." BTNF Plan, NFMA-FS-SAR-000133. The Badger Creek,

          Beaver-Twin, Noble Pastures, Wagon Creek allotments in the UGRA Project area

          lack allotment management plans, in violation of this BTNF Plan standard.

          UGRA Project ROD, NFMA-FS-SAR-062830. Still, USFS continues to allow

          livestock grazing on the allotments pursuant to AOIs. Further, USFS is not

          managing the Upper Green River and Roaring Fork allotments under the direction

          of their respective 1976 and 1978 allotment management plans, NFMA-FS-SAR-

          043792 and NFMA-FS-SAR-043734, also in violation of this BTNF Plan

          standard.

      B.     The Forage Utilization Standard requires USFS to "prescribe site-specific

          utilization levels needed to meet Forest Plan objectives" in allotment management

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 9

plans. BTNF Plan, NFMA-FS-SAR-000134. In the UGRA Project ROD, USFS states that "[n]ew allotment management plans will be developed for the Badger Creek, Beaver-Twin Creeks, Noble Pastures, and Wagon Creek allotments and existing allotment management plans for the Upper Green River and Roaring Fork allotments will be revised to reflect the management *described in this decision*." UGRA Project ROD, NFMA-FS-SAR-062830 (emphasis added). Yet the UGRA Project ROD fails to update management of the allotments and prescribe such site-specific utilization levels needed to meet several BTNF Plan objectives, including but not limited to Objective 4.7(d): "Require that suitable and adequate amounts of forage and cover are retained for wildlife and fish." BTNF Plan, NFMA-FS-SAR-000126.

C.   In addition, the BTNF Plan's Forage Utilization Standard requires USFS to change "season-long grazing" on allotments to "rotational grazing" in order to prevent livestock use of the same places at the same times year after year. BTNF Plan, NFMA-FS-SAR-000134. Yet the UGRA Project ROD does not truly change season-long grazing to rotational grazing on the River Bottom Pasture, Badger Creek Allotment, or Roaring Fork Allotment, in violation of the Forage Utilization Standard. UGRA Project ROD, NFMA-FS-SAR-062844; FEIS, NFMA-FS-SAR-059138.

31.   Finally, WWP *et al.* seek the Court's review of the failure by USFS and FWS to engage in formal Section 7 consultation regarding the effects of the UGRA Project on the ESA-listed endangered Kendall Warm Springs dace. *See* 2019 BiOp, FWS_000652 and FS-004180; *see also* UGRA Project ROD, FS-013708 to FS-013710.

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 10

WHEREFORE, Petitioners WWP *et al.* respectfully request that the Court grant the following relief:

A.      Order, adjudge, and declare that USFS violated NFMA by signing the UGRA Project ROD, and associated AOIs despite their inconsistency with the Forage Utilization Standard of the BTNF Plan;

B.      Order, adjudge, and declare that USFS violated NFMA by authorizing grazing pursuant to AOIs for the Badger Creek, Beaver-Twin, Noble Pastures, and Wagon Creek allotments, despite the lack of allotment management plans required by the BTNF Plan's Allotment Planning Standard;

C.      Order, adjudge, and declare that USFS violated NFMA by authorizing grazing through issuance of AOIs for the Roaring Fork and Upper Green River allotments that do not follow the direction of the relevant allotment management plans as required by the BTNF Plan's Allotment Planning Standard;

D.      Order, adjudge, and declare that FWS and USFS violated the ESA in connection with FWS's issuance of the 2019 Biological Opinion and Incidental Take Statement for the UGRA Project, and USFS's reliance on those documents to satisfy its own ESA duties;

E.      Order, adjudge, and declare that USFS and FWS violated the ESA by failing to initiate formal consultation on the effects of the UGRA Project on the Kendall Warm Springs dace;

F.      Order, adjudge, and declare USFS's authorization of herding and trailing cattle through the Kendall Warm Springs exclosure to be unlawful without formal consultation with FWS pursuant to the ESA;

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 11

G.      Reverse, set aside, hold unlawful, and/or vacate the UGRA Project ROD and remand the decision to USFS for further action consistent with the requirements of NFMA and the BTNF Plan's Forage Utilization Standard;

H.      Reverse, set aside, hold unlawful, and/or vacate USFS's authorization of herding and trailing cattle through the Kendall Warm Springs exclosure and remand the issue of the UGRA Project's effects on the Kendall Warm Springs dace to USFS and FWS for further action consistent with the requirements of the ESA;

I.      Reverse, set aside, hold unlawful, and/or vacate USFS's issuance of AOIs and authorization of livestock grazing pursuant to the UGRA Project ROD until allotment management plans have been developed and/or revised as required by the BTNF Plan's Allotment Planning Standard and Forage Utilization Standard;

J.      Reverse, set aside, hold unlawful, and/or vacate FWS's 2019 Biological Opinion and Incidental Take Statement for the UGRA Project and remand the issue of grizzly bear take in connection with the UGRA Project to FWS and USFS for further action consistent with the requirements of the ESA;

K.      Enter such preliminary and/or permanent injunctive relief as Petitioners may specifically request hereafter;

L.      Retain jurisdiction of this action to ensure compliance with the Court's decree;

M.      Award Petitioners their reasonable fees, costs, and expenses associated with this litigation, including attorneys' fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and other applicable provisions; and

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 12

N.       Grant Petitioners such further and additional relief as the Court may deem just

and proper.

Dated this 9th day of August, 2021.                    Respectfully submitted,

*/s/ John Persell*

John Persell (WY Bar #7-4672)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

*Attorney for Petitioners*
*Western Watersheds Project et al.*


## CERTIFICATE OF SERVICE

I certify that on August 9, 2021, I electronically filed the foregoing Supplemented and

Amended Petition on behalf of Petitioners Western Watersheds Project, Alliance for the Wild

Rockies, and Yellowstone to Uintas Connection through the CM/ECF system, sending notice to

all counsel of record.

*/s/ John Persell*

*Attorney for Petitioners*
*Western Watersheds Project et al.*

SUPPLEMENTED AND AMENDED PETITION FOR REVIEW - 13



**FILED**

**Margaret Botkins
Clerk of Court**

*8:56 am, 5/17/22*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

CENTER FOR BIOLOGICAL
DIVERSITY and SIERRA CLUB,

*and*

WESTERN WATERSHEDS PROJECT,
ALLIANCE FOR THE WILD ROCKIES,
and YELLOWSTONE TO UINTAS
CONNECTION,

                      Petitioners,

vs.

DEBRA A. HAALAND *et al.*,

                      Federal Respondents, and

STATE OF WYOMING and UPPER
GREEN RIVER CATTLE
ASSOCIATION *et al.*,

                      Respondent-Intervenors.

Lead Case No. 20-cv-231-NDF

Member Case No. 20-cv-234-NDF

---

**OPINION AND ORDER**

---

       This consolidated matter comes before the Court upon the Amended
Complaint/Petition for Review of Petitioners Center for Biological Diversity and Sierra
Club (collectively, "CBD"), and the Supplemented and Amended Petition for Review of
Agency Action of Western Watersheds Project, Alliance for the Wild Rockies, and

Yellowstone to Uintas Connection (collectively, "WWP"), against Respondents Debra A. Haaland in her official capacity as United States Department of Interior Secretary, United States Forest Service, and United States Fish and Wildlife Service (collectively, "Federal Respondents"). On July 29, 2020, the State of Wyoming was granted permission to intervene, as were the Upper Green River Cattle Association, Sommers Ranch, LLC, Price Cattle Ranch, Murdock Land and Livestock Co., and the Wyoming Stock Growers Association.

As an aid, the Court provides the following list of less familiar acronyms:

AMP – Allotment Management Plan

AOI – Annual Operating Instructions

BiOp – Biological Opinion

BTNF – Bridger-Teton National Forest

DMA – Demographic Monitoring Area

GYE – Greater Yellowstone Ecosystem

IGBST – Interagency Grizzly Bear Study Team

ITS – Incidental Take Statement

KWS – Kendall Warm Springs

PCA – Primary Conservation Area

ROD – Record of Decision

UGRA Project – Upper Green River Area Rangeland Project

2

After considering the administrative record, reading the briefs of the parties, reviewing the materials on file, and being fully advised in the premises, the Court **FINDS and ORDERS** as follows:

## I. Introduction

On October 11, 2019, the United States Forest Service (USFS) signed the Record of Decision (ROD) for the Upper Green River Area Rangeland Project (UGRA Project). NFMA-FS-SAR-062815. The 170,643-acre project area is located in western Wyoming—and within the Greater Yellowstone Ecosystem (GYE) — approximately 30 miles northwest of Pinedale near the Green River Lakes. NFMA-FS-SAR-062816. The GYE is one of the largest intact ecosystems remaining in the temperate zones of the world. FS-012073.

There are six cattle and horse grazing allotments in the project area: Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Wagon Creek, and Upper Green River. FS-13686. The stated purpose of the UGRA Project is to "authorize livestock grazing in a manner that will maintain or improve resource conditions." *Id.* Under the UGRA Project ROD, USFS will issue grazing permits for the project for a period of 10 years. FWS-664. The project allows approximately 8,819 livestock, including 8,772 cow/calf pairs and yearlings and 47 horses, to graze in the six allotments from June 14th to October 15th. FS-13699.

To assess the effects of the UGRA Project on the federally threatened grizzly bear, USFS requested consultation with the United States Fish and Wildlife Service (FWS). FWS-648. USFS also requested concurrence from FWS on its determination for the

3

endangered Kendall Warm Springs dace (KWS dace). *Id.* On April 29, 2019, FWS issued

its biological opinion (BiOp) finding that the effects of livestock grazing as proposed in

the UGRA Project are not likely to jeopardize the continued existence of the grizzly bear.

FWS-706. As part of its informal consultation, FWS also concurred with USFS's

determination that the project is not likely to adversely affect the KWS dace. FWS-653.

Petitioners CBD and WWP jointly argue that FWS's 2019 BiOp is arbitrary,

capricious, and violates the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), and

the Administrative Procedure Act (APA), 5 U.S.C. § 706. Petitioners also jointly argue that

USFS arbitrarily, unreasonably, and unlawfully relied on the BiOp when approving the

UGRA Project. Petitioner WWP additionally argues that USFS and FWS unlawfully failed

to engage in formal consultation regarding the UGRA Project's effects on the KWS dace.

WWP also argues that, in violation of the National Forest Management Act (NFMA), the

UGRA Project's ROD and associated Annual Operating Instructions (AOIs) and Allotment

Management Plans (AMPs) do not prescribe the site-specific forage utilization levels

needed to meet Bridger-Teton National Forest (BTNF) Plan objectives and fail to retain

cover for sensitive amphibians and birds.

Petitioners request that the Court 1) set aside/vacate FWS's 2019 BiOp and

Incidental Take Statement (ITS) for the UGRA Project as well as FWS's concurrence

regarding the KWS dace; 2) set aside/vacate USFS's UGRA Project ROD and associated

AOIs; 3) enjoin the lethal removal of grizzly bears from UGRA Project allotments until

FWS and USFS complete consultation in compliance with the ESA; 4) enjoin cattle trailing

through the KWS dace enclosure until FWS and USFS complete consultation in

4

compliance with the ESA; 5) enjoin grazing authorizations within the UGRA Project area until USFS ensures that such authorizations comply with the BTNF Plan's Forage Utilization Standard.

For the reasons that follow, the Court **AFFIRMS** the UGRA Project ROD, associated AOIs, and associated BiOp and ITS, as supported by substantial evidence, and neither arbitrary, capricious, an abuse of discretion, or inconsistent with law. Consequently, CBD's Amended Complaint/Petition for Review and WWP's Supplemented and Amended Petition for Review of Agency Action are **DISMISSED**.

## II. Legal Background

### A. The Endangered Species Act

The ESA defines an endangered species as one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Once FWS lists a species, Section 7 of the ESA dictates that federal agencies must ensure that any federal agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" *Id.* § 1536(a)(2). To achieve this goal, an "action agency must first determine whether its proposed discretionary action may affect a listed species or a critical habitat." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 (10th Cir. 2010) (citing to 50 C.F.R. § 402.14(a), (c)). "If so, the agency must consult with the FWS." *Id.* The FWS then formulates a biological opinion, and, based on the best scientific and

5

commercial data available, determines whether the action is likely to jeopardize the continued existence of listed species. *Id.*

Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). However, "[i]f the biological opinion concludes that jeopardy is not likely… the consulting agency can issue an 'Incidental Take Statement.'" *Rio Grande*, 601 F.3d at 1106 (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008)); 16 U.S.C. § 1536(b)(4). An ITS "constitutes a permit authorizing the action agency to take the endangered or threatened species so long as it respects the [FWS's] terms and conditions." *Rio Grande,* 601 F.3d at 1106. (quoting *Bennett v. Spear*, 520 U.S. 154, 170 (1997)).

B.  *National Forest Management Act*

NFMA requires the USFS to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" 16 U.S.C. § 1604(a). These "forest plans" must "provide for multiple use and sustained yield" and "include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]" *Id.* § 1604(e)(1). A forest plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." *McKeen v. U.S. Forest Serv.,* 615 F.3d 1244, 1247 (10th Cir. 2010) (citing 16 U.S.C. § 1604(g)(3)(B)).

Projects approved by the USFS "must be consistent with the applicable forest plan." *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 427 (10th Cir. 2011) (citing *Utah Env't Cong. v. Bosworth (UEC III)*, 443 F.3d 732, 737 (10th Cir. 2006); 16 U.S.C. §

6

1604(i)). Specifically, "AMPs must be consistent with the [f]orest [p]lan for the forest in which the allotment sits." *McKeen*, 615 F.3d at 1247 (citing 36 C.F.R. § 222.2(c)). Grazing permits allow a recipient to graze livestock in accordance with policies including the relevant forest plan and any relevant AMPs. *Id.* (citing 36 C.F.R. § 222.3(c)(1); 43 U.S.C. § 1752(a), (d), (e)).

### III. Factual Background

#### A. *The Grizzly Bear in the GYE*

Grizzly bears are among the largest terrestrial mammals in North America, and, in the lower 48 states, range from 250 to 600 pounds. FS-4198. They are omnivorous, opportunistic feeders and can live 25 years or longer in the wild. *Id.* Grizzlies originally inhabited a variety of habitats from the Great Plains to the mountains of western North America, and from central Mexico to the Arctic Ocean. FS-4201. South of Canada, the grizzly population has dropped from 50,000 to less than 1,000 over the last two hundred years, and they now occupy less than two percent of their former range. *Id.* Grizzlies have one of the lowest reproductive rates among terrestrial mammals, and a female grizzly requires a decade, at best, to replace herself. FWS-2424. The low survival rate of adult females was identified as the single most important factor in causing the decline in the Yellowstone population prior to the mid-1980's. FS-4205. The two primary challenges in grizzly conservation lie in reducing human-caused mortality and conserving remaining habitat. FS-4201.

The grizzly bear was listed as a threatened species under the ESA in the lower 48 states on July 28, 1975. *Id.* Prior to listing, the Interagency Grizzly Bear Study Team

(IGBST) was formed in 1973 to further understanding of grizzly bear dynamics and centralize data collection and analysis. FS-3117. The IGBST is a cooperative effort between the USGS, NPS, USFS, FWS, and state wildlife agencies in Idaho, Montana, and Wyoming. *Id.*

FWS issued a "Grizzly Bear Recovery Plan" in 1982 and revised the plan in 1993. FWS-2405–2585. To facilitate consistency in the management of grizzly habitat across ecosystems, the Interagency Grizzly Bear Committee also developed the Interagency Grizzly Bear Guidelines in 1986. FS-4205. The most recent supplement to the recovery plan ("Revised Demographic Recovery Criteria for the Yellowstone Ecosystem") was approved in 2017. FWS-6884. The supplement outlines specific recovery criteria for the GYE (such as minimum population size, female bear distribution, and mortality limits) that will be discussed in further detail *infra.* FS-4206.

The recovery plan identifies six recovery zones—the GYE recovery zone is one of them—which were established to include areas large enough and of sufficient habitat quality to support a recovered bear population. FS-4202. For each zone, the plan details recovery objectives and strategies. FS-4201. The 5,438,000-acre GYE recovery zone includes portions of Wyoming, Montana, and Idaho, portions of five National Forests, Yellowstone and Grand Teton National Parks, the John D. Rockefeller, Jr. Memorial Parkway, and adjacent Bureau of Land Management, state, and private lands. FS-4203-204. The GYE recovery zone lies within but does not constitute the whole of the broader GYE, which is substantially larger. As of 2017, the known area occupied by grizzlies in the entire GYE was 16,024,482 acres. FS-4204. Between the 1970s and early 2000s,

occupied range in the GYE increased by 48 percent; between 2000 and 2017, it increased another 51 percent. *Id.* In 2017, the estimated grizzly population in the GYE was 718. FWS-706. This number is likely an underestimate. FWS-682. Current population growth in the GYE is estimated at 0 to 2 percent annually. FWS-706.

Within the GYE, grizzlies are now managed using an inter-agency approach[1] that identifies a Primary Conservation Area (PCA) as well as adjacent areas where occupancy by grizzlies is anticipated and acceptable. FS-3020. The PCA is the area within the GYE recovery zone. *Id.* The PCA plus adjacent areas within the GYE form the Demographic Monitoring Area (DMA). *Id.* The DMA was delineated around suitable habitat in order to capture the extent of grizzly bear occupancy over time. FWS-686. The goal within the DMA is to manage grizzlies to ensure a recovered population in accordance with established recovery criteria (including those found in the Grizzly Bear Recovery Plan and the 2017 supplement). FS-3023.

All six of the grazing allotments in the UGRA Project area lie outside the bounds of the GYE recovery zone/PCA. FWS-687. However, all UGRA allotments are within the DMA. *Id.*

*B. The Kendall Warm Springs (KWS) Dace*

The only known location of the KWS dace—a small fish federally listed as endangered in 1970—is within the bounds of the Kendall Warm Springs located

---

[1] *See* 2016 Conservation Strategy for the Grizzly Bear in the GYE. FS-3013. The USFS, Idaho Department of Fish and Game, Montana Fish, Wildlife and Parks, Wyoming Game and Fish Department, National Park Service, BLM, and FWS were all signatories. FS-3032.

approximately 32 miles north of Pinedale. FS-12346, FS-4481, FS-4580. The springs are within the UGRA Project area. FS-4481. Originating at the base of a bluff, the springs flow through a braided channel for 328 yards and cascade into the Green River. *Id*. Fences currently exclude domestic livestock from the springs. FS-12357. However, native ungulates can easily navigate the fence and still have access to the springs. *Id.* A road and culvert built across the channel prior to 1934 (which fragmented the dace's habitat into two sections) was removed and replaced with a bridge in 1997, allowing reconnection of the habitat. FS-4588.

The dace utilize various habitats within the springs; adults favor shallow pools in the main channel while juveniles are found mostly in slower channels on the margins. FS-4481. Aquatic vegetation in the springs provides important hiding cover, and small pools created by large ungulates are believed to provide valuable habitat for the dace. *Id.* The USFS conducted surveys monitoring the dace population between 1995 and 2013. *Id.* The monitoring indicated a sharp decline in the dace population density between 2005 and 2007 but the population trend may have stabilized since that time. *Id.* The cause of this decline is unknown, but a narrowing and deepening of the stream has been noted which reduces the shallow, small pools valuable to dace. FS-12357. The channel changes may be related to the exclusion of domestic livestock from the springs. *Id.*

The UGRA Project excludes grazing livestock from the Kendall Warm Springs enclosure except when cattle are allowed through on their way to the allotments or back from the allotments. FS-12360. Cattle within the enclosure are required to be actively herded through to the other side. *Id.* Herding cattle through the enclosure will cause some

10

bank and channel alteration. *Id.* This could have a beneficial effect on the dace habitat but could also cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetation cover. *Id.* Ultimately, USFS determined that the UGRA Project was not likely to adversely affect the KWS dace or their habitat. *Id.* FWS concurred with this determination, noting that any negative impacts to the dace are temporary and insignificant. FS-4172.

### C. 2019 UGRA Project ROD and 1990 BTNF Forest Plan

The UGRA Project ROD authorized grazing on the six allotments using a management strategy that represents a modification of "Alternative 3" that includes some elements of Alternative 2 (as the alternatives are described in the 2017 FEIS). NFMA-FS-SAR-62818. The ROD allows a maximum of 8,819 head of livestock within the project area and a maximum 44,722 animal unit months of forage authorized for consumption. NFMA-FS-SAR-62829. Grazing was re-authorized on the allotments to "contribute to the accomplishment of Bridger-Teton Land and Resource Management Plan (Forest Plan) Goal 1.1 to support community prosperity and Objective 1.1(h) to provide forage for about 260,000 animal unit months of livestock grazing annually." NFMA-FS-SAR-62816. The ROD states that "[t]here is also a need to avoid unacceptable effects from livestock use (Forest Plan Goal 4.7)." *Id.*

The ROD set maximum forage utilization percentages on key forage species for each pasture and for seven focus areas. NFMA-FS-SAR-62819. The key forage species are primarily Idaho fescue in the uplands and sedges or tufted hairgrass in riparian and meadow areas. *Id.* The Noble Pastures Allotment's maximum forage utilization was set at 60% in

11

the uplands and 65% in riparian/meadow areas. *Id.* All other allotments have a maximum

set at 50% forage utilization in both upland <u>and</u> riparian/meadow areas. *Id.*

The 1990 BTNF Forest Plan set Resource Management Prescriptions, Standards,

and Guidelines. NFMA-FS-SAR-127. They "represent land management direction

responsive to… the Bridger-Teton Management Problems, Challenges, Goals, and

Objectives." *Id.* Of relevance to this case, Objective 4.7(d) "require[s] that suitable and

adequate amounts of forage and cover are retained for wildlife and fish." NFMA-FS-SAR-

126.

The Forage Utilization Standard imposes maximum utilization levels allowed for

all herbivores on key vegetative species. NFMA-FS-SAR-133. The Forage Utilization

Standard also states that "[d]uring AMP revision, the Interdisciplinary (ID) Team and

livestock permittees will prescribe site-specific utilization levels needed to meet Forest

Plan objectives." NFMA-FS-SAR-134.

In the Forest Plan, by the Court's count, there are 24 "Goals" and 73 "Objectives."

NFMA-FS-SAR-118–127.

### IV. Standard of Review

Claims arising under the ESA and NFMA are reviewed under the Administrative

Procedure Act (APA). *See Biodiversity Legal Foundation v. Babbitt*, 146 F.3d 1249, 1252

(10th Cir. 1998); *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1058-59

(10th Cir. 2014). Under the APA, a reviewing court shall "hold unlawful and set aside

agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's

decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Env't. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).

"The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't. of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) (citation omitted). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)). Further, a deferential approach to judicial review is particularly appropriate where the challenged decision implicates substantial agency expertise. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

However, the presumption of validity does not shield the agency from a "thorough, probing, in-depth review." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574

13

(10th Cir. 1994). Further, the "[d]etermination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency action can reasonably be said to be within that range." *Id.*

## V. Discussion

### A. *FWS compliance with the ESA in issuing the 2019 BiOp*

Petitioners argue that the FWS's 2019 BiOp is arbitrary and capricious and violates the ESA. In support of this argument, they assert that 1) the 2019 BiOp and accompanying ITS do not specifically limit the number of female grizzly bears that can be removed under the ITS's 10-year, 72-bear lethal removal limit, nor do they examine the effect of the project on female bears; 2) previous BiOps (1999, 2013, and 2014) included sex-based removal limits or reporting triggers for female bears, while the 2019 BiOp does not—rendering this departure without a reasoned explanation arbitrary and capricious; 3) the 2019 BiOp failed to address the likelihood that the project's 72 lethal removals will perpetuate the UGRA Project allotments as mortality sinks; 4) the 2019 BiOp failed to consider other anticipated take of grizzlies within the GYE; and 5) the FWS arbitrarily relied on ineffective conservation measures that lack certainty and specificity to support its no jeopardy finding.

### i. 2019 BiOp does not specifically limit female grizzly take

The 2019 BiOp states that "[t]he long-term survival of the Yellowstone grizzly bear population over the next 100 to 200 years is contingent upon minimizing average annual mortality within the total population and especially that of adult females," FWS-681, and

14

that "female bears have established territories within the [UGRA Project] area." FWS-689. The USFS's Final Environmental Impact Statement (FEIS) for the UGRA Project notes that "[s]urvival of adult female grizzly bears in the Greater Yellowstone Area is the most important factor influencing population trend." FS-12387.

The 2019 BiOp (in the associated ITS) exempts 72[2] lethal grizzly bear removals starting in 2019 and ending in 2028 (10 years) as a consequence of livestock grazing in the allotments in the UGRA Project. FWS-708. Of these 72, the ITS does not separately limit the number of female bears that can be removed during the period. *See* FWS-708–711. Petitioners argue—given the vital demographic role of female bears outlined above—that without a limit on the take of female bears, and without an examination of the Project's effect on female bears, the 2019 BiOp cannot ensure against jeopardy and that its no-jeopardy determination is thus unsupported, unlawful, and failed to use best available science.

All Respondents variously assert that FWS manages the grizzly bear population at the GYE level, and that because female-specific take limitations exist on the GYE scale, Petitioners' contentions are based on faulty premises.

The 2017 supplement to the Grizzly Bear Recovery Plan (FWS-6884) was appended to the Yellowstone chapter of the Grizzly Bear Recovery Plan as well as the 2016 Conservation Strategy. FWS-6890. The 2017 supplement revised three demographic criteria based on updated demographic analyses and the best available science. FWS-6885.

---

[2] For an explanation of how this number was generated, *see* FWS-708–709.

Demographic Recovery Criterion 1 requires a minimum grizzly population of 500 bears, and at least 48 females with cubs-of-the-year, within the DMA. *Id.* Criterion 2 requires that 16 of 18 bear management units within the GYE recovery zone[3] be occupied by females with young, with no two adjacent units unoccupied. FWS-6887.

Perhaps most importantly, Criterion 3 imposes annual mortality limits within the DMA. FWS-6888. The mortality limits—which are on a sliding scale based on the total grizzly population in the DMA—were set to achieve/maintain the population goal within the DMA of 674 bears. FWS-6888–889. There are separately calculated limits for independent females, independent males, and dependent young, and take into account all known and probable grizzly mortality from <u>all</u> causes[4]. *Id.* If any of the sex/age class mortality limits are exceeded for three years and any annual population estimate falls below 612, Criterion 3 requires that the IGBST produce a "Biology and Monitoring Review" to inform the appropriate management response. *Id.* If any annual population estimate falls below 600, Criterion 3 requires a cessation of all discretionary mortality within the DMA except as necessary for human safety. *Id.*

The 2019 BiOp fully discusses the 2017 supplement and its demographic recovery criteria. FWS-677. It notes that—as per the data collected by the IGBST—none of the

---

[3] As previously referenced, the GYE recovery zone is now also referred to as the "Primary Conservation Area" or PCA. FS-3020.

[4] These causes include management removals, illegal kills, mistaken identity kills, self-defense kills, vehicle kills, natural mortalities, undetermined-cause mortalities, grizzly bear hunting, and a statistical estimate of the number of unknown or unreported mortalities. FWS-6889.

mortality thresholds for females, males, or young were exceeded in 2017[5] (the first year that Criterion 3, as it appears in the 2017 supplement, was imposed) and that recent levels of mortality in the GYE (including those mortalities within the UGRA Project area) have been sustainable. FWS-682, 696. It also states that the anticipated level of grizzly bear mortality caused by the UGRA Project falls within the scope of the demographic recovery criterion 3. FWS-706. There is no assertion by Petitioners that the data used in these findings falls short of best available science.

In short, the criteria in the 2017 supplement supply a mechanism to remedy the possibility of an uptick in take of female bears. A lack of a female-specific take limit in the UGRA Project area does not connote with an absence of protections for female grizzlies within the DMA. There are female mortality limits in the DMA, and FWS states (see above) that projected take in the UGRA Project area will not cause those limits to be exceeded. Accordingly, the lack of female-specific take limits within the UGRA Project does not render the 2019 BiOp's determination (that the UGRA Project will not jeopardize the GYE grizzly population) arbitrary or capricious.

The Court agrees with Petitioners that it may have been better had the 2019 BiOp directly discussed the possible effects of a worst-case scenario in which—as an example— all 72 authorized removals were female grizzlies. However, this lapse does not require a finding that FWS made a clear error in its determination that UGRA take would not cause

---

[5] Although the recovery criterion were different prior to 2017, the 2019 BiOp also states that demographic recovery criteria (as they existed at the time) have been met for all age and sex classes since 2004. FWS-706.

GYE demographic recovery criteria to be exceeded, or that it would not jeopardize the continued existence of the grizzly bear in the GYE. A showing of error in this regard is Petitioners' burden, which they have not satisfied.

      ii.    Departure from previous BiOps with sex-based removal limits

Petitioners assert that previous BiOps for the project area (1999, 2013, 2014) included sex-based removal limits or reporting triggers for females, and that the 2019 BiOp's lack of this feature represents an arbitrary and capricious departure from agency past practice. *See Cotton Petro. Corp. v. U.S. Dep't. of Interior*, 870 F.2d 1515, 1526 (10th Cir. 1989) ("An administrative agency must explain its departure from prior norms (guidelines)"); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure.")(citation omitted).

Respondents point to previous BiOps for the project area that did <u>not</u> include female-specific take limitations (2011, 2014). An examination of the 2011 BiOp shows this to be true (FWS-80–115); the 2014 BiOp does not set female-specific take limits but does require that USFS contact FWS if three or more females are lethally removed in a given year (FWS-209–272, 255). Given this, the Court finds that FWS imposing a female-specific take limit is hardly boilerplate past practice, and does not find the 2109 BiOp's lack of such a limit to be an arbitrary and capricious reversal.

      iii.    2019 BiOp did not address existing sink habitat in the project area

As an additional argument that a female-specific take limitation is required, Petitioner WWP points to USFS's 2017 FEIS for the project area which identifies an existing mortality sink for female grizzly bears occurring throughout much of the project area, meaning female mortality exceeds or nearly exceeds survival.[6]   FS-012396.   WWP argues that FWS failed to address the fact that the project would contribute to this existing "sink" habitat for females, thereby completely ignoring an important aspect of the problem before it.   As support, WWP cites *Helena Hunters & Anglers Ass'n v. Marten*, 470 F.Supp.3d 1151 (D. Mont. 2020) for the proposition that this failure violates the ESA and the APA.

The *Hunters* case is not persuasive.   *Helena Hunters* presented a grizzly bear consultation issue for a project which added non-motorized trails in grizzly bear "secure" areas, and grizzly bear survival was strongly linked to the availability of secure habitat. *Id.* at 1179.   In the case before this Court, the purpose of the UGRA Project was to authorize livestock grazing through permits covering six cattle and horse grazing allotments, where most  allotments do not qualify as source/secure habitat.   The Wildlife Specialist Report for the project relies on a model (Schwartz et al. (2010)) which concludes that grizzly bear survival declined as road density, and number of homes and site developments increased, and the bear's "survival on the landscape [was] not explained by the amount of time bears spent on cattle or sheep allotments in the Yellowstone Ecosystem." FS-2822 (emphasis

---

[6] "Source" and "sink" habitat are terms used to differentiate areas based on whether mean female survival estimates are over 91%. FS-2822.  If the 91% threshold is satisfied, the habitat is source habitat. If it is not, the habitat is sink habitat. *Id*. Only the Badger Creek Allotment within the project area had mean female survival estimates over 91%; thus the remaining allotments are sink habitat. *Id*.

19

added).  Therefore, the case at hand could not be more different than the *Hunters* case, as the UGRA Project does not add development features (such as trails), it is not primarily in source/secure habitat, and it constitutes a landscape where grizzly survival is unrelated to time bears spend on livestock allotments.  WWP does not contest any of these facts, nor does it fault the conclusions of the Schwartz et al. (2010) model, or the science behind it.

Given all this, WWP fails in its burden to show that the BiOp's failure to address sink habitat for female grizzly bear survival within a grazing project violates the ESA or the APA, or that the failure renders the no jeopardy determination unlawful.

iv.   2019 BiOp failed to consider other anticipated take of grizzlies in GYE

WWP argues that FWS unlawfully failed to explain how anticipated take elsewhere in the GYE factors into the agency's conclusion that 72 lethal removals in the project area will not jeopardize the species. WWP cites to *Mayo v. Jarvis,* 177 F. Supp. 3d 91 (D.D.C. 2016) in support. *Mayo* held a FWS BiOp addendum to be arbitrary and capricious because the agency "failed to consider and evaluate the impact of the other incidental takes of the grizzly bear that had been authorized in the GYE since 2007 when making its 'no jeopardy' finding." *Id.* at 137. "The FWS must therefore evaluate the impact of an agency's action 'in light of the environmental baseline' even if the BiOp 'does not numerically add the takes from different sources together." *Id.* (citing *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 230 (D.D.C. 2005)).

Here, the 2019 BiOp does not add up all prospective anticipated take within the DMA. Yet it does consider the proportion of removals within the UGRA allotments compared to total grizzly mortality in the GYE due to livestock depredations. FWS-691. It

20

notes all known and probable grizzly bear mortalities in the GYE from 1997-2017. FWS-680. It discusses the 35 grizzly removals within the UGRA allotments from 2010 to 2018 (FWS-689) and explains (with a cite to the IGBST 2017 report) that those mortalities have not affected population growth at the level of the DMA. FWS-696. It explains that the 72 removal limit over 10 years allowed by the ITS (a larger number than the 2010-2018 period) was decided upon in light of increased conflicts due to a growing grizzly population within the project area. Lastly, and in general, the environmental baseline section of the BiOp (FWS-686–698) is robust and comprehensive.

In *Mayo*, the offending BiOp addendum contained no discussion of the environmental baseline at all. 177 F. Supp. 3d at 137. That is not the case here. Accordingly, the Court does not find that FWS "entirely failed to consider an important aspect of the problem." *Richardson*, 565 F.3d at 704.

v.   FWS reliance on conservation measures to support a no jeopardy finding

The 2019 BiOp reviewed "the Forest's commitment to implement their Conservation Measures" when issuing its no-jeopardy opinion. FWS-706. There are nine measures, outlined briefly here: 1) sanitation guidelines, 2) rider requirement to watch livestock closely, 3) FS employees' monitoring of allotments, 4) carcass removal requirements, 5) exception to carcass removal requirements if safety is a concern, 6) recommendation that grazing permittees carry bear spray, 7) further identification/implementation of grizzly conflict reducing opportunities, 8) permittee awareness of ESA responsibilities, and 9) a goal to continue to work in cooperation with FWS, Wyoming Game and Fish Department, and the IGBST to collect information on

21

grizzlies in the allotment areas. FWS-667–668. These measures can also be found in the UGRA Project ROD. NFMA-FS-62834. They are made enforceable by making them a term and condition of all grazing permits in the project area. FWS-701.

Petitioners argue that FWS's reliance on the BiOp's conservation measures to support a no-jeopardy finding was unlawful as the measures are ineffective, vague, and not certain to occur. Both WWP and CBD cite to *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002) in support. *Rumsfeld* involved a challenge to a BiOp which concluded that the Army's activities at Fort Huachuca would not cause jeopardy to the Huachuca water umbel or the Southwestern willow flycatcher. *Id.* at 1143. After a draft BiOp included a number of reasonable and prudent alternatives to address a jeopardy finding, the Army entered into a memorandum of agreement (MOA) to avoid the jeopardy finding. *Id.* at 1144. The MOA, which outlined mitigation measures, provided the basis for the FWS's later no jeopardy finding. *Id.* The court held the Final BiOp to be unlawful, stating that "[t]o avoid a substantive violation of the prohibition against jeopardy, the agency must develop mitigation measures" which must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Id.* at 1152.

Petitioners' reliance on this case is problematic as the facts are readily distinguishable from the case at hand. The Conservation Measures in the 2019 BiOp are intended to "help prevent conflicts with Grizzly Bears in the Upper Green Project Area." FWS-667. They were not specifically designed to <u>avoid</u> a jeopardy finding (as in *Rumsfeld)*

22

but rather act to generally lower bear/human conflict and the number of management removals within the action area. The Court does not agree that the Conservation Measures in this case equate to the mitigation measures in *Rumsfeld*, and does not find the *Rumsfeld* case to be persuasive.

The Court notes that it has also reviewed *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020), in which the mitigation measures in question were found to be "too vague to enforce" but that such a finding had no legal consequence without evidence the FWS relied on the measures. *Id.* at 747. A "BiOp that integrates mitigation measures into its decision making is more likely to have relied upon those measures." *Id.* The court then held that FWS did not rely on the measures in its no-jeopardy determination because it "appear[ed] to conclude that the [project], as a whole, will not significantly impact polar bears, with or without mitigation measures." *Id.* at 748.

Here, the 2019 BiOp states that it reviewed the Conservation Measures when arriving at its opinion. FWS-706. It's unclear, though, how the mitigation measures were integrated into FWS's decision making beyond the act of review. The BiOp's conclusion does make explicitly clear that the no-jeopardy determination was reached by considering: anticipated change in grizzly population in the project area; the rate of growth and expansion of the GYE population; overall GYE population density; anticipated levels of mortality in the project area and the demographic recovery criteria; that those criteria have been met since 2004; and that the level of projected mortality caused by the project will not appreciably reduce the population, distribution, or reproduction of GYE grizzlies. FWS-706. The Conservation Measures are not mentioned. *Id.* Thus, the BiOp appears to

23

conclude that, with or without the Conservation Measures, the project as a whole will not jeopardize GYE grizzlies.

This is not to downplay the significance of the Measures or the fact that FWS reviewed them in coming to its no-jeopardy determination. However, Petitioners' various objections that these measures are not certain to occur or are otherwise unlawful—even if such a standard should be rigidly applied here—are unconvincing. For instance, Measure 6 requires that the USFS recommend that all permittees carry bear spray while working within allotments. FWS-668. CBD argues that because permittees will not be _required_ to carry bear spray, the measure is not certain to occur. Yet Measure 6 only requires that bear spray be _recommended_. CBD does not argue that the recommendation is uncertain to occur.

As another example, WWP argues that Measures 7-9 "do not require any substantive action whatsoever" and thus do not satisfy Section 7 of the ESA. However, the 2019 BiOp did not premise its no-jeopardy finding on Measures 7-9. It rather reviewed all the Conservation Measures as a whole and considered their implementation as a factor in its determination. That some of the measures are clearly aspirational (as FWS surely noticed when reviewing them) cannot coherently serve to invalidate the 2019 BiOp.

The Court finds similar deficiencies in Petitioners' remaining arguments regarding the Measures. In conclusion, the Court does not find that FWS's "reliance" on the Conservation Measures violates the ESA or the APA.

B. *USFS reliance on the 2019 BiOp*

The Court does not find the FWS's 2019 BiOp to be arbitrary, capricious, or otherwise unlawful. Accordingly, USFS did not unlawfully rely on the FWS's 2019 BiOp when approving the UGRA Project ROD.

C. *Compliance with the ESA regarding the Kendall Warm Springs Dace*

WWP argues that USFS and FWS unlawfully failed to engage in formal consultation regarding the UGRA Project's effects on the endangered KWS dace. The 2019 BiOp, through informal consultation, concurred with USFS's determination that the project is not likely to adversely affect the KWS dace. FWS-653. However, the Court finds that FWS's concurrence both considered important aspects of the risks to the dace and based its decision on consideration of relevant factors. *See Richardson*, 565 F.3d at 704.

Notably, FWS links a since-stabilized decline (1997-2007) in the dace's population to a "narrowing and deepening of the [KWS] stream" and discusses the potential that this change relates to the exclusion of domestic livestock from the KWS enclosure. FWS-653. FWS acknowledges that herding cattle through the enclosure (on the way to the allotments or back from them) may result in "a few" animals straying into the water leaving hoof prints. *Id.* The prints "could result in some bank and channel alterations" and cause "temporary displacement of dace, an elevation in turbidity, and alteration of submerged vegetation." *Id.* Yet FWS states that the prints could also act to counteract the stream's recent trend of narrowing and deepening. *Id.* Ultimately, FWS found that the negative impacts of a few stray animals in the stream (dace displacement, elevated turbidity, and

vegetation alteration) were temporary and would cause insignificant impacts. *Id.* Moreover, FWS states that livestock impacts on the stream channel could actually result in beneficial effects to the dace. *Id.*

WWP asserts that the concurrence failed to consider the following relevant considerations: 1) the total number of cattle trailed past the Springs, 2) how many "a few" animals straying into the stream actually means, and 3) whether FWS incorrectly stated that cattle would only be present in the KWS area "for one or two days." These assertions do not show the 2019 concurrence to be unlawful. The total number of cattle herded through the KWS enclosure is variable and perhaps impossible to prospectively quantify. *See* FS-12360 ("Based on current management, the permittees would often opt to herd the cattle around the exclosure or allow them to drift around the exclosure.") Short of *requiring* permittees to herd cattle through the KWS area, the total number of cattle herded through could range from zero to the entire permitted number of animals in the allotments. Similarly, a projection that "a few" animals may stray into the stream is acceptably precise and need not be specified down to the exact number to constitute a valid consideration of this factor.

As for WWP's assertion that FWS was wrong in stating that cattle would only be present in the KWS for one or two days per season, the Court concludes WWP misapprehends the record. The UGRA FEIS states that "[c]attle would be confined to the roadway when they are actively herded through the Kendall Warm Springs exclosure. In the fall, cattle would be allowed to drift out towards the southern Forest Boundary and spend additional time grazing within the River Bottom Pasture and along the livestock

26

driveway." FS-12174. WWP cites this language in support of their assertion that cattle would be present for longer periods. However, there is no evidence that allowing cattle to drift out towards the southern Forest boundary means that cattle will be allowed to remain within the KWS exclosure. The FEIS and the 2019 BiOp are clear that cattle in the KWS area will be actively herded to the other side, regardless of the season. FWS-653.

WWP asserts that no language in relevant permits requires cattle to be actively herded through the exclosure. But the grazing permits in the record "specify that the allotment management plan is part of the permit and that the permittee will carry out its provisions, other instructions, or both as issued by the Forest officer in charge for the area under permit[.]" NFMA-FS-SAR-63489. WWP does not assert that Forest officers have not been directing permittees to actively herd cattle through the KWS exclosure. The Court finds WWP's argument unavailing.

Ultimately, FWS not only determined that cattle-related temporary impacts on the KWS dace would be insignificant but found that such impacts could be beneficial at the level imposed by the UGRA Project. WWP does not directly dispute the science that led FWS to this conclusion and only disagrees with the end result of the informal consultation. Accordingly, the Court finds that USFS and FWS did not unlawfully fail to engage in formal consultation regarding the UGRA Project's effects on the endangered KWS dace.

### D. WWP's NFMA claims

WWP argues that the UGRA Project ROD (and associated AOIs and AMPs) do not prescribe site-specific forage utilization levels that are necessary to meet BTNF Plan Objectives and thus violate NFMA. The argument, as the Court understands it, is that

27

projects must adhere to Forest Plan standards, such as the Forage Utilization Standard.[7]

The Forage Utilization Standard in the 1990 Forest Plan states that "[d]uring AMP revision,

the Interdisciplinary (ID) team and livestock permittees will prescribe site-specific

utilization levels needed to meet Forest Plan objectives." NFMA-FS-SAR-134. Objective

4.7(d) "require[s] that suitable and adequate amounts of forage and cover are retained for

wildlife and fish." NFMA-FS-SAR-126. WWP asserts that specialist reports, the FEIS, and

other materials show that the selected grazing alternative in the UGRA Project ROD does

not retain suitable cover for wildlife, and that the ROD thus violates NFMA.

     As an initial matter, the State of Wyoming argues that Petitioners WWP waived all

of their NFMA arguments that the UGRA Project ROD does not comply with the Forage

Utilization Standard and Objective 4.7(d) related to Idaho fescue, migratory birds, or

sensitive amphibians, by not raising specific concerns during public review of UGRA

Project ROD.[8]   The State of Wyoming also argues that no other objector raised similar

concerns.

     "Persons challenging an agency's compliance with NEPA must structure their

participation so that it … alerts the agency to the [parties'] position and contentions, in

order to allow the agency to give the issue meaningful consideration." *Silverton*

*Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006) (quotation

simplified and citations omitted).  As the State of Wyoming recognizes, this general rule

---

[7] In support, WWP cites *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) ("The Forest Service must strictly comply with a forest plan's 'standards,' which are considered binding limitations, but it may deviate from the forest plan's 'guidelines,' so long as the rationale for deviation is documented.")

[8] In support, the State of Wyoming references NFMA-FS-SAR-060566-612 and 060629-52.

has exceptions.  Claims are not waived if "the problems underlying the claim are obvious or otherwise brought to the agency's attention." *Forest Guardians*, 641 F.3d at 430 (internal quote and citation omitted).

The Court is satisfied that WWP's claim is not waived as its comments to the agency complain that the Forage Utilization Standard and Objective 4.7 were ignored, and that the cattle's use of forage in some pastures would not provide for the habitat needs of Sensitive Species.  NFMA-FS-SAR-060663; *see also*, 060664 & 060671 (reference to herbaceous retention not meeting 70% retention objective).  The Court concludes these comments by WWP are sufficient to alert the agency to the issue.

Turning to WWP's substantive argument that the UGRA Project ROD does not comply with the Forage Utilization Standard and Objective 4.7(d), the Court finds that there are fatal problems with this argument. Objective 4.7(d) is somewhat vague—i.e., what exactly are suitable and adequate amounts of forage and cover—and including Objective 4.7(d), there are 73 objectives contained within the 1990 Forest Plan. NFMA-FS-SAR-118–127. Many of them conflict to a certain degree—which is to be expected given the USFS's multiple use mandate. Objective 1.1(h) is to "[p]rovide forage for about 260,000 Animal Unit Months (AUMs) of livestock grazing annually." NFMA-FS-SAR-119. Using WWP's logic, the Forage Utilization Standard's prescription of site-specific utilization levels needed to meet Forest Plan objectives must also take this into account.

The objectives in the Forest Plan apply to all land within the BTNF. Naturally, some sites within the BTNF will more fully accomplish some objectives at the expense of others. USFS's site-specific management necessarily falls, then, within the realm of their agency

29

expertise.  Accordingly, the Court does not find that the UGRA Project ROD violates NFMA.

## VI. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the UGRA Project ROD and its associated AOIs, along with the associated BiOp and ITS, as supported by substantial evidence, and neither arbitrary, capricious, an abuse of discretion, or inconsistent with law. Consequently, CBD's Amended Complaint/Petition for Review and WWP's Supplemented and Amended Petition for Review of Agency Action are **DISMISSED**.

Dated this 16th day of May, 2022.


_____

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE

**FILED**

9:03 am, 6/1/22

**Margaret Botkins
Clerk of Court**

# United States District Court
## For The District of Wyoming

CENTER FOR BIOLOGICAL DIVERSITY
and SIERRA CLUB,

and

WESTERN WATERSHEDS PROJECT,
ALLIANCE FOR THE WILD ROCKIES,
and YELLOWSTONE TO UINTAS
CONNECTION,

          Petitioners,

                                  Civil No. 20-CV-231-F

vs.                                     20-CV-234-F

DEBRA A. HAALAND, *et al.*,

          Federal Respondents and

STATE OF WYOMING and UPPER
GREEN RIVER CATTLE ASSOCIATION,
*et al.*,

          Respondent-Intervenors.

## JUDGMENT IN A CIVIL ACTION

The Court having entered an Opinion and Order affirming the Upper Green River Area

Rangeland Project Record of Decision and its associated Annual Operating Instructions, along with

the associated Biological Opinion and Incidental Take Statement on May 16, 2022, has ordered that

Center for Biological Diversity's Amended Complaint/Petition for Review and Western Watersheds

Project's Supplemented and Amended Petition for Review of Agency Action is DISMISSED.

Dated this 1st day of June, 2022.



_____
*Clerk of Court of Deputy Clerk*

John Persell (WY Bar #7-4672)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

*Attorney for Petitioners Western Watersheds Project et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, <br><br> and <br><br> WESTERN WATERSHEDS PROJECT, ALLIANCE FOR THE WILD ROCKIES, and YELLOWSTONE TO UINTAS CONNECTION, <br><br> Petitioners, <br><br> v. <br><br> DEBRA A. HAALAND *et al.*, <br><br> Federal Respondents, and <br><br> STATE OF WYOMING and UPPER GREEN RIVER CATTLE ASSOCIATION *et al.*, <br><br> Respondent-Intervenors. | Lead Case No. 0:20-CV-231-NDF <br><br> Member Case No. 0:20-CV-234-NDF <br><br><br> Judge: Hon. Nancy D. Freudenthal <br> Magistrate: Hon. Kelly H. Rankin |

## NOTICE OF APPEAL

1

Petitioners Western Watersheds Project, Alliance for the Wild Rockies, and Yellowstone to Uintas Connection ("Petitioners" or "WWP *et al.*"), through their counsel of record, hereby file this Notice of Appeal pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, Tenth Circuit Local Rule 3.1, and 28 U.S.C. § 1291.

Petitioners appeal from the Opinion and Order dismissing Petitioners' Supplemented and Amended Petition for Review of Agency Action, Docket No. 147, and the Judgment, Docket No. 148, entered by the Court in this matter on May 17, 2022, and June 1, 2022, respectively, as well as any or all issues or rulings adverse to Petitioners that are antecedent to, or subsumed within, the foregoing judicial determinations in the above-captioned action. Appeal is taken to the United States Court of Appeals for the Tenth Circuit.

Dated the 10th of June, 2022.                Respectfully submitted,

                                            */s/ John Persell*

                                            John Persell (WY Bar #7-4672)
                                            Western Watersheds Project
                                            P.O. Box 1770
                                            Hailey, ID 83333
                                            (503) 896-6472
                                            jpersell@westernwatersheds.org

                                            *Attorney for Petitioners WWP et al.*

2

**CERTIFICATE OF SERVICE**

I certify that on June 10, 2022, I electronically filed the foregoing notice on behalf of Petitioners Western Watersheds Project, Alliance for the Wild Rockies, and Yellowstone to Uintas Connection through the CM/ECF system, which sent electronic notice to counsel for all parties.

*/s/ John Persell*

*Attorney for Petitioners WWP et al.*

3

Andrea Zaccardi (WY Bar No. 7-5396)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

William John Snape (D.C. Bar No. 455266)
Admitted pro hac vice
Center for Biological Diversity
American University
4300 Nebraska Avenue, NW
Washington, D.C.  20016
(202) 536-9351
wsnape@wcl.american.edu

*Attorneys for Petitioners Center for Biological Diversity and Sierra Club*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, <br><br> and <br><br> WESTERN WATERSHEDS PROJECT, ALLIANCE FOR THE WILD ROCKIES, and YELLOWSTONE TO UINTAS CONNECTION, <br><br>     *Petitioners*, <br><br> v. <br><br> DEBRA A. HAALAND, *et al.*, <br><br>     *Federal Respondents*, and <br><br> STATE OF WYOMING and UPPER GREEN GRAZING ASSOCIATION, *et al.*, <br><br>     *Respondent-Intervenors*. | Lead Case No. 0:20-cv-231-NDF <br><br> Member Case No. 0:21-cv-234-NDF <br><br><br> Judge: Hon. Nancy D. Freudenthal <br> Magistrate: Hon. Kelly H. Rankin |

## NOTICE OF APPEAL

Petitioners Center for Biological Diversity and Sierra Club, by and through their counsel of record, hereby file this Notice of Appeal pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure and Tenth Circuit Local Rule 3.1.

Petitioners appeal from the Opinion and Order upholding agency action, Docket No. 147, and the Judgment, Docket No. 148, entered by the Court in this matter on May 17, 2022, and June 1, 2022, respectively.  Appeal is taken to the United States Court of Appeals for the Tenth Circuit.

Dated:  July 7, 2022                          Respectfully submitted,

                                             /s/  Andrea Zaccardi
                                             Andrea Zaccardi (WY Bar No. 7-5396)
                                             Center for Biological Diversity
                                             P.O. Box 469
                                             Victor, ID 83455
                                             (303) 854-7748
                                             azaccardi@biologicaldiversity.org

                                             William John Snape, III (D.C. Bar No. 455266)
                                             Admitted pro hac vice
                                             Center for Biological Diversity
                                             American University
                                             4300 Nebraska Avenue, NW
                                             Washington, D.C. 20016
                                             (202) 536-9351
                                             wsnape@wcl.american.edu

                                             *Attorneys for Petitioners Center for Biological Diversity and Sierra Club*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 7, 2022, I caused the foregoing document to be served upon

counsel of record through the Court's electronic service system (ECF/CM).


<u>/s/ Andrea Zaccardi</u>
Andrea Zaccardi

2

**United States Department of the Interior**

FISH AND WILDLIFE SERVICE

Ecological Services
4000 Airport Parkway
Cheyenne, Wyoming 82001



U.S. Department of the Interior
1849•1999

ES-61411                                                          July 16, 1999
MEJ/W.19/2302/(pndlgrz2.bo)
6-WY-97-F-002

Mr. Michael Schrotz
Acting Forest Supervisor
Bridger-Teton National Forest
P.O. Box 1888
Jackson, Wyoming 83001

Dear Mr. Schrotz:

This document transmits the U.S. Fish and Wildlife Service's (Service) biological opinion based on our review of the proposed continuance of permitted Livestock Grazing on the Northern Portions of the Pinedale Ranger District (including the Badger Creek, Beaver-Twin, Elk Ridge Complex, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River allotments) located in Sublette County, Wyoming, and its effects on the threatened grizzly bear (*Ursus arctos horribilis*) in accordance with section 7 of the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.). Your January 1999 amendment to the March 1997 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District (Amended Assessment) was received on February 1, 1999, and supplemented information accompanying your initial request for formal consultation dated March 3, 1997, and received by this office on March 10, 1997.

This biological opinion is based on information provided in the January 1999 amendment to the March 1997 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District, during telephone conversations and visits with Forest staff (Bob Reese, Barb Franklin, and others), and other sources of information. A complete administrative record of this consultation is on file in this office.

**CONSULTATION HISTORY**

On August 22, 1996, the Service requested the Pinedale Ranger District initiate formal consultation regarding potential adverse effects to grizzly bears associated with the continuance of permitted livestock grazing on four sheep allotments in the Upper Green River drainage. On August 29, 1996, Service representative Mary Jennings met with District staff and Jay Gore of the Intermountain Region of the Forest Service to further discuss the need for formal consultation. It was determined the Bridger-Teton National Forest would prepare a biological assessment for the allotments early in 1997. The scope of the assessment was expanded to

Mr. Michael Schrotz                                                              2

include six permitted cattle allotments when additional possible grizzly bear activity was identified in the vicinity of these allotments. The allotments added were the Badger Creek, Beaver-Twin, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River allotments. The Forest requested formal consultation and provided a biological assessment in its March 3, 1997, letter, received by this office on March 10, 1997. The deadline for completion of the associated biological opinion was further extended during the course of its preparation. The Service's October 31, 1997, draft Biological Opinion was provided to the Forest Service and, subsequently, through the Forest Service to the Upper Green River Cattle Association (UGRCA) permittees and their attorney. On October 28, 1998, the UGRCA permittees and their attorney met with representatives of the Forest Service and the Service to discuss issues associated with the March 1997 Biological Assessment and the October 1997 draft Biological Opinion for the project. Based upon those discussions, several changes to both documents were agreed upon. The Forest Service provided the Service with an amendment to the March 1997 Biological Assessment (dated January 27, 1999, and received February 1, 1999). This biological opinion addresses the proposed project as described in the Amended Assessment.

## BIOLOGICAL OPINION

It is our biological opinion that continued grazing on the Badger Creek, Beaver-Twin, Elk Ridge Complex, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River allotments, as described in the January 1999 Amended Assessment, is not likely to jeopardize the continued existence of the grizzly bear. No critical habitat has been designated for this species. Therefore, the proposed action will not destroy or adversely modify critical habitat for this species. Additionally, the allotments covered by this biological opinion are outside the Grizzly Bear Recovery Zone Recovery Zone) and contain no habitat considered essential for the recovery and survival of the grizzly bear. This opinion is based on implementation of actions by the Forest identified as part of the proposed project in the Amended Assessment, particularly the Forest's commitments to have livestock carcasses removed from portions of the allotments as soon as practical, to implement sanitation guidelines at all camps associated with livestock operations, to encourage better herding techniques to minimize vulnerability to predation, and to monitor allotments on a regular basis. Additionally, the Service is supportive of the Forest's efforts to fund a seasonal position to monitor grazing, predator activity, livestock losses, and compliance. As discussed during previous meetings and telephone conversations between the Pinedale Ranger District staff and Mary Jennings of my staff, we also concur with your determination that the proposed action will have no effect on any other listed species and will not jeopardize the experimental population of the gray wolf (*Canis lupus*).

## DESCRIPTION OF THE PROPOSED ACTION

The proposed action is to allow continued permitted livestock grazing on 210,000 acres on the Pinedale Ranger District within the upper drainages of the Green River and its tributaries. This area contains seven grazing allotments: Elk Ridge Complex. Upper Green, Roaring Fork, Badger Creek, Beaver-Twin, Pot Creek, and New Fork-Boulder. Approximately 9,500 cow/calf pairs

FWS_000002

Mr. Michael Schrotz                                                                    3

and 3,750 ewe/lamb pairs are present within the area from June 16 to October 16. A more complete description of the allotment characteristics, livestock type and number authorized, and grazing system currently used is available in the March 3, 1997, biological assessment prepared for these allotments.

This area provides habitat for grizzly (*Ursus arctos horribilis*) and black bears (*U. americana*). Though only scattered grizzly sightings were reported prior to1996, in that year eight individual grizzly bears were observed using portions of this area. Grizzly bear use of the area and documented grizzly bear sightings are expected to increase over time.

Grizzly bear depredation on cattle and calves may have begun as early as 1992 and appears to have become progressively worse. The Service was not made aware of the severity of the problem until 1996. In 1996, livestock losses were attributed to bear predation on two of the seven allotments. On the Elk Ridge Complex, 116 losses (32% of all losses, 4% of all ewe/lamb pairs) were known to be caused by bears. Six black bears were killed and four grizzly bears were trapped and relocated. On the Upper Green Cattle Allotment, 7 losses (10% of all losses, 0.1% of all cow/calf pairs) were known to be caused by bears. In addition, on the New Fork-Boulder Allotment an unconfirmed grizzly bear track was reported and one grizzly-sized scat was collected, suggesting grizzly bear use of this area during 1996. In 1997 and 1998, bear predation accounted for the loss of 53 sheep and 21 calves and yearlings and 63 sheep and 14 calves and yearlings, respectively, on the allotments discussed in this opinion. Under the Interagency Grizzly Bear Committee recommendations for nuisance bears, should livestock losses continue, individuals identified as repeat offenders would be removed from the population.

Given continued use of the Elk Ridge Complex and Upper Green Cattle Allotment by livestock and grizzly bears, depredations and human/grizzly bear conflicts are expected to continue. The Amended Assessment includes as part of the proposed project the following required conservation measures to reduce the possibility of human/bear conflict and bear predation on livestock in all seven allotments:

1) The Service's Wyoming Field Office will review the Amended Assessment and prepare a biological opinion.

2) The Forest Service will request reinitiation of consultation with the Service in the event of significant changes to the grazing situation.

3) All livestock predation will be reported to the Service, the Forest Service, and the Wyoming Game and Fish Department (or its authorized agent).

4) There will be annual discussions between the Service, Forest Service, Wildlife Services, Wyoming Game and Fish Department, and the UGRCA permittees to discuss the adequacy of measures implemented to conserve grizzly bears.

Mr. Michael Schrotz                                                                                    4

In addition, the following conservation measures are required for the Elk Ridge Complex, the
Upper Green, the Roaring Fork, and the Beaver-Twin allotments:

5) All predator control work will be conducted by the Wyoming Game and Fish Department or
its authorized agent following Wyoming Game and Fish Department standards for grizzly
control.

6) On sheep allotments (Elk Ridge complex), all livestock carcasses will be removed as soon as
practical, and sick or injured animals will be removed or treated when possible. On cattle
allotments, all carcasses will be removed or treated when those carcasses are within ½
mile of Green River Lakes Road (#650, 658), Union Pass Road (#600), unnamed roads
on the west and north of the Green River (#605, 660 north to Cow Camp, 663B and
663C), GRL and Whiskey campgrounds, private cabins/dwellings, Kendall Guard
Station, Fish Creek Guard Station, permitted cow camps (4 plus 1 on private land),
permitted outfitter camps (4), Lake of the Woods, Waterdog Lakes, North Beaver
trailhead, and Tosi Creek trailhead. Additionally, there is an existing requirement to
move dead stock posing a health or safety hazard when within 1/4 mile of live streams,
springs, lakes, water, riparian areas, system roads and trails, developed recreation areas,
dispersed camping and picnic sites. Sick or injured animals will be removed when
possible. However, no sheep, cattle, or carcass will be removed if human safety is of
concern.

7) Bear sanitation guidelines will be followed for all camps associated with livestock operations.
Guidelines include: all human and prepared livestock and pet food, beverages, garbage,
cooking grease, and other odorous substances must be stored, handled, and disposed of in
such a manner as to make them totally unavailable to bears at night and during the day
when unattended.

8) Herders and riders will be required to watch sheep and cattle closely for sick or injured
animals and stray sheep.

9) If budget allows, a full time Forest Service rider will be employed to monitor livestock
grazing, predator activity, livestock losses, and adherence to bear sanitation guidelines,
including carcass removal. Otherwise, permanent Forest Service employees will monitor
allotments on a regular basis.

In addition, the following conservation measures are included in the Amended Assessment as
recommendations for the Badger Creek, Pot Creek, and New Fork-Boulder allotments:

1) All livestock carcasses should be removed if possible and treatment or removal of sick or
injured animals should occur when possible. However, no animal or carcass will be
removed if human safety is of concern.

FWS_000004

Mr. Michael Schrotz                                                                                          5

2) Bear sanitation guidelines should be followed for all camps associated with livestock
   operations. Guidelines include: all human and prepared livestock and pet food,
   beverages, garbage, cooking grease, and other odorous substances must be stored,
   handled, and disposed of in such a manner as to make it totally unavailable to bears at
   night and during the day when unattended.

3) Herders and riders should watch sheep and cattle closely for sick or injured animals.

## STATUS OF THE GRIZZLY BEAR

The grizzly bear was listed as a threatened species on July 28, 1975. Currently in the contiguous
United States, the grizzly population has been reduced to roughly two percent of its former range.
Only five, or perhaps six, areas remain in portions of Washington, Idaho, Montana, and
Wyoming that support small self-perpetuating or remnant populations. These areas are referred
to as grizzly bear ecosystems. The estimated total population of grizzly bears stands at 800 to
1,000 individuals (U.S. Fish and Wildlife Service 1993). The exact size of the grizzly bear
population in the Yellowstone Grizzly Bear Ecosystem (YGBE) is unknown, as the very nature
of the species and the rugged terrain it inhabits makes any census extremely difficult. Therefore,
monitorable population parameters are used as an alternative index to population abundance
(Knight and Eberhardt 1987). However, Eberhardt and Knight (1996) used several estimates and
determined a minimum total population size of 245 bears, an estimated population size of 390
bears using marked females, and an estimated population size of 344 bears using distinct family
groups. In 1998 the population estimate for the grizzly bear population in the YGBE, based on
the minimum number of unduplicated adult females with cubs observed over the past 3 years is a
minimum of 262 bears (U.S. Fish and Wildlife Service 1999).

The listing of a species requires Federal agencies to: 1) utilize their authorities to carry out
conservation programs for the species; 2) ensure their activities do not jeopardize the continued
existence of the species; and, 3) ensure their activities or programs do not result in the
destruction or adverse modification of critical habitat, if it is designated. In an effort to facilitate
consistency in the management of grizzly bear habitat within and across ecosystems, the
Interagency Grizzly Bear Guidelines were developed by the Interagency Grizzly Bear Committee
(51 FR 42863, November 26, 1986) for use by land managers.

The Yellowstone Grizzly Bear Ecosystem includes 23,300 sq km (9,500 sq mi) primarily within
Yellowstone and Grand Teton National Parks, John D. Rockefeller Memorial Parkway,
significant portions of the Bridger-Teton, Shoshone, Targhee, Gallatin, Beaverhead, and Custer
National Forests, adjacent private and State lands, and lands managed by the Bureau of Land
Management.

Recovery zones also have been established for the grizzly bear and include areas large enough
and of sufficient habitat quality to support a recovered bear population. According to the Grizzly

Mr. Michael Schrotz                                                                                6

Bear Recovery Plan (U.S. Fish and Wildlife Service 1993), a recovery zone is defined as that area in each grizzly bear ecosystem within which the population and habitat criteria for achievement of recovery will be measured. Areas outside of recovery zones may provide habitat that grizzly bears will use, but are not considered necessary for the survival and recovery of this species. Recovery zones are divided into smaller areas called Bear Management Units (BMUs) for the purpose of habitat evaluation and monitoring. The allotments discussed in this biological opinion are outside the Recovery Zone and are not part of any BMUs. BMUs were designed to:

1)      assess the effects of existing and proposed activities on grizzly bear habitat without having the effects diluted by consideration of too large an area;

2)      address unique habitat characteristics and bear activity and use patterns;

3)      identify contiguous complexes of habitat which meet year-long needs of the grizzly bear; and,

4)      establish priorities for areas where land use management needs would require cumulative effects assessments (U.S. Forest Service 1990).

The Yellowstone Grizzly Bear Recovery Zone covers approximately 5,438,000 acres of primarily National Park Service and Forest Service lands, roughly 89 percent of the currently known distribution of the grizzly bears in the YGBE. Yellowstone National Park contains nearly 40 percent of the Recovery Zone for the YGBE grizzly bear population. Grizzly bears also occur in and use areas outside the Recovery Zone. Areas within the recovery zone are stratified into Management Situation 1, 2, or 3 Zones, with each zone having a specific management direction. The allotments included in this consultation are located outside of the Recovery Zone and, therefore, are not included in any of the Management Situation Zones discussed below.

Management Situation 1 (MS1) lands contain population centers of grizzlies, are key to the survival of the species and are where management decisions will favor the needs of the bear even when other land use values compete.

Management Situation 2 (MS2) lands are those areas that lack distinct population centers and the need for this habitat for survival of the grizzly bear is more uncertain. The status of such areas is subject to review. Here, management will at least maintain those habitat conditions that resulted in the area being classified as MS2.

Management Situation 3 (MS3) designation is intended for lands where grizzly bears may occur infrequently. There is high probability that Federal activities here may affect the species survival and recovery. Management focus is on human-bear conflict minimization rather than habitat maintenance and protection.

Mr. Michael Schrotz

7

The current Grizzly Bear Recovery Plan (U.S. Fish and Wildlife Service 1993) outlines recovery strategies for the various grizzly bear ecosystems. The Plan defines a recovered population as one that can sustain the existing level of known and unknown human-caused mortality that exists in the ecosystem and is well-distributed throughout the recovery zone. Demographic recovery criteria outlined for the Yellowstone ecosystem include:

1.    observation of 15 females with cubs of the year (unduplicated sightings) over a 6-year running average;

2.    sixteen of the 18 Bear Management Units occupied by females with young from a running 6-year sum of verified observations, and no two adjacent BMUs unoccupied with a study to be initiated in the Plateau and Henry's Lake BMUs to determine the capability of these units to support females with cubs;

3.    known, human-caused mortality not to exceed 4 percent of the current population estimate (based on most recent 3-year sum of females with young);

4.    no more that 30 percent of this 4 percent mortality limit (see number 3 above) shall be females; and,

5.    these mortality limits cannot be exceeded during any 2 consecutive years.

In addition, the existence of adequate regulatory mechanisms for population and habitat management through the development of a conservation strategy must be demonstrated.

Based on population monitoring, data show an average of over 26 females with cubs for the period of 1993 through 1998. Sixteen of the 18 BMUs were occupied by females with cubs during 1988-1991, 17 of 18 BMUs were occupied during 1994 - 1996, and 18 of 18 BMUs were occupied during 1998. The study on the Plateau and Henry's Lake BMUs has been completed. Until 1995, the 6-year average known, human-caused mortality had averaged less than 4 percent of the current population estimate and less than 30 percent of this mortality had been females. However, during 1995 there were 17 known, human-caused grizzly bear mortalities in the Yellowstone ecosystem including 7 known, human-caused female mortalities. However, since then human-caused mortality and female mortality have declined. The 6-year running average of known, human-caused mortality calculated in 1998 was below the allowable 4 percent level and less than 30 percent of that mortality has been females. Development of a conservation strategy to demonstrate the existence of adequate regulatory mechanisms for population and habitat management is currently underway.

According to the Grizzly Bear Recovery Plan, in order to facilitate recovery of the population, a conservative approach is taken toward allowable mortality, accounting for error in both minimum population estimates and unknown, unreported mortality. Studies by Harris (1984) indicate that a grizzly bear population can sustain an average annual human-caused mortality of six percent

FWS_000007

Mr. Michael Schrotz                                                                                      8

without experiencing a decline. Based on a conservative approach allowing for an estimated level of unknown, unreported bear mortality and to help achieve population recovery, the maximum allowable known, human-caused mortality for the Yellowstone population is set at four percent of the most recent 3-year sum of the population estimate, of which no more than 30 percent may be female (U.S. Fish and Wildlife Service 1993). Applying this four percent figure to the 1998 minimum population estimate yields 262 x 0.04 or 13 bears (or 4 female bears) that could theoretically be taken each year without population decline. The recent (1993-1998) 6-year average annual, known, human-caused mortality in the Yellowstone Ecosystem is 8.2 bears per year, with an annual, known, human-caused female mortality of 3.7 bears per year. Thus, human-caused grizzly bear mortality appears to be below the thresholds established in the recovery plan. However, as mentioned above, during 1995 there were 17 known, human-caused grizzly bear mortalities in the Yellowstone ecosystem including 7 known, human-caused female mortalities. Thus, during 1995 and 1996 the female mortality exceeded those levels identified in the Grizzly Bear Recovery Plan (based on a percentage of the minimum population). The implications of the 1995 mortality to long-term survival of the grizzly bear and the ability to meet recovery criteria have not yet been analyzed. It should be noted, though, that estimations are based upon the minimum population estimate, with other estimation methods resulting in significantly higher population estimates (Eberhart and Knight 1996). Long-term survival of the Yellowstone grizzly bear population, over the next 100-200 years, is contingent upon minimizing average annual mortality within the total population and especially that of adult females (Knight and Eberhardt 1984, 1985). Preventing adult female mortality is the key factor in maintaining the grizzly bear population (Knight and Eberhardt 1984).

As stated above, based on population monitoring, sightings of females with young have increased in recent years. These increases may, in part, be due to increases in survey efforts, or increased effectiveness of survey methods or sightability. In general, recent years have been good in terms of natural bear food production/availability, resulting in younger age classes of bears accustomed to fairly good food availability. As was evidenced in 1994, a year of drought and poor food production, bears searched widely for food, bringing them into closer contact with humans, increasing bear-human conflicts and resulting in more control/management actions.

## ENVIRONMENTAL BASELINE

### Status of the Grizzly Bear Within the Action Area

In 1996, grizzly bears were documented in the upper Green River valley for the first time in 40 years. In 1996, at least eight grizzly bears were documented using the general vicinity of the allotments and four grizzly bears were trapped from the general vicinity. These four bears were not young and may have been in the area for quite some time before being detected. Other grizzly bears have been documented using the general vicinity in subsequent years. However, since grizzly bears have only recently been detected using the area, little is known about their numbers, distribution, and habitat use. However, these bears are likely resident bears since they are located more than 10 miles from the Recovery Zone and, therefore, are not considered

FWS_000008

Mr. Michael Schrotz

9

necessary for the recovery of the grizzly bear. Mortalities of these bears are not considered when determining whether recovery goals are being met.

## Factors Affecting the Environment of the Grizzly Bear

Many activities occurring in the action area may adversely affect grizzly bear habitat under some circumstances. Such activities may include recreational use (such as camping, hunting, outfitting activities, hiking, and back country use), timber and fire management, and other forest management activities. Most habitat-altering activities occurring in this area are not of concern because the area is a great distance from the Recovery Zone. Although the area does provide high quality habitat for grizzly bears and maintenance of those values is desirable when possible, the habitat is not considered essential for the survival and recovery of the grizzly bear.

## EFFECTS OF THE ACTION

### Presence of Sheep

Losses of sheep to bear predation commonly occur when bears and sheep use the same habitat concurrently (Mysterud 1977, Jorgenson 1980, Johnson and Griffel 1982). Bears, like other predators, may kill one or a few sheep at a time or may kill a number of sheep in a limited space and time period, leaving sheep unconsumed (Mysterud 1977). The potential for grizzly bears to prey upon domestic sheep is so great the Interagency Grizzly Bear Guidelines recommend sheep be removed from all allotments within Management Situation 1 (areas key to the survival of grizzly bears within the Recovery Zone). In general, three management concerns are associated with the grazing of sheep within occupied grizzly bear habitat. These include the effect on the permittee as a result of significant losses of sheep to bear depredation, the affect on grizzly bears as new bears learn to utilize sheep as a food source, and the loss of grizzly bears through control actions as they become a nuisance bear (Johnson and Griffel 1982). Johnson and Griffel (1982) found sheep-killing grizzly bears also have an increased potential for bear-human contact as both the bears and the herder center their activities around the herd of sheep. Jorgensen (1980) concluded that improved herder technique is probably the greatest factor in reducing sheep losses to predation and stressed the importance of improved Forest Service inspections and enforced compliance. Johnson and Griffel (1982) stress the need for a cooperative approach to dealing with grizzly bear-sheep interactions, since problems can be expected any time sheep graze in occupied grizzly habitat and the bears are highly vulnerable to man-caused mortality.

### Presence of cattle

Only a few studies have addressed grizzly bear-cattle interactions specifically, although several studies have focused on bear-cattle interactions in general (Murie 1948, Knight and Judd 1983, Claar et al. 1986, Anderson et al. 1997). Some general patterns of grizzly bear-cattle interactions have emerged from these and other studies. Knight and Judd (1983) reported grizzly-caused cattle depredations were relatively infrequent, since most bears that came into

FWS_000009

Mr. Michael Schrotz                                                                              10

contact with cattle did not make kills.  Claar et al. (1986) found that cattle depredations resulted from a small segment of the bear population using cattle occupied habitats, with individual bear behavior often creating potential conflict situations.  Murie (1948) proposed selective removal of problem individuals to alleviate cattle losses while maintaining the grizzly bear population.  The findings of Anderson et al. (1997) suggest a relatively small segment of the grizzly bear population is associated with the majority of cattle losses in their study area, and these individuals tend to be older-aged males.  Their study found no evidence that bears feeding on cattle carcasses eventually become cattle depredators, suggesting that carcass removal, although it may reduce the concentration of bears in an area, may not prevent bears from developing predatory tendencies or insure that predatory bears are not attracted into an area.  However, they indicated that a carcass may increase grizzly activity in the general area.  This may increase the potential for human/bear conflicts.

## Control of Nuisance Grizzly Bears

Unacceptably high levels of livestock depredation by grizzly bears may lead to control of grizzly bears, depending upon the specific circumstances.  The Plan for Determining Grizzly Bear Nuisance Status and for Controlling Nuisance Grizzly Bears (pages 51-70 in the Interagency Grizzly Bear Guidelines) outlines management direction agreed upon by participating agencies with respect to determination of grizzly bear nuisance status, and the capture, translocation, release and/or disposal of nuisance grizzly bears.  These guidelines are most specifically directed at nuisance bears within Management Situation Areas 1 or 2 within the Recovery Zone and indicate a bear may be determined to be a nuisance if "the bear causes significant depredation to lawfully present livestock or uses unnatural food materials (human and livestock foods, garbage, home gardens, livestock carrion, and game meat in possession of man) which have been reasonably secured from the bear resulting in conditioning of the bear or significant loss of property."  Additionally, these guidelines include examples of reasonably secure conditions, such as "livestock use did not occur in habitat components critically important to grizzlies in time or space" and "livestock and wildlife carcasses were removed, destroyed or treated so that the material would not reasonably be expected to attract grizzlies."  However, the allotments discussed in this biological opinion are not located in Management Situation Areas 1 or 2, but rather are located far from the Recovery Zone and do not contain those "habitat components critically important to grizzlies in time or space."  Therefore, less restrictive guidelines should and do apply to the area including these allotments.  The least restrictive guidelines indicate that any grizzly involved in a grizzly-human conflict situation is considered a nuisance and will be controlled.  Once determined a nuisance, the bear may be either relocated or removed from the population, depending upon the age and sex of the bear, as well as the number of previous offenses the bear may have.  For example, in the Recovery Zone, a depredating young female grizzly bear is usually removed from the population only in response to her third offense.  A depredating old adult male grizzly bear may be removed from the population on his first offense.  The Forest Service's commitments to minimize availability of livestock carcasses in some areas and to follow bear sanitation guidelines should help minimize the likelihood of grizzly-human conflicts and, thus, minimize the number of nuisance bears and resulting control actions.

FWS_000010

Mr. Michael Schrotz                                                                         11

Trapping and relocation of a bear has the potential to result in accidental injury or death of a bear through physical injury during trapping or accidental overdose of immobilizing drugs. Additionally, depending on the age, sex, and condition of a relocated bear, its lack of knowledge of the habitat and its food resources may result in starvation or conflict with resident bears.

In most cases, relocation provides only a short-term solution to an immediate crisis with a high return rate due to the homing ability of bears. However, often relocation provides time to resolve the problem creating the conflict. Knight et al. (1988) state that while translocation of bears from population sinks may remove them temporarily from situations of high death risk, the best management strategy remains elimination of those food sources that attract bears to sinks, thus supporting efforts to minimize food availability through carcass removal. Blanchard and Knight (1995) believe that transporting grizzly bears should be considered a final action to eliminate a conflict situation, because of low survival and high return rates. However, Blanchard and Knight (1995) also found subadult females returned the least of all groups and indicated transporting females must be considered a viable management technique because transports of some individuals have resulted in contributions to the population through subsequent reproduction.

**Displacement**

The survival and recovery of the grizzly bear is dependent upon minimization of human-caused mortality and maintenance of sufficient, quality habitat to support a viable, self-sustaining population. The Service is concerned with the loss of bear use in important habitat due to long-term displacement as a result of human activities. The Service recognizes that the displacement of bears away from developed areas and into more isolated areas is probably occurring on the Bridger-Teton National Forest. Thus, relatively isolated areas such as some of those found on these allotments may be providing habitat for bears already displaced from their preferred environment and potentially more susceptible to impacts from increased human use of these isolated areas. Grizzly bears can and do exist in areas of multiple use. However, research indicates that bears are not able to fully exploit these areas, often the highest quality habitats, due to displacement effects of human presence (Mace and Manley 1993).

Increased access and associated human presence can impact both grizzly bear behavior and population trends by displacing bears from areas of human use. Contact with humans can result in changes in bear behavior - potentially increasing the frequency of strong, energetically expensive reactions in bears (such as causing costly flight responses in bears as they avoid humans) that disrupt their normal behavior or, in the other extreme, in habituation of bears to humans through continuing contact. Displacement also results in effective alteration of habitats, disruption of the bears' social system, and ultimately in increased mortality rates. While studies have documented that bears are displaced by human use/presence, the degree of displacement appears to be dependant on several factors, including type of habitat and bear densities in the area and to what degree a bear is habituated to people. The significance of this displacement depends on time of year and availability of alternate food sources. As some seasonal habitats are very

FWS_000011

Mr. Michael Schrotz                                                                                    12

limited, displacement from such areas could be very costly especially if it comes at a critical period for bears (during hyperphagia).

Indirect population constraints can also result as long-term displacement of bears from an area leads to an effective loss of that often limited habitat or increased pressures on similar habitats elsewhere and thus increased competition for limited resources (McLellan and Shackleton 1988). This is especially true concerning females, as studies have shown that female cubs generally establish their home range within, or with significant overlap to, their mother's range. Thus, long-term displacement of a female grizzly bear from important habitat within her home range may result in that area being lost to all females since her offspring will not have the opportunity to learn foraging opportunities in these areas.

**Increased habituation and mortality due to increased access and availability of attractants**

Increased access precipitates increased frequency of bear-human encounters, often with negative consequences for the bear. In their study of the effects of access on human-caused mortality of Yellowstone grizzly bears, Mattson and Knight (1991) revealed that mortality rates associated with all levels of access (roads, developments, and back-country) have decreased over time. They point out that most of this observed improvement is due to better management /removal of attractants such as garbage and other edibles that have been a major cause of bear deaths in the past; and that these may have been the easiest reductions to achieve.

Habituation, the loss of a bear's natural wariness of humans, results from continued exposure to human presence, activity, noise, etc., without negative consequences. A bear habituates to other bears, humans, or situations when such interaction gives it a return in resources, such as food, that outweighs the cost of the stress that precedes habituation. Similarly, bears may habituate to people when such interaction results in access to a source of natural food in the vicinity of human use areas (McArthur-Jope 1980). Increases in human access and subsequent increased human use in grizzly bear habitat can lead to bear habituation to humans, which in turn increases the potential for bear-human conflicts. Habituated bears often end up obtaining human food or garbage and learn to associate people with food. As a result, they may need to be removed from the population. Such habituated or food conditioned bears are also more vulnerable to illegal killing because of their tolerance of people.

## CUMULATIVE EFFECTS

Cumulative effects include the effects of future State, tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

The Federal action under consideration in this consultation is continuation of permitted livestock grazing as described in the Biological Assessment on the Badger Creek, Beaver-Twin, Elk Ridge

Mr. Michael Schrotz                                                                    13

Complex, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River allotments. Most additional activities in the action area would be within and under the purview of the Bridger-Teton National Forest, unrelated to the proposed action, and, thus, would be Federal actions subject to separate consultation.

Recreational use is expected to increase in the area. One recreational use of particular concern is black bear hunting and associated bear baiting. Baiting could result in grizzly death due to misidentification of bears by hunters, or habituation to unnatural food sources, leading to increased human/grizzly conflicts. Bear baiting is managed by and bait locations are registered with the Wyoming Game and Fish Department. Therefore, bear baiting is not subject to section 7 consultation requirements.

## CONCLUSION

The loss of individual nuisance bears could represent a negative impact to the grizzly bear population. However, this impact to the population should not hinder the eventual recovery of the species, because these bears are located more than 10 miles outside of the Recovery Zone. Therefore, after reviewing the current status of the grizzly bear, available information on the environmental baseline for the Bridger-Teton National Forest in general and the Badger Creek, Beaver-Twin, Elk Ridge Complex, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River allotments in particular, the effects of continued livestock grazing on these allotments, and the cumulative effects, it is the Service's biological opinion that livestock grazing on these allotments, as proposed, is not likely to jeopardize the continued existence of the grizzly bear. No critical habitat has been designated for this species, therefore, none will be affected.

This opinion is based on implementation of actions by the Forest as proposed in the Amended Assessment, particularly the Forest's commitments to have livestock carcasses removed from some allotments as soon as practical, to implement sanitation guidelines at all camps associated with livestock operations on certain allotments, to encourage better herding techniques to minimize vulnerability to predation, and to monitor allotments on a regular basis. This opinion also takes into consideration the distance of these allotments from the Recovery Zone and, therefore, the relative unimportance of this habitat for the recovery and survival of the grizzly bear.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, would, kill trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is

FWS_000013

Mr. Michael Schrotz                                                                                      14

defined by the Service as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary, and must be undertaken by the Forest Service so that they become binding conditions of any grant or permit issued to the applicant, as appropriate, for the exemption in section 7(o)(2) to apply. The Forest Service has a continuing duty to regulate the activity covered by this incidental take statement. If the Forest Service (1) fails to assume and implement the terms and conditions or (2) fails to require the applicant to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7 (o)(2) may lapse. In order to monitor the impact of incidental take, the Forest Service must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. [50 CFR 402.14(i)(3)].


## AMOUNT OR EXTENT OF TAKE

The Service anticipates four male grizzly bears and one female grizzly bear may be lethally taken as a result of this proposed action. The incidental take is expected to be in the form of killing and is most likely to occur through management actions/nuisance bear control in compliance with the Interagency Nuisance Bear Guidelines (pages 51-70 of the Interagency Grizzly Bear Guidelines). The amount of lethal take anticipated is based upon input from the Wyoming Game and Fish Department and the Bridger-Teton National Forest regarding the number of grizzly bears in the vicinity of these allotments and information regarding which bears may be depredating.

Additionally, the Service anticipates non-lethal take, such as harm or harassment resulting from displacement of grizzly bears from important habitats, will continue to occur as a result of continued grazing on these allotments. However, the best scientific and commercial data available are not sufficient to enable the Service to quantify a specific amount of non-lethal incidental take for the proposed action. The affects of the proposed action are largely unquantifiable in the short term and may be measurable only as long-term effects on the species' habitat and population levels. Without additional information and analyses that are currently unavailable, we must designate the anticipated level of non-lethal incidental take for the proposed continued grazing on these allotments as unquantifiable.

Mr. Michael Schrotz                                                                                    15

## EFFECT OF THE TAKE

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species. This is based, in part, on the distance of these allotments from the Recovery Zone and the fact that bear population parameters and mortality levels this far from the Recovery Zone are not factored into the calculations used in determining whether population and mortality criteria established in the Recovery Plan for recovery are being met.

## REASONABLE AND PRUDENT MEASURES

The Service believes the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of grizzly bears:

1.    Minimize bear/livestock conflicts and associated management actions.

2.    Minimize habituation and bear-human conflicts.

## TERMS AND CONDITIONS

In order to be exempt from the prohibitions of section 9 of the Act, the U. S. Forest Service must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are nondiscretionary.

1.    The Forest Service will implement and enforce all conservation measures outlined in the 1999 Amended Assessment as they apply to the Elk Ridge Complex, the Upper Green, the Roaring Fork, and the Beaver-Twin allotments. Of particular importance are Wyoming Game and Fish Department oversight of grizzly bear control; removal or treatment of livestock carcasses on the Elk Ridge Complex and, on the Upper Green, Roaring Fork, and Beaver-Twin allotments, when those carcasses are within ½ mile of Green River Lakes Road (#650, 658), Union Pass Road (#600), unnamed roads to the west and north of the Green River (#605, 660 north to Cow Camp, 663B and 663C), GRL and Whiskey campgrounds, private cabins/dwellings, Kendall Guard Station, Fish Creek Guard Station, permitted cow camps (4 plus 1 on private land), permitted outfitter camps (4), Lake of the Woods, Waterdog Lakes, North Beaver trailhead, and Tosi Creek trailhead; and, enforcement of bear sanitation guidelines.

2.    The Forest Service will continue to require removal of dead stock posing a health or safety hazard when within 1/4 mile of live streams, springs, lakes, water, riparian areas, system roads and trails, developed recreation areas, dispersed camping and picnic sites.

FWS_000015

Mr. Michael Schrotz                                                              16

3.  The Forest Service will, in coordination with the U.S. Fish and Wildlife Service, annually review the effectiveness of the conservation measures in the Amended Assessment as they apply to the Elk Ridge Complex, the Upper Green, the Roaring Fork, and the Beaver-Twin allotments and implement any additional measures deemed necessary. The agencies will also evaluate the need for similar, mandatory conservation measures on the Badger Creek, Pot Creek, and New Fork-Boulder allotments and implement any measures deemed necessary.

4.  Forest Service personnel will continue to monitor compliance with all appropriate regulations designed to provide appropriate and safe grazing on these allotments, as well as those regulations designed to provide a safe recreational experience. While the Service acknowledges that the Forest Service's educational efforts have been quite successful and compliance is generally good, the Service remains concerned with the potential for unreported grizzly bear encounters resulting from non-compliance on the part of some forest users. Continued efforts by Forest Service personnel should help prevent this problem.

The Service believes that no more than four male and one female grizzly bears will be incidentally taken in the form of killing as a result of the proposed action. The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. If, during the course of the action, this level of incidental take is exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided. The Federal agency must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of ESA directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

1.  In cooperation with the U.S. Fish and Wildlife Service and the Wyoming Game and Fish Department, develop additional criteria related to the amount of livestock losses considered significant and warranting removal of a grizzly bear from the population.

2.  When possible, avoid important grizzly habitat components such as riparian areas, travel corridors/drainages, and berry stands for intense livestock use.

FWS_000016

Mr. Michael Schrotz                                                                    17

3.      Investigate the use of guard dogs to ward off predators, including grizzly bears, thereby
        avoiding conflicts and precluding the need to relocate or euthanize bears.

4.      Evaluate the potential for aversive conditioning of nuisance grizzly bears in the vicinity
        of the allotments.

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or
benefitting listed species or their habitats, the Service requests notification of the implementation
of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the action outlined in your January 1999 Amended
Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger
District (the Badger Creek, Beaver-Twin, Elk Ridge Complex, New Fork-Boulder, Pot Creek,
Roaring Fork, and Upper Green River allotments).  As provided in 50 CFR 402.16, reinitiation of
formal consultation is required where discretionary Federal agency involvement or control over
the action has been retained (or is authorized by law) and if: (1) the amount or extent of
incidental take is exceeded; (2) new information reveals effects of the agency action that may
affect listed species or critical habitat in a manner or to an extent not considered in this opinion;
(3) the agency action is subsequently modified in a manner that causes an effect to the listed
species or critical habitat that was not considered in this opinion; or (4) a new species is listed or
critical habitat designated that may be affected by the action.  In instances where the amount or
extent of incidental take is exceeded, any operations causing such take must cease pending
reinitiation.

If you have any questions regarding this consultation, please contact me or Mary Jennings of my
staff at the letterhead address or phone (307) 772-2374.

                                            Sincerely,

                                            Michael M. Long

                                            Michael M. Long
                                            Field Supervisor
                                            Wyoming Field Office

cc:     Field Supervisor, FWS, Montana Ecological Services Office, Helena, MT
        Grizzly Bear Coordinator, FWS. Missoula, MT
        Director, WGFD, Cheyenne, WY
        Non-game Coordinator, WGFD, Lander, WY (Attn: D. Moody)
        Wildlife Services, Casper, WY

Mr. Michael Schrotz                                                          18

## Literature Cited

Anderson, C.R., M.A. Ternent, D.S. Moody, M.T. Bruscino, and D.F. Miller. 1997. Grizzly
    bear-cattle interactions on two cattle allottments in northwest Wyoming. Wyoming
    Game and Fish Department, 78pp.

Blanchard, B.M. and R.R. Knight. 1995. Biological consequences of relocating grizzly bears in
    the Yellowstone ecosystem. J. Wildl. Manage. 59(3):560-565.

Claar, J.J., R.W. Klaver, and C.W. Servheen. 1986. Grizzly bear management on the Flathead
    Indian Reservation, Montana. Int. Conf. Bear Res. and Manage. 6:203-208.

Eberhardt, L. and R. Knight. 1996. How many grizzlies in Yellowstone? J. Wildl. Manage.
    60(2): 416-421.

Harris, R.B. 1984. Harvest age structure as an indicator of grizzly bear population status. M.S.
    Thesis, Univ. of Montana, Missoula. 204 pp.

Johnson, S. J. and D.E. Griffel. 1982. Sheep losses on grizzly bear range. J. Wildl. Manage.
    46:786-790.

Jorgensen, C.J. 1980. Bear-sheep interactions, Targhee National Forest. Int. Conf. Bear Res. and
    Manage. 5:191-200.

Knight, R.R. and L.L. Eberhardt. 1984. Projected future abundance of the Yellowstone grizzly
    bear. J. Wildl. Manage. 48:1434-1438.

Knight, R.R. and L.L. Eberhardt. 1985. Population dynamics of Yellowstone grizzly bears.
    Ecology 66:323-334.

Knight, R.R. and L.L. Eberhardt. 1987. Prospects for Yellowstone grizzly bears. Int. Conf. Bear
    Res. and Manage. 7:45-50.

Knight, R.R. and S.L. Judd. 1983. Grizzly bears that kill livestock. Int. Conf. Bear Res. and
    Manage. 5:186-190 .

Knight, R.R., B.M. Blanchard, and L.L. Eberhardt. 1988. Mortality patterns and populations
    sinks for Yellowstone grizzly bears, 1973-1985. Wildl. Soc. Bull. 16:121-125.

Mace, R. and T.L. Manley. 1993. South Fork Flathead River grizzly bear project: progress report
    for 1992. Mont. Dept. of Fish, Wildl. and Parks, Helena. 32pp.

FWS_000018

Mr. Michael Schrotz                                                                    19

Mattson, D.J. and R.R. Knight. 1991. Effects of access on human-caused mortality of
    Yellowstone grizzly bears. U.S.D.I. Natl. Park Serv. Interag. Grizzly Bear Study Team
    Report.

McArthur-Jope, K.L. 1980. Habituation of grizzly bears to people: A hypothesis. Int. Conf. Bear
    Res. and Manage. 5:322-327.

McClellan, B.N. and D.M. Shackleton. 1988. Grizzly bears and resource extraction industries:
    effects of roads on behavior, habitat use, and demography. J. Appl. Ecol. 25:451-460.

Murie, A. 1948. Cattle on grizzly bear range. J. Wildl. manage. 12:57-72.

Mysterud, I. 1977. Bear management and sheep husbandry in Norway, with a discussion of
    predatory behavior significant for evaluation of livestock losses. Int. Conf. Bear Res. and
    Manage. 4:233-241.

U.S. Fish and Wildlife Service. 1993. Grizzly bear recovery plan. U.S. Fish and Wildlife Service,
    Missoula, MT. 181pp.

U.S. Fish and Wildlife Service. 1999. Annual Yellowstone grizzly bear population and known,
    human-caused mortality data. Unpubl. rept.

U.S. Forest Service. 1990. CEM-a model for assessing effects on grizzly bears. U.S. Forest
    Service. 24pp.

FWS_000019

FWS_000020

USDA | United States | Forest | Bridger-Teton | 340 N. Cache
| Department of | Service | National Forest | PO Box 1888
| Agriculture | | | Jackson, WY 83001-1888

RECEIVED

2010 APR 13 AM 10: 36

US FISH & WILDLIFE SVC
CHEYENNE, WY

File Code: 2670
Date: April 1, 2010

Brian Kelly
Field Supervisor
Ecological Services, Wyoming Field Office
USDI Fish and Wildlife Service
4000 Airport Way
Cheyenne, WY 82001

Dear Brian:

Enclosed is the 2010 Amended Biological Assessment for livestock grazing on the northern portions of the Pinedale Ranger District, Bridger-Teton National Forest. The four sheep allotments (Elk Ridge Complex) and six cattle allotments were initially consulted on in 1997. A final Biological Opinion was received in 1999, and it was the Service's opinion that continued grazing on these allotments was not likely to jeopardize the continued existence of the grizzly bear (*Urus arctos horriblis).*

From the time of the initial consultation until today, the Yellowstone grizzly bear population has exceeded recovery goals following the 1993 Recovery Plan, and the Yellowstone grizzly bear was de-listed in 2007. However, in September 2009, the Federal District Court in Missoula issued an order vacating the de-listing. In compliance with this order, the Yellowstone grizzly population is once again designated a threatened population under the Endangered Species Act.

This Amended Biological Assessment has determined that continued grazing on these allotments may affect and is likely to adversely affect the grizzly bear. Due to the re-listing of the grizzly bear and the attached Amended Biological Assessment, the Pinedale Ranger District requests re-initiation of formal consultation. It has also been determined that continued grazing on these allotments may, but is not likely to adversely affect the Canada lynx (*Lynx canadensis*) or Canada lynx Critical Habitat. Additionally, it is not likely to jeopardize the continued existence of the Western Gray Wolf (*Canis lupus*) or the Greater Sage-Grouse (*Centrocercus urophasianus*).

We thank you for participating as an official cooperating agency for the project, and appreciate the assistance your staff has given in the development of this Amended Biological Assessment. If you have any questions regarding this request or the enclosed document, please contact me at 307-739-5510 or Jenna Casey at 307-276-5813.

Sincerely,

CAROLE 'KNIFFY' HAMILTON
Forest Supervisor

cc: Eric Winthers, Pam Bode

Enclosure



Caring for the Land and Serving People

Printed on Recycled Paper

FWS_000022

# 2010 Amendment to the 1999 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District

BRIDGER-TETON NATIONAL FOREST
PINEDALE RANGER DISTRICT
SUBLETTE COUNTY, WYOMING

Prepared By:

Jenna Casey
Wildlife Biologist

Reviewed By:

Lee Jacobson
Regional Threatened and Endangered Species Coordinator – Region 4

Received By:

Eric Winthers
Acting Pinedale District Ranger

FWS_000023

# 2010 Amendment to the 1999 BA for Livestock Grazing on the Northern Portion of the Pinedale Ranger District

## Table of Contents

Appellate Case: 22-8043   Document: 26-1   Date Filed: 09/15/2022   Page: 182

Introduction ............................................................................................................................. 5

Description of the Proposal ..................................................................................................... 5

  Continued Livestock Grazi.ng ............................................................................................ 5

    Table 1: Livestock grazing in the project area ................................................................. 6

    Figure 1: Project Area ...................................................................................................... 7

    Required Grizzly Bear Conservation Measures: .............................................................. 8

Species Considered and Species Evaluated ............................................................................ 8

    Table 2: Threatened, Endangered or Candidate Species on the Pinedale Ranger District of the Bridger-Teton National Forest (USDI Fish and Wildlife Service, 2009) ............................................................................. 8

Consultation History ............................................................................................................... 9

  Grizzly Bear ....................................................................................................................... 9

    Figure 2: Yellowstone Grizzly Bear DPS Boundary and Suitable Habitat .................... 12

  Canada Lynx and Canada Lynx Critical Habitat ............................................................. 13

Status of the Grizzly Bear ..................................................................................................... 13

  Home Range Size ............................................................................................................. 13

  Food Habits ...................................................................................................................... 13

  Denning Chronology and Habitat .................................................................................... 14

  Grizzly Bear/Human Interactions .................................................................................... 14

    Table 2: All GYE Grizzly Bear Mortalities 1973-2009 ................................................ 15

  Grizzly Bear Mortalities on the BTNF ............................................................................ 15

    Table 3: Grizzly Bear Human-Caused Mortalities on All National Forest System Lands 1999-2009 (IGBST 2000-2009). .................................................................................................... 15

    Table 4: Grizzly Bear Human-Caused Mortalities on the BTNF 1999-2009 (IGBST 2000-2009). ....... 16

  Grizzly Bear/Human Conflicts in the GYA ..................................................................... 16

  Grizzly Bear/Motorized Access and Secure Habitat Interactions .................................... 17

  Grizzly Bear/Developed Site Interactions ....................................................................... 18

  Grizzly Bear/Livestock Interactions ................................................................................ 18

Status of the Western Gray Wolf ........................................................................................... 19

  Listing Status of NRM DPS ............................................................................................ 19

  Habitat Requirements, Home Range, Food Habits .......................................................... 20

  Population Status of NRM DPS in Wyoming .................................................................. 20

2

Figure 3: Wyoming Wolf Packs 2009 (USFWS 2009). ........................................................... 21

Wolf/Livestock Interactions ........................................................................................................ 22

Table 5: Wolf Depredations in Wyoming: 2000-2009 (Jimenez et.al 2009) .......................... 22

Status of Canada Lynx and Canada Lynx Critical Habitat ............................................................... 22

Listing Status of the Contiguous U.S. DPS ................................................................................ 22

Canada Lynx Critical Habitat .................................................................................................... 23

Habitat Requirements, Home Range, Food Habits .................................................................... 23

Status of Greater Sage-Grouse ....................................................................................................... 24

Listing Status ............................................................................................................................. 24

Habitat Requirements, Home Range, Food Habits .................................................................... 24

Sage Grouse Habitat in Management Zone II ........................................................................... 25

Environmental Baseline for the Species Evaluated ......................................................................... 25

Grizzly Bear .................................................................................................................................... 25

Forest Plan Direction for Grizzly Bear Habitat Management ..................................................... 27

Forest Plan Amendment for Grizzly Bear Habitat Conservation ............................................... 27

Summary of Management Actions Related to Habitat and Mortality Risk Implemented within the
Project Area ................................................................................................................................ 28

Food storage orders/regulations Food storage Order 04-00-104 (USDA Forest Service 2004): ......... 28

Bear resistant facilities/sanitation ......................................................................................... 29

Information, Education and Patrolling ................................................................................... 29

Special grizzly bear requirements in permits ........................................................................ 29

Whitebark pine ....................................................................................................................... 29

Planning, coordination, monitoring, and cooperation .......................................................... 29

Grizzly Bear Population ............................................................................................................. 29

Figure 5: 2004 Distribution of Grizzly Bears in the GYE .................................................... 31

Secure Habitat ........................................................................................................................... 32

Secure Habitat in the Project Area ............................................................................................ 32

Figure 6: Map of Secure Habitat within the Project Area .................................................... 32

Figure 7: Percent of Secure Grizzly Bear Habitat within the Project Area .......................... 33

Grizzly Bear Denning Habitat in the Project Area .................................................................... 33

Grizzly Bear Conflicts in the Project Area ................................................................................ 33

Figure 8: Grizzly Bear Conflicts in the Project Area (WGFD 2009) .................................... 34

Grizzly Bear/Livestock Relocations in the Project Area ........................................................... 34

Figure 9 and 10 Management Trapped Bears (Male and Females) in the Project Area .......... 35

Grizzly Bear Mortalities in the Project Area ............................................................................. 35

Female Grizzly Bear Survival in the Project Area ..................................................................... 35

3

Figure 11: Source and Sink Habitats within the Project Area (per Schwartz et al. 2010 ) .................. 36

Western Gray Wolf .................................................................................................................. 37

    Wolf Population within the Project Area .............................................................................. 37

    Wolf/Livestock Interactions within the Project Area ............................................................ 38

Canada Lynx and Canada Lynx Critical Habitat ...................................................................... 38

    Northern Rockies Lynx Management Direction ................................................................... 38

    Canada Lynx Locations within the Project Area .................................................................. 39

    Canada Lynx Critical Habitat within the Project Area .......................................................... 39

Greater Sage-Grouse ................................................................................................................ 40

    Forest Plan Direction for Sage Grouse Management ............................................................ 40

    State of Wyoming Direction for Sage Grouse Management ................................................. 41

Greater Sage-Grouse within the Project Area ........................................................................... 41

Effects of the Proposed Management Action on Species Evaluated............................................. 41

Grizzly Bear .......................................................................................................................... 41

    Direct and Indirect Effects .................................................................................................. 41

    Cumulative Effects ............................................................................................................. 42

Western Gray Wolf .................................................................................................................. 43

    Direct Indirect and Cumulative Effects ............................................................................... 43

Canada Lynx and Canada Lynx Critical Habitat ...................................................................... 43

    Direct and Indirect Effects .................................................................................................. 43

    Cumulative Effects ............................................................................................................. 44

Greater Sage-Grouse ................................................................................................................ 44

    Direct and Indirect Effects .................................................................................................. 44

    Cumulative Effects ............................................................................................................. 45

Determinations of Effect................................................................................................................ 45

Table 6: Determinations of Effect ............................................................................................ 45

Rationale .................................................................................................................................. 45

    Grizzly Bear ....................................................................................................................... 45

    Gray Wolf .......................................................................................................................... 46

    Canada Lynx and Canada Lynx Critical Habitat ................................................................. 46

    Greater Sage-Grouse .......................................................................................................... 47

Works Cited ................................................................................................................................. 48

FWS_000026

## Introduction

This Biological Assessment was prepared to display the possible effects on all Federally Endangered, Threatened, Experimental, or Candidate species known to occur, or that may occur within the area influenced by the continuance of livestock grazing on the Northern Portion of the Pinedale Ranger District on the Bridger-Teton National Forest (BTNF). Endangered, Threatened, Experimental, and Candidate species are managed under the authority of the Federal Endangered Species Act (PL 93-205, as amended) and the National Forest Management Act (PL 94-588). Section 7 of the Endangered Species Act directs Federal departments and agencies to ensure actions authorized, funded, or carried out by them are not likely to jeopardize the continued existence of Endangered or Threatened species or result in the destruction or adverse modification of their critical habitats (16 USC 1536, 2009).

In accordance with the Endangered Species Act (ESA), its implementation regulations, and FSM 2671.4, the BTNF Pinedale Ranger District is required to request reinitiation of formal consultation when: (1) new information reveals effects, which may impact Threatened, Endangered, and Proposed species or their habitats in a manner or to an extent not considered in the assessment; (2) the proposed action is subsequently modified in a manner that causes an effect, which was not considered in the original assessment; or (3) a new species is listed or habitat identified, which may be affected by the action.

This need for re-assessment is based on new information and effects that may impact grizzly bears to an extent that was not considered in the original assessment in 1999. There is also a need to analyze the impact to Canada lynx, Canada lynx Critical Habitat and the Greater Sage Grouse; species that were not protected under the ESA at the time of initial consultation.

## Description of the Proposal

### Continued Livestock Grazing

The proposed action specifies grazing management to sustain current livestock operations within nine cattle and sheep allotments in the Northern section of the Pinedale Ranger District (Fig. 1).

Approximately 46,100 Animal Unit Months (AUM's) of domestic cattle grazing will continue to be authorized in the project area under this alternative. Allotment Management Plans (AMP) are prepared for each of the allotments. They are designed with specific objectives and management practices needed to move resource conditions toward goals and Desired Future Conditions (DFC's) described by the Forest Plan (USDA Forest Service, 1990). Table 1 displays livestock grazing proposed in the project area under the proposed action.

FWS_000027

*Table 1: Livestock grazing in the project area*

| Allotment Name | Total Acres | Suitable Acres | Grazing Season | Number Livestock | Grazing Management System |
|---|---|---|---|---|---|
| Badger Creek | 7,325 | 2533 | July 1st – September 30th | 157 Cc | Season long |
| Beaver-Twin Creeks | 22,266 | 13351 | July 15th – October 15th | 700 Cc | Season long |
| Noble Pastures | 760 | 760 | June 14th – September 20th | 1616 Cc | Deferred Rotation |
| Roaring Fork | 8,275 | 6047 | June 16th – October 15th | 170 Cc | Season long |
| Upper Green River:<br>Mud Lake/Fish Creek<br>Mosquito Lake Pastures<br>Tepee/Tosi /Kinky S<br>Moose/Gypsum<br>Kinky Creek N | 123,933 | 73181 | June 16th – October 15th | 7596 Cc | Deferred Rotation<br>Rest Rotation<br>Deferred Rotation<br>Deferred Rotation<br>Rest Rotation |
| Wagon Creek | 240 | 240 | July 15th – October 15th | 106 Cc | Deferred On/off |
| New Fork-Boulder | 8294 | 3932 | July 1st – September 30th | 511 Cc | Deferred Rotation |
| Pot Creek | 4665 | 2307 | July 16th – October 15th | 380 Cc | Deferred Rotation |
| Elk Ridge Complex:<br>Elk Ridge<br>Rock Creek<br>Lime Creek<br>Tosi Creek | 31,430 | 17548 | July 6th – September 26th | 3750 El | Rest Rotation |
| **TOTALS:** | **207,188** | **119,899** | | **3,750El**<br>**11,236 Cc** | |

6

FWS_000028



*Figure 1: Project Area*

7

***Required Grizzly Bear Conservation Measures:***
➢ The FS will request re-initiation of consultation in the event of significant changes to the grazing situation.
➢ All livestock predation will be reported to Fish and Wildlife Service (USFWS), BTNF, and Wyoming Game and Fish Department (WGFD).
➢ Annual discussions between FWS, BTNF, Wildlife Services and Upper Green River Cattle Association permittees to discuss the conservation measures.
➢ All depredation control work will be conducted by WGFD or its authorized agent following Interagency Nuisance Bear Guidelines (pages 51-70 of the Interagency Grizzly Bear Guidelines, USDI Fish and Wildlife Service 1986)
➢ Bear Sanitation Guidelines will be followed for all camps associated with livestock operations (See Food Storage Order 04-00-104).
➢ Herders and riders are  required to watch all livestock closely for sick, injured or stray animals
➢ Permanent FS employees will monitor allotments on a regular basis.
➢ On Sheep Allotments:
  ▪ All livestock carcasses will be removed as soon as practical and sick or injured animals will be removed or treated when possible.
➢ On Cattle Allotments:
  ▪ All carcasses will be removed or treated within ½ mile of Green River Lakes Road, Union Pass Rd, FS 605, 660, 663B and 663C, GRL and Whiskey campgrounds, private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Lake of the Woods, Waterdog Lakes and North Beaver and Tosi trailhead.
➢ Additionally, all dead stock posing a health or safety hazard will be moved when within ¼ mile of live streams, springs, lakes, water, riparian areas, system roads and trails, developed recreation areas, dispersed camping and picnic sites.
➢ Sick or injured animals will be removed when possible.
➢ No sheep cattle or carcass will be removed if human safety is of concern.

## Species Considered and Species Evaluated

Below is a list of species identified which may occur on the Pinedale Ranger District by the USFWS. Species that do not occur in the project area or species where water depletion of the Platte or the Green River is the main concern are not further analyzed for effects. There is 'no effect' to these species from this project because it does not result in water depletion of these systems.

***Table 2: Threatened, Endangered or Candidate Species on the Pinedale Ranger District of the Bridger-Teton National Forest (USDI Fish and Wildlife Service, 2009)***

| Species or Critical Habitat | ESA Status | Status in Project Area |
|---|---|---|
| Canada Lynx (*Lynx canadensis*) | Threatened | Known |
| Critical Habitat for Canada Lynx | Designated | Known |
| Gray Wolf (*Canis lupus*) | Non-essential Experimental | Known |
| Grizzly bear (*Urus arctos horriblis*) | Threatened | Known |
| Kendall Warm Springs dace (*Rhinichthys osculuc thermalis*) | Endangered | Known |

8

| Greater Sage Grouse* (*Centrocercus urophasianus*) | Candidate | Known |
|---|---|---|
| Yellow-billed cuckoo (*Coccyzus americanus*) | Candidate | Not Suspected |
| Bonytail (*Glia elegans*) | Endangered | Found downstream in the Green River |
| Colorado pikeminnow (*Ptychocheilus lucinus*) | Endangered | Found downstream in the Green River |
| Humpback chub (Glia cypha) | Endangered | Found downstream in the Green River |
| Razorback sucker (*Xyrauchen texanus*) | Endangered | Found downstream in the Green River |
| Critical Habitat for: Bonytail, Colorado pinekminnow, Humpback chub, and Razorback sucker | Designated | Found downstream in the Green River |
| Whooping crane (*Grus americana*) | Endangered | Not Suspected: Found in Platte River System |
| Critical habitat for Whooping crane | Designated | Not Suspected: Found in Platte River System |
| Interior least tern (*Sterna antillarum*) | Endangered | Not Suspected: Found in Platte River System |
| Piping Plover (*Charadrius melodus*) | Threatened | Not Suspected: Found in Platte River System |
| Pallid Sturgeon (*Scaphirhynchus albus*) | Endangered | Not Suspected: Found in Platte River System |
| Western prairie fringed orchid (*Platanthera praeclara*) | Threatened | Not Suspected: Found in Platte River System |

*Greater Sage-grouse designated as a Candidate Species on 3/23/2010

## Consultation History

### Grizzly Bear

In 1996, at least 8 different grizzly bears were documented utilizing northern portions of the Pinedale Ranger District. On August 22, 1996, after a meeting between the USFWS, the FS, WGFD, and Wildlife Services, the USFWS requested the Pinedale Ranger District initiate formal consultation regarding potential adverse effects to grizzly bears associated with the continuance of permitted livestock grazing on four sheep allotments (Elk Ridge Complex) in the Upper Green River drainage. On August 29, 1996, Service representative Mary Jennings met with District staff and Jay Gore of the Intermountain Region of the FS to further discuss the need for formal consultation. It was determined the Bridger-Teton National Forest would prepare a biological assessment for the allotments in early 1997. The scope of the assessment was expanded to six permitted cattle allotments when additional possible grizzly bear activity was identified in the vicinity of these allotments. The allotments added were the Badger Creek, Beaver-Twin, New Fork-Boulder, Pot Creek, Roaring Fork and the Upper Green River allotments. The Forest requested formal consultation and provided a biological assessment in its March 3, 1997 letter, received by the USFWS on March 10, 1997. The deadline for the completion of the associated biological opinion was further extended during the course of its preparation. The USFWS's October 31, 1997 draft Biological Opinion was provided to the FS and through the FS to the Upper Green River Cattle Association (UGRCA) permittees and their attorney.

9

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 190

On October 28, 1998, the UGRCA permittees and their attorney met with representatives of the BTNF and the USFWS to discuss issues associated with the March 1997 Biological Assessment (USDA Forest Service 1997) and the October 1997 draft Biological Opinion for the project. Based on those discussions, several changes to both documents were agreed upon. The FS provided the USFWS with an amendment to the March 1997 Biological Assessment (USDA Forest Service 1999)

It was the USFWS's biological opinion that the continued grazing on the identified cattle and sheep allotments in the northern portions of the Pinedale Ranger District was not likely to jeopardize the continued existence of the grizzly bear. The allotments covered by the biological opinion were at that time outside of the grizzly bear Recovery Zone (Recovery Zone) and were determined to contain no habitat that was considered essential for the recovery and the survival of the grizzly bear. The USFWS also concurred with the FS determination that the action will have no effect on any other listed species and will not jeopardize the experimental population of the Western gray wolf (*Canis lupus*).

The Service anticipated four male grizzly bears and one female grizzly bear may be lethally taken as a result of the proposed action. The incidental take was expected to be in the form of killing and was most likely to occur through management actions/nuisance bear control in compliance with the Interagency Nuisance Bear Guidelines (pages 51-70 of the Interagency Grizzly Bear Guidelines, USDI Fish and Wildlife Service 1986).The amount of lethal take anticipated was based on input from the WGFD and the BTNF regarding the number of grizzly bears in the vicinity of these allotments and information regarding which bears may be depredating. Additionally, the service anticipated non-lethal take from the displacement of grizzly bears from important habitats would continue to occur as a result of the proposed action. At the time, the USFWS was unable to quantify a specific amount of non-lethal incidental take for this proposed action.

On March 29, 2007, the USFWS established a distinct population segment (DPS) of the grizzly bear for the Greater Yellowstone Area (GYA) and the surrounding area (Figure 1) and removed this DPS (Yellowstone grizzly bear population) from the List of Threatened and Endangered Wildlife (USDI Fish and Wildlife Service, 2007). According to this ruling, robust population growth, coupled with State and Federal cooperation to manage mortality and habitat, widespread public support for grizzly bear recovery, and the development of adequate regulatory mechanisms had brought the Yellowstone grizzly bear population to the point where making a change to its status was appropriate.

Prior to the publication of this final rule, the USFWS (1) finalized the Conservation Strategy that would guide post-delisting monitoring and management of the grizzly bear in the GYA, (2) appended the habitat-based recovery criteria to the 1993 Recovery Plan and Strategy, and (3) appended an updated and improved methodology for calculating total population size, known to unknown mortality ratios and sustainable mortality limits for the Yellowstone grizzly bear population to the 1993 Recovery Plan and Conservation Strategy.

On September 21, 2009, the Federal District Court in Missoula issued an order enjoining and vacating the delisting of the Yellowstone grizzly bear population. In compliance with this order, the Yellowstone grizzly population is once again a threatened population under the Endangered Species Act (USDI Fish and Wildlife Service 2010a). Conversations between Forest Service representatives and the USFWS began promptly after the relisting of the grizzly bear to identify ongoing activities that may need prompt consultation under Section 7 of the ESA. With the relisting of the Yellowstone population of the grizzly bear, the validity of the take statement detailed in the 1999 BO was in question due to the increase in grizzly bears within the project area, the amended recovery criteria to the 1993 Recovery Plan and Strategy and the

10

FWS_000032

2006 Forest Plan Amendment for Grizzly Bear Habitat Conservation in the GYA National Forests EIS (USDA Forest Service, 2006).

Based on numerous discussions between USFWS, BTNF and WGFD representatives, it was agreed upon that due to the increase in available information on the status of the grizzly bear population in the GYA and dramatic increase of grizzly bears within the project area from 1999-2009, the BTNF would prepare a biological assessment for the allotments and reinitiate formal consultation in early 2010.

On February 5, 2010 representatives from the Bridger-Teton National Forest and the WGFD met to discuss the livestock-bear conflict data between 2005 and 2009 and the adequacy of the conservation measures and terms and conditions detailed in the 1999 BO and the implications of the 2005 updated Food Storage Order (04-00-104) requirements. The majority of the results of that meeting are described in the Proposed Action; as these are required measures in the decision and sequentially the Allotment Management Plans for each of the allotments addressed in this BA. Grizzly bear/livestock conflicts were discussed and in summary, there was agreement between the WGFD and the FS that most, if not all, grizzly bears that come in contact with domestic sheep prey on sheep and conflicts are inevitable and not all grizzly bears that come in contact with cattle make kills. This is similar to conclusion in the Conservation Strategy and work done by Knight and Judd (1983). Conflicts between livestock and grizzly bears are likely to continue in spite of all known/ applicable conservations measures applied to the action. These conflicts are likely to result in the relocation or removal (direct mortality) of grizzly bears.

On March 5, 2010, continued grazing on the northern portions of the Pinedale Ranger District was presented to the Level 1 Team in Lander, WY. The consultation history, coordination with WGFD, detailed description of the conservation measures and a summary of conflicts, mortalities and relocations were presented to the entire team. Conservation measures and impacts on the Yellowstone grizzly bear population were discussed between all agencies present and there were no additional conservation measures or concerns from the team about the project and the associated impacts to the continued existence of the Yellowstone grizzly bear.

FWS_000033

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 192



*Figure 2: Yellowstone Grizzly Bear DPS Boundary and Suitable Habitat*

12

FWS_000034

*Canada Lynx and Canada Lynx Critical Habitat*

The Northern Rockies Lynx Management Direction EIS ROD (NRLMD) was signed in March 2007 (USDA Forest Service, 2007). The purpose of the NRLMD was to incorporate management direction into land and management plans that conserve and promote the recovery of lynx in the Northern Rockies Ecosystem. The direction applies to National Forest System lands presently occupied by lynx, (BTNF included).

The continued grazing identified in this project will be analyzed for compliance with the Standards and Guidelines in the NRLMD and the associated effects to lynx and designated critical habitat.

## Status of the Grizzly Bear

The following information, with the exception of data post-2005 and project specific data analysis, is from the Final Biological Assessment for the Forest Plan Amendments for Grizzly Bear Conservation for the Greater Yellowstone Area National Forests (Barber and Orme 2005) and the references within. Grizzly bear mortality and conflict data post 2005 is from the corresponding IGBST Annual Reports (Interagency Grizzly Bear Study Team, 2000-2009).

*Home Range Size*

Home range sizes of grizzly bears vary in relation to food availability, weather conditions, and interactions with other bears. In addition, individual bears may extend their range seasonally or from one year to the next (USDI FWS 1993) and the home ranges of adult grizzly bears frequently overlap. The home ranges of adult male grizzlies are generally two to four times larger than that of females, averaging in approximately 884 $km^2$ (341 $mi^2$) for females and 3,757 $km^2$ (1,450 $mi^2$) for males (Blanchard and Knight 1991). The home ranges of grizzly females appear to be smaller while they are with cubs, but ranges expand when the young are yearlings in order to meet increased foraging demands.

Grizzly bears disperse as subadults and their pattern of dispersal is not well documented. Dispersing young males apparently leave their mother's home ranges and their dispersal may be mediated by the avoidance of the home ranges of established adults. Young females may establish a home range soon after family breakup, often within the vicinity of their mothers' home ranges. Grizzly bear mothers may tolerate female offspring and may shift their home ranges to accommodate them (USFWS 1993).

*Food Habits*

Although the digestive systems of bears are essentially that of carnivores, bears are successful omnivores, and in some areas may be almost entirely herbivorous. Bears feed on animal matter or vegetable matter that is highly digestible and high in starch, sugars, protein, and stored fat. Grizzly bears must avail themselves of foods rich in protein or carbohydrates in excess of maintenance requirements in order to survive denning and post-denning periods. Other plant materials are eaten as the plants emerge, when crude protein levels are highest. Grizzly bears are opportunistic feeders and will prey or scavenge on almost any available food including ground squirrels, ungulates, carrion, and garbage. In areas where animal matter is less available, roots, bulbs, tubers, fungi, and tree cambium may be important in meeting nutrient requirements. High quality foods such as berries, nuts, and fish are important in some areas.

The search for food has a primary influence on grizzly bear movements. Upon emergence from the den, they seek lower elevations, drainage bottoms, avalanche chutes, and ungulate winter ranges where their food requirements can be met. Throughout late spring and early summer, they follow plant maturity back to higher elevations. In late summer and fall, there is a transition to fruit and nut sources, as well as other plant

FWS_000035

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 194

materials. This is a generalized pattern, however, and it should be kept in mind that bears are individuals trying to survive and will go where they can best meet their food requirements.

Grizzly bears in the GYA have the highest percent of meat consumption in their diet of any inland grizzly bear population (Hilderbrand et al. 1999). Approximately 30 to 70% of the Yellowstone grizzly bear diet is some form of meat. Adult males eat the greatest proportion of meat. Meat is considered to be any form of animal including ungulates (i.e. deer, elk, moose, bison), fish, army cutworm moths, other insects, and small mammals (i.e. ground squirrels, mice, voles).

Specific to the GYA, four seasonal foods have been identified as being important to the grizzly bear population. Ungulates (primarily elk and bison, but also deer and moose) are especially important during spring after emergence from dens and through the calving/fawning seasons (Cole 1972, Gunther and Renkin 1990, Mattson et al. 1991, Mattson and Knight 1992, Green et al. 1997, Mattson 1997a). Recent research has demonstrated that grizzly bears seek hunter-killed carcasses and gut-piles (Haroldson et al. 2004). Whitebark pine seeds are the most important fall food of Yellowstone grizzly bears, and the availability of nuts influences annual feeding strategies and movement patterns (Kendall 1983, Blanchard 1990, Mattson et al. 1992 a and 1992b, Mattson and Reinhart 1997, Mattson 1997b). Army cutworm moths are a preferred source of nutrition for many grizzly bears in the Yellowstone ecosystem and represent a high quality food that is available during the summer (Mattson et al. 1991, French et al. 1994, Ternent et al. 2001). Grizzly bears feed on spawning cutthroat trout along the tributaries of Yellowstone Lake during the spawning season from May 1 to July 15 (Mattson and Reinhart 1995).

### Denning Chronology and Habitat

Grizzly bears in the GYA can den from the end of September to the last week in April or early May, with entrance and emergence dates being affected by the gender and reproductive status of the bears (Judd et al. 1986, Haroldson et al. 2002). Denning periods differed among classes and averaged 171 days for females that emerged from dens with cubs, 151 days for other females, and 131 days for males. Known pregnant females tended to den at higher elevations and, following emergence, remained at higher elevations until late May. Females with cubs remained relatively close (< 3 km) to den sites until the last two weeks in May.

Denning habitat has been described as follows (Judd et al. 1986, Haroldson et al. 2002):
- Den sites are associated with moderate tree cover (26 to 75% canopy cover).
- Den sites are usually on 30 to 60 degree slopes.
- Den sites occurred on all aspects, although northerly exposures were most common.
- Grizzly bears usually dig new dens, but occasionally used natural cavities or a den from a previous year.
- Mean elevation at den sites for females with cubs that emerged from dens was 8,845 feet. Mean elevation for other females was 8,467 feet, and for males was 8,444 feet.

### Grizzly Bear/Human Interactions

A primary factor in providing for the conservation of grizzly bears is the management of grizzly bear/human interactions. A majority of grizzly bear mortality is attributable to grizzly bear/human conflicts with a common outcome of bear removal by interagency bear managers or killing by humans for other reasons. In addition to mortality concerns, providing secure habitat (areas free of motorized access) is important to enable bears to fully use their food sources, denning sites, and other living needs. Human presence can limit bear use of habitat, create tolerance among some bears that allows for interaction at great risk to the bears, or attract bears to unnatural or unsecured food sources increasing the risk of habituation to unnatural foods and human conflict.

14

FWS_000036

## Grizzly Bear Mortalities on the BTNF

From 1973 to 2009 there have been approximately 530 grizzly bear deaths in the GYA (Table 2, IGBST 2000-2009). It's important to note that the 2009 data is preliminary and limited information is available for mortalities still under investigation. Of these 530 deaths, there were 391 human-caused grizzly bear deaths (74% of the total) and 139 natural and unknown-cause grizzly bear deaths (26% of the total). From 1973 through 1996, grizzly bear deaths occurred outside of the PCA (Recovery Zone) in only five years. Starting in 1997, grizzly bear deaths have occurred each year outside the PCA.

For the last 11 years (time since initial consultation of this action, 1999 to present), approximately 80% (129 out of 160) of known and probable grizzly bear mortalities on National Forest System lands within the GYA have been human-caused. Almost half of these mortalities are in the category of hunting related self defense (46%) and the remaining are a combination of food habituated or bears responsible for property damage (12%), hunting related mistaken identity (11%), unknown (8%), livestock related (8%) and others (Table 3)

Of these human –caused mortalities on the National Forests in the GYA, approximately 35% (45) have occurred on the BTNF. The majority of the human-caused mortalities on the BTNF have occurred from hunting related self defense (46%) or management removal from livestock conflicts (16%) (Table 4).

### Table 3: Grizzly Bear Human-Caused Mortalities on All National Forest System Lands 1999-2009 (IGBST 2000-2009).

| Type of Mortality | Percent | Number |
|---|---|---|
| Self Defense Hunting related | 46% | 59 |
| Livestock | 7% | 9 |
| Handling/Accident | 5% | 6 |
| Mistaken Identity | 11% | 14 |
| Food Habituated or Property Damage | 12% | 16 |
| Malicious Killing | 5% | 7 |
| Human-Caused unknown | 8% | 10 |
| Roadkill | 4% | 5 |
| Human-Caused Defense of Life | 2% | 3 |
| | Total: | 129 |

### Table 2: All GYE Grizzly Bear Mortalities 1973-2009

| Year | All Bears GYE | | | |
|---|---|---|---|---|
| | Human Caused | | Other | |
| | In[a] | Out[a] | In | Out |
| 1973 | 14 | 0 | 3 | 0 |
| 1974 | 15 | 0 | 1 | 0 |
| 1975 | 3 | 0 | 0 | 0 |
| 1976 | 6 | 0 | 1 | 0 |
| 1977 | 14 | 0 | 3 | 0 |
| 1978 | 7 | 0 | 0 | 0 |
| 1979 | 7 | 1 | 0 | 0 |
| 1980 | 6 | 0 | 4 | 0 |
| 1981 | 10 | 0 | 3 | 0 |
| 1982 | 14 | 0 | 3 | 0 |
| 1983 | 6 | 0 | 1 | 0 |
| 1984 | 8 | 0 | 2 | 0 |
| 1985 | 5 | 1 | 7 | 0 |
| 1986 | 5 | 4 | 2 | 0 |
| 1987 | 3 | 0 | 0 | 0 |
| 1988 | 5 | 0 | 6 | 0 |
| 1989 | 2 | 0 | 1 | 0 |
| 1990 | 9 | 0 | 0 | 0 |
| 1991 | 0 | 0 | 0 | 0 |
| 1992 | 4 | 0 | 4 | 0 |
| 1993 | 3 | 0 | 2 | 0 |
| 1994 | 10 | 1 | 0 | 0 |
| 1995 | 17 | 0 | 0 | 0 |
| 1996 | 10 | 0 | 4 | 0 |
| 1997 | 8 | 2 | 10 | 1 |
| 1998 | 1 | 2 | 3 | 0 |
| 1999 | 7 | 1 | 8 | 0 |
| 2000* | 16 | 6 | 14 | 0 |
| 2001 | 17 | 3 | 8 | 1 |
| 2002 | 15 | 2 | 8 | 0 |
| 2003 | 10 | 2 | 5 | 0 |
| 2004 | 17 | 2 | 7 | 0 |
| 2005 | 7 | 4 | 0 | 0 |
| 2006 | 5 | 2 | 5 | 2 |
| 2007** | 24 | | 7 | |
| 2008*** | 37 | | 11 | |
| 2009 | 15 | | 2 | |

[a] - In refers to inside the Recovery Zone (RZ) or within a 10-mile perimeter of the RZ. Out refers to >10 miles outside RZ.

*Beginning in 2000, probably mortalities were included in the calculation of mortality thresholds and COY orphaned as a result of human causes will be designated as probably mortalities. Prior to these changes, COY orphaned after 1 July were designated possible mortalities (Craighead et al. 1988)

**2007 was the first year the updated methods for claculating population levels and allowable mortality limits as a percentage of the population

***2008 was the first year mortality thresholds were exceeded for males and females. The mortality thresholds for dependant young was not exceeded.

15

FWS_000037

On the BTNF, 80% (36 of the 45) human-caused grizzly bear deaths are in the categories of accidents, mistaken ID, vandal killings hunter related self defense killings, and unknown, which are not directly attributable to BTNF management activities or actions.

**Table 4: Grizzly Bear Human-Caused Mortalities on the BTNF 1999-2009 (IGBST 2000-2009).**

| Type of Mortality | Percent | Number |
|---|---|---|
| Self Defense Hunting related | 58% | 26 |
| Livestock | 16% | 7 |
| Mistaken Identity | 9% | 4 |
| Food Habituated or Property Damage | 2% | 1 |
| Malicious Killing | 7% | 3 |
| Human-Caused unknown | 7% | 3 |
| Road-kill | 2% | 1 |
| | Total: | 45 |

To reduce grizzly bear deaths on National Forest System lands, the BTNF has closed domestic sheep allotments and cattle allotments with recurring conflicts in the PCA, established food storage regulations, provided bear resistant containers for garbage and food storage, provided information and education materials and programs, established special grizzly bear requirements in contracts and permits, and issued access restrictions and regulations.

### Grizzly Bear/Human Conflicts in the GYA

Grizzly bear/human conflicts are defined as incidents, in which grizzly bears injure people, damage property, kill or injure livestock, damage beehives, obtain anthropogenic (unnatural) foods, or damage or obtain garden and orchard fruits and vegetables. All conflicts reported to state and federal agencies are entered into state databases and complied annually by Yellowstone National Park and reported in the IGBST Annual Report. Grizzly bear/human encounters that did not result in human injury or property damage are also recorded but categorized as confrontations rather than conflicts.

There were 190 grizzly bear/human conflicts in the GYE in 2008. These incidents included bears obtaining anthropogenic foods (38%), killing livestock (35%) damaging property (20%), obtaining vegetable and fruits from gardens and orchards (4%) and injuring people (3%). Most (58%) conflicts occurred on private land. The remaining 42% occurred on public land with 36% percent National Forest System lands and 6% on National Park Service lands. Of these 190 reported conflicts, 25% occurred outside of the PCA. The number of incidents of grizzly bear-human conflict in 2008 were similar to long-term averages recorded from 1992-2007 (IGBST 2009). Grizzly bear habitat under different ownership exhibited different types of bear-human conflicts in 2008. On private property, bears obtaining anthropogenic foods were most common; on National Forest System lands, livestock depredations were most common and on National Park Service lands, few human-grizzly bear conflicts occurred but habituation of bears to people is a significant management challenge (IGBST 2009).

A conflict distribution map was constructed in 2008 by the IGBST using fixed kernel 80% conflict distribution isopleths. This map identified 5 areas where most grizzly bear-human conflicts occurred over the last 3 years. These 5 areas contained 75% of the conflicts that occurred between 2006 and 2008. The 5 areas are 1) the Gardiner Basin area; 2) the area encompassing the Clarks Fork River, Crandall Creek, Sunlight Creek and the North and South Forks of the Shoshone River; 3) the Wood River/Cottonwood Creek/Grass Creek drainages; 4) the Green River/Dunoir Creek drainages and 5) the area encompassing West

16

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 197

Yellowstone and Island Park. Area 4, the Green River drainage is the location of this project area and compromised 88% (24 out of 27) of the conflicts on the BTNF in 2008.

Historically, numbers of grizzly bear-human conflicts and management actions tend to decrease during years with good white bark pine cone production (IGBST 2009). IGBST research clearly shows that bears tend to eat more meat when whitebark pine seeds are not available and that there is an increase in hunter-grizzly bear conflicts and mortalities in poor seed years. According to the 2008 Whitebark Pine Cone Production Report (Interagency Grizzly Bear Study Team 2009), whitebark pine surveys showed poor cone production. The mean cones/tree were 8.6, which was the first year since 2004 that cone production was below average (mean cones/tree is 15). Typically, there is a reduction in numbers of management actions during fall months with abundant cone availability. During August-October 2008, the number of management actions (n = 11) was near the overall average of management actions during this timeframe from 1980-2007 (n = 9). However, the number of bear mortalities from hunting related self-defense kills was high (n = 8). Whitebark pine cone production surveys in 2009 showed good to excellent cone production (Interagency Grizzly Bear Study Team. 2010). Mean cones/tree was 46.5. The final 2009 conflict report is not currently available from the IGBST; however the conflict data from the project area was provided by the WGFD and is presented in the Environmental Baseline section of this document.

### *Grizzly Bear/Motorized Access and Secure Habitat Interactions*

The management of human use levels through access route management is one of the most powerful tools available to balance the needs of grizzly bears with the needs and activities of humans. It has been documented in several research projects, completed and ongoing, that unregulated human access and development within grizzly bear habitat can contribute to increased bear mortality and affect bear use of existing habitat (IGBC 1998, Interagency Conservation Strategy Team 2003).

Historically, management of motorized use has been primarily accomplished through restriction of certain types of motorized use on established access routes, i.e. management of open motorized route densities. Recent research has shown that secure habitat (areas that are free of motorized traffic, also referred to as core areas) is an important component of grizzly bear habitat (IGBC 1998).

By managing motorized access, the following grizzly bear management objectives can be met (IGBC 1998):

- Minimize human interaction and potential grizzly bear mortality
- Minimize displacement from important habitats
- Minimize habituation to humans
- Provide relatively secure habitat where energy requirements can be met

History has demonstrated that grizzly bear populations survived where frequencies of contact with humans were very low. Populations of grizzly bears persisted in those areas where large expanses of relatively secure habitat were retained and where human-induced mortality was low. In the Yellowstone area, this is primarily associated with national parks, wilderness areas, and large blocks of public lands (IGBC 1998). Habitat security requires minimizing mortality risk and displacement from human activities in a sufficient amount of habitat to allow the population to benefit from this secure habitat and respond with increasing numbers and distribution. Habitat security allows a population to increase in numbers and distribution as lowered mortality results in more reproduction and cub recruitment into the adult population. This results in an increasing population. As the population increases, it begins to expand in range and distribution. Both of these responses to habitat security are currently ongoing in the

17

FWS_000039

Yellowstone population as the population is increasing at 3 to 4% per year (Boyce et al. 2001) and increasing in distribution (Schwartz et al. 2002).

Secure habitat must also provide the basic seasonal habitat requirements for grizzly bears and should be representative of seasonal habitats available to bears in the entire analysis area (IGBC 1998). The Cumulative Effects Model was used to evaluate the relative habitat value of the existing secure habitat inside the PCA (Interagency Conservation Strategy Team 2003). This project area is not within the PCA; therefore the CEM does not cover the project area.

Calculations for secure habitat are presented in the Environmental Baseline section of this BA.

### Grizzly Bear/Developed Site Interactions

The effects of human activity associated with developments on grizzly bear habitat use have been reported by Mattson et al. (1987), and include the following:

- Grizzly bear use was lower in areas near human developments
- Foraging behavior was disrupted
- Dominant bears tended to displace subordinate bears into areas with more human development
- Adult females and subadult males residing closer to developments were more likely to be involved in management actions (such as being trapped and relocated)

The Bridger-Teton National Forest has instituted a food storage order (04-00-104) which applies to the project area. The guidelines in the food storage order are detailed in the Environmental baseline of this report and in Appendix A.

This food storage order was implemented to reduce grizzly bear/human conflicts associated with developed sites as well as dispersed sites. Mattson and Knight (1991) analyzed grizzly bear mortality data by three eight-year periods (1962 to 1969, 1975 to 1982, and 1983 to 1990) and by association with different levels of human access, including major developments, primary roads, secondary roads, and backcountry areas. They reported that unit area mortality rates associated with all levels of access decreased over the three time periods. Renkin and Gunther (1996) evaluated bear mortalities in relation to developed sites over a 10-year period (1987 to 1996) and found that bear mortalities in relation to developed areas declined during that period. Even though grizzly bear/human conflicts still occur throughout the GYE (and the project area), these studies show that efforts to reduce those conflicts have been successful.

### Grizzly Bear/Livestock Interactions

Knight and Judd (1983) reported the following information about bears that kill livestock:

- All instrumented (radio-collared) grizzly bears known to have had the opportunity (bears that came in close contact with sheep), killed sheep.
- Most grizzly bears that encountered cattle did not make kills.
- All known cattle killers were adult bears, while sheep killers included both adults and subadults.
- They concluded that sheep grazing in occupied grizzly range is a serious problem, since bears kill sheep more readily and because the sheep are closely tended by herders that are protective of their flocks.

Anderson et al. (1997) reported the following information from a study on grizzly bear/cattle interactions on two cattle allotments in northwest Wyoming:

- From a minimum of 24 grizzly bears that were known to use two cattle allotments during a three-year period, seven bears (possibly eight) preyed on cattle.

18

FWS_000040

- Thirty percent of 194 cattle mortalities documented during the three years were the result of bear predation, 65% were not bear-related, and 5% were classified as unknown.
- Predatory grizzly bears selected calves (51 of 58, or 88%) over adult and yearling cattle.
- All sex/age groups of grizzly bears, except subadult male, were associated with cattle depredations. However, three adult males were responsible for 84% of the documented losses where individual depredators could be identified.
- Cattle depredations were limited to a relatively short period (three to eight weeks) during two of the three grazing seasons, and five of the eight bears suspected of killing cattle did not appear to kill more than one calf each.
- Translocating grizzly bears appears to be a viable option for reducing losses, since homing bears may not return before that depredation period ends. Additionally, translocation could prevent the occasional depredator, which appears to be common among grizzlies, from being unnecessarily removed from the population.
- Removing cattle carcasses from allotments also appeared to reduce bear densities, but it could not be determined whether this would reduce depredations.
- Since adult males are responsible for the majority of cattle depredations, selective removal may also be a possible management option, particularly when habitual adult males are involved and translocation, aversion tactics, or carcass removal efforts are ineffective.

In summary, most, if not all, grizzly bears that come in contact with domestic sheep prey on sheep and conflicts are inevitable. Within the project area, all of the sheep allotments have had documented grizzly bear conflicts. Not all grizzly bears that come in contact with cattle make kills. However, within the project area, 3/6 of the cattle allotments have had documented grizzly bear conflicts- Green River, Badger Creek and Beaver-Twin allotments.

Conflicts between livestock and grizzly bears have resulted in the relocation, removal, or direct mortality of grizzly bears. Conflicts with livestock have increased in recent years in the project area as the grizzly bear population has increased. There were 67 documented grizzly bear/livestock conflicts in the GYA in 2008. This was approximately 35% (67 out of 190) of the totally conflicts. Of these grizzly/livestock conflicts; 42% occurred on the Shoshone National Forest, 36% occurred on the BTNF, 21% occurred on private property and 1% occurred on the Caribou-Targhee National Forest. Approximately 7% of the documented grizzly bear mortalities on National Forest System lands since 1999 have been livestock related (Table 3). On the BTNF, 16% of the grizzly bear mortalities have been livestock related (Table 4).

## Status of the Western Gray Wolf

### Listing Status of NRM DPS
The following information (and references therein) is from USDI Fish and Wildlife Service 2009a.

In 1974, the USFWS listed two subspecies of gray wolf as endangered: The Northern Rocky Mountain (NRM) gray wolf (C. l. irremotus) and the eastern timber wolf (C. l. lycaon) in the Great Lakes region (39 FR 1171). On November 22, 1994, the USFWS designated portions of Idaho, Montana, and Wyoming as two nonessential experimental population areas for the gray wolf under section 10(j) of the Act, including the Yellowstone Experimental Population Area (59 FR 60252). In 2005 and 2008, the USFWS revised these regulations to provide increased management flexibility for this recovered wolf population in States with Service approved post-delisting wolf management plans (70 FR 1286; 73 FR 4720; 50 CFR 17.84(n)).

The NRM wolf population achieved its numerical and distributional recovery goals at the end of 2000 and the temporal portion of the recovery goal was achieved in 2002 when the numerical and distributional

19

recovery goals were exceeded for the 3rd successive year. To meet ESA requirements Idaho, Montana, and Wyoming needed to develop post-delisting wolf management plans to ensure that adequate regulatory mechanisms would exist should ESA protections be removed. In 2004 and in 2009, they determined that the Wyoming legislation and plan was inadequate to conserve Wyoming's share of a recovered NRM gray wolf population. Wolf management in all of Wyoming (except the Wind River Tribal Lands because the tribe had a Service approved plan) is currently under the less flexible provisions of the 1994 experimental population rules. Because of the dynamic listing history of the NRM wolf population, the gray wolf will be included in the consultation process for this project to avoid future confusion on the proper level of analysis if the species is re-listed or reclassified under the ESA in the near future.

### Habitat Requirements, Home Range, Food Habits

The following information is from: Endangered and Threatened Wildlife and Plants; Final Rule To Identify the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife (USDI Fish and Wildlife Service, 2009a).

Gray wolves (*C. lupus*) are the largest wild members of the dog family. In the NRM, adult male gray wolves average over 45 kg (100 lb), but may weigh up to 60 kg (130lb). Females weigh slightly less than males. Wolves primarily prey on medium and large mammals and normally live in packs of 2 to 12 animals. In the NRM, pack sizes average about 10 wolves in protected areas, but a few complex packs have been substantially bigger in some areas of Yellowstone National Park (YNP) (Smith *et al.* 2006, p. 243; Service *et al.* 2008, Tables 1–3). Packs typically occupy large distinct territories from 518 to 1,295 square kilometers (km2) (200 to 500 square miles (mi2)) and defend these areas from other wolves or packs. Once a given area is occupied by resident wolf packs, it becomes saturated and wolf numbers become regulated by the amount of available prey, intra-species conflict, other forms of mortality, and dispersal. Dispersing wolves may cover large areas as they try to join other packs or attempt to form their own pack in unoccupied habitat (Mech and Boitani 2003, pp. 11–17).

Typically, only the top-ranking (''alpha'') male and female in each pack breed and produce pups (Packard 2003, p. 38; Smith *et al.* 2006, pp. 243–4; Service *et al.* 2008, Tables 1–3). Females and males typically begin breeding as 2-year olds and may annually produce young until they are over 10 years old. Litters are typically born in April and range from 1 to 11 pups, but average around 5 pups (Service *et al.* 1989–2007, Tables 1–3). Most years, four of these five pups survive until winter (Service *et al.* 1989–2008, Tables 1–3). Wolves can live 13 years (Holyan *et al.* 2005, p. 446), but the average lifespan in the NRM is less than 4 years (Smith *et al.* 2006, p. 245). Pup production and survival can increase when wolf density is lower and food availability per wolf increases (Fuller *et al.* 2003, p. 186). Pack social structure is very adaptable and resilient. Breeding members can be quickly replaced either from within or outside the pack and pups can be reared by another pack member should their parents die (Packard 2003, p. 38; Brainerd *et al.* 2008; Mech 2006, p. 1482). Consequently, wolf populations can rapidly recover from severe disruptions, such as very high levels of human-caused mortality or disease. After severe declines, wolf populations can more than double in just 2 years if mortality is reduced; increases of nearly 100 percent per year have been documented in low-density suitable habitat (Fuller *et al.* 2003, pp. 181–183; Service *et al.* 2008, Table 4).

### Population Status of NRM DPS in Wyoming

The following information (and refernces therein) is from the 2009 Wyoming Wolf Recovery Annual Report (Jimenez et. al 2009).

The USFWS combines three census techniques to estimate the total number of wolves in WY: 1) Direct observations of wolves; 2) Winter track counts of wolves traveling in snow; and 3) Confirmed reports of

FWS_000042

Appellate Case: 22-8043      Document: 26-1      Date Filed: 09/15/2022      Page: 201

wolf sightings from other agencies. A pack is defined as >2 wolves traveling together using a defined home range. A breeding pair is defined as >1 adult male and >1 adult female in a pack producing >2 pups that



survived through 31 December of that year.

*Figure 3: Wyoming Wolf Packs 2009 (USFWS 2009).*

In 2009, >320 wolves in >44 packs (>27 breeding pairs) inhabited Wyoming, including YNP. The wolf population increased statewide by approximately 6%, making 2009 the seventh consecutive year that the wolf population in WY has exceeded the numerical, distributional, and temporal recovery goals established by the USFWS. The wolf population in WY (outside YNP) increased by approximately 26%, consisting of

21

FWS_000043

>224 wolves in >30 packs of which >21 breeding pairs produced >89 pups that survived through 31 December 2009. From 2000 through 2009, the wolf population has grown each year, with the exception on 2008. Average increase has been approximately 19% per year. Average pack size in 2009 was 7 wolves per pack and average litter size was 4.1 pups per litter. Wolf numbers in YNP declined by approximately 23% with 96 wolves living in 14 packs of which 6 breeding pairs produced 23 pups that survived through the end of the year. Average pack size in YNP was 7.1 wolves per pack. This is also the first population decline (there were three other years the YNP wolf population declined: 1999, 2005, 2008) without evidence of the disease distemper, and also the first consecutive year decline since wolf reintroduction in 1995. Intraspecific strife, food stress, and mange are all likely reasons for fewer wolves in YNP.

There were 40 dead wolves recorded in WY (outside YNP). Causes of mortality included: agency control = 31; under investigation and unknown = 7; and natural = 2. YNP recorded 10 dead radio collared wolves. Causes of mortality included: harvest or control outside YNP =3; control inside YNP =1; intraspecific pack strife =3; disease/unknown =2; and malnutrition = 1. Mortality numbers for YNP did not include pups born in spring 2009 that did not survive through 31 December 2009.

### Wolf/Livestock Interactions

In 2009, wolves killed >215 livestock (20 cattle and 195 sheep). Agency control efforts removed 31 depredating wolves (approximately 12% of the WY wolf population outside YNP) to reduce livestock losses due to wolves. Confirmed livestock depredations included 20 cattle (13 calves; 7 cows/yearlings) and 195 sheep. Two sheep and 2 cattle depredations were recorded as probable wolf-kills. Two cattle and 1 dog were reported injured by wolves. The number of cattle depredations in WY decreased in 2007, 2008, and 2009; however, the number of sheep killed by wolves increased in 2008 and 2009.

*Table 5: Wolf Depredations in Wyoming: 2000-2009 (Jimenez et.al 2009)*

| Depredations | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cattle | 3 | 18 | 23 | 34 | 75 | 54 | 123 | 55 | 41 | 20 |
| Sheep | 25 | 34 | 0 | 7 | 18 | 27 | 38 | 16 | 26 | 195 |
| Dogs | 6 | 2 | 0 | 0 | 2 | 1 | 1 | 2 | 0 | 7 |
| Goats | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 |
| Horses | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 1 | 0 | 0 |
| Wolves Controlled | 1 | 2 | 4 | 6 | 18 | 29 | 41 | 44 | 63 | 31 |

## Status of Canada Lynx and Canada Lynx Critical Habitat

### Listing Status of the Contiguous U.S. DPS

The following history (and reference within) is from USDI Fish and Wildlife Service 2003.

In 1977, the Canada lynx (lynx) was added to Appendix II of the Convention on International Trade in Endangered Species (CITES) of Wild Flora and Fauna. The species was classified as a category 2 candidate species in the December 30, 1982, Vertebrate Notice of Review (47 FR 58454); meaning that more information was necessary to determine whether the species' status was declining. The USFWS published a notice of a 90-day petition finding on October 6, 1992, that listing the North Cascades population of the lynx as endangered may be warranted (57 FR 46007). On July 9, 1993, the USFWS published a notice indicating

FWS_000044

that they did not have substantial information to indicate that listing the population may be warranted (58 FR 36924). The USFWS began a status review throughout the lower 48 States to determine if the species was threatened or endangered, and on December 27, 1994, the USFWS published a notice (59 FR 66507) of the 12-month finding that listing the lynx in the contiguous United States was not warranted because of the lack of residency in lynx populations in the lower 48 States and their inability to substantiate threats to the population. On March 27, 1997, the court remanded this decision and on May 27, 1997, the USFWS published a 12-month finding (62 FR 28653) that the lynx population in the contiguous United States was warranted for listing under the Act but precluded by higher priority listing actions. This warranted but-precluded finding automatically elevated the lynx to candidate species status. A proposed rule to list the contiguous United States DPS of the Canada lynx as threatened was published on July 8, 1998 (63 FR 36994) and on March 24, 2000, the USFWS, determined threatened status for the contiguous U.S. Distinct Population Segment of the Canada lynx (*Lynx canadensis*) (65 FR 16052). This population segment ruling was updated in 2003 (68 CFR 40072) and the DPS includes the States of Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, Wisconsin, and Wyoming.

### Canada Lynx Critical Habitat

The proposed rule to designate critical habitat for the lynx was published in the Federal Register on November 9, 2005 (70 FR 68294) and on November 9, 2006, the USFWS published the final rule designating critical habitat for the contiguous United States distinct population segment of the Canada lynx (71 FR 66007). In total, approximately 1,841 square miles fell within the boundaries of the critical habitat designation, in Minnesota, Montana, and Washington. On July 20, 2007, the USFWS announced that they would review the November 9, 2006, final critical habitat rule after questions were raised about the integrity of scientific information used and determined that the critical habitat designation was improperly influenced by then deputy assistant secretary of the Interior Julie MacDonald. On February 25, 2009, the USFWS designated revised critical habitat for the contiguous United States distinct population segment of the Canada lynx under the Endangered Species Act of 1973, as amended (Act) (74 FR 8616). In total, approximately 39,000 square miles fell within Maine, Minnesota, Montana, Wyoming, Idaho, and Washington. In the Greater Yellowstone Area (YNP and surrounding lands in southwestern Montana and northwestern Wyoming): approximately 9,500 square miles of critical habitat was designated in portions of Gallatin, Park, Sweetgrass, Stillwater, and Carbon Counties in Montana; and Park, Teton, Fremont, Sublette, and Lincoln Counties in Wyoming.

### Habitat Requirements, Home Range, Food Habits

Canada lynx are solitary carnivores, generally occurring at low densities in boreal forest habitats. In most of their range, Canada lynx densities and population dynamics are strongly tied to the distribution and abundance of snowshoe hare *(lepus americanus)*, their primary prey.

Foraging habitat for lynx is typically described in terms of suitability for their primary prey; snowshoe hares. Hares use young conifer stands that are densely stocked with seedlings or saplings, tall enough to provide browse for snowshoe hares above typical winter snow depth (Koehler and Brittel 1990). Buskirk et al. (1999) suggested that snowshoe hare abundance should be high in sapling and old, "gap phase" forests, where tree mortality and snag loss create gaps in the mature forest canopy allowing increased understory production.

Denning habitat is defined by the presence of ground-level structures that provide security and cover for kittens. Suitable structures are most often found in old and mature forests with substantial amounts of coarse woody debris. The common components of natal den sites appear to be high horizontal cover in the form of downed logs, root wads, and high sapling density (Koehler 1990, Mowat et al. 2000, Squires and Laurion

FWS_000045

2000). In Wyoming, two dens were located in 1998 on moderately steep slopes (36%) in mature subalpine fir forest with co-dominant lodgepole pine (Squires and Laurion 2000). The natal den was located in a cave-like tree well with downed logs over the opening. The maternal den was located about 200 meters from the natal den in a depression beside a fallen tree. Although not rigorously quantified, the habitat characteristics around four additional dens found in 1999 were all associated with coarse woody debris (ibid).

Lynx may avoid recent clearcuts that are more than 100 meters wide because they lack sufficient cover (Koehler 1990). Such areas may also not be recolonized by prey species (mainly snowshoe hares) until as much as 20 to 25 years after harvest (Koehler and Brittell 1990). On a landscape scale, Canada lynx habitat includes a mosaic of early seral stands that support snowshoe hare populations and late seral stands of dense old-growth forest that provide ideal denning and security habitat.

## Status of Greater Sage-Grouse

### Listing Status

In 2008, the USFWS initiated a status review of the greater sage grouse to determine if the species should be protected under the ESA throughout its range or a significant portion of its range (73 FR 10218). On March 5, 2010 the USFWS announced three 12–month findings on petitions to list three entities of the greater sage-grouse (Centrocercus urophasianus) as threatened or endangered under the ESA. They found that that listing the greater sage-grouse (rangewide) was warranted, but precluded by higher priority listing actions.

Based on this finding, the greater sage-grouse and the Bi-State DPS of the greater sage-grouse will each be added to the list of candidate species upon publication of these 12–month findings. Each candidate species is assigned a Listing Priority Number (LPN) (48 FR 43098). Using this guidance, the USFWS assigns each candidate an LPN of 1 to 12, depending on the magnitude of threats (high vs. moderate to low), immediacy of threats (imminent or nonimminent), and taxonomic status of the species (in order of priority: monotypic genus (a species that is the sole member of a genus); species; or part of a species (subspecies, DPS, or significant portion of the range)).

The greater sage-grouse was assigned an LPN of 8 based on the finding that the species faces threats that are of moderate magnitude and are imminent. These threats include the present or threatened destruction, modification, or curtailment of its habitat, and the inadequacy of existing regulatory mechanisms to address such threats. The USFWS considered the threats that the greater sage-grouse faces to be moderate in magnitude because the threats do not occur everywhere across the range of the species at this time, and where they are occurring, they are not of uniform intensity or of such magnitude that the species requires listing immediately to ensure its continued existence. Refer to the Environmental Baseline section of this report for detailed information on the threats to the greater sage-grouse.

### Habitat Requirements, Home Range, Food Habits

Sage-grouse are a large upland game bird, annually using widespread areas of sagebrush habitats. Suitable habitat consists of plant communities dominated by sagebrush and a diverse native grass and forb (flowering herbaceous plants) understory. The composition of shrubs, grass and forb varies with the subspecies of sagebrush, the condition of the habitat at any given location, and range site potential. Seasonal habitats must occur in a patchwork or mosaic across the landscape. Their spatial arrangement, the amount of each seasonal habitat, and the vegetative condition determine the landscape's potential for sage-grouse. This arrangement is an important factor in determining if a population is migratory or non-migratory in nature. Both quantity and

24

FWS_000046

quality of the sagebrush environment determines suitability for and productivity of sage-grouse (WGFD 2003).

### Sage Grouse Habitat in Management Zone II

The Western Association of Fish and Wildlife Agencies identified 7 Management Zones (MZ) for sage brush and sage grouse management based on differences in floristic provinces the unit that the related to each sage grouse habitat type. The BTNF is in MZ II, the Wyoming Basin. MZ II contains approximately 41,996 mi2 of sagebrush habitat. A majority of this MZ is under jurisdiction of the BLM (49%) and Private (35%). The remainder of this habitat is State lands (7%), Bureau of Indian Affairs (4%), Forest Service lands (4%) and other Federal lands (1%). The population of sage grouse throughout Wyoming (a combination of MZ I and MZ II) was estimated at 207,560 in 2007. The long-term population trend estimate based on annual rates of change from 1965-2007 for the sage grouse in MZ II is -2.7 to -3.5. According to Garton et al. (in press) in (USDI Fish and Wildlife Service 2010), the percent change in number of males per lek between 1965 and 2007 was -30% and during that time there has been an estimated 7% reduction in active leks.

## Environmental Baseline for the Species Evaluated

The environmental baseline for this BA includes the existing grizzly bear habitat conditions and conflict situation within the project area since the time of initial consultation of this project (1999-2009), relationship to the threats to the species and grizzly bear management direction in the existing land and resource management plan for the Bridger-Teton National Forest, including the 2007 Amendment to the BTNF Plan. The Amendment to the BTNF Forest Plan was implemented after delisting of the bear. However, with the relisting, this amendment, along with the updates to the 1993 Recovery Plan and the Conservation Strategy are determined the 'best available science' in regards to grizzly bear management. According to Forest Service Regional Office direction, the direction in these documents will be used in this analysis regarding impacts to grizzly bears.

The environmental baseline also includes the existing Western gray wolf, Canada lynx, Canada lynx Critical Habitat and greater sage grouse status and habitat within the project area, relationship to existing threats to these species and the management direction in the BTNF Forest Plan and the Northern Rockies Lynx Management Direction (USDA Forest Service 2007a).

### Grizzly Bear

At minimum, grizzly bears need food, seasonal foraging habitat, denning habitat and security in an area of sufficient size for survival. The precise mixture of these diverse elements however, is impossible to specify. The difficulty lies in the fact that grizzly bears are long-lived opportunistic omnivores whose needs for foods and space vary depending on a multitude of environmental and behavioral factors and on variation in the experience and knowledge of each individual bear. According to the Conservation Strategy (USDI Fish and Wildlife Service 2007), the key to establishing habitat criteria that will maintain a healthy population is to look at the habitat factors in the past that produced a grizzly bear population in the Yellowstone area that is increasing in numbers and expanding in range. These habitat factors were used to establish the habitat criteria for the future that must be maintain if a healthy population continues to be preserved and are detailed in the Conservation Strategy. Since there is no quantitative way to estimate precisely the number of animals required for a viable population of any species, the best way to ensure a healthy population of grizzly bears is to monitor both population and habitat parameters closely and respond when necessary with adaptive management addressing the problems of the population in a dynamic way (USDI Fish and Wildlife Service

25

FWS_000047

2007). The Conservation Strategy is designed to accomplish this and all the Forests in the GYA are signed partners (ibid).

The Conservation Strategy for the Grizzly Bear in the GYA was released in 2003 and the strategy became effective once the final delisting rule took effect in 2007. The state and federal implementation plans within the Strategy provided a framework for managing the Primary Conservation Area (PCA, formerly the Recovery Zone) and adjacent areas of suitable grizzly bear habitat (Figure 1). The PCA is the area considered the adequate seasonal habitat needed to support the recovered Yellowstone grizzly bear population for the foreseeable future and allow bears to continue to expand outside the PCA. A recovered grizzly bear population is one having high probability of existence into the foreseeable future (greater than 100 years) and for which the five factors in Section 4(a)(1) of the ESA have been successfully addressed. The PCA was designed specifically with these five factors in mind.

Approximately 58.5% (5,383mi$^2$) of the PCA is National Forest System lands, consisting of six National Forests. The Bridger-Teton National Forest is one of the primary forests responsible for implementing the Strategy and in 2006, the six National Forests of the GYA published the Final Environmental Impact Statement, proposing to amend six forest plans of the GYA forests to incorporate the habitat standards and other relevant provisions in the Final Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area. The purpose and need was to ensure conservation of habitat to sustain the recovered grizzly bear population, update the management and monitoring of grizzly bear habitat, provide consistency among Greater Yellowstone Area national forests in managing grizzly bear habitat, and ensure the adequacy of regulatory mechanisms for grizzly bear habitat protection upon delisting as identified in the Grizzly Bear Recovery Plan. The selected alternative would go into effect when all partner agencies signed the Conservation Strategy, the Final Rule delisting the Yellowstone grizzly bear population had been published in the Federal Register, and the Record of Decision was signed for the Forest Plan Amendment for Grizzly Bear Habitat Conservation for the Greater Yellowstone National Forests. If the grizzly bear was not delisted, existing forest plan direction for grizzly bears would remain in place.

A major change to the 1993 Demographic Recovery Criterion 3 in the Recovery Plan was updated with the 2007 Demographic Recovery Criteria because the 1993 version was no longer considered the best technique to assess recovery of the Yellowstone grizzly bear populations. The end result was revised methods for calculating population size, estimating the known to unknown mortality ratio and estimating sustainable mortality levels for the Yellowstone grizzly population based on best available science (USDI Fish and Wildlife Service 2007). The allowable mortality limits for each bear class are calculated annually based on total population estimates of each bear class for the current year. The Interagency Grizzly Bear Study Team (IGBST) calculates both the total population size and the mortality limits within an area designated by the Conservation Strategy that overlaps and extends beyond suitable habitat (the project area is within the Conservation Strategy area).

For independent females, a 9 percent limit was considered sustainable because simulations have shown that this level of adult female mortality rate allows a stable to increasing population 95 percent of the time (Harris et. al 2006). For independent males, a 15 percent limit was considered sustainable because it approximates the level of male mortality in the GYA from 1983 to 2001, a period when the mean growth rate of the population was estimated at 4 to 7 percent per year. The IGBST will reevaluate mortality limits every 8 to 10 years or as new scientific information becomes available or at the request of the Coordinating Committee.

FWS_000048

***Forest Plan Direction for Grizzly Bear Habitat Management***

In addition to the Conservation Strategy; forestwide grizzly bear recovery objectives were identified in the 1990 Bridger-Teton National Forest Land and Resource Management Plan (USDA Forest Service 1990, Forest Plan), prior to the 1993 Recovery Plan and the development of the Conservation Strategy. These are:

- Provide suitable and adequate amounts of habitat for recovery of a viable grizzly bear population in the Greater Yellowstone Area as identified in the Grizzly Bear Recovery Plan
- Long-term Forest habitat management should provide vegetation diversity, approximate natural conditions, and include all successional stages important to the grizzly bear
- Prevent needless encounters between grizzly bears and people, and prevent grizzly bears from gaining access to attractants such as food and garbage

Detailed in the Forest Plan, management of grizzly bears and habitat inside the recovery zone is directed by "existing and future Interagency Grizzly Bear Management Guidelines." Direction is also specified to follow the special order for sanitation, to make some changes in livestock distribution and numbers as necessary to avoid adverse effects to grizzly bears and not to allow changes in class of livestock in MS 1 and MS 2. Several management areas inside the recovery zone emphasize enhancement of habitat and maintenance of recovered grizzly bear populations. Various standards and guidelines in these management areas require considerations for cover retention, size of openings, duration of activities, and size of the area impacted. Inside the recovery zone, direction for several management areas states that no surface disturbing activities can occur until the grizzly bear CEM can be run to help determine potential effects on the bear.

The grizzly bear is also a management indicator species and monitoring requirements include compliance with interagency grizzly bear guidelines by ground checking 75% of certain Forest activities to ensure compliance with food storage regulations and to use the CEM to ensure habitat capability for grizzly bears does not drop below recovery levels. This project area is not within the area covered by the CEM or within the Recovery Zone (now called the Primary Conservation Area) and the guidance of Management Situations is not longer applicable, per the direction in the Conservation Strategy.

***Forest Plan Amendment for Grizzly Bear Habitat Conservation***

The decision in this amendment applies to National Forest System lands in the six greater Yellowstone Area national forests, which includes the BTNF. This amendment established the framework for future decision making by outlining direction for sustaining a recovered grizzly bear population, as identified in the Conservation Strategy. The selected alternative was programmatic in nature and guides implementation of site-specific projects that tier to forest plans. Since this project is outside of the PCA, only guidance in this Amendment for activities outside of the PCA will be discussed.

The Goals, Standards, Guidelines and Monitoring Items for areas outside the PCA identified in the chosen alternative in the Record of Decision (ROD) for the 2006 Forest Plan Amendment for Grizzly Bear Habitat Conservation (USDA Forest Service 2006) are:

- Goal:
  - Outside of the PCA, in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, accommodate grizzly bear populations to the extent that accommodation is compatible with the goals and objectives of other use.

27

- Standard 5 – Nuisance Bears:
  - Coordinate with State wildlife management agencies to apply Conservation Strategy nuisance bear standards
- Guideline 2 – Livestock Grazing:
  - Outside of the PCA in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, livestock allotments or portions of allotments with recurring conflicts that cannot be resolved through modification of grazing practices may be retired as opportunities arise with willing permittees.
- Guideline 3 – Food Storage:
  - Outside of the PCA in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, emphasize proper sanitation techniques, including food storage orders, and information and education, while working with local governments and other agencies.
- Monitoring Item 1 – Secure Habitat and Motorized Access:
  - Outside of the PCA, in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, monitor and submit for inclusion in the Interagency Grizzly bear Study Team Annual Report: changes in secure habitat by national forests every two years.
- Monitoring Item 3 – Livestock Grazing:
  - Inside and outside the PCA, monitor and evaluate allotments for recurring conflicts with grizzly bears.
- Monitoring Item 5- Whitebark Pine:
  - Monitor whitebark pine occurrence, productivity and health inside and outside the PCA in cooperation with other agencies. Annually submit for inclusion in the Interagency Grizzly Bear Study Team Annual Report: results of whitebark pine cone production from transects or other appropriate methods and results of other whitebark pine monitoring.

### *Summary of Management Actions Related to Habitat and Mortality Risk Implemented within the Project Area*

The following is a brief summary of the actions that the Bridger-Teton National Forest has required within the project area to maintain or improve grizzly bear habitat and reduce grizzly bear/human conflicts.

*Food storage orders/regulations Food storage Order 04-00-104 (USDA Forest Service 2004):*

1. All food and refuse must be acceptably stored or acceptably possessed during daytime hours.
2. All food and refuse must be acceptably stored during nighttime hours, unless it is being prepared for eating, being eaten, being transported, or being prepared for acceptable storage.
3. Any harvested animal carcass must be acceptably stored, unless the carcass is being field dressed, transported, being prepared for eating, or being prepared for acceptable storage.
4. Camping or sleeping areas must be established at least ½ mile from a known animal carcass or at least 100 yards from an acceptably stored animal carcass.

FWS_000050

*Bear resistant facilities/sanitation*

The Bridger-Teton NF and WGFD has provided bear resistant facilities (i.e. bear resistant food boxes, food tubes, garbage containers, meat hanging poles, panniers, etc.) at campgrounds, trailheads, dispersed campsites, and to permittees in the project area.

*Information, Education and Patrolling*

Substantial information and education materials (pamphlets, brochures, signs, videos, etc.) and programs have been provided to the public at all Forest Service offices, including the Pinedale Ranger District. Signs and brochures are available at campgrounds, trailheads, dispersed recreation sites, picnic areas, etc. Forests contributed financing for the production of the information and education film "Living in Grizzly Country." Forests have cooperated with state wildlife management agencies and other cooperating institutions and individuals in giving "Living in Bear Country Workshops," which includes bear identification, safe camping, hiking, hunting, and working procedures to use in bear country, and the proper use of bear deterrent pepper spray. Wilderness rangers and other backcountry patrols have been used to inform and educate the public on food storage orders, and to check on compliance with these orders. Field patrols have been used during hunting seasons to reduce hunter-caused conflicts and grizzly bear mortalities, specifically within the project area.

*Special grizzly bear requirements in permits*

Permits associated with this action contain clauses requiring protection of the grizzly bear and its habitat, and proper food storage and sanitation. See proposed action for details regarding livestock permits requirements in the project area.

*Whitebark pine*

Whitebark pine seeds are an important food source for grizzly bears. A GYA Whitebark Pine Task Group has been formed to gather information on the status of this tree in the GYA. Current work on whitebark pine includes planting in several areas of the GYA to provide long-term habitat improvement, cone collection from healthy superior trees, silvicultural treatments to improve growth and establishment, prescribed burning to encourage whitebark pine seedling establishment, inventory and blister rust surveys, inventories to locate superior trees, work to prevent mountain pine bark beetle attacks on superior trees, and reading of whitebark pine cone production transects every year in cooperation with the IGBST.

*Planning, coordination, monitoring, and cooperation*

The forest works cooperatively with the USFWS and WGFD on nuisance grizzly bear management, specifically within this project area. Forest Service personnel contributed to the development of the Conservation Strategy and the state management plans for the grizzly bear. They participate in annual coordination meetings with state agencies, other federal agencies, organizations, and various committees. The Forest Service cooperates in the collection of data on the grizzly bear population and habitat throughout the project area.

**Grizzly Bear Population**

Following the direction in the Conservation Strategy; the IGBST annually monitors unduplicated females with cubs of the year (COY) within the GYA; calculates a total population estimate for the entire GYA based on the model averaged Chao2 estimate of females with COY, monitors the distribution of females with all young in each BMU within the PCA (project area not within the PCA) and monitors all sources of mortality. The new analysis protocol for estimating total population and sustainable mortality limits were developed by the IGBST and was appended to the Conservation Strategy.

29

Based on the number of sightings of females with COY, the IGBST was able to differentiate 44 unduplicated females in 2008. Based on this estimate, other observation data and associated sighting frequencies, the number of females with cubs of the year in 2008 was estimated at 56 and the estimated population size was 596. This estimate of 56 exceeds the demographic objective of 48 specified in demographic criteria for the GYE and a population estimate of 596 exceeds the minimum 500 necessary for to maintain the genetic needs of the population, identified in the Final Conservation Strategy (2007). Additionally, the data continued to support a linear model, indicating an increasing trend in the population. Dispersion of reproductive females throughout the GYA is also monitored by BMUs within the PCA according to the direction in the Conservation Strategy. Eighteen of 18 BMUs contained verified observations of females with young in at least 4 years of the last 6-year period (2003-2008). This exceeds the minimum criteria that 16 of the 18 BMUs must be occupied by young on a running 6-year sum with no 2 adjacent BMUs unoccupied.

In summary, current information indicates that this population of grizzly bears is growing at approximately 3 to 4% annually. In addition, the grizzly bear has increased its distribution in the GYA by almost 50% since the 1970s (USDA Forest Service 2005); expansion is expected to continue. While there is some debate related to the actual level of population increase since the bear was listed in 1975, all of the current information (i.e. number of unduplicated females, distribution of reproducing females, distribution of bears, informal sightings by agency personnel, and areas where nuisance bears are being managed) indicates this population has increased in both numbers of bears and the geographic area they occupy (Interagency Conservation Strategy Team 2003). The distribution of the grizzly bear population in 2004 in relation to the project area is displayed in Figure 5.

30

FWS_000052

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 211



*Figure 5: 2004 Distribution of Grizzly Bears in the GYE*

FWS_000053

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 212

### Secure Habitat

Secure habitat is defined as areas more than 500 meters from an open or gated motorized access route or recurring helicopter flight line, greater than or equal to 10 acres in size. This is the same definition used in the Conservation Strategy, the best available science. Secure habitat is categorized into long and short term secure habitat based on the management area category (USDA Forest Service 2005). A management area category describes the natural resource setting for an area of land and established the types of management actions that are allowed to occur within the area of land.

### Secure Habitat in the Project Area

According to the 2006 Grizzly Bear Forest Plan Amendment, management of secure habitat outside of the PCA will be guided by existing forest plan direction, with some additional requirements to monitor changes in secure habitat in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy.



*Figure 6: Map of Secure Habitat within the Project Area*

Evaluation of secure habitat was calculated by the IGBST (M. Haroldson pers. com). Above (Fig. 6) is a map of the secure habitat within the project area fitting the Conservation Strategy secure habitat

32

FWS_000054

definition mentioned above (secure habitat is in green). Below (Fig. 7) is the estimation of secure habitat in each allotment.



*Figure 7: Percent of Secure Grizzly Bear Habitat within the Project Area*

This project area is within Desired Future Condition (DFC) 10 – Simultaneous Development of Resources, Opportunities for Human Experiences, and Support of Big-game and a Wide Variety of Wildlife Species. The Road Management Standard in DFC 10 is an 'average open road density of 1 mile per square mile of standard or equivalent road with 1-year to 5-year variations of 0.25 to 1.25 miles of road per square mile. Temporary roads will be returned to Elimination Class 3 or 4 Standards." This project does not impact the road densities within the project area.

### Grizzly Bear Denning Habitat in the Project Area

Grizzly bears excavate dens and are usually dug on steep slopes in forest cover. According to Podruzny and Gunther (2002), abundant denning habitat is available in the GYA and is not considered a limiting factor for grizzly bears. Denning habitat was mapped within the project area by M. Haroldson based on habitat parameters identified (Podruzny et al. 2002 *in* USDI Fish and Wildlife Service 2007). According to this model, Rock Creek, Badger Creek and Pot Creek allotments and the Green River Drift Driveway contain habitat that is 100% suitable for denning. Approximately 99% of the habitat in Roaring Fork, Elk Ridge, Beaver-Twin, Lime Creek and New Fork-Boulder is suitable for denning. The Green River allotment, which makes up the majority of the project area is 97% suitable and the remaining allotments, Noble Pasture, Wagon Creek and Tosi Creek are 71%, 87% and 82% suitable, respectively.

### Grizzly Bear Conflicts in the Project Area

From 1999-2009 there have been 305 reported grizzly bear conflicts in the project area (Fig. 6). A majority of these conflicts (67%, n = 203) were from cattle injuries/depredations, followed by sheep conflicts (24%, n = 73), property damage (5%, n = 16), chance encounters (2%, n = 7) and garbage (1% n = 3). There was 1 human injury conflict in 2009, 1 conflict categorized as 'other' in 2007 and 1 animal death in 2005.

33

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 214

It is important to note the variables that impact conflict reporting in the project area. According to local WGFD biologists, the number of sheep conflicts reported annually depends on the individual herders working for the permittee. It has been hypothesized that a number of years where conflicts were under-reported (conflict of interest between herders and nuisance bear management guidelines). No sheep conflicts were reported in 2006 and 2007 and it is highly unlikely that this was an accurate representation of the conflict situation. Discrepancy in reporting accounts for the variability in the sheep conflict history and accounts for the relatively small percentage of sheep conflicts related to cattle conflicts in the project area. Conflict reporting from cattle permittees has been documented as reliable and consistent throughout the past 11 years and subsequently remained relatively constant.



*Figure 8: Grizzly Bear Conflicts in the Project Area (WGFD 2009)*

### Grizzly Bear/Livestock Relocations in the Project Area

There have been 26 grizzly bears trapped and relocated from the project area due to livestock conflicts. Four of those bears were female and 2 were non-target bears captured in 2005. One was released within its home range and the other was released onsite. Of the 26 individual bears that have been trapped within the project area from 1999-2009, a majority of those bears are still alive or unknown (50%, n = 13). Eight of these relocated bears (31%) were removed after their relocation in the GYA for another livestock, garbage or developed site conflict (one of these bears was not associated with depredations but preemptively relocated to Mormon Creek). Four of the relocated bears (15%) were killed in hunter related self defense conflicts and 1 of the bears was killed by a vehicle on Togwotee Pass.

FWS_000056




*Figure 9 and 10 Management Trapped Bears (Male and Females) in the Project Area*

### Grizzly Bear Mortalities in the Project Area

From 1999-2009 there have been 5 grizzly bear mortalities within the project area, all males and all had previous history of livestock depredation prior to removal. The first mortality during this time period was bear 404. This bear was removed in 2002 from the Elk Ridge allotment for sheep depredation. This bear was a previous relocated bear from Cody. The next mortality occurred in 2005. This mortality was bear 471 (estimated age 5) which was previously caught in 2004 for cattle depredation and relocated to Mormon Creek. The remaining 3 mortalities all occurred in 2008. Bear 464 was previously caught in 2004 (estimated age 8) for cattle depredation and relocated to Mormon Creek. The next bear was 504 who was previously caught in 2005 (estimated age 4) for cattle depredation and relocated. Bear 433 was the third bear removed from the project area in 2008. This bear was first captured in 2003 for cattle depredation in the project area and relocated to the North Fork of the Shoshone. This bear was captured again in 2005 for cattle depredation in the project area (estimated age 7) and relocated again. He eventually returned to the project area and was subsequently removed for cattle depredation in 2008.

### Female Grizzly Bear Survival in the Project Area

It is well accepted throughout the GYA that survival of adult female grizzly bears is the most important factor driving population trajectory (Eberhardt et al. 1994, Hovey and McLellan 1996, Boyce et al. 2001, Eberhardt 2002 and Harris et al. 2006 *in* Schwartz et al. 2010 in press). Schwartz et al. (2010 in press) recently used data from radio-marked bears to model annual survival of grizzly bears (1983-2003) to identify landscape features that best described spatial differences among bear mortalities, spatially depict the differences in grizzly bear survival across the GYA and demonstrated how this model can be linked with demographic factors to identify source and sink habitats across the GYA. According to their model, survival of independent grizzly bears improved as secure habitat and elevation increased, but declined as road density, number of homes and site developments increased.

This project area was modeled for female survival following Schwartz et al. 2010 by M. Haroldson (Table 6). Only 2 allotments, Tosi Creek and Badger Creek have mean female survival estimates over 91%. This threshold was based on the estimate of sustainable mortality from Harris et al. (2006) that demonstrated increasing population growth for the Yellowstone bear population ($\lambda \geq 1.0$ with 95% probability) when female survival $= 0.91$. All other allotments were below this threshold, indicating a sink habitat (Schwartz et al. in press).

FWS_000057



*Figure 11: Female Survival Estimates within the Project Area (Schwartz et al. in press)*

FWS_000058

*Table 6: Female Survival Estimates by Allotment (Schwartz et al. in press)*



This model and associated survival estimates were calculated using a sample of independent bears that were not conflict/problem bears. According to Schwartz et al., the conflict set of bears (management trapped due to conflict situations) are considered a biased subset of problem bears. These bears were not used in the representative sample used for making inferences about the GYE population or in the results detailed in the publication. It's important to note that research trapping, which targets grizzly bears not necessarily involved in conflicts or identified as 'problem bears, does not occur in the project area. Only management trapped bears (problem bears) are currently monitored in the project area.

### Western Gray Wolf

Gray wolf populations naturally fluctuate with food availability, strife within packs, and disease. Within the project area, the main factor controlling the population is management by the FWS for livestock/wolf conflicts.

### Wolf Population within the Project Area

Since 1999, at least three wolf packs have been known to use the Upper Green area: the Green River pack, the Gros Ventre pack and the Black Butte pack. The following information from Ken Mills: WGFD Wolf Management Biologist.

Green River Pack: In 2005, new wolves replaced the original Green River pack in this same area, bred, and produced pups. This pack was subsequently lethally dismantled because of livestock depredation. In 2006, a pack of 4 adult wolves produced 6 pups, making a total of 10 wolves known in the project area. The entire

37

pack was removed following >27 cattle depredations. In 2007, a pack of at least 4 adult wolves established and produced at least 2 pups, making a total of >6 wolves known in the project area. Later in 2007, six wolves were removed following 12 cattle depredations. In 2008, a pack of 3 wolves was known in the project area, but they did not reprȯduce pups. There were 11 cattle depredations during the 2008 grazing season associated with this pack however no wolves were removed despite efforts. In 2009 a pack of 3-4 adult wolves produced 8 pups during the summer, making a total of 11-12 wolves known on the project area; however, there is always a possibility for more wolves or packs to be present that are unknown. There were 7 cattle depredations during the 2009 grazing season reported for this pack and one mule was also bitten by a wolf at the Fish Creek Guard Station. Wildlife Services removed 4 wolves from this pack in early September due to these confirmed cattle depredations currently leaving 7-8 wolves (4 adults and 4 pups) from this pack within the project area.

Black Butte pack: In 2008, the Black Butte Pack reformed and consisted of two adults. No cattle depredations were attributed to this pack in 2008. In 2009, the Black Butte pack used the southern boundary of the project area near Rock Creek and consisted of 2 adult wolves and 6 pups. Both adults and 4 pups were removed in 2009 after killing 37 sheep. They did not kill any cattle in 2009.

Gros Ventre pack: In 2006, the Gros Ventre pack contained 6 wolves (2 adults and 4 pups) and was responsible for one cattle depredation in the project area. In 2007, the Gros Ventre pack may have used the northern boundary of the project area and consisted of 13 wolves (5 adults and 8 pups). In 2008 it was reported at 3 wolves, all adults and was not responsible for any depredations. The Gros Ventre pack is still likely in existence though they have not been confirmed this year.

### Wolf/Livestock Interactions within the Project Area
There were 46 wolf/livestock conflicts within the project area in 2009. Eight of these conflicts (17%) were cattle injuries/depredations and 37 (80%) were sheep depredations. One mule was also bitten by a wolf at the Forest Service Fish Creek Guard Station. Wolf/livestock conflicts have been constant throughout the project area, especially related to the sheep allotments and Wildlife Services and WGFD routinely monitors the population within the project area and removes the individuals responsible for the depredations.

## Canada Lynx and Canada Lynx Critical Habitat

### Northern Rockies Lynx Management Direction
Following the listing of the lynx as a threatened species in March 2000 (USDI Fish and Wildlife Service 2000), the Forest Service (FS) signed a Lynx Conservation Agreement with the USFWS in 2001 to consider the Lynx Conservation Assessment and Strategy (LCAS) (Ruggerio et al., 2000) during project analysis and the FS agreed to not proceed with projects that would be "likely to adversely affect" lynx until Forest Plans were amended. The Conservation Agreement (CA) was amended in 2006 to define occupied habitat and list the national Forests that were occupied. The CA was extended until all relevant forest plans were revised to include guidance necessary to conserve lynx. In response, the Northern Rockies Lynx Management Direction EIS ROD (NRLMD) was signed in March 2007. The management direction in the NRLMD was based upon science and recommendations in the "Ecology and Conservation of Lynx in the United States (Ruggerio et. al 2000), the LCAS, and other publications. The purpose of the NRLMD was to incorporate management direction into land and management plans that conserves and promotes the recovery of lynx in the Northern Rockies Ecosystem. The direction applies to National Forest System lands presently occupied by lynx, (BTNF included). Plans and projects that incorporate the Standards and Guidelines in the NRLMD are generally not expected to have adverse effects on lynx, and implementation of these measures across the range of the lynx is expected to lead to conservation of the species.

FWS_000060

*Canada Lynx Locations within the Project Area*

There have been several studies and surveys during the past few years on the Bridger-Teton National Forest and adjacent Shoshone National Forest. The most recent track surveys in this area occurred during the winter of 2006/07. Endeavor Wildlife Research surveys discovered potential lynx tracks in the Moose/Gypsum Creek area on the Pinedale R.D. and in the North Cottonwood Creek and Hoback Rim area on the Big Piney R.D. Currently, a crew surveying for snowshoe hare horizontal cover in the project area (for a different project) has not located any lynx tracks during their surveys. Snowshoe hare tracks have also been low; only documenting one track in the Pinyon Ridge area and a few tracks (only one within a designated plot) near the lower portion of Green River lakes Road, near Dollar Lake.

According to information received from the Colorado Division of Wildlife (CDOW); a radio-collared Canada lynx currently monitored by the CDOW is residing in the Wyoming Range on the Grey's River District. The most recent location was from 3/15/2010, on the Grey's River District, approximately 40 miles southwest of the project area. Togwotee Pass is approximately 18 miles north of the project area. This area of the Jackson and Buffalo Ranger Districts is also known occupied lynx habitat.

In the winter of 2004/05, Endeavor Wildlife Research conducted snow track surveys in the Sheridan Creek watershed in the Wind River Range on the Shoshone National Forest, approximately 9 miles north of the project area. They found tracks from potentially two different lynx. DNA amplified from scat collected from one of the lynx in the Sheridan Creek area came from the lynx that was collared in the Wyoming Range by Squires and Laurion (2000).   In order for this lynx to travel from the Wyoming Range to this location in Sheridan Creek, it likely passed through the project area.

According to "Distribution of Lynx and Other Forest Carnivores in the Wyoming Range, south-central Wyoming" (Squires et al. 2003); one male and one female lynx were captured and equipped with radio transmitter collars (Squires and Laurion 2000). The two lynx home ranges overlapped and were located in the Beaver and Horse Creek watersheds about 20 miles southwest of the project area. During winter of 2001, four sets of lynx tracks were located (1 in North Horse Creek Watershed and 3 in Beaver Creek watershed). It was believed that the 2001 survey indicated that three lynx plus the collared male occupied the Wyoming Range. These lynx made periodic exploratory movements outside of their homeranges which included the northern end of the Wind River Range on the Pinedale Ranger District and within the allotments in the project area. Several historic observations of lynx were made in and near the project area during the 1960's and 1970's (WYNDD 2009).

*Canada Lynx Critical Habitat within the Project Area*

LAUs have been delineated across the BTNF and provide the fundamental scale at which to evaluate and monitor effects of management actions on lynx habitat. The project area is located within seven LAU's; Fish Creek South, Roaring Fork West, Big Twin West, Big Twin East, Big Twin-Middle Beaver, Upper New Fork and Upper Gros Ventre South. Lynx habitat has been mapped following criteria in the Lynx Conservation Assessment and Strategy (LCAS) (Ruediger et al. 2000). The best opportunities for snowshoe hares and lynx are on north slopes with mixed conifers, including a strong subalpine fir component. Subalpine fir retains live and dead branches close to the ground for an extended period of time. Disturbance or late-seral conditions reduce canopy closure allowing development of enhanced ground vegetation forage base for hares. Cattle use typically does not overlap with late seral forest types.

Historically, wildfire was the main factor in promoting dense natural regeneration in the Wind River Range. There were large expanses of dense regeneration, as indicated by present-day forests interspersed with

39

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 220

sagebrush openings and mountain meadows. The resulting mix of residual overhead cover and dense lodgepole and aspen regeneration provided the best possible conditions for snowshoe hares. Also, these disturbances occurred across areas large enough to have a very substantial impact in regards to the amount of productive snowshoe hare and lynx habitat that was available. This habitat would have persisted for some decades, but the initiation of effective fire control resulted in an end to such widespread disturbances. Since that time canopy closure and the self-pruning process have greatly reduced snowshoe hare cover and forage availability during winter. This is also shown by lack of snowshoe hare sign during horizontal cover surveys in the project area during this winter (2009-2010) Several wildfires have occurred in the Lynx Analysis Units (LAUs) that encompass the project area in the past 40+ years.

### Greater Sage-Grouse

Detailed in the recent finding that listing the greater sage-grouse was warranted but precluded; the USFWS summarized information regarding the status and threats to the greater sage-grouse in relation to the five factors provided in section 4(a)(1) of the ESA. The five factors are: (A) Present or threatened destruction, modification, or curtailment of habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. The factors that specifically relate to impacts from this project are factors A (threats to habitat or range) and D (existing regulatory mechanisms).

According to the USFWS 12-month finding, the identified threats to sage-grouse habitat (Factor A) are: Habitat Conversion for Agriculture, Urbanization, Habitat Fragmentation, Power lines/Transmission Corridors/ Communication Towers, Fences, Roads/Railroads, Fire, Invasive Plants, Pinyon-Juniper encroachment, Grazing, Energy Development / mining, and Climate Change. The identified threats to sage grouse habitat related to this project are impacts from grazing, invasive species and fences.

#### Forest Plan Direction for Sage Grouse Management

Sage grouse on the BTNF are currently managed as a Regional Forester's Sensitive Species. According to Forest Service Manual 2672.1 "Sensitive species of native plant and animal species must receive special management emphasis to ensure their viability and to preclude trends toward endangerment that would result in the need for Federal listing. There must be no impacts to sensitive species without an analysis of the significance of adverse effects on the populations, its habitat, and on the viability of the species as a whole. It is essential to establish population viability objectives when making decisions that would significantly reduce sensitive species numbers". Objectives for sensitive species include implementing management practices to ensure that species do not become threatened or endangered because of Forest Service actions. The Forest Service policy for sensitive species is to: (1) Assist States in achieving their goals for conservation of endemic species, (2) As part of the NEPA process, review programs and activities through a biological evaluation, to determine their potential effect on sensitive species, (3) Avoid or minimize impacts to species whose viability has been identified as a concern, (4) If impacts cannot be avoided, analyze the significance of potential adverse effects on the population or its habitat within the area of concern and on the species as a whole and (5) Establish management objectives in cooperation with the States when projects on National Forest System lands may have a significant effect on sensitive species population numbers or distributions. Establish objectives for Federal candidate species, in cooperation with the FWS or NMFS and the States.

Sage grouse are included in this Biological Assessment due to their status change to a Candidate Species under the ESA. They are analyzed in detail to assure that the impacts from this project do not risk the future viability of the species and that the species does not become listed due to Forest Service actions.

40

FWS_000062

*State of Wyoming Direction for Sage Grouse Management*

According to a range-wide Conservation Assessment of Greater Sage-Grouse and Sagebrush Habitats (Connelly et al. 2004), sage-grouse have declined across their range during the past 50 years, as has the quality and distribution of the bird's requisite sagebrush-steppe habitat. In Wyoming, management strategies and population goals for sage grouse are directed by the Wyoming Greater Sage Grouse Conservation Plan (WGFD 2003). In this plan, Wyoming elected to create a comprehensive statewide document, with locally developed plans to follow. With the establishment of eight Sage-grouse Working Groups (WG) throughout Wyoming in 2004, each working group area has established goals and objectives, as well as reporting criteria. According to this direction, using the concepts of rangeland health as a management philosophy is intended to lead to a more balanced rangeland ecosystem, including a mosaic of seral stages beneficial to the greater sage grouse.

Additional, in 2008, the Governor issued Executive Order 2008-2 which outlined the "core area concept" (State of Wyoming 2008). This designates certain portions of the state where viable sage grouse populations will be maintained at current levels. Within these core areas, activities will be approved only if a project proponent can demonstrate that the activity will not cause declines in sage grouse populations. Protection of sage grouse within core areas outlined in the Governor's Executive Order should demonstrate to the U.S. Fish and Wildlife Service that adequate regulatory mechanisms are in place in Wyoming to protect the species and avoid listing.

### Greater Sage-Grouse within the Project Area

Of the 8 working groups formed in 2004, the Upper Green River Basin Working Group Area (UGRBWGA) is the local chapter associated with this project area. According to the working group; habitats in the UGRBWGA support greater numbers of sage-grouse, probably one of the highest densities with all of occupied sage-grouse habitats range-wide (WGFD 2004). Even though this project area is within this working group, only four sage grouse observations have been documented in the project area (WYNDD 2009). Additionally there are no leks within the project area and the closest lek, Warren Bridge 2, is approximately 4 miles to the southeast of the Beaver-Twin allotment. As of 2009, this lek was considered occupied by the WGFD and has had noticeable increase in attending males over the past years. This area is not within the 'Core' habitat designated by the Governor's Executive Order and is considered marginal brood rearing habitat due to its higher elevation sagebrush habitats and subsequent late summers (pers. com. Dean Clause WGFD).

## Effects of the Proposed Management Action on Species Evaluated

### Grizzly Bear

### Direct and Indirect Effects

There will be no indirect or direct impacts to secure habitat, denning habitat or whitebark pine associated with the activity because livestock grazing (reduction of herbaceous forage and presence of livestock) typically doesn't impact these habitats. Livestock/grizzly bear conflicts are likely to continue as a result of this activity. Conflicts may result in the relocation of problem bears inside or outside of the project area or result in direct mortality of individuals; following the Interagency Nuisance Bear Guidelines (pages 51-70 of the Interagency Grizzly Bear Guidelines, USDI Fish and Wildlife Service 1986). All forest plan amendment guidelines and conservation measures identified in the 1999 Biological Opinion are adhered to in this activity. Following all conservation measures and the Food Storage Order will help to prevent human-grizzly bear conflicts, however, livestock/grizzly bear conflicts will continue.

FWS_000063

Appellate Case: 22-8043      Document: 26-1      Date Filed: 09/15/2022      Page: 222

*Cumulative Effects*

With the implementation of the Conservation Strategy, the 1993 Recovery Plan was updated with the 2007 Demographic Recovery Criteria because the 1993 version was no longer considered the best technique to assess recovery of the Yellowstone grizzly bear populations. The end result was revised methods for calculating population size , estimating the known to unknown mortality ratio and estimating sustainable mortality levels for the Yellowstone grizzly population based on best available science (72 FR 11376; 72 FR 11376-11377). The allowable mortality limits for each bear class are calculated annually based on total population estimates of each bear class for the current year. The Interagency Grizzly Bear Study Team (IGBST) calculates both the total population size and the mortality limits within an area designated by the Conservation Strategy that overlaps and extends beyond suitable habitat, which the project area is included.

For independent females, a 9 percent limit was considered sustainable because simulations have shown that this level of adult female mortality rate allows a stable to increasing population 95 percent of the time (Harris et. al 2006). For independent males, a 15 percent limit was considered sustainable because it approximates the level of male mortality in the GYA from 1983 to 2002, a period when the mean growth rate of the population was estimated at 4 to 7 percent per year. Based on these calculations, the bears that are removed from management actions associated with this project are included in the evaluations for allowable mortality within the GYA. Annually, this allowable threshold is calculated based on the yearly population estimate. In 2008, the population remained over the minimum of 500 bears per the Conservation Strategy, despite exceeding the mortality thresholds for independent males and females.

Based on this information, grizzly bear mortalities associated with this action will be incorporated into the allowable mortality threshold for the Yellowstone grizzly population. These mortalities are monitored and calculated by the IGBST and maintaining these thresholds should allow a stable to increasing population 95 percent of the time and not hinder the recovery of the species. Exceeding the allowable mortality for independent females in any 2 consecutive years will trigger a Biology and Monitoring Review by the IGBST. Exceeding the allowable mortality thresholds for independent males or dependant young in any 3 consecutive years will also trigger a Biology and Monitoring Review. According to the direction in the Conservation Strategy, the Yellowstone Grizzle Bear Coordinating Committee responds to the Biology and Monitoring Review (Review) with actions to address the deviations from the population (or any habitat) standards. If, after the completion of the Review, the opinion of the YGCC is such that some or all of the population or habitat standards are not being met, the YGCC will petition the USFWS for relisting.

Communication with the WGFD implementing the nuisance bear guidelines and responding to grizzly bear/livestock conflicts is crucial to assure compliance with the allowable mortality thresholds throughout the GYA. Strict compliance with all conservation measures and Food Storage requirements will also help minimize potential conflicts associated with the activity. Annual meetings between the USFS, WGFD, USFWS and permittees are required to discuss the effectiveness of the conservation measures. Additionally, if new information reveals effects which may impact grizzly bears or their habitat in a manner or to an extent not considered in this assessment or the action is subsequently modified in a manner that causes an effect which was not considered in this assessment; the USFS will immediately reinitiate formal consultation.

Therefore, based on the implementation of the Conservation Strategy (complete with all monitoring and reporting guidelines), compliance with the grizzly bear Forest Plan Amendment and implementation of the conservation measures detailed in the project description; the cumulative effects of this action, when combined with other past, present and future actions, is likely to adversely affect grizzly bears but will not impact the recovery of the Yellowstone grizzly bear population.

FWS_000064

## *Western Gray Wolf*

### *Direct Indirect and Cumulative Effects*

Livestock/wolf conflicts are likely to continue as a result of this activity. Conflicts may result in direct mortality of individuals responsible for depredations. Since pack social structure is very adaptable and resilient, breeding members can be quickly replaced either from within or outside the pack and pups can be reared by another pack member should their parents die (Packard 2003, p. 38; Brainerd *et al.* 2008; Mech 2006, p. 1482 in USDI Fish and Wildlife Service 2009a). Consequently, wolf populations can rapidly recover from severe disruptions, such as very high levels of human-caused mortality or disease. After severe declines, wolf populations can more than double in just 2 years if mortality is reduced; increases of nearly 100 percent per year have been documented.

The cumulative effects analysis area is the NRM population boundary, the area the USFWS (combined with state management plans) manages the DPS. The entire NRM wolf population increased in 2009 and was estimated at 1,706 wolves in 242 wolf packs and 115 breeding pairs. This is up from 2008 estimates of 1,645 wolves; 217 packs; and 95 breeding pairs. The overall distribution of the NRM wolf packs also increased. Minimum recovery goals (an equitably distributed NRM wolf population that never goes below 100 wolves and 10 breeding pairs in Montana, in Idaho, and in Wyoming) have been exceeded in the NRM DPS every year since 2002. In response to the 214 cattle, 721 sheep, 24 dogs, and 7 other livestock (4 llamas and 4 goats) depredations that occurred in 2009 throughout the NRM;, 272 wolves were lethally removed. This was 12% of the calculated minimum population estimate of the NRM population (an estimated 1,706 wolves living on Dec 31 plus all known wolf mortality - 272 by agency control, 206 by hunting, and 108 by all other known causes).

Based on the documented increase in the wolf population throughout the NRM annually since 2002 and related increase in the Wyoming population (see Status of Gray Wolf section) even after numerous management removals due to livestock depredations; this activity may continue to result in management removal of wolves responsible for livestock depredation but these mortalities will not jeopardize the continued existence of the species.

## *Canada Lynx and Canada Lynx Critical Habitat*

### *Direct and Indirect Effects*

The direct effects associated with this action include a slight potential for displacement of lynx from the presence of cattle or riders in suitable habitat in the project area. By looking at known lynx locations within the project area and with conversation with WGFD nongame biologist Susan Patla; the Upper Green River area has been used by lynx as a corridor between the Wyoming range and YNP. Individuals that were collared in the Wyoming Range went through this area during 'walkabouts' to YNP or to other areas in the Wind River Range. Additionally, ongoing horizontal cover surveys that are being collected in mapped lynx habitat within the project area have only documented snowshoe hare tracks within one plot out of 56 that have been surveyed. So based on the low density of winter snowshoe tracks recorded in the project area and the assumption that lynx potentially using the project area are using the area as a corridor to other more optimal habitats and are only present for a short period of time: the likelihood of cattle or riders displacing lynx within the project area is very minimal.

Direction in the NRLMD for grazing activities in LAUs indicates that grazing should be compatible with improving or maintaining lynx habitat, contribute to maintaining conditions that would have occurred under

43

historic disturbance regimes and in aspen stands, contribute to the long-term health and stability of aspen. Utilization, stubble height, and stocking rates in this project are intended to maintain or improve upland range and riparian habitat. Approximately 40% of the project area is not used by domestic livestock due to distance from water, steep slopes, inaccessibility and/or insufficient amounts of forage for cattle. These areas not typically utilized by cattle correspond with the optimal lynx habitat within the project area because they are more heavily forested with down debris: areas typically avoided by cattle. Continued grazing would not alter overall structure or composition of native plant communities including shrub-steppe, riparian, and aspen habitats or impact lynx habitat.

### Cumulative Effects
The cumulative effects analysis is based upon the standards and guidelines outlined in the NRLMD (USDA Forest Service 2007). As mentioned previously, the NRLMD provides guidelines for livestock management in lynx habitat. Continued grazing would not alter overall structure or composition of native plant communities including shrub-steppe, riparian, and aspen habitats and areas not meeting Proper Functioning Conditions (PFC) are intended to move closer to the desired PFCs. No potential denning habitat in the LAU's in the project area will be altered by livestock grazing because cattle tend to avoid dense forests with a large amount of deadfall and horizontal cover.

## Greater Sage-Grouse

### Direct and Indirect Effects
While grazing management has limited effect on sagebrush, grazing does affect the height and density of herbaceous material available for hiding cover and food for sage-grouse utilizing the suitable habitats within the project area (WGFD 2009). Grazing, under this action, may reduce herbaceous vegetation understory of the sagebrush community (ibid).  According to *Grazing Influence, Management and Objective Development in Wyoming's Greater Sage-Grouse Habitat (WGFD 2009),* moderate utilization will maintain sites in preferred sage-grouse plant communities and maintain cover for sage-grouse in nesting and early brood-rearing habitat. According to monitoring data, utilization measurements on pastures in the Green River grazing allotment have not exceeded 35% (the low end of moderate utilization) on any of the upland monitoring sites measured in the last 10 years. This is also below the maximum allowable utilization in this alternative. Utilization (documented from 10 years of monitoring data for the project area) for the other allotments was also well below the maximum allowable use, because stocking rates were considerably lower than the use on the Green River allotment, the highest stocking rates of any allotment in the project area. Utilization and AUM numbers prescribed in this action are designed to maintain the appropriate ground cover percentage to ensure proper functioning condition of the range type. Ground cover measurements collected in the past 10 years for pastures within the Green River allotment have not been recorded below 88%, with 6 out of 11 monitoring sites recording 100% ground cover.

There are no documented leks within the project area and the closest lek is the occupied Warren Bridge 2 lek, approximately 4 miles to the southwest of the Beaver-Twin allotment (WGFD 2009). In this area of Wyoming, about 75% of hens nest within 4 miles and about 66% nest within 3 miles of the lek where they are bred. The majority of the allotments are farther than this distance from an occupied lek, so the amount of hens utilizing the project area for nesting and brood-rearing is a minority of the breeding population of sage-grouse in this area. The allotments in the project area are known sage-grouse brood rearing and nesting habitat (WYNDD 2009), however, lands associated with 75% of sage-grouse nesting is on highly utilized neighboring BLM lands south of the project area. Therefore, grazing utilization as proposed in this alternative is at the higher than the moderate level recommended to maintain sites in preferred sage-grouse plant communities. When grazed at maximum utilization as proposed under this alternative, there is a

44

FWS_000066

potential to impact individual sage grouse that may use the project area for nesting and brood rearing habitat. However, the impacts will be minor due to the low number of sage grouse utilizing the project area and the absence of any leks.

**Cumulative Effects**

The cumulative effects analysis area for sage grouse is the MZ II - the Wyoming Basin Management Zone. Currently within the state there are numerous cumulative actions that are contributing to the decline of the greater sage grouse (USDI Fish and Wildlife Service 2010). These mainly stem around impacts to sage grouse habitats. This project is not within 'Core' sage grouse habitat delineated by the State of Wyoming and supported by local working groups and the USFWS. There are no leks are within 4 miles of the project area, habitat in the project area is marginal due to elevation and weather and the Forest Service only manages 4% of the available habitat; in MZ II (the project area is a minimal percentage of that). Based on this information, and the fact that the major limiting factor to sage grouse is from loss or modification of sage brush habitats and the ground cover and utilization throughout the project area indicate moderate utilization; the minimal indirect impacts to sage grouse associated with this alternative may add minor cumulative effects to sage grouse but would not further impact the population viability of the species.

# Determinations of Effect

*Table 6: Determinations of Effect*

| Species or Critical Habitat | Status | Determination |
|---|---|---|
| Canada Lynx (Lynx canadensis) | Threatened | Not likely to Adversely Affect |
| Critical Habitat for Canada Lynx | Designated | Not Likely to Adversely Affect |
| Gray Wolf (Canis lupus) | Non-essential Experimental | Not likely to Jeopardize the Continued Existence of the Species |
| Grizzly bear (Urus arctos horriblis) | Threatened | Likely to Adversely affect |
| Greater Sage-Grouse (Centrocercus urophasianus) | Candidate | Not likely to Jeopardize the Continued Existence of the Species |

## Rationale

### Grizzly Bear

- Grizzly bears (at a minimum) need food, seasonal foraging habitat, denning habitat and security in an area of sufficient size for survival.
- The project area provides this type of habitat; however it is modeled as unsecure (see environmental baseline). Additionally there is a high probability for livestock/bear interactions.
- It's well documented that most grizzly bears that come in contact with domestic sheep prey on sheep and bears that come in contact with cattle also make kills.
- Conflicts between livestock and grizzly bears are common in the project area and have resulted in the relocation, removal, or direct mortality of grizzly bears. These conflicts have increased in recent years in the project area as the grizzly bear population is increasing in size and distribution.
- Numerous conservation measures to reduce human or livestock/bear conflicts are incorporated into the operating instructions for the permittees in the area – however conflicts will continue.

45

FWS_000067

- The Yellowstone grizzly bear population is monitored annually and the conflicts and mortalities that are reported in the project area are included in these monitoring reports.
- It was determined by the IGBST that a 15% male allowable mortality rate and 9% female mortality rate allows for a stable to increasing grizzly bear population.
- This project is likely to impact individual bears due to livestock/bear conflicts however – is not likely to impact the recovery of the Yellowstone grizzly bear population if mortality thresholds are not exceeded (per direction in USDI Fish and Wildlife Service 2007).
- Per the Conservation Strategy, if these thresholds are exceeded (2 consecutive years for females or 3 consecutive years for males) the IGBST will closely review the status of the population and identify actions to address the deviations from the population (or any habitat) standards.
- In light of the relisting of the grizzly bear, it is unclear who (the IGBST or the USFWS) would conduct this review; however the science behind the process is still applicable and the results from that review should apply to the actions associated with this project.
- If new direction is received or additional information regarding mortality thresholds is available; the BTNF will re-initiate consultation (per FSM 2671.4) to ensure the actions in this project do not impact the recovery of the Yellowstone grizzly bear population.

*Gray Wolf*
- Gray wolf populations naturally fluctuate with food availability, strife within packs, and disease.
- Within the project area, the main factor controlling the population of wolves is management removal for livestock/wolf conflicts.
- Livestock/wolf conflicts are likely to continue as a result of this activity.
- Conflicts may result in direct mortality of individuals responsible for depredations.
- Since pack social structure is very adaptable and resilient, breeding members can be quickly replaced either from within or outside the pack and pups can be reared by another pack member should their parents die (Packard 2003, p. 38; Brainerd *et al.* 2008; Mech 2006, p. 1482 in USDI Fish and Wildlife Service 2009a).
- Consequently, wolf populations can rapidly recover from severe disruptions, such as very high levels of human-caused mortality or disease.
- Based on the rapid recovery of wolves to reductions in population and the annual increase in the NRM population; this action may result in the direct removal of wolves from livestock/wolf conflicts, however, these removals and this action will not likely jeopardize the continued existence of the species.

*Canada Lynx and Canada Lynx Critical Habitat*
- Canada Lynx require denning habitat ( ground-level structures that provide security and cover for kittens) and foraging habitat (suitable for their primary prey; snowshoe hares -young conifer stands that are densely stocked with seedlings or saplings, tall enough to provide browse for snowshoe hares above typical winter snow depth).
- Livestock grazing results in a reduction of herbaceous forage in the project area and introduces domestic animals and people into the project area.
- The reduction of herbaceous forage by cattle is typically not in suitable denning or foraging habitat - so this action would not impact these factors.
- The presence of animals and individuals in the project area has the potential to displace lynx – this may impact individuals. This impact is expected to temporary (only during grazing season) and minor (only potentially impacting a few individuals that may use the project area).

46

FWS_000068

Appellate Case: 22-8043          Document: 26-1          Date Filed: 09/15/2022          Page: 227

- Based on this information, and in compliance with the NRLMD, this project 'may impact individual lynx or critical habitat for lynx, but is not likely to adversely affect the species or habitat.

***Greater Sage-Grouse***

- According to the USFWS in the recent designation of the Greater sage-grouse as a Candidate Species, the most limiting factor to sage grouse in this area is habitat fragmentation.
- This action would affect the height and density of herbaceous material available for hiding cover and food for sage-grouse utilizing the suitable habitats within the project area but under moderate utilization, have minimal effects to sagebrush.
- Additionally, about 75% of hens in this area or Wyoming nest within 4 miles of the lek and about 66% nest within 3 miles of the lek where they are bred.
- There are no documented leks within the project area and the closest lek is the occupied Warren Bridge 2 lek, approximately 4 miles to the southwest of the Beaver-Twin allotment.
- Additionally, this project is not within 'Core' sage grouse habitat delineated by the State of Wyoming which contains 80% of the sage grouse population of the state.
- Based on this information, the impacts to sage grouse associated with this alternative may have minor negative effects to individual sage grouse utilizing the project area by reducing cover but this effect is minor under moderate utilization and is a very small subset of the population so would not further impact the population viability of the species.

FWS_000069

# Literature Cited

16 USC 1536. 2009. United States Code Title 16: Conservation, Chapter 35: Endangered Species, Section 1536: Interagency Cooperation. Government Printing Office United States Code Online. [Online] 2009. http://www.gpoaccess.gov.

Buskirk, S.W., L.F. Ruggiero, K.B. Aubry, D.E. Pearson, J.R. Squires, and K.S. McKelvey. 1999. Comparative ecology of lynx in North America. Chapter 14 inin Ecology and conservation of lynx in the United StatesThe scientific basis for lynx conservation. General Technical Report RMRS-GTR-30. USDA Forest Service. Rocky Mountain Research Station

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies. Unpublished Report. Cheyenne, Wyoming.

Interagency Grizzly Bear Study Team. 2000-2009. Interagency Grizzly Bear Study Team - Annual Reports. USGS Northern Rocky Mountain Science Center. [Online] 2000-2009. http://www.nrmsc.usgs.gov/products/IGBST.

Interagency Grizzly Bear Study Team. 2010. 2009 Whitebark Pine Cone Production Report. USGS Northern Rocky Mountain Science Center. [Online]. http://www.nrmsc.usgs.gov/files/norock/products/IGBST/2009_WBP_Report

Interagency Grizzly Bear Committee. 1986. Interagency Grizzly Bear Guidelines. Missoula, MT. 100pp.

Jimenez, M. D., D. W. Smith, D.R. Stahler, E. Albers, and R. F. Krischke. 2009. Wyoming Wolf Recovery 2009 Annual Report. Ecological Services. Helena : USDI Fish and Wildlife Service, 2009. pp. WY-1 to WY-28.

Koehler, G.M. 1990. Population and habitat characteristics of lynx and snowshoe hares in north central Washington. Canadian Journal of Zoology 68:845-851.

Koehler, G.M. and J.D. Britell. 1990. Managing spruce-fir habitat for lynx and snowshoe hares. Journal of Forestry.

Mowat, G., K.G. Poole, and M. O'Donoghue. 2000. Ecology of lynx in northern Canada and Alaska. Chapter 9 *in* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvely, and J.R. Squires. Ecology and conservation of lynx in the United States. General Technical Report RMRS-GTR-30. USDA Forest Service. Rocky Mountain Research Station.

Schwartz, C. C., M. A. Haroldson and G. C. White. 2010. Hazards Affecting Grizzly Bear Survival in the Greater Yellowstone Ecosystem. In press.

Squires, J.R. and T.R. Laurion. 2000. Lynx home range and movements in Montana and Wyoming: preliminary results. Chapter 11 *in* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvely, and J.R. Squires. Ecology and conservation of lynx in the United States. General Technical Report RMRS-GTR-30.

FWS_000070

State of Wyoming. 2008. Executive Order 2008-2: Greater-Sage-Grouse Core Area Protection. Office of the Governor, State Capitol. Cheyenne, WY USA

USDA Forest Service. Rocky Mountain Research Station.

USDA Forest Service. 1990. Bridger-Teton Land and Resource Management Plan. Jackson, WY : USDA Forest Service Bridger-Teton National Forest, 1990.

USDA Forest Service. 1997. 1997 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District Bridger-Teton National Forest.Unpublished.

USDA Forest Service. 1999. 1999 Amendment to the 1997 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District Bridger-Teton National Forest. Unpublished.

USDA Forest Service. 2004. USDA Forest Service Rocky Mountain Region - Shoshone National Forest and Intermountain Region - Bridger-Teton National Forest Order 04-00-104. Bridger-Teton National Forest Food Storage Order. [Online] 2004. http://www.fs.fed.us/r4/btnf/news/food_storage.shtml.

USDA Forest Service. 2005. Grizzly Bear Final Biological Assessment for the Forest Plan Amendments for Grizzly Bear Conservation for the Greater Yellowstone Area National Forests. Unpublished.

USDA Forest Service. 2006. Forest Plan Amendment for Grizzly Bear Habitat Conservation for the Greater Yellowstone Area National Forests Final Environmental Impact Statement. United States Department of Agriculture Forest Service, 2006.

USDA Forest Service. 2007. Northern Rockies Lynx Management Direction Record of Decision. Missoula, MT. USDA Forest Service, Missoula, MT USA, 2007.

USDI Fish and Wildlife Service. 1993. Grizzly Bear Recovery Plan. Missoula, MT USA.181 pp.

USDI Fish and Wildlife Service. 1999. Biological Opinion of the Proposed Continuance of Permitted Livestock Grazing on the Northern Portions of the Pinedale Ranger District. Cheyenne, WY USA. Unpublished.

USDI Fish and Wildlife Service. 2000. Determination of threatened status for the contiguous United States distinct population segment of the Canada lynx and related rule. March 24, 2000. Federal Register 65(58): 16052-16086.

USDI Fish and Wildlife Service. 2003. Endangered and Threatened Wildlife and Plants; Notice of Remanded Determination of Status for the Contiguous United States Distinct Population Segment of the Canada Lynx; Clarification of Findings; Final Rule. July 3, 2003. Federal Register 68(128): 40076-40101

USDI Fish and Wildlife Service. 2007. Endangered and Threatened Wildlife and Plants; Final Rule Designating the Greater Yellowstone Area Population of Grizzly Bears as a Distinct Population Segment; Removing the Yellowstone Distinct Population Segment of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife; 90-Day Finding on a Petition To List as Endangered the Yellowstone Distinct Population Segment of Grizzly Bears. March 29, 2007. Federal Register 72(60): 14866-14938.

FWS_000071

USDI Fish and Wildlife Service. 2007a. Final Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area. Interagency Conservation Strategy Team. Missoula, MT USA

USDI Fish and Wildlife Service. 2009. Threatened and Endangered Species, Designated Critical Habitat and Candidate Species, U.S. Forest Service, Bridger-Teton National Forest, Pinedale Ranger District. Cheyenne, Wyoming : Unpublished, October 2009.

USDI Fish and Wildlife Service. 2009a. Endangered and Threatened Wildlife and Plants; Final Rule to Identify the Northern Rocky Mountain Populaiton of Gray Wolf as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife. April 2, 2009 Federal Register 74 15123-15188.

USDI Fish and Wildlife Service. 2010. Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocercus urophasianus) as Threatened or Endangered. March 23, 2010. Federal Register 75(55): 13910-14014

USDI Fish and Wildlife Service. 2010a. Endangered and Threatened Wildlife and Plants; Reinstatement of Protections for the Grizzly Bear in the Greater Yellowstone Ecosystem in Compliance With Court Order, Final Rule. March 26, 2010. Federal Register 75(58): 14496-14498.

Wyoming Game and Fish Department. 2003. Final Wyoming Greater Sage Grouse Conservation Plan. June 24, 2003. Cheyenne, WY USA.

Wyoming Game and Fish Department. 2009. Grazing Influence, Management and Objective Development in Wyoming's Greater Sage Grouse Habitat. Cheyenne, WY USA.

Wyoming Natural Diversity Database. 2009. University of Wyoming. Laramie, WY USA

FWS_000072

**United States Department of Agriculture**
**Forest Service**
**Rocky Mountain Region—Shoshone National Forest**
**Intermountain Region—Bridger-Teton National Forest**

### OCCUPANCY AND USE RESTRICTIONS

For the purpose of minimizing adverse interactions between bears and humans and pursuant to Title 36 Code of Federal Regulations (CFR), 261.50 (a) and (b), the following uses are restricted in those areas of the Shoshone National Forest and the Bridger-Teton National Forest as shown on the attached map (Exhibit B) and hereby made part of this Order. Also attached, and hereby made part of this Order, are Definitions (Exhibit A) of terms used in support of the restrictions. This Order is effective March 1 through December 1, annually, until rescinded.

1. Possessing or storing any food or refuse, as specified in the Order (36 CFR 261.58 (cc).
2. Possessing, storing, or transporting any bird, fish, or other animal, or parts thereof, as specified in the Order (36 CFR 261.58 (s).
3. Camping as specified in the Order (36 CFR 261.58 (e).

### UNDER THIS ORDER IT IS REQUIRED THAT

1. All food and refuse must be acceptably stored or acceptably possessed during daytime hours.
2. All food and refuse must be acceptably stored during nighttime hours, unless it is being prepared for eating, being eaten, being transported, or being prepared for acceptable storage.
3. Any harvested animal carcass must be acceptably stored, unless the carcass is being field dressed, transported, being prepared for eating, or being prepared for acceptable storage.
4. Camping or sleeping areas must be established at least ½ mile from a known animal carcass or at least 100 yards from an acceptably stored animal carcass.

### EXEMPTIONS

Pursuant to 36 CFR 261.50 (e) the following persons are exempt from this Order:

1. Persons with a permit issued by the Forest Supervisor specifically exempting them from the effect of this Order.
2. Persons in the act of placing black bear baits for the lawful purpose of hunting black bears under state law and regulation.
3. Any Federal or State officer placing baits to capture animals for research or management purposes as part of their official duties.

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 231

FWS_000073

These restrictions are in addition to the general prohibitions in 36 CFR Part 261, Subpart A. This Order supersedes any previous Order prohibiting or restricting the same, or similar, acts in the above-described areas.

Done this day 12 of December, 2004.

| | |
|---|---|
| /s/ Rick Cables | /s/ Jack Troyer |
| RICK CABLES | JACK TROYER |
| Regional Forester | Regional Forester |
| Rocky Mountain Region | Intermountain Region |

Any violation of these prohibitions is punishable by a fine of not more than $5,000.00 for an individual or $10,000.00 for an organization, and/or imprisonment for not more than six (6) months, or both (Title 16 USC 551, Title 18 USC 3571 (b)(6), Title 18 USC 3581 (b)(7)).

FWS_000074

**Exhibit A**
**Occupancy and Use Order No. 04-00-104**
**Special Order—Food Storage and Sanitation**
**Definitions**

1. "Food and Refuse" means any substance, solid or liquid (excluding water, baled hay, or hay cubes without additives) or refuse, which is or may be eaten or otherwise taken into the body to sustain health or life, provide energy, or promote growth of any person or animal. Also includes items such as soft drinks, alcoholic beverages, canned foods, pet foods, processed livestock feed and grains, personal hygiene products, and empty food and beverage containers.

2. "Animal carcass" means the dead body or parts thereof, of any harvested mammal, bird, or fish, including the head or skull plate with antlers or horns and hide or cape of big game animals and any domestic livestock that may be found in the restricted area. Packaged or prepared animal carcass products transported into the restricted area for consumption, game birds, small mammals, or fish harvested for consumption in the restricted area are considered food under the previous definition.

3. "Acceptably stored" means:

   a. Stored in bear-resistant container certified through the Interagency Grizzly Bear Committee Courtesy Inspection Program. A container may be certified by the local district ranger or their designated representative(s) if it meets the IGBC criteria, or

   b. Stored in a closed vehicle where the storage compartment is constructed of solid, non-pliable material that, when secured, will have no openings, hinges, lids, or coverings that would allow a bear to gain entry by breaking, bending, tearing, biting, or pulling with its claws (any windows in the vehicle must be closed), or

   c. Suspended at least 10 feet clear of the ground at all points and four feet horizontally from any supporting tree or pole, or

   d. Stored within a hard-sided residence, building, or storage container subject to the terms and conditions of a special-use authorization or operating plan, or

   e. Stored by other methods approved in a permit issued by the forest supervisor responsible for the area where the method is proposed for use.

   f. For animal carcasses: stored as per 3. a-e when located from 100 yards to ½ mile of a camping or sleeping area or within 200 yards of a National Forest System Trail. Animal carcasses are not considered acceptably stored when within 100 yards of a camping or sleeping area or National Forest System Trail. Animal carcasses more than ½ mile from a camping area or sleeping area and more than 200 yards from a National Forest System Trail may be left on the ground.

   g. Animal carcasses killed or harvested (and parts thereof) within ½ mile of any established camping area or sleeping area must be acceptably stored, possessed, or moved to a distance beyond ½ mile from any such camp or sleeping area by the party(-ies) responsible for killing or harvesting such mammal.

4. "Acceptably possessed" means:

   a. Possessed or attended during daytime by a person(s) that is physically present within 100 feet and direct sight of the accessible food, or

   b. Possessed or attended by such a person(s) for the purpose of field dressing lawfully taken animal carcasses, transporting any food or animal carcass, preparing any animal carcass or food for eating, or eating any food.

Appellate Case: 22-8043   Document: 26-1   Date Filed: 09/15/2022   Page: 233

5. "Camping/sleeping area" means National Forest System Lands temporarily used for the purpose of overnight occupancy without a permanently fixed structure or lands temporarily occupied by unattended camping equipment.

6. "Daytime" means ½ hour before sunrise to ½ hour after sunset, Mountain Time.

7. "Night time" means ½ hour after sunset to ½ hour before sunrise, Mountain Time.

8. "National Forest System Trail" means a trail wholly or partly within, or adjacent to, and serving a part of the National Forest System and which has been included in a forest recreation map.

FWS_000076

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 234

**Exhibit B**
**Occupancy and Use Order No. 04-00-104**
**Special Order—Food Storage and Sanitation**
**Area of Application**

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 235



WESTERN BOUNDARY: North from Alpine along divide of Snake River Range from Dry Gulch to Ferry Peak summit, along top of divide to Deadhorse Peak and north along Targhee-Bridger-Teton Forest boundary.

SOUTHERN BOUNDARY: The expanded food storage boundary on the Bridger-Teton National Forest begins on the southwest at the south side of the confluence of the Snake and Greys Rivers. It then runs east and north along the Snake River corridor, including that area ½ mile south and east of the river itself, to the junction with the Hoback River. At Hoback Junction the area covered by the food storage order runs east along the Hoback River corridor, also including that area up to ½ mile south of the river, to where the Hoback River leaves U.S. 189/191. From there the food storage order applies north of the U.S.189/191 corridor, also including that area up to ½ mile south of the highway and running east to the Forest boundary in T37N, R111W, Section 32 (The Rim). From there the boundary runs northeast along the Forest boundary to the Green River, then southeast along the Forest boundary to Boulder Creek, then east and north along the south side of Boulder Creek to Pipestone Creek, then north along the south side of Pipestone Creek to Lake Prue, then northeast along the south side of Europe Canyon to the Continental Divide.

FWS_000077

---

**61411-2010-F-0225 USDA - Bridger-Teton Natl Forest - BA for Lives...**

---

### New Consultation Started

|  |  |
|---|---|
| **Consultation Code:** | 61411-2010-F-0225 |
| **Office:** | WYOMING ECOLOGICAL SERVICES FIELD OFFICE |
| **Fiscal Year:** | 2010 |
| **Consultation Title:** | USDA - Bridger-Teton Natl Forest - BA for Livestock Grazing on Pinedale Ranger District |
| **ARRA Fund:** | No ARRA funding |
| **Consultation Description:** | Initiate Formal Consultation regarding the 2010 Amended Biological Assessment for livestock grazing on the northern portions of the Pinedale Ranger District, Bridger-Teton National Forest. |
| **Consultation Type:** | Formal Consultation |
| **Consultation Complexity:** | Standard |
| **Action/Work Types:** | *None entered* |
| **Species:** | *None entered* |
|  |  |
| **Staff Lead:** | Ann Belleman |
| **Staff:** | *None entered* |
|  |  |
| **Lead Agency:** | Forest Service |
| **Other Lead Agency:** | *None entered* |
| **Supporting Agencies:** | *None entered* |
| **Other Supporting Agencies:** | *None entered* |
| **No further Service work performed:** | *None entered* |
| **First Contact Date:** | 04/13/2010 |
| **Date of Correspondence:** | 04/13/2010 |
| **Start Date:** | 04/13/2010 |
| **Formal Consultation Initiated:** | 04/13/2010 |
| **Days until Due:** | 132 |
| **Due Date:** | 08/26/2010 |
| **Conclusion Date:** | *None entered* |

Page: 236    Date Filed: 09/15/2022    Document: 26-1    Appellate Case: 22-8043

FWS_000078
4/16/2010

September 04, 2021 Document Act - Date Filed: 10/05/2022 Page: 237

| Date Received: | Date Issued: | Date Due: |
|---|---|---|
| 4-13-10 | | |

| Date Assigned: | Assigned By: | Assigned to: |
|---|---|---|
| 4-15-10 | Group | Ann |

**From:**
**Example Consulting** USDA

**Assignment:**
Formal Consultation —

**Instructions:** Review BA for Livestock Grazing on Pinedale Ranger Dist. – Bridger Teton Nat'l Forest

---

✓ **Prepare Standard Response**

✓ **Format:** ☐ Letter ☐ DOI Memo
☐ **No Concern Letter** ☐ **Platte River BO**
☐ **Gen. Scoping** ☐ **CO River No Fee**
☐ **Oil Pit Concern**

**Species List:**
☐ ALBANY ☐ HOT SPRINGS ☐ SHERIDAN
☐ BIG HORN ☐ JOHNSON ☐ SUBLETTE
☐ CAMPBELL ☐ LARAMIE ☐ SWEETWATER
☐ CARBON ☐ LINCOLN ☐ TETON
☐ CROOK ☐ NATRONA ☐ UNITA
☐ FREEMONT ☐ NIOBRARA ☐ WASHAKIE
☐ GOSHEN ☐ PARK ☐ WESTSON
☐ PLATTE

---

✓ **Draft Letter with Following:**

| Listed, CH, Candidates | Species of Concern |
|---|---|
| ☐ Black-footed Ferret | ☐ Grizzly Bear |
| ☐ Blowout penstemon | ☐ Prairie dog B-tailed |
| ☐ Canada lynx | ☐ Prairie dog W-Tailed |
| ☐ Canada lynx CH | ☐ Greater sage-grouse |
| ☐ Colorado butterfly plant | ☐ Mt. plover |
| ☐ Colorado BP CH | ☐ Gray wolf |
| ☐ Colorado River fish | |
| ☐ Desert yellowhead | **Additional** |
| ☐ Desert yellowhead CH | |
| ☐ Kendall WS dace | ☐ MBTA-Federal |
| ☐ Platte River System | ☐ MBTA –Non Fed |
| ☐ Preble's meadow JM | ☐ BGEPA Bald Eagle |
| ☐ Preble's MJM CH | ☐ BGEPA-Golden Eagle |
| ☐ Ute ladies'-tresses | ☐ Power Lines |
| ☐ Wyoming toad | ☐ Wind Power |
| ☐ Yellow-billed cuckoo | ☐ Wetlands/Riparian |
| | ☐ Invasive Plants |
| **Enclosures** | ☐ Oil Waste Pits |
| ☐ Black-ff Surveys | ☐ Produced Water |
| ☐ Mig Birds High Fed. | ☐ Selenium |
| ☐ Wind Power Guidelines | ☐ Uranium |
| ☐ Power Line Guidelines | |
| ☐ Tower Guidelines | |

---

**TAILS:** ☐ Federal Activity ☒ Section 7 ☐ EC

F

**TAILS Number:** :
**61411** -- 2010 F̶ -- 0225

| Document Review (Surname) | | | |
|---|---|---|---|
| Any Standard Language Changes? ☐ NO ☐ YES | | | |
| ✓ Surname | Initials | Date | Hours TAILS |
| **Administrative** | | | |
| **Biologist (Lead)** | | | |
| **Depletions/Recovery** | | | |
| **Energy** | | | |
| **E. Contaminants** | | | |
| **Sagebrush/Avian** | | | |
| **Section 7** | | | |
| **Supervisor** | | | |
| **Signed By** | | | |

---

✓ **Agency (File Code)**

☐ MINES (Mines)
☐ Dept. of Commerce (8)
☐ DOD - Army Corps of Engineers (06  COE)
☐ DOD - Dept. of Defense  (10 DOD)
☐ DOE - Dept. of Energy, Western Area Power Admin)
    (Bonneville Power) (35  DOE, WAPA)
☐ DOI - Bureau of Indiana Affairs      (01 BIA)
☐ DOI - Bureau of Land Management (02  BLM)
☐ DOI - Bureau of Reclamation  (04  BOR )
☐ DOI - Fish & Wildlife Service (21  FWS)
☐ DOI - Geological Survey (33 USGS)
☐ DOI - National Park Service (25  NPS)
☐ DOI - Office of Surface Mining (28  OSM)
☐ DOT - Federal Aviation Admin (14  FAA)
☐ DOT - Federal Highway Administration (17  FHWA)
☐ DOT - Federal Railroad (18 – FRA)
☐ Environmental Protection Agency (11 EPA)
☐ Federal Communications Commission (13  FCC)
☐ Federal Energy Regulatory Commission (15  FERC)
☐ FEMA/Homeland Security (5 FEMA)
☐ Housing and Urban Development    (23  HUD)
☐ Interstate Commerce Commission (24  ICC)
☐ Nuclear Regulatory Commission   (26  NRC)
☐ Resolution Trust Corp. (12  RTC)
☒ USDA - Dept. of Agriculture (0 USDA)
☐ USDA - Farmer Home Administration (16 FmHA)
☐ USDA - Forest Service (19 FS)
☐ USDA - Natural Resource Con. Service (32  NRCS)
☐ USDA - Rural Electrification Admin. (30  REA)
☐ USDA - Rural Utilities (31)
☐ WY Department of Transportation  (38 WYDOT)
☐ State of Wyoming (Commerce Dept., DEQ,
    WGFD, Water Development)  (39  WY)
☐ Local Government - City, County   (36)
☐ Consultant Letters (Non Agency Specific) (22)
☐ The Nature Conservancy  (29 TNC)

FWS_000079

# ENDANGERED SPECIES ACT SECTION 7 CONSULTATION

## BIOLOGICAL OPINION

for the 2010 Amendment to the 1999 Biological Assessment
for Livestock Grazing on the Northern Portions of the
Pinedale Ranger District

**Agency:**                U.S. Forest Service
Bridger-Teton National Forest
Jackson, WY

**Consultation Conducted by:**   U.S. Fish and Wildlife Service
Wyoming Field Office
Cheyenne, Wyoming

**Date Issued:**          January 18, 2011

FWS_000080

## Table of Contents

Introduction and Consultation History…………………………………..  1

I.   Description of the Proposed Action………………………………..  1

II.  Status of the Species and Critical Habitat……………………………  5

III. Environmental Baseline……………………………………………  13

IV.  Effects of the Action………………………………………………  16

V.   Cumulative Effects………………………………………………...  19

VI.  Conclusion…………………………………………………………  21

Incidental Take Statement………………………………………………  22

Reasonable and Prudent Measures………………………………………  24

Terms and Conditions…………………………………………………...  24

Conservation Recommendations………………………………………..  26

Reinitiation Notice………………………………………………………  27

Literature Cited…………………………………………………………  28

Attachment………………………………………………………………  32

## List of Tables

Table 1. Livestock grazing allotments on the northern portion of the Pinedale
         Ranger District, Bridger-Teton National Forest………………………………..  3

## List of Figures

Figure 1.  Grazing allotments on the northern portion of the Pinedale
Ranger District…………………………………………………………………….  2

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 239

FWS_000081

Appellate Case: 22-8043   Document: 26-1   Date Filed: 09/15/2022   Page: 240

## INTRODUCTION

This document transmits the U.S. Fish and Wildlife Service's (Service) biological opinion on our review of the Bridger-Teton National Forest's (Forest) 2010 Amendment to the 1999 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District and its determination of "may affect, likely to adversely affect" the threatened grizzly bear (*Ursus arctos horribilis*), in accordance with section 7 of the Endangered Species Act (Act) of 1973, as amended 50 CFR §402.14. Your April 1, 2010 letter requesting initiation of formal consultation and amended Biological Assessment (BA) were received on April 13.

This biological opinion is based on information provided in the BA, telephone conversations with Ms. Jenna Casey of your staff, Northwest Wyoming Level 1 meeting discussions in October 2009 and March 2010, and other sources of information. A complete administrative record of this consultation is on file in the Cheyenne Field Office.

### Consultation History

In 1997, the Forest developed a BA to assess the effects of livestock grazing on the Elk Ridge Complex allotments and after on-going discussions with the Service, the BA was later expanded to include six additional permitted allotments: Badger Creek, Beaver-Twin, New Fork-Boulder, Pot Creek, Roaring Fork, and Upper Green River. The BA was amended in January 1999 based on further discussions between the Forest and the Upper Green River Cattle Association permittees and their attorney after which formal consultation was subsequently initiated. The Service completed the associated biological opinion (6-WY-97-F-002, July 16, 1999), which included incidental take in the form of lethal removal for 5 grizzly bears (4 males and 1 female) for on-going grazing activities. Non-lethal take was not specified.

Since the original consultation, grizzly bear populations in the Greater Yellowstone Area (GYA; hereafter referred to as GYA, Yellowstone Grizzly Bear Ecosystem (YGBE), or Greater Yellowstone Ecosystem (GYE)) have expanded and grizzly bears are much more likely to come into conflict as a result of forest management activities, in particular, recreation and grazing. The Forest has also met or exceeded the level of take provided in the 1999 biological opinion (BO). Therefore, based on new information including increasing grizzly bear ranges and population levels, as well as on-going livestock depredations in the Project area, the Bridger-Teton National Forest reinitiated consultation on livestock grazing in the northern portions of the Pinedale Ranger District. The Forest has expanded the original Project area to include nine allotments, due in part to adjacency of additional allotments and associated grizzly bear activity.

## I. DESCRIPTION OF THE PROPOSED ACTION

The proposed action addresses on-going, authorized, commercial, domestic cattle and sheep grazing on nine allotments in the northern portion of the Bridger-Teton National Forest's Pinedale Ranger District: Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Upper Green River (Mud Lake/Fish Creek, Mosquito Lake Pastures, Tepee/Tosi/Kinky S, Moose/Gypsum, Kinky Creek N), Wagon Creek, New Fork-Boulder, Pot Creek, and Elk Ridge Complex (Elk Ridge, Rock Creek, Lime Creek, Tosi Creek); see Figure 1 and Table 1.

FWS_000082



Figure 1. Grazing allotments on the northern portion of the Pinedale Ranger District (2010 BA).

Table 1. Livestock grazing allotments on the northern portion of the Pinedale Ranger District, Bridger-Teton National Forest (from 2010 BA).

| Allotment Name | Total Acres | Suitable Acres | Grazing Season | Number Livestock | Grazing Management System |
|---|---|---|---|---|---|
| Badger Creek | 7,325 | 2533 | July 1st – September 30th | 157 Cc | Season long |
| Beaver-Twin Creeks | 22,266 | 13351 | July 15th – October 15th | 700 Cc | Season long |
| Noble Pastures | 760 | 760 | June 14th – September 20th | 1616 Cc | Deferred Rotation |
| Roaring Fork | 8,275 | 6047 | June 16th – October 15th | 170 Cc | Season long |
| Upper Green River:<br>Mud Lake/Fish Creek<br>Mosquito Lake Pastures<br>Tepee/Tosi /Kinky S<br>Moose/Gypsum<br>Kinky Creek N | 123,933 | 73181 | June 16th – October 15th | 7596 Cc | Deferred Rotation<br>Rest Rotation<br>Deferred Rotation<br>Deferred Rotation<br>Rest Rotation |
| Wagon Creek | 240 | 240 | July 15th – October 15th | 106 Cc | Deferred On/off |
| New Fork-Boulder | 8294 | 3932 | July 1st – September 30th | 511 Cc | Deferred Rotation |
| Pot Creek | 4665 | 2307 | July 16th – October 15th | 380 Cc | Deferred Rotation |
| Elk Ridge Complex:<br>Elk Ridge<br>Rock Creek<br>Lime Creek<br>Tosi Creek | 31,430 | 17548 | July 6th – September 26th | 3750 El | Rest Rotation |
| TOTALS: | 207,188 | 119,899 | | 3,750 El<br>11,236 Cc | |

3

FWS_000084

Allotment Management Plans are prepared for each allotment, which includes approximately 46,100 Animal Unit Months (AUM's) of domestic cattle grazing proposed for continued authorization in the Project area (nine allotments), which is located in portions of Fremont, Sublette, and Teton Counties, Wyoming. This Project will not impact the road densities within the Project area.

All nine grazing allotments occur within occupied grizzly bear habitat, but are outside the GYE Recovery Zone (described below in the "Conservation" section) and 10-mile buffer surrounding the Recovery Zone. The Elk Ridge Complex allotment, which is comprised of 4 smaller allotments (Elk Ridge, Tosi Creek, Lime Creek, and Rock Creek), is for sheep grazing and the remaining eight allotments are for grazing cattle. Given continued use of these grazing allotments by livestock and grizzly bears, depredations and human/grizzly bear conflicts are expected to continue.

The Forest's BA included as part of the proposed action the following required Conservation Measures. Additional measures related to the 2003 Grizzly Bear Conservation Strategy, the Forest Service Occupancy and Use Restrictions (Order Number 04-00-104), and a summary of required grizzly bear management actions are provided in the Attachment. Conservation measures and directions listed immediately below are verbatim from the Forest's updated BA and have been identified as necessary to minimize potential adverse effects to grizzly bears and to meet the intent of the Act relative to the Forest Service's responsibilities under section 7(a)(1) of the Act.

**Bridger-Teton National Forest's Required Grizzly Bear Conservation Measures (BA p. 8):**

- The FS will request reinitiation of consultation in the event of significant changes to the grazing situation.
- All livestock predation will be reported to U.S. Fish and Wildlife Service (USFWS), BTNF, and Wyoming Game and Fish Department (WGFD).
- Annual discussions between USFWS, BTNF, WGFD, Wildlife Services, and Upper Green River Cattle Association permittees to discuss the conservation measures.
- All depredation control work will be conducted by WGFD or its authorized agent following Interagency Nuisance Bear Guidelines (pp. 51-70 in Interagency Grizzly Bear Guidelines; USDI U.S. Fish and Wildlife Service 1986).
- Bear Sanitation Guidelines will be followed for all camps associated with livestock operations (See Food Storage Order 04-00-104).
- Herders and riders are required to watch all livestock closely for sick, injured, or stray animals.
- Permanent Forest Service employees will monitor allotments on a regular basis.
- On Sheep Allotments:
    - All livestock carcasses will be removed as soon as practical and sick or injured animals will be removed or treated when possible.
- On Cattle Allotments:
    - All carcasses will be removed or treated within ½ mile of Green River Lakes Road, Union Pass Rd, FS 605, 660, 663B and 663C, GRL and Whiskey Campgrounds,

4

FWS_000085

        private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Lake of the Woods, Waterdog Lakes, and North Beaver and Tosi trailheads.
- o  Additionally, all dead stock posing a health or safety hazard will be moved when within ¼ mile of live streams, springs, lakes, water, riparian areas, system roads and trails, developed recreation areas, dispersed camping, and picnic sites.
- o  Sick or injured animals will be removed when possible.
- o  No sheep, cattle, or carcass will be removed if human safety is of concern.

# II. STATUS OF THE SPECIES

## Species Description

The grizzly bear is a subspecies of the brown bear (*Ursus arctos*). The grizzly is a large bear with long, curved claws, humped shoulders, and a face that appears to be concave. A wide range of color variations exist; from light brown to nearly black. Guard hairs are often paled at the tips giving the pelage a grizzly appearance, hence the name "grizzly." The bear's coloration is influenced by springtime shedding, new growth, nutrition, and climate (USFWS 1993).

In the lower 48 states, the average weight of grizzly bears is 400 to 600 pounds for males and females average 250 to 350 pounds. An occasional male may exceed 800 to 1,000 pounds. Adults stand 3.5 feet at the hump when on all fours. They may rear up on their hind legs reaching heights of over 8 feet (USFWS 1993).

The muscle structure of the grizzly bear is developed for massive strength and quickness. It can run at speeds of up to 45 miles per hour. Movement is achieved by a normal ambling position on all fours and an upright position on the hind legs that improves the opportunity to see and smell (USFWS 1993).

## Life History

Home range and dispersal: Grizzly bears require large areas to fulfill their basic biological needs, including food and shelter. Their home ranges average 130 to 1,300 square kilometers (50 to 500 square miles). Within these home ranges, the grizzly bear uses a diverse mixture of forests, moist meadows, grasslands, and riparian habitats to complete its life cycle. Grizzly bears generally prefer large, remote areas of habitat for feeding, denning, and reproduction that are isolated from human development (USFWS 1993). They require dense forest cover for hiding and security. In the Yellowstone ecosystem, lodgepole pine (*Pinus contorta*) forests are a large and dynamic part of grizzly bear habitat. Long distance movements of some grizzly bears increase the risk of contact with highway crossings, hunters, recreationists, and a variety of developments associated with human use.

Diet: The grizzly bear is an opportunistic omnivore that uses a wide variety of plant and animal food sources. Grizzly bears in the YGBE have the highest percentage of meat consumption in their diet of any inland grizzly bear population (Hilderbrand *et al.* 1999). About 30 to 70 percent

5

FWS_000086

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 245

of the grizzly bear diet in the YGBE is from some form of animal matter. Meat in the grizzly bear's diet varies by season and available forage. Ungulates are an especially important food source for bears in the spring and fall (Knight *et al.* 1984) and use of carcasses in Yellowstone National Park is well documented (Podruzny and Gunther 2001).

Grizzly bears also eat small mammals such as pika and marmots, however, these mammals form a relatively minor portion of the bear's diet. Spawning cutthroat trout in streams surrounding Yellowstone Lake have been documented as an important food source for grizzly bears (Mattson and Reinhart 1995). Army cutworm moths are also an important food source for bears in the YGBE (Mattson *et al.* 1991). Army cutworm moths congregate in remote, high altitude alpine talus areas and feed on alpine flowers. These moths provide important dietary fat in the fall, when grizzly bears are preparing for hibernation, and are also positively correlated with bear reproductive success (Bjornlie and Haroldson 2001). During times of great moth abundance, White *et al.* (1999, as cited in Robison *et al.* 2006) estimated a grizzly bear may eat up to 40,000 moths per day and more than one million per month, representing 47 percent of its annual caloric budget. The uneaten moths then migrate back to lower elevations to deposit their eggs, leaving the alpine areas between August and October. Army cutworm moth congregation sites are in remote areas and therefore, potentially reduce human-bear conflicts by isolating the bears. Grizzly bears will also eat ants (Mattson 2001) and earthworms (Mattson *et al.* 2002). Grizzly bears make use of domestic ungulates to varying degrees in some portions of the GYA, either in the form of carrion or as prey.

The grizzly bear also makes use of a variety of vegetative food sources. Whitebark pine seeds are an important fall source of food for grizzly bears in the YGBE (Mattson and Reinhart 1997). Bears consume whitebark pine seeds contained in red squirrel cone caches (Mattson and Reinhard 1997). Studies show that in years when the whitebark pine seed crop is low, there is an increase in human-bear conflicts (Haroldson *et al.* 2003). This is likely due to bears seeking alternative food sources, such as exotic clover species (Reinhart *et al.* 2001) and yampa that occur at lower elevations and closer to humans. In addition to supplying a food source high in fat, whitebark pine seed crops also serve grizzly bears by keeping them occupied at high elevations far from intense human use. Other grizzly bear seasonal foliage use includes roots (Mattson 1997), graminoids, horsetail, forbs, and fruits (whortleberry and huckleberry) (Knight *et al.* 1984, Mattson *et al.* 1991). Bears also eat limited amounts of mushrooms.

Den site selection: Grizzly bears generally construct dens in areas far from human disturbance at elevations of approximately 2,000 to 3,050 meters (6,500 to 10,000 feet). Grizzly bears den from the end of September to the last week in April or early May, with entrance and emergence dates affected by the gender and reproductive status of the bears. Denning bears can be disturbed by winter sport activities, such as snowmobiling; current studies are focused on minimizing disturbance by controlling access to important denning areas (Haroldson *et al.* 2002, Podruzny *et al.* 2002). If pregnant female bears are disturbed in their dens and this disturbance causes them to relocate to a new den prior to parturition, negative consequences can occur in the form of reduced cub fitness and survival (Linnell *et al.* 2000, Swenson *et al.* 1997).

6

FWS_000087

## Population Dynamics

Grizzly bear numbers have greatly declined during the past two centuries. It is believed that the grizzly bear population in the contiguous American west numbered over 50,000 individuals prior to the 18th Century (USFWS 1993). As of 2009, the estimated total population of grizzly bears in the lower 48 states was 1,400 individuals (C. Schwartz, pers. comm., August 10, 2010). The exact size of the grizzly bear population in the YGBE is currently unknown, as the very nature of the grizzly bear and the rugged terrain it inhabits make any census efforts extremely difficult.

In 1996, Eberhardt and Knight (1996) used several different estimates of population parameters to determine a minimum total population size in the GYA of 245 grizzly bears, an estimated population size of 390 grizzly bears using marked females, and an estimated population size of 344 grizzly bears using distinct family groups. In 2003, the Interagency Conservation Strategy team identified the minimum population estimate for the YGBE grizzly bear population in 2001 as 365 grizzly bears. In 2009, The Interagency Grizzly Bear Study Team (IGBST) estimated the total YGBE population at 582 bears (Haroldson 2009). Intensive management has resulted in the YGBE population increasing at a rate of 4 to 7 percent per year since the early 1990s. However, the most recent linear model estimate shows a slowing trend in the rate of increasing population than was observed in 2008 (Haroldson 2009).

The Grizzly Bear Recovery Plan (USFWS 1993) outlines recovery strategies for the various grizzly bear ecosystems. The plan defines a recovered population as one that can sustain the existing level of known and unknown human-caused mortalities that exist in the ecosystems and are well-distributed throughout their recovery zones. Long-term survival of the Yellowstone grizzly bear population over the next 100 to 200 years is contingent upon minimizing average annual mortality within the total population and especially that of adult females (Knight and Eberhardt 1984, 1985). Preventing adult female mortality is the key factor in maintaining the grizzly bear population (Knight and Eberhardt 1984).

Changes were made to the 1993 Recovery Plan's Demographic Recovery Criteria 1 and 3 and included in the 2007 Demographic Recovery Criteria (USFWS 2007), because the 1993 version was no longer considered the best technique to assess recovery of the Yellowstone grizzly bear population. Methods for calculating population size, estimating the known to unknown mortality ratio, and estimating sustainable mortality levels for the Yellowstone grizzly population based on best available science (USFWS 2007) were subsequently revised. All demographic estimates are based on annual information from the Recovery Zone and 10-mile buffer area.

Criterion 1 now sets a minimum target number of 48 adult females with cubs of the year (COY), which is equivalent to approximately 500 total individual bears in the GYA. The desirable total population of grizzly bears in the GYA is 400; therefore, to assure this goal is met, 48 adult females with COY is conservative. In addition, this target number shall not go below 48 for any 2 consecutive years.

Criterion 3 changed the allowable mortality limits for each bear class, which are calculated annually based on total population estimates of each bear class for the current year. For

7

independent females (at least 2 years old), a 9 percent limit was considered sustainable because simulations have shown that this level of adult female mortality allows a stable to increasing population 95 percent of the time (Harris *et al.* 2006, as cited in USFWS 2007). This rate is not to be exceeded in 2 consecutive years. For independent males (at least 2 years old), a 15 percent limit was considered sustainable because it approximates the level of male mortality in the GYA from 1983 to 2001, a period when the mean growth rate of the population was estimated at 4 to 7 percent per year. This rate is not to be exceeded in 3 consecutive years. Both are based on all causes of mortality. Sustainable mortality for dependent young (i.e., cubs of the year and yearlings) is 9 percent for this population segment and is based on human causes only.

In 2009, there were 117 verified sightings of females with COY within the YGBE. Of those sightings, 42 unduplicated females were differentiated using the rule set described by Knight *et al.* (1995) and the total number of COY observed was 89, with a mean litter size of 2.12 (Haroldson 2009). Based on the linear model under the Revised Criteria, there were 55 females with COY, which is above the required minimum of 48 in any 2 consecutive years. All 18 Bear Management Units (BMU; BMUs are described below in the "Conservation" section) in the GYA were occupied by female grizzly bears with COY in 2009 and all 18 BMUs have had verified observations of females with young in at least 4 years of the last 6-year (2004 to 2009) period (Podruzny 2009).

There were 31 known and probable mortalities in the GYE during 2009; of these, 24 were attributable to human causes and 6 are under investigation. Thirteen of the mortalities were females, 12 of which count toward the mortality threshold, 11 were independent aged males, and 8 were dependent young. Using the Revised Criteria and methodology presented by IGBST, estimates of total mortality of independent females and independent males were within sustainable limits in 2009 (under 22 and 24 mortalities, respectively) as were human-caused dependent young mortalities (under 16).

## Status and Distribution

Historically, the grizzly bear ranged in the United States from the Great Plains to the Pacific Coast and from the northern U.S. border with Canada to the southern border with Mexico. Currently in the contiguous U.S., the grizzly population has been reduced to roughly 2 percent of its former range. It presently occupies portions of British Columbia and Alberta, Canada and portions of Montana, Idaho, Wyoming, Washington, and Alaska.

The grizzly bear was listed as threatened in the lower 48 states in 1975 [70 Federal Register (FR) 69858] due to concerns about the bear's population status throughout its remaining range. The Yellowstone area population had been reduced to 229-312 bears due to low adult female survival (Knight and Eberhardt 1985). The first grizzly bear recovery plan in 1982 identified five ecosystems thought to support the species within the conterminous United States. They include the GYA, the Northern Continental Divide Ecosystem in north-central Montana, the Cabinet-Yaak area of northwest Montana and northern Idaho, the Selkirk Mountains of northern Idaho, northeast Washington and southeast British Columbia, and the North Cascades area of north-central Washington. The Yellowstone grizzly bear population is discrete from other grizzly

8

FWS_000089

populations, has markedly different genetic characteristics, and exists in a unique ecological setting where bears use terrestrial mammals as their primary source of nutrition (Mattson 1997, 70 FR 69865).

The Service proposed to establish a Distinct Population Segment of the grizzly bear for the GYA and surrounding lands, and concurrently delist it from the Act on November 17, 2005 (70 FR 69854). As part of this proposal, grizzly bear habitat security in the Primary Conservation Area (defined below in the "Conservation" section) is achieved primarily by managing motorized access which: (1) minimizes human interaction and reduces potential grizzly bear mortality risk, (2) minimizes displacement from important habitat, (3) minimizes habituation to humans, and (4) provides habitat where energetic requirements can be met with limited disturbance from humans (70 FR 69867). To prevent habitat fragmentation and degradation, the quantity and levels of secure habitat, road densities, developed sites, and livestock allotments will not be allowed to deviate from 1998 baseline measures (70 FR 69882).

The final rule to delist the grizzly bear was published on March 28, 2007, and became effective April 30, 2007. Prior to this final rule, the Service: (1) finalized the 2003 Conservation Strategy (Interagency Conservation Strategy Team 2007) that guides post-delisting monitoring and management of grizzly bears in the GYA, (2) appended the habitat-based recovery criteria to the 1993 Recovery Plan and the Strategy, and (3) appended the 1993 Recovery Plan and the Strategy with an updated and improved methodology for calculating total population size, known to unknown mortality ratios, and sustainable mortality limits for the Yellowstone grizzly bear population.

An order was issued by the Federal District Court in Missoula on September 21, 2009, which enjoined and vacated the delisting of the GYA grizzly population. In compliance with this order, the GYA grizzly population is again treated as a threatened population under the Act. Because two remaining cases challenge the same Final Rule in the District of Idaho, the Service is coordinating closely with the Department of Justice to determine what effect, if any, this order has on that pending litigation, and whether further proceedings in the District of Montana are warranted.

The range of the grizzly bear in the Greater Yellowstone Ecosystem has increased, as evidenced by the 48 percent increase in occupied habitat since the 1970s (Pyare *et al.* 2004, Schwartz *et al.* 2002, USFWS 2005). The most recent estimate of the known area occupied by grizzly bears in the YGBE is approximately 37,258 sq km (14,385 sq mi), an increase of 2,842 sq km from 34,416 sq km reported in the year 2000. In addition to increased sampling effort, the increase in distribution likely reflects bears continuing to expand into suitable but unoccupied habitats on the edge of their current distribution. Because of the methods used to determine occupied area however, occupancy beyond this perimeter cannot be ruled out. Figure 1 in Schwartz *et al.* (2006) shows unique sightings of unduplicated females with cubs outside of the known grizzly bear distribution in the GYE during the period of 1990-2004, suggesting occupancy by resident females in the area.

9

FWS_000090

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 249

## Conservation

In an effort to facilitate consistency in the management of grizzly bear habitat within and across ecosystems, the Interagency Grizzly Bear Guidelines were developed by the Interagency Grizzly Bear Committee (IGBC) (51 FR 42863, November 26, 1986) for use by land managers. The IGBC developed specific land management guidelines for use in each of the five ecosystems including the YGBE. The YGBE includes lands primarily within Yellowstone and Grand Teton National Parks, John D. Rockefeller, Jr. Memorial Parkway, significant portions of the Bridger-Teton, Shoshone, Targhee, Gallatin, Beaverhead, and Custer National Forests, adjacent private and State lands, and lands managed by the U.S. Bureau of Land Management.

The Conservation Strategy for the Grizzly Bear in the GYA was released in 2003 and the strategy became effective once the final delisting rule took effect in 2007. The State and Federal implementation plans within the Strategy provided a framework for managing the Primary Conservation Area (PCA, synonymous with the Recovery Plan's Recovery Zone) and adjacent areas of suitable grizzly bear habitat. The PCA is the area considered the adequate seasonal habitat needed to support the recovered Yellowstone grizzly bear population for the foreseeable future and allow bears to continue to expand outside the PCA. A recovered grizzly bear population is one having high probability of existence into the foreseeable future (greater than 100 years) and for which the five factors in Section 4(a)(1) of the Act have been successfully addressed. The PCA was designed specifically with these five factors in mind. Approximately 58.5 percent (5,383 sq mi) of the PCA encompasses National Forest System lands within six National Forests. Due to grizzly bear relisting in 2009, the 1993 Recovery Plan is the current management document in use in addition to existing forest plan direction; however, the Conservation Strategy provides the best available science, so all are incorporated into project analyses.

Recovery zones have been established for the grizzly bear and include areas large enough and of sufficient habitat quality to support a recovered bear population. According to the Grizzly Bear Recovery Plan (USFWS 1993), a recovery zone is defined as that area in each grizzly bear ecosystem within which the population and habitat criteria for achievement of recovery will be measured. Areas outside of recovery zones may provide habitat that grizzly bears will use, but are not considered necessary for the survival and recovery of this species. The area outside the recovery zone but within a 10-mile diameter buffer is managed to conserve grizzlies and their habitat whenever possible; population and mortality data within this buffer zone are collected and used to assess recovery criteria. Beyond the 10-mile buffer, grizzly bear populations are not considered when determining whether recovery goals have been met, however protection is still accorded to the grizzly bear under the Act.

The Yellowstone Grizzly Bear Recovery Zone covers approximately 23,828 sq km (9,200 sq mi or 5,888,000 acres) of primarily National Park Service and Forest Service lands – approximately 89 percent of the known distribution of grizzly bears in the YGBE. Grizzly bears also occur in and use areas outside the Recovery Zone.

FWS_000091

The Recovery Zone is divided into smaller areas called Bear Management Units (BMUs) for the purpose of habitat evaluation and monitoring. BMUs were designed to:

(1)     Assess the effects of existing and proposed activities on grizzly bear habitat without having the effects diluted by consideration of too large an area,

(2)     Address unique habitat characteristics and bear activity and use patterns,

(3)     Identify contiguous complexes of habitat which meet year-long needs of the grizzly bear, and

(4)     Establish priorities for areas where land use management needs would require cumulative effects assessments.

Areas within the Recovery Zone are also stratified into Management Situation Zones 1, 2, 3, 4, or 5, each having a specific management direction.

"Management Situation 1" (MS1) lands contain population centers of grizzlies, are key to the survival of the species and are where management decisions will favor the needs of the bear even when other land use values compete.

"Management Situation 2" (MS2) lands are those areas that lack distinct population centers and the need for this habitat for survival of the grizzly bear is more uncertain. The status of such areas is subject to review. Here, management will at least maintain those habitat conditions that resulted in the area being classified as MS2.

"Management Situation 3" (MS3) designation is intended for lands where grizzly bears may occur infrequently. There is high probability that Federal activities here may affect the species survival and recovery. Management focus is on human-bear conflict minimization rather than habitat maintenance and protection.

"Management Situation 4" (MS4) lands are areas where grizzlies do not occur in the area but habitat and human conditions make the area potentially suitable for grizzly occupancy, and the area is needed for the survival and recovery of the species. Grizzly-human conflict minimization is not a management consideration on these lands.

"Management Situation 5" (MS5) lands are areas where grizzlies do not occur, or occur only rarely in the area. Habitat may be unsuitable, unavailable, or suitable and available but unoccupied. The area lacks survival and recovery values for the species or said values are unknown. In this area, maintenance of grizzly habitat is an option. Grizzlies involved in grizzly-human conflict are controlled.

11

**Threats**

Isolation from human activities is extremely important for bear survival, as grizzly bears habituate to human foods quickly and become pests. Pest bears often must be eliminated or removed from developed areas. Managing human-caused bear mortality is a goal of the Recovery Plan and is essential to maintaining a viable grizzly bear population (USFWS 1993). Primary threats to grizzly bears are associated with motorized and dispersed recreational use, livestock grazing, and forest management activities, including timber harvest. Recreation use includes hunting, fishing, camping, horseback riding, hiking, biking, off-road vehicle (ORV) use, activities associated with private lands, and snowmobiling. Direct human-caused mortality is the most obvious threat to the grizzly bear. This kind of mortality can occur in several ways: (1) mistaken identification by big game hunters, (2) malicious killing, (3) defense of human life or property, (4) accidental death (vehicle strike, electrocution, etc.), or (5) management removals. Bears are removed to defend human life or property, usually because bears have become dangerously bold as a result of food conditioning and habituation at campsites, lodges, resorts, and private residences, or they become habituated predators of livestock (Knight and Judd 1983).

Human-grizzly bear interactions have been increasing in the ecosystem due, in part, to increasing human use and development, increasing bear numbers, and bears and people both expanding their range of occupancy, thereby increasing the chances of adverse encounters. The frequency of grizzly bear-human conflicts is inversely associated with the abundance of natural bear foods (Gunther *et al.* 2004a). That is, most grizzly bear mortalities are directly related to grizzly bear-human conflicts. The greatest mortality increase in recent years is self-defense in fall by big game hunters. According to Gunther *et al.* (2009), five areas were identified as having 76 percent (411 of 539) of conflicts in the GYE over the previous 3 years. These included: (1) the area encompassing Cooke City, MT, the Clarks Fork River, Crandall Creek, Sunlight Creek, and the North and South Forks of the Shoshone River (152 conflicts), (2) the Green River and Dunoir Creek drainages (134 conflicts), (3) the Gardiner Basin (64 conflicts), (4) the area encompassing West Yellowstone, MT and Island Park, ID (47 conflicts), and (5) the area encompassing the Wood River, Cottonwood Creek, and Grass Creek drainages (14 conflicts).

There are a number of naturally or semi-naturally occurring factors that also may influence GYE grizzly bear population levels. Whitebark pine seeds provide an important food source for grizzly bear; however, abundant cone crops are not produced every year. Additionally, white pine blister rust, which has had severe consequences on whitebark pine in the Northern Continental Divide Ecosystem, occurs in the Yellowstone area. The Yellowstone cutthroat trout, which is an important food source for grizzly bears in the area, has been negatively influenced by introduced lake trout, which are less available to bears due to their deeper water habits (Reinhart *et al.* 2001). Winter-killed ungulates are an important food supply, but ungulate populations vary widely in numbers and are influenced by weather conditions. The reintroduction of wolves has increased competition for ungulate prey and winter-killed carrion. Army cutworm moths, which also provide important food for bears in some areas, could be affected by pesticide use in agricultural areas. Recent fires may have impacts on available food and cover over the short term, particularly to individual bears with heavily burned home ranges. Fire, in general, over

FWS_000093

time stimulates many forage species and berries preferred by bears, provided alternate food supplies and cover are available to maintain bears through the immediate aftermath of a fire.

Grizzly bears have experienced displacement from available habitat (loss of habitat effectiveness) due to increased human uses from: (1) increased amount of roading (Kasworm and Manley 1989), (2) ORV use, and (3) recreation use. They have also experienced loss of existing available habitat due to: (1) increased development on private land related primarily to residential housing and (2) potential for increased development on public land related primarily to oil/gas and recreation development. The grizzly bear also faces a decrease in value of available habitat due to: (1) a loss of biodiversity (especially early succession vegetative types) and (2) sub-optimal composition, structure, and juxtaposition of vegetation as a result of fire suppression, management strategies, and advancing succession. Finally, the bear faces isolation from fragmentation of available habitat due to: (1) major development of private land, (2) construction of major highways that block or restrict movement, (3) inadequate provisions for linkage on minor roads and highways, and (4) large blocks of clearcuts.

## III. ENVIRONMENTAL BASELINE

Under the provisions of section 7(a)(2), when considering the "effects of the action" on listed species, the Service is required to consider the environmental baseline. Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts on the grizzly bear of all Federal, state, or private actions and other human activities in the action area. Also included in the environmental baseline are the anticipated impacts of all proposed Federal projects in the action area that have undergone section 7 consultation, and the impacts of state and private actions which are contemporaneous with the consultation in progress.

Activities considered in the environmental baseline include several highway reconstruction projects and livestock grazing allotment authorizations for the Shoshone and Bridger-Teton National Forests and Bureau of Land Management (BLM) lands in northwestern Wyoming. Specifically, these project activities are the 287/26 Highway Reconstruction project (aka Towgotee Pass Highway, letter number WY5998, August 22, 2003), the Forest Services' issuance of commercial grazing permits on the Teton Division of the Bridger-Teton National Forest (WY4715, December 3, 2002), and the permitting of commercial livestock grazing on the North and South Zones of the Shoshone National Forest (WY7155, September 30, 2004) and livestock grazing as described in the BLM's Pinedale, Cody, Lander, and Worland Resource Management Plans (WY9751d, September 1, 2006).

### Action Area

Action area, as defined by the Act's implementing regulations (50 CFR 402.02), is the entire area to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action. For the purposes of this consultation, the Service defines the action area as those portions of the GYA that include all nine livestock allotments (Project area) and any surrounding area with grizzly bear occupied habitat, where grizzly bear home ranges may

13

FWS_000094

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 253

partially or wholly overlap with any of the nine allotments. We assume that some of those grizzly bear home ranges likely overlap the Recovery Zone or 10-mile buffer; however, most of the action area is primarily outside of either.

## Status of the Grizzly Bear within the Action Area

The action area is occupied by grizzly bears and based on radio-collared bears, there were a minimum of 11 known grizzly bear home ranges that overlapped the allotments in 2009 (Pers. comm. between J. Casey and M. Haroldson, Oct. 2009). The BA indicated that from 1999 to 2009, there were 305 reported grizzly bear conflicts in the Project area (nine allotments). Most of these (67 percent) resulted in cattle injuries or depredations, 24 percent were sheep conflicts, 5 percent were property damage, 2 percent chance encounters, and 1 percent was garbage-related. One human injury occurred within a sheep allotment in 2009. During this 11-year period, there were 5 grizzly bear mortalities within the Project area; all were males and while all had a previous history of livestock depredation prior to removal, the mortalities were not directly related to grazing. They occurred in both sheep and cattle allotments. There were also 26 grizzly bears trapped in the Project area and relocated as a result of livestock conflicts. Of those 26 bears, 50 percent (13) are alive or of unknown status, 31 percent (8) were subsequently relocated elsewhere for livestock, garbage, or developed site conflicts, 15 percent (4) were killed in hunter-related self defense, and 1 bear was a vehicle-strike mortality.

Female grizzly bear survival was modeled for the Project area using landscape features (as described in the BA, pp. 35-37) to identify source and sink habitats (habitat quality that affects (grizzly bear) population increase or decline, respectively). According to the model, survival of independent grizzly bears improved as secure habitat and elevation increased, but declined as road density, number of homes, and site developments increased. Two allotments, Tosi Creek and Badger Creek, had mean female survival estimates over 91 percent. This 91 percent threshold was based on an estimate of sustainable mortality that demonstrates increasing population growth (source habitat) for the Yellowstone bear population. All other allotments were below this threshold, indicating the Project area overall is a potential sink for grizzly bears.

Secure habitat, defined in the BA as areas greater than or equal to 10 acres (4 hectares) in size and occurring more than 500 meters from an open or gated motorized access route or recurring helicopter flight line, was calculated for the Project area by the IGBST. Most allotments have 50 percent or less secure habitat except for Roaring Fork (75 percent), Tosi Creek (part of Elk Ridge Complex sheep allotment, 95 percent), Beaver-Twin (80 percent), Badger Creek (95 percent), and New Fork-Boulder (60 percent). As previously mentioned, road densities will not be impacted by the Project.

Denning habitat was mapped within the Project area. Of the nine allotments, all have at least 97 percent suitable denning habitat except for Noble Pasture and Wagon Creek allotments, and Tosi Creek, which have 71, 87, and 82 percent, respectively.

14

FWS_000095

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 254

**Factors Affecting the Grizzly Bear within the Action Area**

Factors affecting grizzly bears in the action area are primarily associated with livestock grazing but may also include timber harvest activities, recreational activities (hunting, fishing, camping, horseback riding, hiking, biking, off-road vehicle use, and snowmobiling), management control actions, residential development, educational programs, food storage orders and garbage disposal practices, wildlife and fisheries management practices, realty actions, insect control programs, fire management practices, drought, disease, or insect outbreaks. These factors may result in: (1) increased mortality, (2) change in the quality or quantity of habitat and availability of food, (3) displacement from habitat, and (4) change in the rate of human/grizzly bear encounters.

*Increased mortality.* Grizzly bears may be killed as either a direct or indirect result of management removals due to habitual conflicts with livestock. They may also be killed in defense of human life or property, usually a result of food conditioning and habituation at campsites, lodges, resorts, and private residences. Big game hunters may mistakenly identify grizzly bears as black bears and kill them. In other cases, individuals may maliciously kill grizzly bears.

*Change in the quality and quantity of habitat.* Grizzly bears face a decrease in value of available habitat due to (1) a loss of biodiversity (especially early succession related vegetative types) and (2) sub-optimal vegetation quality as a result of fire suppression, management strategies, and advancing succession. Grizzly bears also face isolation due to fragmentation of available habitat from (1) major development of private land, (2) construction of major highways that block or restrict movement, (3) inadequate provision for linkage on minor roads and highways, and (4) large clearcuts.

Food and cover are important aspects of grizzly bear habitat. The abundance of important food items can change over time depending on a number of factors, which were discussed in the "Threats" section above.

*Displacement from habitat.* As previously discussed in the "Threats" section, grizzly bears have experienced displacement from available habitat due to increased human uses from (1) roading, (2) ORV use, and (3) recreation use. They have also experienced displacement due to (1) development on private land related primarily to residential housing and (2) development on public land related primarily to oil/gas and recreational development. Realty actions such as conversion of lands to residential or mineral development can result in displacement of the bears from previously suitable habitat.

*Change in the rate of human/grizzly bear encounters and conflicts.* An expanding grizzly bear population may result in an increase in the rate of human/bear encounters and conflicts. However, education, food storage, proper disposal of garbage, pet food and livestock carcasses, management infrastructure, and compliance and enforcement of permit requirements will help prevent these incidents and is part of the overall management strategy for grizzly bears (Pers. comm., M. Bruscino, January 2011).

15

FWS_000096

## IV. EFFECTS OF THE ACTION

Under section 7(a)(2) of the Act, "effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, with the effects of other activities interrelated or interdependent with that action. Indirect effects are those caused by the proposed action and are later in time, but still are reasonably certain to occur (50 CFR 402.02). The effects of the action are added to the environmental baseline to determine the future baseline and to form the basis for the determination in this opinion. Should the Federal action result in a jeopardy situation and/or adverse modification conclusion, the Service may propose reasonable and prudent alternatives that the federal agency can take to avoid violation of section 7(a)(2). Effects to grizzly bears are typically evaluated by assessing potential impacts to known use areas, to important grizzly bear prey or their habitat; and the potential for an increase in mortality risk to grizzly bears. The effects discussed below are the result of direct and indirect impacts of proposed livestock grazing activities that may result in adverse effects to grizzlies.

### Factors to be Considered

Project factors potentially affecting the grizzly bear are sheep and cattle grazing and related activities, such as cow camps, herders, and food storage associated with human presence that may result in conflicts between bears and livestock or humans.

### Analyses for Effects of the Action - Direct and Indirect Effects

The potential direct or indirect effects to grizzly bears from the above factors are: (1) harassment, harm, or death, (2) change in the quality or quantity of habitat and availability of food, (3) displacement from habitat as a result of human activities associated with grazing, and (4) change in the rate of human/grizzly bear encounters. Direct effects are effects that result directly or immediately from the proposed action on the species. Direct impacts of the proposed action include impacts to individuals, habitat displacement, and temporary movement by bears in response to activities associated with livestock herd management and nearby livestock cow camps. Indirect effects are effects that are caused by, or result from, the proposed action and occur later in time after the proposed action is completed. The BA indicated that grazing activities will affect only a small amount of permanent habitat for grizzly bears and there will be no direct or indirect effects to grizzly bear secure habitat, denning habitat, or whitebark pine because livestock grazing typically doesn't impact these habitats.

### Direct Effects

Management removal of bears occurs to defend human life or property such as livestock, usually because bears have become dangerously bold as a result of food conditioning or have become habituated predators of livestock. Direct effects resulting from management actions associated with livestock conflicts may include illegal, accidental, or defensive taking of grizzly bears by grazing permittees, their employees, or members of the public, for example, a herder shooting a bear that is attacking livestock during the night. Vehicle/bear collisions may result from bears feeding on vehicle-killed livestock carcasses on roads. Grizzly bears also experience

16

displacement from available habitat, loss of habitat effectiveness, loss of existing available habitat, a decrease in value of available habitat, and isolation due to fragmentation of available habitat. State and Federal management actions may include harassment or aversive conditioning, trapping and releasing on site, trapping and relocating, and trapping and removing from the population. Recommendations from the Guidelines for Grizzly Bear Control Actions in Response to Livestock Depredations (IGBC 1986) involve a two-strike policy for males and a three-strike policy for females prior to consideration for removal. Additional impacts associated with management actions on individual bears include disruptions to behavior, social systems, and activity patterns and the potential for short-term declines in reproductive potential as a result of trapping, handling, and relocating bears. A low probability exists for inadvertent bear deaths associated with trapping, handling, and transporting bears although there is potential.

A potential risk exists for the taking of bears by public agency personnel, permittee personnel, or members of the public as a result of accidentally encountering bears feeding on livestock carcasses and being charged, feeling that they are at risk of personal harm, and shooting a bear in self-defense (riding unaware upon a bear feeding upon a carcass and being charged). A human mauling occurred in one of the actively grazed sheep allotments in 2009. Human activities associated with grazing or livestock herd management and near livestock cow camps could result in disturbance and displacement of bears in both time and space.

**Indirect Effects**

Indirect effects are those effects that are caused by, or result from, the proposed action and occur later in time after the proposed action is completed. Indirect impacts associated with the proposed action may include: (1) conditioning of bears to livestock as prey and subsequent conflicts and associated management actions outside of the Forest, (2) the loss of reproductive potential for bears removed from the population, and (3) potential disturbance to grizzly bear behavior patterns, social systems, and activity patterns, including declines in foraging efficiency, reproductive potential, and survival associated with relocating bears, and the effects of these on the long-term viability of the GYE population.

Carcass disposal may also disrupt normal behavior patterns, social systems, and activity patterns by attracting bears away from their normal feeding and sheltering areas. Livestock carcasses are strong unnatural attractants, and as such, become very effective bear baits. Wherever such carcasses are available within occupied habitat, bears are drawn to the area causing their normal behavior patterns to be disrupted in the short term. This change in use and behavior has the potential to make the grizzly bear more susceptible to other impacts, in particular, conflicts with humans or motorized vehicles – a potential human health and safety concern. Anderson *et al*. (2002) noted, "(T)hus, while carcass removal may reduce the concentration of bears in an area, it may not prevent bears from developing depredatory tendencies or repel depredating bears from grazing areas."

When carcasses are disposed of in the same location within occupied habitat over the long term, dump behavior develops. Such unnatural dump behavior was well documented in Yellowstone National Park and adjacent communities when garbage dumps were available to bears causing

17

FWS_000098

the bears to become food habituated. These changes in normal behavior can cause food conditioning in bears and generate conflicts between humans and livestock. When these bears are then relocated, significant effects on their social systems, behavior patterns, and activity patterns occur. Removal of bears means a loss of those bears' reproductive potential. It is important to note that survival rate of cubs (not in the company of their mothers) that are relocated into occupied habitat is generally quite low.

Similarly, grizzly bears that are exposed to livestock may also develop a disruption in normal behavior and feeding patterns, including learning to associate livestock as easy prey. Relocation of these animals elsewhere may transfer the learned depredating behavior, potentially resulting in further conflicts or depredations and subsequent removal from the population. According to the BA, during the 11-year period from 1999 to 2009, there were no lethal management removals of grizzly bears in the Project area. However, numerous bears were trapped and relocated due to chronic livestock depredations and some relocated bears were subsequently removed from the population – an indirect effect of learned depredating behavior.

**Analysis for Effects of the Action**

One of the most challenging and controversial aspects of grizzly bear conservation in the Yellowstone ecosystem has been management of the grizzly bear-livestock interface. Grizzly bear conflicts with livestock throughout the ecosystem have generally been managed according to the Interagency Grizzly Bear Guidelines, which include a protocol for nuisance bear management. From 1973 to 2009, there were a total of approximately 530 grizzly bear deaths in the GYA. Of those, 391 were human-caused deaths. From 1999 to 2009 on the Forest, 45 conflicts occurred, of which 7 (16 percent) were attributed to livestock. While livestock depredations in the GYA are on-going, and direct or indirect mortality to depredating grizzly bears, whether in this Project area or elsewhere, applies toward GYA mortality thresholds, the number of allotments and distribution of livestock in the ecosystem have not prevented achieving grizzly bear demographic recovery criteria.

The rate of grizzly bear-human conflicts is inversely associated with the abundance of natural bear foods (Gunther *et al*. 2004). When native bear foods are of average or above average abundance, there tend to be few grizzly bear-human conflicts involving property damage or anthropogenic food. When the abundance of native bear foods is below average, incidents of grizzly bears damaging property and obtaining human foods and garbage increase, especially when bears are hyperphagic in late summer and fall. However, livestock depredations tend to occur independently of the availability of natural bear foods (Gunther *et al*. 2004).

The BA (pp. 18-19) summarized literature indicating a difference in whether grizzly bear depredation of livestock is likely to occur. Most, if not all, situations where grizzly bears are exposed to domestic sheep will result in conflict or depredation. However, not all grizzly bears that come into contact with cattle will make kills. Within the Project area, the sheep allotment (Elk Ridge Complex) has had documented grizzly bear/livestock conflicts and 3 of the 8 cattle allotments have had conflicts (Green River, Badger Creek, and Beaver-Twin). Given that all of

18

FWS_000099

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 258

these allotments are contiguous, it's reasonable to assume all are at risk for on-going or new conflicts.

Human presence and activities in grizzly bear occupied habitats may lead to bear-human encounters. Habituation to humans and human activities can also lead to conflicts with grizzly bears which may ultimately lead to their relocation, harm, or death (McClellan 1989). Habituation is the loss of a bear's natural wariness of humans, resulting from continued exposure to human presence, activity, noise, etc. A bear habituates to other bears, humans, or situations when such interactions give it a return in resources, such as food, that outweighs the cost of the stress that precedes habituation (McArthur-Jope 1980). Habituated bears often end up obtaining human food or garbage and learn to associate people with food. As a result, they can be removed from the population. Such habituated or food-conditioned bears are also more vulnerable to illegal killing because of their tolerance to people. However, in their study of the effects of access on human-caused mortality of Yellowstone grizzly bears, Mattson and Knight (1991) indicated that mortality rates associated with all levels of access (roads, developments, or backcountry) have decreased over time. They point out that most of this observed improvement is due to better management and removal of attractants, such as garbage and other edibles that have been a major cause of bear deaths in the past, and that these may have been the easiest reductions to achieve.

In order to minimize the chances that grizzly bears will conflict with livestock grazing and associated human activities, the Forest has committed to implement a number of conservation measures as listed above in the "Description of the Proposed Action" section and other required actions listed in the Attachment. It is not expected that management relocations or removals to a limited number of grizzly bears in the Project area will have a significant impact on the grizzly bear population as a whole in the Greater Yellowstone Ecosystem.

## V. CUMULATIVE EFFECTS

Cumulative effects include the effects of future state, tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act. Cumulative impacts are the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions. Past, present and foreseeable future actions may include: continued livestock grazing and associated activities, increasing recreational use (non-roaded and roaded, authorized and unauthorized), timber harvesting and fuels reduction, elk feeding on feedgrounds, grazing and other effects from the public's personal-use livestock, and hunting in grizzly bear country. They also might include oil and gas development, increased roading and human use of these roads leading to displacement of bears, private land development, bear baiting in occupied grizzly bear habitat leading to increased chance of accidental shooting, food conditioning bears to natural bait, spread of noxious weeds, management of other wildlife species, especially other threatened, endangered, or sensitive species, and other private, local, or State of Wyoming activities.

FWS_000100

Certain components of these activities could displace or modify the behavior of grizzly bears. Grizzly bear habitats could also be modified or degraded by the activities which, to some extent, are reasonably certain to occur within or adjacent to the Project area. Many of the cumulative effects could result in conflicts to or with grizzly bears. Most grizzly bears that persistently kill livestock are eventually relocated or removed from the population. As grizzly bear populations expand outside the Recovery Zone, the proportion of livestock depredations occurring outside this area will likely increase, especially since there are more livestock grazing operations outside the Recovery Zone than inside. It is likely that more grizzly bears will be killed if livestock depredations continue.

The primary state-permitted activity that will occur on public and private land is regulated wildlife hunting, trapping, and fishing. These activities will likely remain the same or similar to existing levels and thus the potential for grizzly bear/human conflicts will likely increase, particularly as the grizzly bear increases in number and distribution. One of the greatest causes of grizzly bear mortalities in recent years is self-defense in fall by big game hunters. Black bear hunting will continue and possibly increase on state and private lands near the Forest. This is another potential source for grizzly bear/human conflict and human-caused grizzly bear mortality.

Additional activities that will likely occur in the action area include actions on private inholdings and private lands adjacent to the Forest. These activities include construction of homes and development of residential subdivisions. This can reduce or fragment available bear habitat and reduce its effectiveness due to human disturbance. In these human activity areas, bears can become human-habituated and food-conditioned which will lead to increases in grizzly bear/human conflicts, particularly as bears increase in number and distribution. Private lands currently grazed will likely continue to have livestock grazing and these actions can have similar effects as those on the Forest. Loss of, displacement from, or decrease in value of available habitat can occur from increased development on private lands related to oil and gas exploration and development and recreational developments. With increases in developments on the periphery of the Bridger-Teton National Forest, there will be increases in recreational activities on both private and public lands, which can lead to increases in grizzly bear/human conflicts and cumulative effects.

In addition, foreseeable land management actions within the YGBE may also affect grizzly bears. These include: (1) major road reconstruction projects which narrow, change, and confine passage corridors and alter secure habitat both for the grizzly bear and its prey, (2) campground and resort community reconstruction projects, which change the pattern of human use in areas and potentially increase the potential for food conditioning and habituation by the grizzly bear, (3) continued grazing pressure in areas of spring and summer range for the grizzly bear, and (4) continued pressure for development in areas of the YGBE that, until fairly recently, had relatively low levels of human use and occupancy. Higher levels of human activities in an area with increasing grizzly bear populations will continue to result in management actions to protect both bears and humans, and on occasion, direct human-caused mortality to the grizzly bear will occur. However, given that Pyare *et al.* (2004) reported that expansion in the southern end of the ecosystem has been exponential and the area occupied by grizzly bears has doubled

20

approximately every 20 years, the population has been able to withstand this level of management action.

## VI. CONCLUSION

After reviewing the current status of the grizzly bear, the environmental baseline for the action area, effects of the Project and the Forest's commitment to implement conservation measures, and the cumulative effects, it is the Service's biological opinion that the direct and indirect effects of grazing on the nine allotments in the northern portions of the Bridger-Teton National Forest's Pinedale Ranger District, as proposed, is not likely to jeopardize the continued existence of the grizzly bear. Although we anticipate some level of take of grizzly bears from management relocations and mortality due to management removals within the Project area, it is our opinion that the proposed action will not appreciably reduce the likelihood of both the survival and recovery of grizzly bears. No critical habitat has been designated for grizzly bears; therefore, none will be affected. Our conclusion that the proposed action is not likely to jeopardize the continued existence of grizzly bears is based primarily on the information presented in the 2010 Amendment to the 1999 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District, additional information provided by the Forest, and informal discussions between Service and Forest personnel.

The Service has reached this conclusion by considering the following:

1) The grizzly bear has experienced significant recovery and met its recovery zone goals in the Greater Yellowstone Ecosystem. Current information indicates that this population of grizzly bears has grown an average of 3 to 4 percent or more annually, although the rate slowed from 2008 to 2009. In addition, the range of grizzly bears in the Greater Yellowstone Ecosystem has increased, as evidenced by the 48 percent increase in occupied habitat since the 1970s (Pyare *et al.* 2004, Schwartz *et al.* 2002).

2) The Forest is committed to implementing conservation measures, additional measures related to the 2003 Conservation Strategy, the Forest Service Occupancy and Use Restrictions (Order Number 04-00-104), and other Forest Plan required grizzly bear management actions to minimize potential impacts to grizzly bears. These actions include managing livestock carcasses, requiring food storage guidelines at all camps associated with livestock operations, and monitoring allotments on a regular basis.

3) Although grizzly bear/livestock conflicts will likely continue and individual grizzly bears may be adversely impacted by management relocations and removals, the overall core population of grizzly bears of the Greater Yellowstone Ecosystem is expected to remain relatively unaffected by grazing activities in the Project area. The adverse effects from the proposed livestock grazing on grizzly bears will occur in an area that constitutes only a small portion of the grizzly bear's range in the GYA. Therefore, while adverse effects to individual grizzly bears are expected, considering the large amount of grizzly bear habitat in the GYA, resource management within such habitat, and the status of the

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 260

grizzly bear, we do not expect the level of adverse effects to appreciably diminish the numbers, distribution, or reproduction of grizzly bears.

4) Finally, the loss of no more than 6 bears within any consecutive 3-year period throughout the lifespan of this project (approximately 10 years) will have a relatively minor impact on the overall population of this species. Mortality is expected to remain within the constraints of recovery criteria mortality limits established by the Recovery Plan (USFWS 1993).

In summary, we have determined that the proposed action will not appreciably diminish the reproduction, numbers, or distribution of grizzly bears. We conclude that the proposed action will not affect the survival of grizzly bears nor will it impede recovery.

## INCIDENTAL TAKE STATEMENT

Section 4(d) and 9 of the Act, as amended, prohibit the take of listed species of fish or wildlife without a special exemption. The Act defines take as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. A special rule under the Act is in effect for grizzly bears in the 48 conterminous states of the United States (50 CFR 17.40(b), Special Rule). Under the terms of the Special Rule, taking is prohibited except as provided in paragraphs 17.40(b)(1)(i)(B) through (F). The exceptions to the take prohibition include the defense of human life and the removal of nuisance bears when the taking conforms to the requirements specified in the regulations.

Although there are exceptions to the take prohibition for grizzly bears, the exceptions do not address all sources of incidental take that may result from the proposed Federal action. For example, harm is further defined by regulation (50 CFR 17.3) to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering. Harass is defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is any take of listed animal species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or the applicant. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered a prohibited taking provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary, and must be undertaken by the Bridger-Teton National Forest so that they become binding conditions of any grant, permit, or Allotment Management Plan issued by the Forest, as appropriate, for the exemption in section 7(o)(2) to apply. The Forest has a continuing duty to regulate the activity covered by this Incidental Take Statement. If the Forest (1) fails to implement the terms and conditions or (2) fails to require the applicant to adhere to the terms and conditions of the Incidental Take Statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of the incidental take, the Forest must

22

report the progress of the action and its impact on the species to the Service as specified in the Incidental Take Statement [50 CFR 402.14(i)(3)].

**Amount or Extent of Take Anticipated**

Although the act of relocating or removing nuisance grizzly bears in accordance with the special rule is an exception to the taking prohibition (50 CFR 17.40(b)(1)(i)(C)), the exception does not address all forms of take that may be associated with permitting grazing. The Service anticipates take in the form of harm to grizzly bears as a consequence of livestock grazing and the associated livestock management operation in habitats commonly used by grizzly bears. The habitat modification of adding a significant additional potential food source that results in the death or injury of bears is "take" in the form of harm. Grazing livestock as part of the proposed action is a significant modification to grizzly bear habitat, including approximately 46,100 Animal Unit Months of cattle that present a substantial potential food source for grizzly bears. The likely depredation of some of the permitted livestock represents an impairment of natural feeding behavior that will in some cases ultimately lead to management removal or death of grizzly bears. In addition, grazing and associated activities have the potential for other adverse effects to grizzly bears (e.g., displacement, habituation, increased exposure to other potential sources of mortalities, etc.) as described in the Biological Opinion's "Analysis for Effects of the Action." However, it would be speculative for the Service to assume these other potential effects will in fact result in incidental take and identify a specific level of incidental take attributable to these other potential adverse affects.

The level of "take" in the form of harm is difficult to detect and quantify. Therefore, in such cases the Service uses surrogate measures to gauge the level of "take" in the form of harm. In this Incidental Take Statement, we are anticipating that the level of incidental take resulting from the proposed action in the form of harm is proportional to the number of grizzly bears that are killed within the action area. We base this on the fact that both the level of take through harm and bear mortalities (even when excepted by the Special Rule) will correlate to the level of bear use and grazing use within the action area. Specifically, the Service believes this level of take in the form of harm is proportional to the management actions for nuisance bear control in compliance with the Interagency Grizzly Bear Guidelines (IGBC 1986) or from defense of life or illegal killings, when grazing or associated activities are reasonably believed to have contributed to the injury or death of the grizzly bear (e.g., direct connection to grazing, such as the management of bear depredating livestock, or indirect connection to grazing, such as a bear illegally killed while feeding on a livestock carcass, etc.). Although we are including some cases of illegal mortality of grizzly bears within our surrogate used to quantify incidental take, the illegal killing or injury of grizzly bears (including trapping or shooting by private citizens) is not exempted by either the special regulations or this biological opinion.

The Service anticipates a total of 6 grizzly bear mortalities within any consecutive 3-year period as a result of the proposed action. The period in which this biological opinion is anticipated to be in effect is approximately 10 years. The Service has identified this level of take based upon the historic level of conflict that has occurred in this area of the Bridger-Teton National Forest, past and current bear occurrences and discussions with grizzly bear specialists from the Service,

23

FWS_000104

Wyoming Game and Fish Department, and the U.S. Forest Service. The grizzly bear is expanding throughout its range and throughout the Forest. It is incumbent upon the Service to identify a level of take that is reasonably likely to occur. We do not anticipate any other incidental take as a result of the proposed action.

**Effect of the Take**

In this Biological Opinion, the Service has determined that this level of anticipated take is not likely to jeopardize the continued existence of the grizzly bear. This is based in part, on the fact that measured population parameters in past years have met established recovery plan levels, while bear mortality has generally been below the threshold levels established in the recovery plan. However, the Service anticipates that the direct and indirect effects of implementing grazing on northern portions of the Pinedale Ranger District could maintain or add to the existing level of incidental take. The Service is using a surrogate measure to gauge the level of "take" in the form of harm. The measure we are using is the number of bear mortalities in the action area that result from management removals of depredating grizzly bears or from defense of life or illegal killing, where grazing activities are likely to have contributed to the injury or death of the bear. No critical habitat for the grizzly bear has been designated; therefore none will be destroyed or adversely modified.

## REASONABLE AND PRUDENT MEASURES

The reasonable and prudent measures, with their implementing terms and conditions and the reporting criteria, are designed to minimize the impact of incidental take that might otherwise result from the authorized activities under the Livestock Grazing on the Northern Portions of the Pinedale Ranger District. If, during the course of the authorized activities, any level of incidental take has exceeded the amount anticipated in the Incidental Take Statement, such take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided. The Forest must immediately provide information related to the circumstances of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

The Service believes the following reasonable and prudent measures (RPM) are necessary and appropriate to minimize take of grizzly bear.

RPM 1. Minimize bear/livestock conflicts and associated management actions.

RPM 2. Minimize habituation and bear-human conflicts.

## TERMS AND CONDITIONS

In order to be exempt from the prohibitions of Section 9 of the Act, the Bridger-Teton National Forest must comply with the following terms and conditions, which implement the reasonable and prudent measures described above. The terms and conditions described below are non-discretionary, and must be undertaken by the Forest so that they become binding conditions of

24

FWS_000105

any grant or permit issued, as appropriate, for the exemption in section 7(o)(2) to apply. The Forest has a continuing duty to regulate the activity covered by this Incidental Take Statement. If the Forest (1) fails to assume and implement the terms and conditions or (2) fails to require the applicant to adhere to the terms and conditions of the Incidental Take Statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse.

T&C1. To monitor the impacts of the Project, the Forest will, in coordination with the Service, review the effectiveness of the Forest's Conservation Measures and other management efforts outlined in the Biological Assessment as they apply to all allotments and describe the progress of the proposed action, including impacts to the grizzly bear (50 CFR 402.14(1)(3)). This process shall consider: (1) adverse effects resulting from Project activities, including grizzly bear and grazing conflicts and resolutions for these nine allotments within the Forest, (2) when and if the level of anticipated incidental take is approached, and (3) when and if the level of anticipated take is reached.

T&C2. If more than 2 grizzly bears are killed related to grazing activities in the Project area (as described in the Incidental take Statement) in any given year, the Forest will coordinate with the Service regarding the adequacy of existing mechanisms to minimize additional take.

T&C3. *Reporting:* In order to document the review process and improve the understanding of the effectiveness of the Conservation Measures, the Forest will complete an annual report with the following information:

- Document the Forest's efforts to implement and enforce all conservation measures as described as part of the proposed action in the Biological Assessment related to grazing activities on the nine allotments.
- Document the Forest's efforts to implement and enforce the additional measures included in the Attachment to this biological opinion (Food Storage, etc.)
- Document the Forest's efforts to monitor for compliance with all appropriate grazing regulations on these allotments. While the Service acknowledges that the Forest Service's educational efforts have been successful and compliance is generally good, the Service remains concerned about the potential for additional reported or unreported grizzly bear encounters resulting from non-compliance on the part of some forest users. Improved efforts by Forest Service personnel, including food storage compliance and carcass disposal, should help prevent this problem.

This annual report will be submitted to the Service's Wyoming Field Office by April 15 of the subsequent year (e.g., 2011 report will be due April 15, 2012).

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. If, during the course of the action, this level of incidental take is reached (the 6 grazing-related grizzly bear mortalities within any consecutive 3-year period), such incidental take represents new information requiring re-initiation of consultation and review of the reasonable

25

FWS_000106

and prudent measures provided. The Federal agency must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures and development of additional terms and conditions.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations (CR) are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

CR1.    Educate livestock grazing permittees and their employees about their responsibilities relating to conservation of grizzly bears, the potential occurrence of grizzly bears on grazing allotments, the risks of working in bear country, the protected status of the grizzly bear, the need for heightened awareness of bears, appropriate personal safety measures, and proper behavior in bear country.

CR2.    Permittees should make bear pepper spray and proper training on its use available to field going employees in areas of bear occurrence.

CR3.    Where possible, avoid important grizzly habitat components such as riparian areas, travel corridors and drainages, and berry stands for intense livestock use.

CR4.    Continue to identify and implement opportunities that reduce the potential for grizzly bear conflicts.

CR5.    Evaluate the potential for aversive conditioning of nuisance grizzly bears in the vicinity of the allotments.

CR6.    Ensure that electric fences used for sheep are in proper working condition and educate permittees and their employees on proper operation and timing of use. The Service recommends that (1) all permanent fencing be fully wildlife passable, (2) any electrified segments have a bottom wire with a minimum height of 20 inches, and (3) if electrified, the fence be off and down during the period of non-use by livestock. (Note: the Forest Service does allow temporary night fencing under certain circumstances.)

CR7.    Grazing permittees will be made aware of their responsibilities through the permitting process in regard to laws and regulations concerning the taking of grizzly bears (Interagency Grizzly Bear Guidelines 1986).

CR8.    In cooperation with the Service, the Wyoming Game and Fish Department and the permittees, identify levels of livestock losses to grizzly bears that would prompt cattle or sheep relocation within the allotment or to another allotment.

FWS_000107

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 266

CR9.    Work in cooperation with the Service, the Wyoming Game and Fish Department, and the Interagency Grizzly Bear Study Team to identify and collect any needed information related to the movements, survival, and reproduction of grizzly bears inhabiting the allotment area.

## REINITIATION – CLOSING STATEMENT

This concludes formal consultation on the action outlined in your August 30, 1999 and April 2010, request for formal consultation for cattle and sheep grazing on nine allotments in the northern portion of the Bridger-Teton National Forest's Pinedale Ranger District.  As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if: (1) the amount or extent of incidental is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this opinion;  or (4) a new species is listed or critical habitat designated that may be affected by the action.  In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

Thank you for your assistance in the conservation of endangered, threatened, and proposed species.  If you have any questions or comments on this biological opinion or your responsibilities under the Act, please contact our office at the letterhead address or phone Ann Belleman at (307) 578-5116.

27

FWS_000108

# LITERATURE CITED

Bjornlie, D. and M. Haroldson. 2001. Grizzly bear use of insect aggregation sites documented from aerial telemetry and observations. Pages 44-51 *in* C. C. Schwartz and M. A. Haroldson, Eds. Yellowstone grizzly bear investigations: Annual report of the Interagency Grizzly Bear Study Team, 2000. U.S. Geological Survey, Bozeman, Montana.

Eberhardt, L. L. and R. Knight. 1996. How many grizzlies in Yellowstone? J. Wildlife Management 60:416-421.

Gunther, K. A., and M. J. Biel, H. L. Robison. 1998. Factors influencing the frequency of road-killed wildlife in Yellowstone National Park. Pages 32 – 42 *in* G.L. Evink, P. Garrett, D. Zeigler, and J. Berry editors. Proceedings of the International Conference on Wildlife Ecology and Transportation. FL-ER-69-98.

——, M. A. Haroldson, K. Frey, S. L. Cain, J. Copeland, and C. C. Schwartz. 2004a. Grizzly bear--human conflicts in the Greater Yellowstone Ecosystem, 1992-2000. Ursus 15(1):10-22.

——, M.T. Bruscino, S.L. Cain, K. Frey, L. Hanauska-Brown, M. Haroldson and C.C. Schwartz. 2004b. Grizzly bear-human conflicts in the Greater Yellowstone Ecosystem. Pages 53-56 *in* C. C. Schwartz and M. A. Haroldson, Eds. Yellowstone grizzly bear investigations: Annual report of the Interagency Grizzly Bear Study Team, 2003. U.S. Geological Survey, Bozeman, Montana.

——, B. Aber, M.T. Bruscino, S.L. Cain, K. Frey, M.A. Haroldson and C.C. Schwartz. 2009. Grizzly bear-human conflicts in the Greater Yellowstone Ecosystem. Pages 38-40 *in* C. C. Schwartz, M. A. Haroldson, and K. West, editors. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2009. U.S. Geological Survey, Bozeman, Montana, USA. 45pp.

Haroldson, M. 2009. Assessing trend and estimating population size from counts of unduplicated females. Pages 9-14 *in* C.C. Schwartz, M.A. Haroldson, and K. West, editors. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2009. U.S. Geological Survey, Bozeman, Montana, USA. 45pp.

——, Ternant, K. A. Gunther, and C. C. Schwartz. 2002. Grizzly bear denning chronology and movements in the Greater Yellowstone Ecosystem. Ursus 13:29-37.

——, S. Podruzny, and R. Renkin. 2003. Whitebark pine cone production. Pages 41-43 *in* C. C. Schwartz and M. A. Haroldson, eds. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2002. U.S. Geological Survey, Bozeman, MT.

FWS_000109

Page: 268          Date Filed: 09/15/2022          Document: 26-1          Appellate Case: 22-8043

—— and K. Frey. 2009. Estimating sustainability of annual grizzly bear mortalities. Pages 20-23 *in* C.C. Schwartz, M.A. Haroldson, and K. West, editors. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2009. U.S. Geological Survey, Bozeman, Montana, USA. 45pp.

Hilderbrand, G.V., S.G. Jenkins, C.C. Schwartz, T.A. Hanley, and C.T. Robbins. 1999. Effect of seasonal differences in dietary meat intake on changes in body mass and composition in wild and captive bears. Can. J. Zool. 77:1623-1630.

Interagency Conservation Strategy Team. 2007. Final conservation strategy for the grizzly bear in the Greater Yellowstone Area. 86 pp. plus Appendices.

Kasworm, W. F., and T. L. Manley. 1989. Road and trail influences on grizzly bears and black bears in northwest Montana. International Conference on Bear Research and Management 8:79-84.

Knight, R. R. and S. L. Judd. 1983. Grizzly bears that kill livestock. International Conference for Bear Research and Management 5:186-190.

—— and L. L. Eberhardt. 1984. Projected future abundance of the Yellowstone grizzly bear. Journal of Wildlife Management 48:1434-1438.

——, R. R., D. J. Mattson, and B. M. Blanchard. 1984. Movements and habitat use of the Yellowstone grizzly bear. Interagency Grizzly Bear Study Team, Montana State University, Bozeman, Montana.

—— and L. L. Eberhardt. 1985. Population dynamics of Yellowstone grizzly bears. Ecology 66(2):323-334.

—— and ——. 1987. Prospects for Yellowstone grizzly bears. Int. Conf. Bear Res. and Manage. 48:1434-1438.

Linnell, J. D. C., J. E. Swenson, R. Anderson, and B. Barnes. 2000. How vulnerable are denning bears to disturbance? Wildlife Society Bulletin 28(2):400-413.

Mattson, D. J. 1997. Selection of microsites by grizzly bears to excavate biscuitroots. Journal of Mammalogy 78:228-238.

——. 2001. Myrmecophagy by Yellowstone grizzly bears. Canadian Journal of Zoology 79:779-793.

—— and R. R. Knight. 1991. Effects of access on human-caused mortality of Yellowstone grizzly bears. USDI National Park Service, Interagency Grizzly Bear Study Team Report 1991B.

FWS_000110

Appellate Case: 22-8043　　Document: 26-1　　Date Filed: 09/15/2022　　Page: 269

——, B. M Blanchard, and R. R. Knight. 1991. Food habits of Yellowstone grizzly bears, 1977-1987. Canadian Journal Zoology 69:1619-1629.

—— and D. P. Reinhart. 1995. Influences of cutthroat trout (*Onchorhynchus clarki*) on behavior and reproduction of Yellowstone grizzly bears (*Ursus arctos*), 1975-1989. Canadian Journal of Zoology 73:2072-2079.

—— and ——. 1997. Excavation of red squirrel middens by grizzly bears in the whitebark pine zone. Journal of Applied Ecology 34:926-940.

——, M. G. French, and S. P. French. 2002. Consumption of earthworms by Yellowstone grizzly bears. Ursus 13:105-110.

McClellan, B. N. 1989. Relationships between human industrial activity and grizzly bears. International Conference on Bear Research and Management 8:57-64.

National Park Service. 2008. Yellowstone Park Road Reconstruction and Maintenance, 2008-2028 Programmatic Biological Assessment. U.S. Department of the Interior, National Park Service, Yellowstone National Park, Wyoming. 60pp.

Podruzny, S. 2009. Occupancy of Bear Management Units by Females with Young. Page 15 *in* C.C. Schwartz, M.A. Haroldson, and K. West, editors. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2009. U.S. Geological Survey, Bozeman, Montana, USA. 45pp.

Podruzny, S. and K. Gunther. 2001. Spring Ungulate Availability and Use by Grizzly Bears in Yellowstone National Park. Pages 33-36 *in* C.C. Schwartz and M.A. Haroldson, editors. Yellowstone Grizzly Bear Investigations: Annual report of the Interagency Grizzly Bear Study Team, 2000. U.S. Geological Survey. Bozeman, Montana.

Podruzny, S.R., S. Cherry, C. Schwartz, and L. Landenburger. 2002. Grizzly Bear Denning and Potential Conflict Areas in the Greater Yellowstone Ecosystem. In press.

Pyare, S., S. Cain, D. Moody, C. Schwartz, and J. Berger. 2004. Carnivore re-colonisation: reality, possibility, and a non-equilibrium century for grizzly bears in the southern Yellowstone Ecosystem. Animal Conservation 7:1-7. As cited in: USFWS. 2005. Endangered and Threatened Wildlife and Plants; Designating the Greater Yellowstone Ecosystem Population of Grizzly Bears as a Distinct Population Segment; Removing the Yellowstone Distinct Population Segment of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife; Proposed Rule. Federal Register 70 (221):69854-69884.

Reinhart, D. P., M. A. Haroldson, D. J. Mattson, and K. A. Gunther. 2001. Effects of exotic species on Yellowstone grizzly bears. Western North American Naturalist 61(3):227-288.

FWS_000111

Robison, H.L., C.C. Schwartz, J.D. Petty, and P.F. Brussard. 2006. Assessment of pesticide residues in army cutworm moths (*Euxoa auxiliaris*) from the Greater Yellowstone Ecosystem and their potential consequences to foraging grizzly bears (*Ursus arctos horribilis*). Chemosphere 64: 1704-1712.

Schwartz, C. C., M. A. Haroldson, K. A. Gunther, and D. Moody. 2002. Distribution of Grizzly Bears in the Greater Yellowstone Ecosystem, 1990-2000. Ursus 13:203-212.

Schwartz, C. C., M. A. Haroldson, K. A. Gunther, and D. Moody. 2006. Distribution of Grizzly Bears in the Greater Yellowstone Ecosystem in 2004. Ursus 17(1):63-66.

Swenson, J. E., F. Sandegren, S. Brunberg, and P. Wabakken. 1997. Winter den abandonment by brown bears *Ursus arctos*: causes and consequences. Wildlife Biology 3(1):35-38.

U.S. Fish and Wildlife Service. 1993. Grizzly bear recovery plan. Missoula, MT. 181 pp.

——. 2007. Revised demographic recovery criteria for the Yellowstone Ecosystem; supplement to the 1993 Grizzly Bear Recovery Plan. 34pp.

——. 2008. Biological Opinion for the Yellowstone Park Road Reconstruction and Maintenance, 2008-2028 Programmatic Biological Assessment. Wyoming Ecological Services Office, Cheyenne, Wyoming. January 28, 2009. 24pp.

U.S. Forest Service. 2010. 2010 amendment to the 1999 biological assessment for livestock grazing on the northern portions of the Pinedale Ranger District. Bridger-Teton National Forest. 50pp. plus attachment.

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 270

FWS_000112

1-App-268

**Attachment**

**Forest Plan Amendment for Grizzly Bear Habitat Conservation (from BA, pp. 27-28)**

*(FWS Note:* We are including the following information for background purposes only. Due to relisting of the grizzly bear, the amendment to the Forest Plan which incorporated the Conservation Strategy is currently invalidated; however, the Conservation Strategy provides the best available science and is therefore considered in proposed projects.)

The decision in this amendment applies to National Forest System lands in the six Greater Yellowstone Area national forests, which includes the BTNF. This amendment established the framework for future decision making by outlining direction for sustaining a recovered grizzly bear population, as identified in the Conservation Strategy. The selected alternative was programmatic in nature and guides implementation of site-specific projects that tier to forest plans. Since this project is outside of the PCA, only guidance in this Amendment for activities outside of the PCA will be discussed.

The Goals, Standards, Guidelines and Monitoring Items for areas outside the PCA identified in the chosen alternative in the Record of Decision (ROD) for the 2006 Forest Plan Amendment for Grizzly Bear Habitat Conservation (USDA Forest Service 2006) are:

- Goal:
  - Outside of the PCA, in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, accommodate grizzly bear populations to the extent that accommodation is compatible with the goals and objectives of other use.
- Standard 5 – Nuisance Bears:
  - Coordinate with State wildlife management agencies to apply Conservation Strategy nuisance bear standards
- Guideline 2 – Livestock Grazing:
  - Outside of the PCA in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, livestock allotments or portions of allotments with recurring conflicts that cannot be resolved through modification of grazing practices may be retired as opportunities arise with willing permittees.
- Guideline 3 – Food Storage:
  - Outside of the PCA in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, emphasize proper sanitation techniques, including food storage orders, and information and education, while working with local governments and other agencies.
- Monitoring Item 1 – Secure Habitat and Motorized Access:
  - Outside of the PCA, in areas identified in state management plans as biologically suitable and socially acceptable for grizzly bear occupancy, monitor and submit for inclusion in the Interagency Grizzly bear Study

32

FWS_000113

Team Annual Report: changes in secure habitat by national forests every two years.
- Monitoring Item 3 – Livestock Grazing:
  - Inside and outside the PCA, monitor and evaluate allotments for recurring conflicts with grizzly bears.
- Monitoring Item 5 – Whitebark Pine:
  - Monitor whitebark pine occurrence, productivity and health inside and outside the PCA in cooperation with other agencies. Annually submit for inclusion in the Interagency Grizzly Bear Study Team Annual Report: results of whitebark pine cone production from transects or other appropriate methods and results of other whitebark pine monitoring.

## Summary of Management Actions Related to Habitat and Mortality Risk Implemented within the Project Area

The following is a brief summary of the actions that the Bridger-Teton National Forest has required within the project area to maintain or improve grizzly bear habitat and reduce grizzly bear/human conflicts.

### *Food storage orders/regulations Food storage Order 04-00-104 (USDA Forest Service 2004):*

1. All food and refuse must be acceptably stored or acceptably possessed during daytime hours.
2. All food and refuse must be acceptably stored during nighttime hours, unless it is being prepared for eating, being eaten, being transported, or being prepared for acceptable storage.
3. Any harvested animal carcass must be acceptably stored, unless the carcass is being field dressed, transported, being prepared for eating, or being prepared for acceptable storage.
4. Camping or sleeping areas must be established at least ½ mile from a known animal carcass or at least 100 yards from an acceptably stored animal carcass.

### *Bear resistant facilities/sanitation*

The Bridger-Teton NF and WGFD has provided bear resistant facilities (i.e. bear resistant food boxes, food tubes, garbage containers, meat hanging poles, panniers, etc.) at campgrounds, trailheads, dispersed campsites, and to permittees in the project area.

### *Information, Education and Patrolling*

Substantial information and education materials (pamphlets, brochures, signs, videos, etc.) and programs have been provided to the public at all Forest Service offices, including the Pinedale Ranger District. Signs and brochures are available at campgrounds, trailheads, dispersed recreation sites, picnic areas, etc. Forests contributed financing for the production of the information and education film "Living in Grizzly Country." Forests have cooperated with state wildlife management agencies and other cooperating institutions and individuals in giving "Living in Bear Country Workshops," which includes bear identification, safe camping, hiking, hunting, and working procedures to use in bear country, and the proper use of bear deterrent pepper spray. Wilderness rangers and other backcountry patrols have been used to inform and

33

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 273

educate the public on food storage orders, and to check on compliance with these orders. Field patrols have been used during hunting seasons to reduce hunter-caused conflicts and grizzly bear mortalities, specifically within the project area.

***Special grizzly bear requirements in permits***
Permits associated with this action contain clauses requiring protection of the grizzly bear and its habitat, and proper food storage and sanitation. See proposed action for details regarding livestock permits requirements in the project area.

***Whitebark pine***
Whitebark pine seeds are an important food source for grizzly bears. A GYA Whitebark Pine Task Group has been formed to gather information on the status of this tree in the GYA. Current work on whitebark pine includes planting in several areas of the GYA to provide long-term habitat improvement, cone collection from healthy superior trees, silvicultural treatments to improve growth and establishment, prescribed burning to encourage whitebark pine seedling establishment, inventory and blister rust surveys, inventories to locate superior trees, work to prevent mountain pine bark beetle attacks on superior trees, and reading of whitebark pine cone production transects every year in cooperation with the IGBST.

***Planning, coordination, monitoring, and cooperation***
The forest works cooperatively with the USFWS and WGFD on nuisance grizzly bear management, specifically within this project area. Forest Service personnel contributed to the development of the Conservation Strategy and the state management plans for the grizzly bear. They participate in annual coordination meetings with state agencies, other federal agencies, organizations, and various committees. The Forest Service cooperates in the collection of data on the grizzly bear population and habitat throughout the project area.

34

FWS_000115

# 2013 Supplement to the 2010 Amendment to the 1999 Biological Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District

BRIDGER-TETON NATIONAL FOREST
PINEDALE RANGER DISTRICT
SUBLETTE COUNTY, WYOMING

March 22, 2013

Prepared By: _____

Gary Hanvey
Bridger-Teton Forest Biologist

1

## Introduction

This document supplements the March 2010 Amendment to the 1999 Biological Assessment (BA) for livestock grazing on the Northern Portions of the Pinedale Ranger District. The Bridger-Teton National Forest (Forest) requested re-initiation of section 7 formal consultation under the Endangered Species Act (ESA) of 1973, as amended, in a letter to the U.S. Fish and Wildlife Service (Service) on August 11, 2012; the Service acknowledged the Forest's request by letter on September 5, 2012. Re-initiation is required by the ESA (as provided in 50 CFR 402.16) if the amount or extent of incidental take of grizzly bears identified in the Service's January 2011 Biological Opinion (BO) is exceeded. The Service's 2011 BO anticipated incidental take of a total of **6 grizzly bears within any consecutive 3-year period** as a result of livestock grazing on Northern portions of the Pinedale Ranger District. During the grazing seasons of 2011 and 2012, a total of 7 grizzly bears were trapped and lethally removed for livestock depredations within grazing allotments in the Upper Green project area; 4 bears were removed in 2011 and 3 were removed in 2012. On September 05, 2012 the Forest received a letter from the Service that amended the 2011 BO Incidental Take Statement (ITS) to increase the amount of incidental take to an additional 3 grizzly bears during the remainder of the 2012 grazing season. Although conflicts continued within the Upper Green project area after September 5th, no additional bears were lethally removed.

The March 2010 Amended Biological Assessment (BA) prepared by the Forest and submitted to the Service on April 1, 2010 outlined the grazing management plan for on-going, authorized, domestic cattle and sheep grazing on nine allotments in the Upper Green project area. The 2010 BA Amendment described allotment management plans for each of the nine allotments, which provided for approximately 46,100 Animal Unit Months (AUM's); no changes in allotment management plans or the number of AUM's of domestic grazing previously described in the 2010 BA Amendment would occur under this Supplement. Furthermore, the Affected Environment and Environmental Baseline for grizzly bears in the Greater Yellowstone Area (GYA), on the Bridger-Teton National Forest, and within the Upper Green project area (Consultation History, Grizzly Bear Status, and Habitat Requirements) as described in the 2010 BA Amendment, remains relatively unchanged. Those sections are incorporated by reference in this Supplement and will not be further discussed.

In accordance with 50 CFR 402.02, this Supplement will provide updated information that includes: 1) a summary of the informal consultation history between the Service and the Forest since the Service's January 2011 BO, AND a summary the Forest's efforts to implement required conservation measures and Terms and Conditions identified in the Forest's 2010 BA Amendment and Service's 2011 BO; 2) a history of grizzly bear and livestock grazing conflicts since the Forest's March 2010 BA Amendment; and 3) a new itemized list of required conservation measures the Forest will implement in an effort to further reduce the potential for conflicts (and lethal removal of grizzly bears as a result) within Upper Green project area.

## Description of the Management Action – Continued Livestock Grazing

The management action specifies grazing management to sustain current livestock operations within nine cattle and sheep allotments in the Northern section of the Pinedale Ranger District (Fig. 1). The grazing management plan and allotments remain unchanged from that described and analyzed in the Forest's 2010 BA Amendment. The Elk Ridge Complex includes four

2

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 276

domestic sheep allotments (Elk Ridge, Rock Creek, Lime Creek, and Tosi Creek); all remaining allotments are grazed by cattle.

*Figure 1: Project Area*



3

FWS_000120

Date Filed: 09/15/2022   Document: 26-1   Appellate Case: 22-8043

Approximately 46,100 Animal Unit Months (AUM's) of domestic cattle grazing are currently authorized in the project area. Allotment Management Plans (AMPs) are prepared for each of the allotments, and are designed with specific objectives and management practices needed to move resource conditions toward goals and Desired Future Conditions (DFC's) described by the Forest Plan (USDA Forest Service, 1990). Table 1 displays livestock grazing authorized within each allotment in the project area.

*Table 1: Livestock grazing in the project area*

| Allotment Name | Total Acres | Suitable Acres | Grazing Season | Number Livestock | Grazing Management System |
|---|---|---|---|---|---|
| Badger Creek | 7,325 | 2533 | July 1st – September 30th | 157 Cc | Season long |
| Beaver-Twin Creeks | 22,266 | 13351 | July 15th – October 15th | 700 Cc | Season long |
| Noble Pastures | 760 | 760 | June 14th – September 20th | 1616 Cc | Deferred Rotation |
| Roaring Fork | 8,275 | 6047 | June 16th – October 15th | 170 Cc | Season long |
| Upper Green River: Mud Lake/Fish Creek Mosquito Lake Pastures Tepee/Tosi /Kinky S Moose/Gypsum Kinky Creek N | 123,933 | 73181 | June 16th – October 15th | 7596 Cc | Deferred Rotation Rest Rotation Deferred Rotation Deferred Rotation Rest Rotation |
| Wagon Creek | 240 | 240 | July 15th – October 15th | 106 Cc | Deferred On/off |
| New Fork-Boulder | 8294 | 3932 | July 1st – September 30th | 511 Cc | Deferred Rotation |
| Pot Creek | 4665 | 2307 | July 16th – October 15th | 380 Cc | Deferred Rotation |
| Elk Ridge Complex: Elk Ridge Rock Creek Lime Creek Tosi Creek | 31,430 | 17548 | July 6th – September 26th | 3750 El | Rest Rotation |
| **TOTALS:** | **207,188** | **119,899** | | **3,750El 11,236 Cc** | |

4

FWS_000121

**Informal Consultation Summary**

Since the Forest's receipt of the Service's January 2011 BO, both agencies have engaged in numerous communications regarding grizzly bear and livestock conflicts within the project area. The majority of these communications occurred by email and telephone and involved Wyoming Fish and Game Department Bear Biologist's, Pinedale District Staff, the Forest Biologist, and the Service's Consultation Biologist. The Service was notified by the Forest Biologist of each and every trapping event resolution (trapping success and bear removals/relocations) necessitated by livestock depredation conflicts. In addition, meetings occurred in 2012 as outlined below in compliance with Terms and Conditions in the 2011 BO.

T&C1

Term and Condition #1 (T&C1) in the Service's 2011 BO requires that the Forest coordinate with the Service to review the effectiveness of the Forest's required Conservation Measures outlined in the 2010 BA Amendment and any other management efforts within allotments that may affect grizzly bears if: 1) the level of anticipated incidental take is approached; or 2) if the level of anticipated take is reached. Because the level of anticipated incidental take was approached in 2011 and reached in 2012, meetings were held and proceedings of those meetings are summarized below.

T&C2

Term and Condition #2 (T&C2) in the Service's 2011 BO requires that the Forest coordinate with the Service regarding adequacy of existing mechanisms to minimize take if more than two grizzly bears are removed due to grazing activities in any given year. Since 4 bears were lethally removed from the Upper Green project area due to grazing conflicts in 2011 and 2 more removed during the grazing season in 2012 (see the Conflict History Update Summary in this Supplement), several meetings and teleconference calls occurred and are summarized in proceeding sections of this Supplement.

T&C3

Term and Condition #3 (T&C3) in the Service's 2011 BO requires that the Forest annually report and document compliance with required conservation measures as described in the BA (including compliance with Food Storage Requirements) and the Forest's efforts to monitor compliance with all appropriate grazing regulations per the Allotment Management Plan and Annual Operating Instructions within allotments. Annual reports are to be submitted to the Service's Wyoming Field Office by April 15 of the subsequent year; per the BO, the 2011 report would be due in April of 2012. However, in early April of 2012, the Service submitted to the Forest a new Draft USFWS Biological Opinion Terms and Conditions Reporting Template that would be used to meet reporting requirements, along with an allowance for late reporting in 2012 until acceptance of the Template Format. Because four bears were lethally removed from the Upper Green project area due to grazing conflicts in 2011 (as described in the T&C2 section above), a formal meeting with the Service occurred on June 11, 2012 and reporting requirements of T&C3 were discussed in detail during that meeting. A brief summary of the meeting follows, and notes summarizing meeting discussion points are included in the Project File.

FWS_000122

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 279

Formal Meetings

On June 11, 2012 a formal meeting was held at the Pinedale Ranger District Office to discuss conflict issues and bear removals in the Upper Green project that occurred during the 2011 grazing season. The FWS Consultation Biologist, Forest Biologist, Pinedale District Staff, and WGFD Bear Specialists were in attendance. Issues discussed include: 1) review of 2011 incidental takes; 2) review of required Conservation Measures in the 2010 BA Supplement; 3) review of Terms and Conditions, the Incidental Take Statement (ITS), and Conservation Recommendations in the 2011 BO; 4) review of options and opportunities that might further reduce the potential for additional conflicts during the 2012 grazing season; and, 5) follow-up commitments by the Forest that would address compliance monitoring within allotments, issues related to carcass removal, and clarification for use of electric fences and band size within sheep allotments. Notes detailing discussion points are located in the Project File.

On August 23, 2012 a formal meeting was held in Pinedale to discuss the fact that 6 bears had been removed from the Upper Green project area as a direct result of livestock depredations. Thus, this meeting was called to address requirements in T&C 1 and 2 summarized above. The Consultation Biologist and Field Supervisor from the FWS, Department Director from Wyoming Game and Fish Department (WGFD), permittees from the Upper Green project area and their attorney, a liaison from the Wyoming Governor's office, and Staff from the Forest (including the Forest Supervisor, Pinedale District Range, and Forest Biologist) were in attendance. Discussion points included the 2011 BO, re-initiation of formal consultation process, the ITS process, the permittee's participatory involvement rights pursuant to their Applicant Status, and the process of reviewing, editing and/or adding new, required conservation measures that will be incorporated into the new BA Supplement. Notes detailing discussion points are located in the Project File.

Informal Meetings

Several Annual Operating Plan meetings between Forest District Staff and Upper Green permittees were held in Pinedale during the spring of 2010, 2011 and 2012. Provisions and requirements in the 2010 BA Amendment and 2011 BO (including non-discretionary conservation measures and Terms and Conditions and discretionary Recommended Conservation Measures) were reviewed with permittees during these meetings. Notes detailing these discussions are located in District Files.

Several informal meetings occurred between District Forest Staff at Pinedale and the domestic sheep permittee to discuss methods of reducing sheep depredations within the Elk Ridge Complex of Sheep Allotments. Many of these meetings were in regard to the use of electric fencing (panels) for night-penning. Bear Specialists from WGFD assisted initially (2009) by providing advice and instruction on proper panel deployment and assisted in finding funding for the purchase of panels in 2010. Since the use of electric panels for night-penning was initiated, the number of conflicts and the total number of reported/confirmed sheep depredations within the Elk Ridge Complex have declined.

## History of Grizzly Bear and Livestock Grazing Conflicts 2010 to Present

This section will summarize grizzly/livestock conflicts that have occurred since the Forest's March 2010 BA Amendment. Conflicts within Upper Green grazing allotments during the 2010, 2011 and 2012 grazing seasons are summarized in Table 2, Table 3, and Figure 2 below and spatially displayed in attached Figures 3, 4, 5 and 6.

Specifics on lethal removals of grizzly bears by year and allotment are summarized below.

Bears Removed During the 2010 Grazing Season

1. 9/7/2010 - Adult Male Lethally Removed from the Upper Green River Allotment (Lower Teepee Creek Pasture) for repeated cattle depredations.

Bears Removed During the 2011 Grazing Season

1. 7/16/2010 – Adult Male Lethally Removed from the Upper Green River Allotment (Mud Lake West Pasture) for repeated cattle depredations and suspected sheep depredations during prior conflict events.
2. 7/27/2010 – **Adult Female** Lethally Removed from the Upper Green River Allotment (Mosquito Lake SW Pasture) for repeated cattle depredations and conflicts at the Clark Landfill in Park County during previous events.
3. 8/24/2010 – Adult Male Lethally Removed from the Upper Green River Allotment (Mosquito Lake SE Pasture) for repeated cattle depredations.
4. 8/28/ 2010 – Adult Male Lethally Removed from the Upper Green River Allotment (Mud Lake West Pasture) for repeated cattle depredations and conflicts with garbage near Cody during previous events.

Bears Removed During the 2012 Grazing Season

1. 7/28/12 – **Adult Female** Lethally Removed from the Upper Green River Allotment (Fish Creek Pasture) for repeated cattle depredations.
2. 8/3/12 -   Adult Male Lethally Removed from the Upper Green River Allotment (Mosquito Lake NW Pasture) for repeated cattle depredations.
3. 8/17/12 – Adult Male, Lethally Removed from the Upper Green River Allotment (Mosquito Lake NW Pasture) for repeated cattle depredations and conflicts with property damage near Cody during previous events.

The numbers of bears relocated following depredation events are summarized in Table 2 below. Specific locations and months when bears were trapped and relocated following depredation events are also spatially displayed in attached Figures 4, 5, 6, and 7. The majority of bears (11 of 13) trapped and relocated following depredation events during 2010, 2011 and 2012 grazing seasons were removed from pastures within the Upper Green River allotment; 2 were trapped and relocated from the Noble Pastures and Elk Ridge Allotments.

FWS_000124

**Table 2: Total Conflicts, Bear Removals and Bear Relocations by Year and Allotment.**

| Year | Conflicts | Upper Green | Noble Pastures | Wagon Creek | Roaring Fork | Badger Creek | Beaver-Twin | Tosi Creek | Elk Ridge | Lime Creek | Rock Creek | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | Total | 21 | 1 | | | 1 | | | 7 | 1 | 4 | 35 |
| | Removal | 1 | | | | | | | | | | 1 |
| | Relocation | 4 | 1 | | | | | | 1 | | | 6 |
| 2011 | Total | 31 | 1 | | | | | 1 | 2 | 1 | | 36 |
| | Removal | 4 | | | | | | | | | | 4 |
| | Relocation | | | | | | | | | | | 0 |
| 2012 | Total | 42 | | | 1 | | | 1 | 1 | | 1 | 46 |
| | Removal | 3 | | | | | | | | | | 3 |
| | Relocation | 7 | | | | | | | | | | 7 |

\* Yellow Highlighted Columns Indicate Domestic Sheep Allotments

**Table 3: Total Conflicts by Month and Year**

| Year | Month | Upper Green | Noble Pastures | Wagon Creek | Roaring Fork | Badger Creek | Beaver-Twin | Tosi Creek | Elk Ridge | Lime Creek | Rock Creek | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | June | | | | | | | | | | | 0 |
| | July | 6 | 1 | | | | | | 4 | | | 11 |
| | August | 9 | | | | 1 | | | 2 | 1 | 4 | 17 |
| | September | 3 | | | | | | | 1 | | | 4 |
| | October | 3 | | | | | | | | | | 3 |
| 2011 | June | | | | | | | | | | | 0 |
| | July | 9 | | | | | | | | | | 9 |
| | August | 14 | | | | | | 1 | 2 | 1 | | 18 |
| | September | 5 | 1 | | | | | | | | | 6 |
| | October | 3 | | | | | | | | | | 3 |
| 2012 | June | | | | | | | | | | | 0 |
| | July | 16 | | | | | | | | | 1 | 17 |
| | August | 17 | | | 1 | | | 1 | | | | 19 |
| | September | 7 | | | | | | | 1 | | | 8 |
| | October | 2 | | | | | | | | | | |
| Total All Years | Total All Months | 94 | 2 | 0 | 1 | 1 | | 2 | 10 | 2 | 5 | 117 |

\* Yellow Highlighted Columns Indicate Domestic Sheep Allotments

8

FWS_000125

*Figure 2: Total Conflicts by Month and Year*



**Conflict Data Discussion**

Conflict data presented in the section above were obtained from the WGFD database. When Grazing Permittees, their riders, and/or Forest Staff report depredations, the WGFD Bear Specialist investigates the conflict report to determine if the carcass and/or injured livestock was the result of a grizzly bear depredation event or not. In some cases, conclusive evidence may not be available, and in such cases those events are not recorded. It should also be noted that only those carcasses or wounded livestock located and reported are investigated. Because of the size of allotments in the project area, it is not possible to locate all carcasses that could have been the result of a grizzly bear depredation, and therefore, not all depredations are located, reported or investigated.

Thus, the conflict data presented in this section represents an incomplete dataset, and should be reviewed with caution. Regardless, the data does provide some opportunity to address conflict trends, and may provide new ideas for management action adjustments that have potential to reduce conflicts. Some obvious trends in the data include:

1. All bears trapped and lethally removed (n=7) following depredation events during 2010, 2011 and 2012 grazing seasons were removed from pastures within the Upper Green River allotment.
2. Of the bears trapped and lethally removed (n=7) following depredation events during 2010, 2011, and 2012, 5 were adult males and 2 were adult females.

9

3. The majority of bears (11 of 13) trapped and relocated following depredation events during 2010, 2011 and 2012 grazing seasons were relocated from pastures within the Upper Green River allotment; 2 were trapped and relocated from the Noble Pastures Allotment and Elk Ridge sheep Allotment.

4. The majority of reported/confirmed conflicts during the 2010 to 2012 grazing seasons (94 of 117 confirmed depredations) occurred in pastures within the Upper Green River allotment.

5. Conflict data indicates a slight upward annual trend in total conflicts from 2010 to 2012 (see Figure 2).

6. Conflict data indicates that conflicts tend to peak during the month of August, followed by a steep decline during the months of September and October (see Figure 2). With the exception of the one adult male lethally removed from the Upper Green River allotment in September of 2010, the majority of removals occurred in July or August. In addition, all bear relocations resulting from depredation events occurred during the months of July and August. Thus, the annual decline in depredation conflicts is likely related to the fact that the majority of offending bears were removed or relocated just prior to declines in depredation. Similar results were reported in a grizzly bear depredation study conducted in 1994-1996 on grazing allotments in Northern portions of the Bridger-Teton National Forest (**Anderson et. al. 2002**[1]). The Anderson et. al. study found that 2 adult males were responsible for 90% of confirmed depredation losses, and that once the offending bears were removed from the population, depredations declined dramatically; they concluded that removal of chronic depredators can reduce livestock losses.

7. No bears were trapped and removed/relocated from the Elk Ridge Complex of sheep allotments during the 2010-2012 grazing seasons.

8. Since the use of electric panels for night-penning sheep was initiated, the number of conflicts and the total number of reported/confirmed sheep depredations within the Elk Ridge Complex have declined.

**Required Conservation Measures**

The 2010 BA Amendment and 2011 BO identified a number of non-discretionary Conservation Measures that was incorporated into AMPs in the Upper Green project area. Beginning in December of 2012 and continuing into February of 2013, the Forest coordinated meetings with grazing permittees who hold permits in the Upper Green, WGFD bear specialists, and Pinedale District Forest Staff on 7 separate occasions. The purpose of these meetings was to discuss the effectiveness of Conservation Measures summarized in the 2010 BA Amendment and Conservation Recommendations in the 2011 BO and identify other management actions that may promote reduced conflicts with grizzly bears within Upper Green project area allotments. We discussed in detail which existing non-discretionary measures worked well, which measures did not, and which measures needed edits. We also discussed the merits of the Service's discretionary Conservation Recommendations and which ones (if any) should be promoted to the non-discretionary Conservation Measures list. In addition we discussed other management

---

[1] **Anderson, Jr., Charles R., Mark A. Ternent, and David S. Moody.** 2002. Grizzly bear-cattle interactions on two grazing allotments in northwest Wyoming. Ursus 13:247-256.

FWS_000127

strategies with potential to further reduce conflicts in the Upper Green. Examples of additional strategies discussed include:

- ✓ changing the class of livestock from cow/calf pairs to yearlings
- ✓ converting from sheep grazing to cattle grazing within sheep allotments
- ✓ total removal of livestock carcasses
- ✓ treating carcasses so that they are "distasteful" to predators
- ✓ treating sick livestock on site versus totally removing sick stock from allotments
- ✓ adding additional riders and/or sheep herders
- ✓ "herding" cattle via the use of additional riders (which is the common practice of managing sheep bands)
- ✓ required night penning of sheep
- ✓ moving livestock to different pastures or allotments at the onset of chronic grizzly depredation events
- ✓ aversive conditioning of offending bears via a variety of methods, including use of "bear dogs"
- ✓ identification of fence locations that could be altered to modify livestock use patterns that may affect depredation events
- ✓ initiation of a project to trap and radio collar grizzly bears to monitor behavior, habitat use, population size and depredation tendencies in the Upper Green project area

As a result of robust discussions at these meetings, Forest Staff on the Pinedale District met and reviewed, edited, and added to the list of non-discretionary conservation measures that will be applied to permit provisions (identified in Annual Operating Instructions [AOIs]) for all allotments within the Upper Green project area addressed in this Supplement. The new and/or edited list of Conservation Measures is summarized below.

1. The FS will request re-initiation of consultation in the event of significant changes to the grazing situation.

2. All livestock depredation will be reported to U.S. Fish and Wildlife Service (USFWS), U.S Forest Service (USFS), and Wyoming Game and Fish Department (WGFD). Agency contact representatives and contact information will be identified annually prior to each grazing season. The notification protocol for reporting depredation incidents will be as follows:

- ✓ Initial suspected depredations -- Permittee and/or their employees (Rider) → WGFD Bear Specialist → USFS District Rep (designated by the Pinedale District Ranger)

- ✓ Confirmed livestock depredation and initiation of trapping sessions -- WGFD Bear Specialist → Permittee + USFS District Rep → SO Forest Biologist

- ✓ Bear capture events -- WGFD Bear Specialist → FWS Rep + Permittee + USFS District Rep → SO Forest Biologist

- ✓ Bear Removal events -- WGFD Bear Specialist + FWS Rep → Permittee + USFS District Rep → SO Forest Biologist → FWS Consultation Bio

FWS_000128

✓ Bear Relocation events -- WGFD Bear Specialist + FWS Rep → Permittee + USFS District Rep → SO Forest Biologist → FWS Consultation Bio + SO Forest Bio on Forest to which bear was relocated

3. Annual meetings with representatives of the USFWS, BTNF, WGFD, and Upper Green River permittees to discuss the conservation measures and notification protocol summarized in #2 above will be held prior to each grazing season.

4. Livestock depredations will be investigated and managed by WGFD or its authorized agent following Interagency Nuisance Bear Guidelines (pp. 51-70 in Interagency Grizzly Bear Guidelines; USD1 U.S. Fish and Wildlife Service 1986).

5. Bear Sanitation Guidelines will be followed for all camps associated with livestock operations as described and defined in Food Storage Order 04-00-104. Where outdoor toilets are available in Range Camps, keep doors closed and make toilets as "bear proof" as possible.

6. Herders and riders are required to watch all livestock closely for sick, injured, or stray animals. At least 2 herders per sheep band will be required.

7. Forest Service employees designated by the Pinedale District Ranger will monitor allotments on a regular basis.

8. On Sheep Allotments: 1) All sheep carcasses will be removed as soon as possible; and, 2) all sick or injured animals will be removed or treated. In the event that compliance with this measure is not physically possible, an exception may be granted per the discretion of the Pinedale District Ranger and/or his designated representative. In the event that herder safety is deemed an issue, an exception may be allowed as described in CM #10 below.

9. On Cattle Allotments: 1) All carcasses **located within ½ mile** of Green River Lakes Road, Union Pass Rd, FS 605, 660, 663B and 663C, GRL and Whiskey Campgrounds, private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Waterdog Lakes, and North Beaver and Tosi trailheads will be removed if possible or moved so that the carcass is at least ½ **mile away** from the above described facilities, trailheads or roads; 2) All carcasses in locations not described in 1 above that pose a health or safety hazard to the public or to the environment will be removed if possible or moved so that the carcass is at least ¼ **mile from** live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites; and 3) All sick or injured animals will be removed or treated. In the event that compliance with this measure is not physically possible, an exception may be granted per the discretion of the Pinedale District Ranger and/or his designated representative. In the event that rider safety is deemed an issue, an exception may be allowed as described in CM #10 below.

10. Exceptions to requirements for removing or moving carcasses described in CM #8 and #9 above may be granted by the Pinedale District Ranger and/or his designated representative if human rider or herder safety is of concern. Rider or herder safety

FWS_000129

concerns include the possible presence of a grizzly bear in the immediate vicinity of carcasses, and carcasses being located in hazardous terrain such that attempting to move or remove may cause injury. In such cases, a USFS employee or the WGFD bear specialist will be notified immediately of the hazard location and need for exception.

11. Continue to identify and implement opportunities that reduce the potential for grizzly bear conflicts.

12. Through the permitting process and at annual meetings, the USFS will make grazing permittees aware of their responsibilities under the Endangered Species Act (ESA) in regard to laws and regulations concerning the taking of grizzly bears (Interagency Grizzly Bear Guidelines 1986).

13. Work in cooperation with the Service, the Wyoming Game and Fish Department, and the Interagency Grizzly Bear Study Team to identify and collect information related to the habitat use, survival, reproduction, and depredation tendencies of grizzly bears inhabiting Livestock Grazing Allotments on Northern Portions of the Pinedale Ranger District. With assistance of cooperators listed above, the Forest will initiate a trapping project in 2013 to capture and radio collar bears in the Upper Green project area to begin the data collection process described above.

Conservation Measure #13 is significant because it will provide additional information on how grizzly bears use the Upper Green. It will also provide: 1) an estimate of how many bears utilize the Upper Green and during which seasons of the year; 2) better estimates of home range size and how many bears have centralized home ranges within the Upper Green; and, 3) better estimates of how many and what classes of bears tend to depredate. Such information is important to identifying additional means of reducing conflicts in the Upper Green that will reduce losses of both bears and livestock.


**Determination**

As was discussed in the Introduction of this Supplement, the Affected Environment and Environmental Baseline for grizzly bears in the Greater Yellowstone Area (GYA), on the Bridger-Teton National Forest, and within the Upper Green project area (Consultation History, Grizzly Bear Status, and Habitat Requirements) as described in the 2010 BA Amendment, remains relatively unchanged. There will be no indirect or direct impacts to secure habitat, denning habitat or whitebark pine associated with the activity because livestock grazing (reduction of herbaceous forage and presence of livestock) typically does not impact these habitats. Although this Supplement includes new and revised Conservation Measures that will be incorporated into AOIs for continued livestock grazing in the Upper Green project area, livestock/grizzly bear conflicts are likely to continue; conflicts may result in the relocation of problem bears inside or outside of the project area or result in direct mortality of individuals. Thus, continued livestock in the Upper Green project area **is likely to adversely affect the grizzly bear**.

13

Appellate Case: 22-8043 Document: 26-1 Date Filed: 09/15/2022 Page: 287

*Figure 3: 2010 Conflicts by Month and Allotment*

| Allotment | Pasture | Map ID |
|---|---|---|
| Noble Pasture | Pasture 1 | 1 |
| | Pasture 2 | 2 |
| | Pasture 3 | 3 |
| | Pasture 4 | 4 |
| Upper Green | River Bottom | 5 |
| | Lower Gypsum Creek | 6 |
| | Upper Gypsum Creek | 7 |
| | Kinky Creek | 8 |
| | Upper Tepee Creek | 9 |
| | Lower Tepee Creek | 10 |
| | Tosi Creek | 11 |
| | Mosquito Lake SW | 12 |
| | Mosquito Lake NW | 13 |
| | Mosquito Lake NE | 14 |
| | Mosquito Lake SE | 15 |
| | Mud Lake East | 16 |
| | Mud Lake West | 17 |
| | Fish Creek | 18 |

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 288

*Figure 4: 2011 Conflicts by Month and Allotment*



| Allotment | Pasture | Map ID |
|---|---|---|
| Noble Pasture | Pasture 1 | 1 |
| | Pasture 2 | 2 |
| | Pasture 3 | 3 |
| | Pasture 4 | 4 |
| Upper Green | River Bottom | 5 |
| | Lower Gypsum Creek | 6 |
| | Upper Gypsum Creek | 7 |
| | Kinky Creek | 8 |
| | Upper Tepee Creek | 9 |
| | Lower Tepee Creek | 10 |
| | Tosi Creek | 11 |
| | Mosquito Lake SW | 12 |
| | Mosquito Lake NW | 13 |
| | Mosquito Lake NE | 14 |
| | Mosquito Lake SE | 15 |
| | Mud Lake East | 16 |
| | Mud Lake West | 17 |
| | Fish Creek | 18 |

**2011 Grizzly Bear Conflicts By Month**

GBConflicts2011
Month
- ☆ June (August)
- ☆ July (September)
- ☆ October

**RESOLUTION**
- ■ Removed
- ■ Relocated
- Allotment Boundary
- Pasture Boundary

0 0.5 1  2  3  4 Miles

**Allotments**
- BADGER CREEK
- BEAVER-TWIN
- ELK RIDGE
- LIME CREEK
- NOBLE PASTURE
- ROARING FORK
- ROCK CREEK
- TOSI CREEK
- UPPER GREEN RIVER
- WAGON CR HORSE ALLOT

15

FWS_000132

**1-App-286**

Appellate Case: 22-8043    Document: 26-1    Date Filed: 09/15/2022    Page: 289

*Figure 5: 2012 Conflicts by Month and Allotment*



| Allotment | Pasture | Map ID |
|---|---|---|
| Noble Pasture | Pasture 1 | 1 |
| | Pasture 2 | 2 |
| | Pasture 3 | 3 |
| | Pasture 4 | 4 |
| Upper Green | River Bottom | 5 |
| | Lower Gypsum Creek | 6 |
| | Upper Gypsum Creek | 7 |
| | Kinky Creek | 8 |
| | Upper Tepee Creek | 9 |
| | Lower Tepee Creek | 10 |
| | Tosi Creek | 11 |
| | Mosquito Lake SW | 12 |
| | Mosquito Lake NW | 13 |
| | Mosquito Lake NE | 14 |
| | Mosquito Lake SE | 15 |
| | Mud Lake East | 16 |
| | Mud Lake West | 17 |
| | Fish Creek | 18 |

**2012 Grizzly Bear Conflicts By Month**

**Month**
☆ August
☆ June    ☆ September    **RESOLUTION**
☆ July    ☆ October    ■ Removed
        ■ Relocated
        ☐ Allotment Boundary
        ☐ Pasture Boundary

0 0.5 1  2  3  4 Miles    N

**Allotments**
☐ BADGER CREEK    ☐ ROARING FORK
☐ BEAVER-TWIN    ☐ ROCK CREEK
☐ ELK RIDGE    ☐ TOSI CREEK
☐ LIME CREEK    ☐ UPPER GREEN RIVER
☐ NOBLE PASTURE    ☐ WAGON CR HORSE ALLOT

FWS_000133

**1-App-287**

Appellate Case: 22-8043     Document: 26-1     Date Filed: 09/15/2022     Page: 290

*Figure 6: All Conflicts 2010- 2012 and Resolutions.*



17

FWS_000134